## IN THE UNITED STATES DSITRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IAN MACLEOD | ) | |
| | ) | Case Number: |
| v. | ) | Judge: |
| | ) | |
| MIDAMERICAN ENERGY SERVICES, | ) | |
| LLC., and BERKSHIRE HATHAWAY | ) | |
| ENERGY COMPANY | ) | |

## COMPLAINT

Plaintiff Ian Macleod (hereinafter "Plaintiff" or "Macleod"), by and through his attorneys Langone, Johnson, and Cassidy LLC, files his Complaint against Defendants, Midamerican Energy Services, LLC and Berkshire Hathaway Energy Company, (hereinafter "Defendants"). Plaintiff seeks damages from Defendants and states as follows:

## NATURE OF THE CLAIMS

1.      This is an action for monetary damages, under the Age Discrimination Employment Act, 29 U.S.C. § 621 et seq. (hereinafter the "ADEA").

2.      This action is to redress Defendant's unlawful employment practices against Plaintiff. Specifically, Defendant's unlawful discrimination against Plaintiff because of his age, leading to his unlawful termination.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction of the claims herein pursuant to 28 U.S.C. § 1331 and 1343, as this action involves a federal question regarding Plaintiff's civil rights under the ADEA.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**EXHIBIT 1**

## THE PARTIES

5.      Plaintiff, Ian Macleod, ("Macleod"), is a citizen of the United States and a resident of the State of Illinois.

6.      Defendant, Midamerican Energy Services, ("MES"), is an Illinois corporation with a principal place of operations in Chicago, Illinois.

7.      Defendant, Berkshire Hathaway Energy Company, is the parent company of Midamerican Energy Services with a home office in Des Moines, Iowa and a registered agent located at 400 E COURT AVE, DES MOINES, IA, 50309.

8.      Defendants are "employers" as defined by the ADEA.

9.      Defendants each employ over 500 employees.

## PROCEDURAL REQUIREMENTS

10.      Plaintiff has complied with all the statutory prerequisites to filing this action.

11.      On July 23rd, 2018, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, ("EEOC"), alleging that the Defendant violated Title VII of the Civil Rights Act of 1964. A copy of the charge is attached as Exhibit A.

12.      Plaintiff's EEOC charge was filed within three hundred (300) days after the alleged unlawful employment practices occurred.

13.      On or about November 6th, 2018 the EEOC issued to Plaintiff a Notice of Right to Sue, which was dated November 6th, 2018 and presumably placed in the mail that day. A copy is attached as Exhibit B.

14.      This complaint was filed within ninety (90) days of Plaintiff's receipt of the EEOC's Right to Sue letter.

EXHIBIT 1

## FACTS

15.     Plaintiff re-alleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs 1-14, above.

16.     On August 4th, 2017 Plaintiff had a meeting for a sales position at MES with Regional Sales Manager David White ("White") and MES Director of Sales Randy Marzen, ("Marzen"). Marzen had a similar background as Plaintiff and seemed to want him to fill this position.

17.     There was only one position open.

18.     At the meeting, Plaintiff was told he had the option of choosing one of two different "grades" that this position could take: account representative or account executive. The difference being the salary, but also the required quota. Plaintiff chose account executive.

19.     At this meeting Plaintiff was informed that he was not required to come to the office daily and that Defendants would be flexible about the time he was in the office after the first 30-day training period expired.

20.     On September 13th, Plaintiff's first day of work, he discovered that everyone knew his age already as White had told them prior.

21.     White was in charge of training Plaintiff, however the totality of his training over his 30 days with the company consisted of a roughly two-hour seminar with White, Andrew Spencer, and Scott Ebling.

22.     White was present for only an hour during this time.

23.     Throughout Plaintiff's employment, White was often agitated and spoke to Plaintiff (and Rochelle Gobetz ("Gobetz"), the only other member of staff over fifty) in a very demeaning and derogatory way.

EXHIBIT 1

24.     For roughly the first month, Plaintiff wasn't able to fully function within the company as he didn't receive his company computer, on which he was supposed to download his sales software, until October 4th, 2017.

25.     Upon receiving his computer, he discovered that he couldn't use the software as he was not established as a member of the MES system until White turned in some paperwork.

26.     This wasn't remedied until October 9th, 2017.

27.     During Plaintiff's time with MES, White brought up more than once that he would have liked to have someone younger and more moldable for the position.

28.     On October 12th, 2017, during lunch, White informed Plaintiff that he "had gotten the green light to hire someone younger."

29.     On October 20th, 2017 Plaintiff was brought into White's office and caught off guard upon discovering that it was a pre-disciplinary meeting with a member of Human Resources.

30.     White never had anything negative to say about Plaintiff's performance, being on time, or leaving early prior to this meeting.

31.     Prior to this meeting, the last time Plaintiff talked with White was on October 13th, 2017, when White said that Plaintiff was doing "all the right things and that his plan was a good one."

32.     At this meeting Plaintiff was questioned about his attitude, as well as him repeatedly showing up late and leaving early.

33.     The only sales members who were expected to come into the office at all were himself and Rochelle Gobetz. This included for company meetings, where the other two sales members phoned in, even though the other members lived closer to the job site.

34.     Plaintiff was terminated on October 23rd, 2017.

EXHIBIT 1

35.     The next person to be hired for the position Plaintiff filled, although under a different grade, was twenty-five years younger than plaintiff.

## COUNT I

### Age Discrimination in Violation of the ADEA

36.     Plaintiff restates and realleges paragraphs 1-35 of this Complaint as if fully set forth herein.

37.     To establish a prima facie case for age discrimination under the ADEA an employee must show that (1) they are part of a protected class; (2) they were meeting the employer's legitimate job expectations; (3) they suffered an adverse employment action; and (4) they were treated differently than similarly-situated employees who were not members of the protected class.

38.     Plaintiff meets the ADEA requirement of being within a protected class by being over the age of forty.

39.     Plaintiff was told in the first meeting with White and Marzen that he was not required to come to the office daily and that their schedule could be flexible after the initial 5-week training period.

40.     Plaintiff maintains that even with this acting only as a general guideline, he was always in the office by 8:15 am and, with one exception, always stayed until 5:00pm. Plaintiff would take the Metra train from the Ogilvy stop that would arrive at 8:15am, often seeing Gobetz on the train, and return home with the 5:13pm Metra train.

41.     Plaintiff was actively going on field days, including two instances where White accompanied him.

42.     Plaintiff installed the EMA software required the same day that White brought it up as being of primary importance in a meeting with Plaintiff and Gobetz.

EXHIBIT 1

43.     Plaintiff never had any issues brought to his attention until the pre-disciplinary meeting on October 20th, 2017.

44.     Plaintiff never had any complaints made against him until the same meeting.

45.     Due to White's discrimination, Plaintiff was not adequately trained for his position.

46.     Due to White's discrimination, Plaintiff was not able to fully integrate into his new role due to not being able to use the software in a timely manner.

47.     Plaintiff was fired after roughly five weeks, under conditions he was not expecting.

48.     The two younger members of the sales team were not expected to show up. Often not showing up at all.

49.     The two younger members of the sales team were allowed to phone into meetings.

50.     The two younger members of the sales team were not spoken to in the same demeaning and derogatory manner.

51.     The two younger members of the sales team were not subject to disciplinary action for spending less time in the office, whereas Plaintiff was.

52.     Due to White's disdain for Plaintiff due to his age and perceived lack of capability, Plaintiff's growth in his position was stifled and he was ultimately removed from his position.

## **RELIEF SOUGHT**

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.     Damages in accordance with ADEA requirements;

B.     Costs of suit;

C.     Any other relief the Court deems just and appropriate.

## **JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

EXHIBIT 1

Respectfully Submitted,
/s/ Scott Cassidy

Langone Johnson and Cassidy, LLC
17 N. Wabash, Ste. 500
Chicago, IL 60601
(312) 761-3330

**EXHIBIT 1**

ILND 44 (Rev. 09/07/18)

# CIVIL COVER SHEET

The ILND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(See instructions on next page of this form.)*

## I. (a) PLAINTIFFS

Ian Macleod

**DEFENDANTS**

MidAmerican Energy Services, LLC and Berkshire Hathaway Energy Company

**(b)** County of Residence of First Listed Plaintiff   Dupage
*(Except in U.S. plaintiff cases)*

County of Residence of First Listed Defendant   Cook
*(In U.S. plaintiff cases only)*
Note: In land condemnation cases, use the location of the tract of land involved.

**(c)** Attorneys *(firm name, address, and telephone number)*

Langone, Johnson & Cassidy, LLC
17 N Wabash Ave, Ste 500, Chicago, IL 60602

Attorneys *(if known)*

## II. BASIS OF JURISDICTION *(Check one box, only.)*

☐ 1 U.S. Government
  Plaintiff

☒ 3 Federal Question
  *(U.S. Government not a party)*

☐ 2 U.S. Government
  Defendant

☐ 4 Diversity
  *(Indicate citizenship of parties in Item III.)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(For Diversity Cases Only.)*
*(Check one box, only for plaintiff and one box for defendant.)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Check one box, only.)*

| CONTRACT | TORTS | | PRISONER PETITIONS | LABOR | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 510 Motions to Vacate Sentence | ☐ 710 Fair Labor Standards Act | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 530 General | 530 General | ☐ 720 Labor/Management Relations | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | ☐ 367 Health Care/ | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability | Pharmaceutical | **Habeas Corpus:** | ☐ 751 Family and Medical | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & Slander | Personal Injury | ☐ 540 Mandamus & Other | Leave Act | ☐ 430 Banks and Banking |
| & Enforcement of Judgment | ☐ 330 Federal Employers' | Product Liability | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation | ☐ 450 Commerce |
| ☐ 151 Medicare Act | Liability | ☐ 368 Asbestos Personal Injury | ☐ 560 Civil Detainee – Conditions | ☐ 791 Employee Retirement | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student | ☐ 340 Marine | Product Liability | of Confinement | Income Security Act | ☐ 470 Racketeer Influenced and |
| Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | | Corrupt Organizations |
| ☐ 153 Recovery of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | | **PROPERTY RIGHTS** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 370 Other Fraud | | ☐ 820 Copyrights | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 371 Truth in Lending | | ☐ 830 Patent | Protection Act (TCPA) |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 380 Other Personal | | ☐ 835 Patent – Abbreviated | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | ☐ 362 Personal Injury - | Property Damage | | New Drug Application | ☐ 850 Securities/Commodities/ |
| | Medical Malpractice | ☐ 385 Property Damage | | ☐ 840 Trademark | Exchange |
| | | Product Liability | | | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **BANKRUPTCY** | **FORFEITURE/PENALTY** | **SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure | ☐ 861 HIA (1395ff) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 423 Withdrawal 28 USC 157 | of Property 21 USC 881 | ☐ 862 Black Lung (923) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | | ☐ 690 Other | ☐ 863 DIWC/DIWW (405(g)) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | **IMMIGRATION** | | ☐ 864 SSID Title XVI | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 462 Naturalization | | ☐ 865 RSI (405(g)) | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | Application | | | Agency Decision |
| | Employment | ☐ 463 Habeas Corpus - Alien | | **FEDERAL TAXES** | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | Detainee (Prisoner Petition) | | ☐ 870 Taxes (U.S. Plaintiff | State Statutes |
| | Other | ☐ 465 Other Immigration | | or Defendant) | |
| | ☐ 448 Education | Actions | | ☐ 871 IRS—Third Party | |
| | | | | 26 USC 7609 | |

## V. ORIGIN *(Check one box, only.)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation   ☐ Multidistrict Litigation Direct File

## VI. CAUSE OF ACTION *(Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)*

ADEA

## VII. PREVIOUS BANKRUPTCY MATTERS *(For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)*

## VIII. REQUESTED IN COMPLAINT:

☐ Check if this is a **class action** Under rule 23, F.R.CV.P.   Demand $ 

Check Yes only if demanded in complaint.
Jury Demand:   ☒ Yes   ☐ No

## IX. RELATED CASE(S) IF ANY *(See instructions)*

Judge _____   Case Number _____

## X. Is this a previously dismissed or remanded case?   ☐ Yes   ☒ No   If yes, Case # _____   Name of Judge _____

Date   02/01/19

Signature of attorney of record   /s/ Scott Cassidy

**EXHIBIT 1**

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority for Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**      **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

     (b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

     (c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**      **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)

**III.**      **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**      **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**      **Origin.** Place an "X" in one of the six boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.**      **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity. Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**      **Previous Bankruptcy Matters** For nature of suit 422 and 423 enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this court. Use a separate attachment if necessary.

**VIII.**      **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P. Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

 **IX.**      **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**X.**      **Refiling Information.** Place an "X" in the Yes box if the case is being refiled or if it is a remanded case, and indicate the case number and name of judge. If this case is not being refiled or has not been remanded, place an "X" in the No box.

     **Date and Attorney Signature.** Date and sign the civil cover sheet.

Rev. 09/07/2018

**EXHIBIT 1**

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

IAN MACLEOD,                    )
                               )
        Plaintiff,              )   No. 1:19-CV-00683
                               )
vs.                            )   Hon. Judge Charles
                               )   R. Norgle
                               )
MIDAMERICAN ENERGY SERVICES,   )
LLC,                           )
                               )
        Defendant.             )


     DISCOVERY DEPOSITION BY ZOOM VIDEOCONFERENCE OF
                      DAVID WHITE
                   February 5, 2021
                     11:00 a.m.


        The deposition of DAVID WHITE, called
for examination, taken pursuant to the Federal
Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before JENNIE SIOLIDIS, License
No. 084-004818, a Certified Shorthand Reporter
within and for the County of DuPage and State of
Illinois.

EXHIBIT 2

White, David
February 5, 2021

2

1    PRESENT:

2

         LANGONE LAW, by
3        MR. CHRIS LANGONE
         PO Box 5089
4        Skokie, IL   60507
         (312) 720-9191
5        langoneLaw@gmail.com
6
             appeared on behalf of the Plaintiff.
7

8

         SEGAL, McCAMBRIDGE, SINGER & MAHONEY, by
9        MR. BENJAMIN J. NELLANS
         233 South Wacker Drive
10       Suite 5500
         Chicago, IL   60606
11       (312) 645-7800
         bnellans@smsm.com
12

13           appeared on behalf of the Defendant.

14

15

16

17

18

19

20

21

22

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

3

1                          I N D E X

2

   WITNESS:  David White

3

4                                      Page No.

5      Examination By:  MR. LANGONE        4, 77

6

                       MR. NELLANS        72

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

4

1          MR. LANGONE:  You can swear him in.

2          THE COURT REPORTER:  Raise your right

3     hand, please.

4                    (The oath was thereupon duly

5                     administered to the witness

6                     by the Court Reporter.)

7               DAVID      WHITE,

8     Called as a witness by the Plaintiff herein,

9     having been first duly sworn, was examined and

10    testified as follows:

11         EXAMINATION

12         By:  Mr. Langone

13    Q   Okay.  Hi Mr. White, could you state your

14    full name for the record?

15    **A   David Robert White.**

16    Q   And have you ever been in a deposition

17    before?

18    **A   No.**

19    Q   Okay.  So this is an opportunity for me on

20    behalf of my client, Ian Macleod, to discover

21    facts that are relevant to the case by asking you

22    questions under oath which are being recorded by

EXHIBIT 2

White, David
February 5, 2021

5

1   the court reporter, you know, stenographically.

2   Even though we're appearing remotely, there's no

3   video recording that's being made of this, so

4   everything's being taken down verbally.  Given

5   that, if you answer a question, it has to be an

6   audible answer or a yes or a no, so that the court

7   reporter can take it down.  Okay?

8        **A  Okay.**

9        Q  And if you have any questions, feel free

10  to ask.  If you don't understand my question, then

11  ask me to clarify it instead of trying to answer a

12  question you might not understand.  Okay?

13       **A  Okay.**

14       Q  And if you need to take a break at any

15  time for any reason, just let everybody know,

16  except I'd appreciate it if there's a question

17  pending, to answer the question first before

18  taking any break.  Okay?

19       **A  Okay.**

20       Q  Okay.  Great.  So let's begin.  How are

21  you currently employed?

22       **A  I am a regional sales manager for**

EXHIBIT 2

White, David
February 5, 2021

6

1    **MidAmerican Energy Services.**

2        Q   And how long have you been employed in

3    that capacity as a regional sales manager?

4        **A   Five years and three months.**

5        Q   And how long have you been employed with

6    MidAmerican Energy Services?

7        **A   Five years and three months.**

8        Q   Okay.  So you came into the position when

9    you were first hired as regional sales manager?

10       **A   Yes.**

11       Q   And what does MidAmerican Energy Services

12   do as the nature of its business?

13       **A   We are a retail supplier of electricity**

14   **and natural gas.**

15       Q   And who do you supply electricity and

16   natural gas to?

17       **A   Commercial and industrial companies for**

18   **the most part.**

19       Q   And what is the highest level of

20   educational achievement you have obtained?

21       **A   My Bachelor's Degree.**

22       Q   And where did and when did you, from what

EXHIBIT 2

White, David
February 5, 2021

7

1    institution and when did you obtain the Bachelor's

2    Degree?

3        A  **Drake University, 1992.**

4        Q  And after graduating from Drake in 1992,

5    did you commence employment shortly after

6    graduation or immediately upon graduation?

7        A  **Yes.**

8        Q  And where was that?

9        A  **My first job right out of college, is that**

10   **what you're asking me?**

11       Q  Basically.

12       A  **I was a waiter.**

13       Q  Okay.  And I mean how many jobs roughly

14   between the time you graduated college until the

15   time that you started working for MidAmerican I

16   guess in about 2015, so we're looking at from 1992

17   to 2015 so that's about 13 years, roughly how many

18   jobs did you hold over that 13-year period?

19       A  **10 or 12.**

20       Q  Okay.  Well, we're not going to go through

21   all 10 or 12 of them, so that's why I asked that

22   question.

EXHIBIT 2

White, David
February 5, 2021

8

1    A   Okay.

2    Q   What was the job you held right before

3 starting with MidAmerican Energy Services?

4    **A   I was a sales manager for Nobel Americas**

5 **Energy Solutions.**

6    Q   Is that a competitor of MidAmerican?

7    **A   Yes.**

8    Q   And how long were you a sales manager

9 there?

10    **A   Two years.**

11    Q   And how about before that?

12    **A   Prior to that, I worked for Principal**

13 **Financial.**

14    Q   In what capacity?

15    **A   I'm sorry, that's incorrect.**

16    Q   Okay.

17    **A   Prior to Nobel Americas -- no, I was**

18 **correct.   It was Principal Financial.   Apologies.**

19    Q   And in what capacity?

20    **A   I was in sales.**

21    Q   And then prior to that?

22    **A   Prior to that, I worked for Event**

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

9

1    **Transportation Systems.**

2        Q  And in what capacity?

3        **A  I was a sales manager.**

4        Q  So how long, how many years total would

5    you say you've been in sales either as a

6    salesperson, sales manager or regional sales

7    manager?

8        **A  Thirteen.**

9        Q  Okay.  So at MidAmerican Energy Services

10   as regional sales manager, how would you describe

11   your day-to-day responsibilities?

12       **A  I lead a team of salespeople as well as**

13   **oversee the customer account management team.**

14       Q  And how many people are on the sales team

15   that you lead?

16       **A  Four.**

17       Q  And can you identify the names of the

18   people that currently occupy, the four people that

19   currently occupy the positions of that team?

20       **A  Denise Carter, Shabnam Banistiar, Bob**

21   **Quinn, David Grinitzky.**

22       Q  Okay.  And Denise Carter, what position

EXHIBIT 2

White, David
February 5, 2021

10

1   does she occupy?  What would be her job title, so

2   to speak?

3        A  **Senior account executive.**

4        Q  And how long has she occupied that

5   position?

6        A  **I don't know.**

7        Q  Has she been there the entire time you've

8   been at MidAmerican?

9        A  **Yes.**

10       Q  So she predated you, so to speak?

11       A  **Yes.**

12       Q  So at least five years three months?

13       A  **Correct.**

14       Q  And then the next person you said was

15  Shabnam?

16       A  **Shabnam.**

17       Q  Can you spell that as best you can at

18  least phonetically?

19       A  **S-h-a-b-n-a-m.**

20       Q  Okay.  And then the last name?

21       A  **B-a-n-i-s-t-i-a-r.**

22       Q  And what position does Shabnam -- is it a

EXHIBIT 2

White, David
February 5, 2021

11

1    male, female?

2         A  No, it's a female.

3         Q  Okay.  What position does she occupy?

4         A  Account executive.

5         Q  And how long has she occupied that

6    position?

7         A  Six months.

8         Q  And then Bob Quinn, same thing, the

9    position and how long?

10        A  He is an account representative and he

11   also pre-dates me, so I would -- at least five

12   years and three months.

13        Q  Okay.  And then David G., what was the

14   last name?

15        A  Grinitzky, G-r-i-n-i-t-z-k-y.

16        Q  Okay.  And then what position does he

17   occupy?

18        A  Account executive.

19        Q  So then Miss Carter would be the most

20   senior I guess as a senior account executive or

21   account representative or not?

22        A  I don't understand your question.  You

EXHIBIT 2

White, David
February 5, 2021

12

1    said senior account executive.

2        Q   Like on an organizational chart of the

3    four, do they all occupy like lateral positions to

4    each other or is one a higher position relative to

5    the others?

6        A   She's the most senior person.  That's why

7    she's a senior account executive.

8        Q   Okay.  And then is account executive a

9    higher position than account representative?

10       A   Yes.

11       Q   So then Mr. Quinn would be kind of the

12   lowest position of the four account

13   representatives?

14       A   Yes.

15       Q   And what position did Ian Macleod occupy?

16       A   Account executive.

17       Q   And do you know how many people were on

18   the sales team at the time Mr. Macleod was in

19   approximately September/October of 2017?

20       A   Five.

21       Q   And then who replaced Mr. Macleod after he

22   was terminated?

EXHIBIT 2

White, David
February 5, 2021

13

1      **A   No one.**

2        Q   You mean the position has been vacant to

3      this date?

4      **A   I don't understand your question.**

5        Q   Well, what do you mean no one replaced

6      him?  What was his position?  His position was?

7      **A   Account representative.**

8        Q   Okay.  So like Mr. Quinn is an account

9      representative, so like how many account

10     representatives were there in 2017?

11     **A   I don't recall.**

12       Q   Okay.  So when you say nobody replaced Mr.

13     Macleod, and I asked so the position is vacant, so

14     who took over his job responsibilities?

15     **A   No one.**

16       Q   That just went unfulfilled?

17     **A   There were none to fulfill.**

18       Q   Okay.  Why do you say that?  What do you

19     mean?

20     **A   Mr. Macleod's responsibilities were to**

21     **sell business.  He didn't sell any business.  He**

22     **didn't make any opportunities for the company to**

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

14

1    follow up on.  Therefore, when he left, there was

2    nothing for anyone to assume.

3        Q  You mean relative to his accounts then?

4    Other people were hired to sell business, correct?

5        A  Yes.

6        Q  Who are those people?

7        A  Greg Gault.

8        Q  Can you spell the last name, did you say

9    Alt or Gault?

10       A  Gault G-a-u-l-t.

11       Q  Okay.  Anyone else?

12       A  Steve Kim.  And Bob, I'm not remembering

13   Bob's last name.  I apologize.

14       Q  So a different Bob than Bob Quinn?

15       A  Yes.

16       Q  Another Bob.  Okay.

17           And then for each of these three

18   individuals, let's start with Bob, last name

19   unrecalled, what would be the years, the time

20   period he was employed as an account

21   representative?

22       A  He was not an account representative.

EXHIBIT 2

White, David
February 5, 2021

15

1      Q   Okay.   What was his job title?

2      **A   Account executive.**

3      Q   And what was the time period he was in

4   that position?

5      **A   He was with us for roughly a year, so**

6   **potentially July of '19 to July of 2020.**

7      Q   Okay.   And then how about Steve Kim?

8      **A   Steve Kim was with us for a year**

9   **and-a-half, so however that works out, probably**

10   **around the same time.**

11      Q   And then what about Greg Gault?

12      **A   Greg was with us for a year.   He was hired**

13   **in -- he was with us a year and-a-half.   He was**

14   **hired in -- maybe at the end of 2018.   And there**

15   **was one other individual who was hired, Colin**

16   **Trout, who I hired.   Colin Trout C-o-l-i-n**

17   **T-r-o-u-t.**

18      Q   Okay.   And when was that?

19      **A   He was with us a year so I can't remember**

20   **the specific dates that he was with us.**

21      Q   Okay.   Now, one name that I haven't heard

22   mentioned yet but did appear in the documents is

EXHIBIT 2

White, David
February 5, 2021

16

1    Rachel Gobetz.  Did you work with Rachel at all?

2        **A  I worked with a Rochelle.**

3        Q  Rochelle, sorry, yeah.

4        **A  Yes.**

5        Q  Was she on the sales team or in a

6    different position all together?

7        **A  She was on the sales team.**

8        Q  Oh, okay.  So her name hadn't come up.

9        **A  Her name hadn't come up because you asked**

10   **me how many people were on the sales team.  I gave**

11   **you a number.  You didn't ask for their names.**

12   **And then you asked who was hired after Ian and she**

13   **was hired prior to Ian.**

14       Q  Oh, I'm sorry.  Okay.  I had asked you how

15   many people were on the sales team and you said

16   four, so maybe I'm confused.  So she was on the

17   sales team prior?

18       **A  No, no.  Then it's my mistake.  There was**

19   **five.**

20       Q  Okay.  So Rochelle Gobetz was one of the

21   five?

22       **A  Yes.**

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

17

1      Q   And what was her period of employment?

2      **A   She was with us two and-a-half years, so**

3   **it would have been from 2016 to 2019 roughly.**

4      Q   Okay.  And then when you mentioned

5   Mr. Trout, Colin Trout, you said that you hired

6   him.  Were you involved in hiring any of the other

7   people?

8      **A   I was involved in hiring Greg Gault, Steve**

9   **Kim, Bob, and I believe that's it.**

10      Q   Now, when you say you were involved in

11   hiring them, can you hire these people in your

12   sole discretion or do you have to consult with

13   other people?  Can you describe the process by

14   which these individuals, Greg and Steve and Bob,

15   were hired?

16      **A   I am part of the hiring process.  They**

17   **will meet with myself, other members of our team.**

18   **And at that point -- at certain points of when**

19   **some of these people are hired, we had a director,**

20   **who is no longer in that position, and they would**

21   **meet with our director as well.**

22      Q   And what was the director's name?

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

18

1    A  Randy Marzen.

2    Q  And do you know when Mr. Marzen -- can you

3  spell that again for the court reporter?

4    A  Randy is R-a-n-d-y, Marzen is M-a-r-z-e-n.

5    Q  And do you know when Mr. Marzen left?

6    A  He didn't leave.  He assumed another

7  position in the company.  He was no longer the

8  director.

9    Q  Okay.

10   A  Maybe two years ago, a year and-a-half

11 ago.

12   Q  Do you know what position he assumed?

13   A  Key accounts, sales.

14   Q  Would that have been regarded as a

15 promotion for him?

16   A  I don't know.

17   Q  Was Mr. Marzen a supervisor of yours?

18   A  Yes.

19   Q  And did you report directly to him or like

20 a direct report?

21   A  Yes.

22   Q  Other than Randy Marzen, is there anybody

EXHIBIT 2

White, David
February 5, 2021

19

1     else that would have been involved in hiring

2     decisions for members of the sales team?

3         **A   The gentleman that assumed Randy's**

4     **responsibilities, his name was Nyguen, first name**

5     **is V-u, and I may spell the last name incorrectly,**

6     **but I believe it's N-y-g-u-e-n, but it's**

7     **pronounced Vu Nyguen.  He assumed those**

8     **responsibilities after Randy took his new position**

9     **with the company.**

10        Q   Okay.  So would it be fair to say that

11    hiring decisions for these positions on the sales

12    team were made by you and the director at the

13    time, whoever the relevant director was at the

14    time?

15        **A   Yes.**

16        Q   And then were there any other people

17    involved in the decision, other than like human

18    resources or just for doing, you know, background

19    checks and onboarding people, obviously that

20    process, but in terms of the substantive process,

21    other than you and the director, were there any

22    other people that were involved in the hiring

EXHIBIT 2

White, David
February 5, 2021

20

1    decisions?

2        **A   As I stated, other team members would be**

3    **part of the interview process.  But when it came**

4    **time to making the decision, it would be myself**

5    **and my director.**

6        Q   And were you involved in the decision to

7    hire Ian Macleod?

8        **A   Yes.**

9        Q   Okay.  Now, was Mr. Macleod filling any

10   kind of vacancy at the time?

11       **A   We had sales positions that we were**

12   **looking to fill.**

13       Q   Okay.  So what was the process by which

14   Mr. Macleod was hired?

15       **A   Randy Marzen had received his information**

16   **from a recruiter.  The name of the recruiting**

17   **company was Copier Careers.  And then Mr. Marzen**

18   **provided me with Ian's information.**

19       Q   Okay.  Copier like copying like

20   C-o-p-i-e-r?

21       **A   Yes, just like that.**

22       Q   Okay, I'm sorry.  So then what happened

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

21

1    next, you were supplied with his résumé I suppose?

2        **A   Yes, I was provided with his résumé.**

3        Q   And then did you schedule interviews?

4        **A   Yes.   I spoke with Ian on the phone and**

5    **then I invited him into our office for an**

6    **interview.**

7        Q   And do you recall what position Ian had

8    occupied at the time he was being recruited for a

9    position with you all?

10       **A   No.**

11       Q   And what were the job responsibilities

12   that he was hired into?

13       **A   New sales development, new business**

14   **development.**

15       Q   Okay.   Now, you had also mentioned, let me

16   just jump back, you had said that your day-to-day

17   job responsibilities involved supervising the lead

18   sales team and then customer accounts?

19       **A   The customer account management group as**

20   **well.**

21       Q   Can you describe that group and just kind

22   of what your involvement with that group is?

EXHIBIT 2

White, David
February 5, 2021

22

1       **A   They are a different team of people that**
2   **work with existing customers, so we have a team**
3   **that's dedicated for sales and then we have a team**
4   **that's dedicated to work with our existing**
5   **customer base.**
6       Q   And in terms of the time you spend
7   overall, do you split your time between the two
8   groups or do you focus primarily on sales or does
9   it vary?
10      **A   It varies.**
11      Q   And how many people are in the customer
12  account group roughly?
13      **A   Four.**
14      Q   Okay.  Do they have any interaction with
15  the sales team in any significant way?
16      **A   Yes.**
17      Q   Can you describe the nature of that
18  interaction?
19      **A   When a salesperson sells business, that**
20  **customer account manager will be paired up with a**
21  **salesperson, so, in essence, they become a team.**
22  **And in that way, a current customer can reach out**

EXHIBIT 2

White, David
February 5, 2021

23

1    **to a customer account manager and not just the**

2    **salesperson if they have a question.**

3        Q   Okay.  So you hired Mr. Macleod.  Do you

4    recall the date that he was actually hired?

5        **A  It was September of '17.**

6        Q   Okay.  Although, I'm looking at documents

7    that show that, you know, as early as August, he

8    was signing documents like the employment

9    confidentiality agreement.  Do you know why he

10   would be signing documents like that in August,

11   but then beginning in September?

12       MR. NELLANS:  Object to the form, assumes

13   facts.  You can answer.

14       THE WITNESS:  When someone's hired, they

15   sign documentation regarding their salary and

16   other information prior to their start date.

17   BY MR. LANGONE:

18       Q   Okay.  And then so when was Mr. Macleod's

19   start date to your recollection?

20       **A  Sometime in September.**

21       Q   And then when was he terminated?

22       **A  October.  I don't recall the exact date.**

EXHIBIT 2

White, David
February 5, 2021

24

1    It was October of '17.

2        Q   So he was only there a little over a

3    month?

4        A   Yes.

5        Q   How much interaction did you have with Mr.

6    Macleod during that time period?

7        A   Regular interaction.  We were in the same

8    office.

9        Q   So by regular, do you mean daily?

10       A   Yes.

11       Q   And how would you describe your

12   relationship with Mr. Macleod during that time

13   period?

14       A   He was a salesperson in my office and he

15   had just started.

16       Q   And was he performing his job

17   satisfactorily when he just started?

18       A   No.

19       Q   Okay.  Why do you say that?

20       A   During the beginning period in our

21   company, there's training and there's things that

22   we have expectations that people will fulfill, and

EXHIBIT 2

White, David
February 5, 2021

25

1    Ian did not fulfill those expectations.

2        Q   What expectations are you referring to?

3        A   We expect new hires to be engaged and to

4    listen when people are training them and to have

5    an open mind about learning new things when

6    someone is explaining them to that person.

7        Q   Okay.  And what makes you think that Ian

8    did not have an open mind to learning new things?

9        A   The comments that he would make and the

10   interaction that I had with him, he didn't really

11   want to hear what I had to say.  And, quite

12   frankly, when others were training him, that was

13   the same feedback that I received.

14       Q   Okay.  What feedback did you receive, from

15   whom?

16       A   From Kevin Fukumoto who was a salesperson

17   in our office.  He told Kevin that he thought our

18   office was a dump.

19           From Sam Birgin who was working with Ian

20   to explain to him how our customer management

21   system worked, his comments to me were that Ian

22   didn't care to listen to what he had to say and

EXHIBIT 2

White, David
February 5, 2021

26

1    wasn't paying attention.  Sam also for Ian's first

2    sales meeting, I asked them to take a picture so

3    we could introduce Ian to those team members that

4    are not in our office, and he told Sam that he

5    thought he was done with that type of bullshit.

6    Things like that.

7        Q   Were you present with this conversation

8    with Kevin Fukumoto?

9        A   No.

10       Q   So Kevin Fukumoto reported to you that Ian

11   said he thought the offices looked like a dump?

12       A   Yes.

13       Q   And when was that report made?

14       A   I don't recall.

15       Q   What was the context of bringing that to

16   your attention?

17       A   I believe Kevin wanted me to know.  He

18   wanted me to know what our new hire was saying.

19   And it bothered him.

20       Q   Okay.  Why do you say it bothered him?

21       A   Because our offices are not a dump.

22       Q   And you said you don't recall when that

EXHIBIT 2

White, David
February 5, 2021

27

1    conversation occurred?

2        **A   No.**

3        Q   And what was Mr. Fukumoto's position?

4        **A   At that time, he was an account**

5    **representative.**

6        Q   Okay.  So this is another name I guess

7    that didn't come up, but he was in one of these

8    positions?

9        **A   Yes.**

10       Q   How long was he in that position?

11       **A   Kevin was an account representative for**

12   **five years and was promoted to an account**

13   **executive this year -- or late last year I should**

14   **say.**

15       Q   Okay.  So he's still with the company?

16       **A   Yes.**

17       Q   Okay.  And then Sam Birgin, can you spell

18   that last name as well?

19       **A   B-i-r-g-i-n.**

20       Q   What was his position with the company?

21       **A   Senior customer account manager.**

22       Q   Okay.  And you claim that he said that Ian

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

28

1   didn't listen?

2          MR. NELLANS:  Object to the form,

3   misstates prior testimony.  You can answer.

4          THE WITNESS:  Could you repeat the

5   question?

6   BY MR. LANGONE:

7      Q  I have in my notes, and it might have been

8   I was just taking notes too quickly, I said Sam

9   and that Ian didn't listen?

10     **A  No.  Sam was the one who let me know that**

11  **upon my request, which we do for all new**

12  **salespeople which is to have their picture taken**

13  **so we can put it in our weekly sales meeting and**

14  **that way people on the phone can see who's joining**

15  **the company, he told Sam that he thought he was**

16  **done with that type of bullshit.**

17     Q  Okay.  Did you have a discussion with Ian

18  about this?

19     **A  No.**

20     Q  And did you have a discussion with Ian

21  about the report that had been made to you that he

22  had said the office looked like a dump?

EXHIBIT 2

White, David
February 5, 2021

29

1      **A   No.**

2      Q   Okay.  Why not?

3      **A   I don't recall why I didn't.**

4      Q   Did these two incidents play any role in

5      your decision to terminate him?

6      **A   Yes.**

7      Q   So they played a role in your decision to

8      terminate him, but never brought to his attention

9      or gave him any kind of warning or statement that

10     this was an issue that he should be concerned

11     about, correct?

12     **A   Correct.**

13     Q   Now, you said his interactions.  What

14     other interactions do you feel made it that he was

15     not performing well, interactions with you I think

16     you said?

17     **A   When we would work together, whether it**

18     **was training or out in the field, it just seemed**

19     **that he didn't want to take my direction, he**

20     **didn't seem to value my experience, and that was**

21     **the way that I felt.**

22     Q   On what basis?

EXHIBIT 2

White, David
February 5, 2021

30

1       **A   On the basis of when you're training**

2    **someone and you're explaining things to them and**

3    **they're not really following along and they're not**

4    **using your ideas.**

5       Q   Can you give an example?  What do you mean

6    not using your ideas?

7       **A   I don't have a specific example.**

8       Q   Did you counsel Mr. Macleod in any way

9    about not following along or not using your ideas

10   in respect to training?

11      **A   I don't recall if I did or not.**

12      Q   Do you recall if you counseled Mr. Macleod

13   as to any aspect of his job performance before he

14   was terminated?

15      **A   I don't recall.**

16      Q   Is there anything that would refresh your

17   recollection, in other words, is there a procedure

18   for putting any kind of counseling in writing?

19      **A   No, I don't believe so.**

20      Q   Does MidAmerican Energy Services have any

21   kind of progressive discipline policy where people

22   are given any kind of verbal or written warnings

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

31

1   as to job expectations before any kind of

2   discipline is taken against them?

3   **A There is a meeting that takes place with**

4   **HR.**

5   Q Okay. And you mean for the purposes of

6   counseling employees?

7   **A For the purpose of pointing out where**

8   **things are not going well.**

9   Q Okay. And did Mr. Macleod participate in

10   such a meeting before he was terminated?

11   **A Yes.**

12   Q And when did that meeting occur?

13   **A I don't recall.**

14   Q Who was present at that meeting?

15   **A Myself and Burt Short, B-u-r-t S-h-o-r-t.**

16   **He was our HR representative at the time.**

17   Q And what was said to Mr. Macleod at that

18   meeting?

19   **A I honestly don't recall the specifics.**

20   Q How long before he was terminated did this

21   meeting occur?

22   **A I don't know specifically.**

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

32

1    Q   I mean are you talking about the meeting

2   where he was actually terminated or under

3   investigation for termination, or is this some

4   kind of other job performance review or

5   counseling?

6        MR. NELLANS:  Object to the form,

7   compound.  You can answer.

8        THE WITNESS:  The meeting that I'm

9   referring to with Burt, myself and Ian, things

10   were explained to him that he had done or that he

11   was doing and he was made aware that his actions

12   were not appropriate.

13   BY MR. LANGONE:

14   Q   What things are you referring to, things

15   he had done that were inappropriate?

16   **A   The insubordination that we've talked**

17   **about thus far.**

18   Q   Saying about my picture, I thought I was

19   done with that bullshit, you regard that as

20   insubordination?

21   **A   Yes.**

22   Q   But then didn't you just previously

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

33

1    testify that you had not brought this up with Mr.

2    Macleod prior to his termination?

3        A   Individually, I did not.  This was brought

4    up by Burt Short on our HR call.

5        Q   What else was brought up on the call?

6        A   To my recollection, we talked about that,

7    we talked about his comments about the office, we

8    talked about his -- the time he would arrive to

9    work, the time he would leave work, and we also

10   talked about a meeting that occurred between Ian

11   and I where Rochelle Gobetz was in the room and

12   Ian and I had a conversation that should not have

13   taken place.

14       Q   Okay.  Can you describe that?

15       A   Yes.  We were in the conference room.  It

16   was Rochelle, myself and Ian.  And we had

17   completed our meeting and I had asked Ian what his

18   top priority for the day was, and he told me it

19   was his expense report.  And I told him that that

20   wasn't the case, that his top priority was to have

21   the EMA software installed on his computer because

22   that software is vital to our job.  And he told

EXHIBIT 2

White, David
February 5, 2021

34

1    me, no, I'm going to do my God damn expense report

2    because my wife told me that I have to do that.

3    And he became agitated and angry and at that

4    point, I asked Rochelle to excuse herself and I

5    reminded Ian that I was his boss and that was not

6    appropriate to use that kind of language and to

7    yell at me and to try and intimidate me.  So that

8    was another conversation that took place that was

9    part of Ian's conversation with Burt Short from HR

10   and myself.

11        Q   Well, this is the reason you fired him,

12   correct?

13           MR. NELLANS:  Object to the form.

14   BY MR. LANGONE:

15        Q   And the answer you just described is the

16   reason that was given for his termination, right?

17           MR. NELLANS:  Object to the form, leading.

18   You can answer.

19           MR. LANGONE:  Well, I'm allowed to lead.

20           THE WITNESS:  That was one of the things

21   we talked about for his termination, yes.

22   However, the totality of it was much more than

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

35

1    that one incident.  It was his attitude around the

2    office with other salespeople, his comments to

3    other salespeople.  His overall attitude was very

4    poor and it wasn't good for the office or for him.

5    BY MR. LANGONE:

6        Q   What comments?

7        **A   I believe I already spoke about those, but**

8    **do you want me to repeat them?**

9        Q   No.  I just want to make sure that I have

10   them all identified.

11       **A   Okay.**

12       Q   So the comment about the office looks like

13   a dump and I thought I was done with this bullshit

14   when being asked to take a picture, those are the

15   comments you're referring to?

16       **A   Yes.**

17       Q   Nothing else, correct?

18       **A   Give me a moment.**

19           **That's all I can recall at the present**

20   **time.**

21       Q   And with respect to those comments, he was

22   never told or counseled about those correct prior

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

36

1     to his termination?

2          MR. NELLANS:  Object to the form.  You can

3     answer.

4          THE WITNESS:  No, he was not counseled.

5     BY MR. LANGONE:

6       Q   Okay.  Now, let's talk about you brought

7     up this issue of the time that he arrived and

8     left.  First of all, do the employees punch in or

9     is there a record of what time they arrive?

10      **A   The employees do not punch in. However,**

11    **the expectation is that unless you have a meeting**

12    **outside of the office or you let me know, the**

13    **expectation is that you will be there at 8:30 or**

14    **prior to that.**

15      Q   Where is that expectation communicated to

16    people?  How is that expectation communicated to

17    employees?

18      **A   From me, verbally.**

19      Q   Okay.  And did you have any discussions

20    with Mr. Macleod about what time he was arriving?

21      **A   I don't recall if I did or not.**

22      Q   So you don't recall if you communicated

EXHIBIT 2

White, David
February 5, 2021

37

1    the expectation to him, correct?

2        A   Incorrect.   The expectation was

3    communicated.   I believe your question was if I

4    had conversations with him about what time he was

5    arriving.

6        Q   Well, how was the expectation, in what

7    manner was the expectation communicated?

8        A   Verbally.

9        Q   When?

10       A   I can't tell you specifically.

11       Q   One-on-one or in a group?

12       A   When Ian started, we went over basic

13   procedures for the office.   That would have been

14   part of it.   And also as a group, it was very -- I

15   should say I believe it was very clear based on

16   people telling me openly, Dave, I'm not going to

17   be here until 10:00 tomorrow because I have to

18   meet with XYZ or I have this so I will be in

19   later.

20       Q   And what makes you think Ian was not in by

21   8:30?

22       A   There were days that it was past 8:30 and

EXHIBIT 2

White, David
February 5, 2021

38

1    **he was not there and I did not receive any**

2    **communication on why.**

3        Q  How many days?

4        **A  I don't recall.**

5        Q  Did you document it in any way?

6        **A  No.**

7        Q  And you didn't talk to Ian about it,

8    correct?

9        **A  No.**

10       Q  But you claim it played a role in his

11   termination?

12       **A  One of the factors, yes.**

13       Q  Now, are you aware that Ian's position is

14   that he was there every day at 8:30 and that he,

15   in fact, took the same train as Rochelle Gobetz

16   and arrived at the same time as her pretty much

17   every day?

18       MR. NELLANS:  Object to the form,

19   including assumes facts.  Go ahead and answer.

20   BY MR. LANGONE:

21       Q  Okay, go ahead, Mr White.

22       **A  Could you repeat the question?**

EXHIBIT 2

White, David
February 5, 2021

39

1       Q   Yeah.  I'm saying, were you ever made

2   aware by Mr. Macleod or in any other fashion from

3   documents that were filed, you know, with the EOC

4   or subsequently, were you ever aware that Mr.

5   Macleod's position was that he was, in fact,

6   present by 8:30 every day because he took the same

7   train as Miss Gobetz and walked with her into the

8   office every morning?

9       MR. NELLANS:  Same objection and compound.

10  You can answer.

11      THE WITNESS:  If that's his recollection,

12  that's his recollection.

13  BY MR. LANGONE:

14      Q   Okay.

15      **A   I don't know that that was every day.  I**

16  **don't know that that would be possible seeing as**

17  **though he was there 30 days and how would he have**

18  **been able to take the train with her every day as**

19  **in his first, second, third, fourth day?**

20      Q   But you can't recall a specific day that

21  you went looking for Ian and he wasn't there?

22      **A   No, no, I can't.**

EXHIBIT 2

White, David
February 5, 2021

40

1      Q   And you didn't document it at all,

2   correct?

3      **A   No, I did not.**

4      Q   Okay.  Now, you said that the meeting that

5   you had in the conference room --

6          MR. NELLANS:  Counsel, if we're moving on

7   to the content of the meeting, we've been going

8   about 15 minutes, is it okay if we take a quick

9   break?

10         MR. LANGONE:  Sure.

11         MR. NELLANS:  Five minutes?

12         MR. LANGONE:  Sure, that's fine.

13         MR. NELLANS:  Okay.

14             (There was a break taken, after

15              which the deposition was resumed

16              as follows:)

17         MR. LANGONE:  Are we ready to go back on

18   the record?

19         MR. NELLANS:  Yes.

20   BY MR. LANGONE:

21      Q   Mr White, is your counsel there with you?

22      **A   Yes, he is.**

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

41

1      Q   Okay.  So I guess we were about to discuss

2   this, go back and discuss in a little more detail

3   this meeting that occurred in the conference room

4   that you were there with Miss Gobetz and

5   Mr. Macleod and yourself.  Was there anybody else

6   present in this meeting?

7      **A   No.**

8      Q   Do you recall the date of this meeting?

9      **A   No.**

10     Q   Why did you ask Mr. Macleod what his top

11   priority was that day if you knew what you wanted

12   him to do?

13     **A   I wanted to know what his answer was.**

14     Q   Okay.  So you were quizzing him?

15     **A   No, I wasn't quizzing him.  I asked him a**

16   **question.  I wanted to know what his top priority**

17   **was, nothing more than that.**

18     Q   Okay.  Wouldn't you agree that for

19   salespeople, expense reports is an important thing

20   since they're advancing the money on behalf of the

21   company, right, and getting reimbursed for it?

22     **A   No, not after less than 30 days, no,**

EXHIBIT 2

White, David
February 5, 2021

42

1   **expenses would not be important.  What would be**

2   **important is having a software system installed**

3   **that allowed you to do your job.  So no, I don't**

4   **agree.**

5       Q  Well, wasn't there delays in getting him

6   his notebook or laptop computer, whatever?  People

7   refer to it differently.

8       **A  Yes.**

9       Q  Okay.  So he wasn't responsible for those

10  delays in getting his laptop, right, that's your

11  IT department or your procurement department,

12  right?

13      **A  I don't see what one has to do with the**

14  **other.  He had his laptop when I asked him what**

15  **his priority was, when I asked him what his**

16  **priority for the day was.**

17      Q  Okay.  It's his job responsibility to set

18  up the EMA software?

19      **A  It was his responsibility to work with our**

20  **TRC group, which is our IT help desk, to get that**

21  **installed, yes.**

22      Q  And when was he first asked to install the

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

43

1   EMA software?

2      **A   I don't recall.**

3      Q   And when did he first receive his laptop?

4      **A   I don't recall when he first received his**

5   **laptop.**

6      Q   Okay.  And how did he try to intimidate

7   you?

8         MR. NELLANS:  Object to the form, assumes

9   facts.

10        MR. LANGONE:  Well, he said, Counsel, the

11   witness had said that he tried to intimidate him.

12   That was one of the things.  He said, I reminded

13   him that I'm his boss and that he shouldn't try to

14   intimidate me and that his language was

15   inappropriate.

16        MR. NELLANS:  I'll leave my objection for

17   the record in case.

18        MR. LANGONE:  I'll just take a step back.

19   BY MR. LANGONE:

20      Q   Do you recall using the word that he was

21   trying to intimidate you or a phrase to that

22   effect?

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

44

1    A   Yes.  I didn't say it out loud, but yes.

2    I didn't tell him that he shouldn't be trying to

3    intimidate me.

4    Q   What made you feel like he was trying to

5    intimidate you?

6    A   He raised his voice, slammed his hands

7    down on the table, and said that he was going to

8    do his God damn expense report because his wife

9    told him he needed to do that.  So his tone, his

10   language, the tone of his voice, slamming his

11   hands down on the desk, it was such that I asked

12   Rochelle Gobetz to please excuse us because it was

13   not appropriate for him to be acting that way in

14   front of her.

15   Q   Well, people have never used any kind of

16   phrase like God damn in the workplace at

17   MidAmerican Energy before?

18   A   They have.

19   Q   And were they fired for it?

20   A   No, but they were not directing that at

21   somebody.  Out of frustration, but it was not

22   directed at anybody, nor was it spoken in a way --

EXHIBIT 2

White, David
February 5, 2021

45

1    **in a loud voice at someone else.  There's a**

2    **difference.**

3         Q  Nobody's ever raised their voice at

4    somebody else in the MidAmerican Energy workplace

5    to your knowledge?

6         **A  I'm sure they have.**

7         Q  And were they terminated for it?

8         **A  No.  I don't know if they have or not.**

9         Q  I mean were you really that offended by

10   the use of the word God damn?

11        **A  Yes.**

12        Q  Why?

13        **A  Because he was staring at me, yelling at**

14   **me.  I was offended.  I'm his boss.  You're not**

15   **supposed to do that.**

16        Q  But you didn't give him any kind of

17   warning or anything like that, right?

18        **A  Warning, how would I know what he was**

19   **going to do?  I didn't know he was going to lose**

20   **his temper.  I didn't know he was going to act**

21   **that way.**

22        Q  Right.  So after he lost his temper, you

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

46

1   didn't say, look that's really inappropriate for

2   you to do and we don't really tolerate that around

3   here, if you do anything like that again, you're

4   going to be terminated, like a fair warning?  It's

5   one strike and he's out it sounds like, right?

6          MR. NELLANS:  Object to the form of the

7   question, compound, improper hypothetical.  You

8   can answer.

9          THE WITNESS:  I did.  After I asked

10  Rochelle to excuse herself, I did tell him that

11  what he was doing, what he said and the way he was

12  acting was inappropriate.  So to answer your

13  question, I did tell him at that time that he

14  cannot do that.

15  BY MR. LANGONE:

16     Q  And then you initiated termination

17  procedures, correct?

18         MR. NELLANS:  Object to the form, vague as

19  to time.  You can answer.

20         THE WITNESS:  So you're asking me if after

21  that meeting, the very next thing I did was to

22  start the process to have him terminated?

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

47

BY MR. LANGONE:

1  BY MR. LANGONE:

2      Q  I didn't say the very next thing, but you

3  made up your mind at that point you were going to

4  terminate him, correct?

5      **A  No.**

6      Q  No?  When did you make up your mind you

7  were going to terminate him?

8      **A  I don't recall exactly when I made up my**

9  **mind.**

10     Q  But sometime after that meeting before you

11  brought him in on the termination meeting?

12     **A  Yes.**

13     Q  And was there any other conduct he had

14  engaged in during that time period after the

15  conference meeting before he was brought in for

16  the termination meeting?

17     **A  You mean more insubordination activities?**

18  **I don't know what you're referring to.**

19     Q  Anything, yeah, anything that you think

20  would have played a role in the decision to

21  terminate.

22     **A  I don't recall.**

EXHIBIT 2

White, David
February 5, 2021

48

1    Q  So you're saying he had a chance to not be

2    terminated after that conference room meeting?

3    **A  The conference --**

4    Q  Why didn't you write him up?  Why didn't

5    you write him up with a written warning about his

6    tone like you would normally expect, you know,

7    would be done in a workplace?

8         MR. NELLANS:  Object to the form,

9    compound, misstates prior testimony, assumes

10   facts.  You can answer.

11        MR. LANGONE:  Okay.  I'll rephrase the

12   question.

13   BY MR. LANGONE:

14   Q  Why didn't you write him up?

15        MR. NELLANS:  Object to the form, assumes

16   facts.

17        MR. LANGONE:  Okay.  I'll rephrase the

18   question.

19   BY MR. LANGONE:

20   Q  Did you write him up?

21   **A  No.**

22   Q  Why not?

EXHIBIT 2

White, David
February 5, 2021

49

1    A  I spoke with our HR representative, Burt

2  Short.

3    Q  Okay.  And when did you speak with Mr.

4  Short?

5    A  I don't recall the exact date.

6    Q  And did you speak with him in person or on

7  the telephone?

8    A  On the phone.

9    Q  And what did you say to him and what did

10  he say to you?

11    A  I don't recall the specifics.  It was four

12  years ago.

13    Q  Do you recall anything about it?

14    A  I recall talking to him about the

15  activities that had taken place that we've

16  discussed today, the insubordination.  Those were

17  the things that we talked about.

18    Q  And you indicated you wanted Mr. Macleod

19  terminated, correct?

20    A  That call was specifically about letting

21  him know what was happening in our office from my

22  recollection.

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

50

1    Q  Okay.  Why were you letting HR know?

2    **A  That is our process.**

3    Q  What is the process?  Describe the

4 process.

5    **A  Calling your HR representative.**

6    Q  To do what?

7    **A  To determine based on a situation what the**

8 **outcome should be or what are the options.**

9    Q  And what were the options that were

10 described to you?

11    **A  I don't recall.**

12    Q  Is there anything that would refresh your

13 recollection?

14    **A  I'm not sure.**

15    Q  Have you ever given an employee any kind

16 of written warning or written discipline, you

17 know, what would commonly be known as a writeup?

18    **A  I have put salespeople on performance**

19 **plans respected to new business generation**

20 **numbers, but those plans aren't in -- they aren't**

21 **something we use until you've been with us for**

22 **seven, eight months.  So the answer is yes, but**

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

51

1    **specific to -- they're generally specific to sales**

2    **numbers and sales activities.**

3        Q  Have you ever encountered an employee

4    other than Mr. Macleod who you regarded as being

5    insubordinate in any way?

6        **A  I don't recall.**

7        Q  Have you ever given an employee any kind

8    of verbal warning about employment-related

9    conduct?

10       **A  Specifically I can't remember an exact**

11   **instance, so I can't recall.**

12       Q  In the five years and three months that

13   you've been at MidAmerican Energy Services, have

14   you terminated any other employees other than Mr.

15   Macleod?

16       **A  Yes.**

17       Q  How many?

18       **A  Three.**

19       Q  And can you tell me their names?

20       **A  Greg Gault.**

21       Q  Okay.

22       **A  Steve Kim.**

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

52

1    Q   Okay.

2    **A   And Bob.   My apologies, I cannot remember**

3    **Bob's last name.**

4    Q   Bob last name unknown.   Okay.

5        What about Miss Gobetz?

6    **A   What about Miss Gobetz.**

7    Q   Well, she was terminated, correct?

8    **A   No.**

9    Q   She was not terminated?

10   **A   No.**

11   Q   Okay.   Why was Greg Gault terminated?

12   **A   Performance.**

13   Q   What do you mean by performance?

14   **A   Sales performance.**

15   Q   When was he terminated?

16   **A   I don't have a specific date.   He was with**

17   **us for about a year and-a-half.**

18   Q   Was he given any kind of warning before

19   being terminated?

20   **A   I don't recall if he received a PD plan or**

21   **not.**

22   Q   Did you have any communications with Burt

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

53

1    Short prior to terminating Mr. Gault?

2        **A   Burt Short was no longer our HR**

3    **representative when Mr. Gault was terminated.**

4        Q   Okay.  Do you know who was?

5        **A   Ashley Brandt, A-s-h-l-e-y, B-r-a-n-d-t.**

6        Q   Okay.  How about Kim, Steve Kim did you

7    say?

8        **A   Yes.**

9        Q   When was Mr. Kim terminated?

10       **A   I don't have the specific date.**

11       Q   And what was the reason?

12       **A   Performance.**

13       Q   And was Mr. Kim given any kind of warning

14   before he was terminated?

15       **A   I don't recall.**

16       Q   And then Bob last name unknown, when was

17   he terminated?

18       **A   I don't have the specific date.**

19       Q   And what was the reason he was terminated?

20       **A   Performance.**

21       Q   How is performance evaluated at

22   MidAmerican?  Are there sales targets that are

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

54

1    given in advance that people are expected or

2    required to meet, quotas, etc.?

3        **A   Key performance indicators which combines**

4    **sales margin, also includes activities, cold**

5    **calls, E-mails, those types of activities.  So**

6    **yes, we do have a set of criteria that we**

7    **benchmark and use as minimum requirements for**

8    **employment.**

9        Q   And these are written down?

10       **A   Yes.**

11       Q   Okay.  How old was Mr. Gault at the time

12   he was terminated?

13       **A   I don't know how old he was.**

14       Q   No idea?

15       **A   No.**

16       Q   You don't know if he was in his 30s, 40s

17   or 50s?

18       **A   No.**

19       Q   How about Mr. Kim?

20       **A   I don't know how old he is.**

21       Q   No idea?  You can't tell if someone's in

22   their 30s, 40s or 50s?

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

55

1      **A   I don't know how old Mr. Kim was.**

2      Q   You don't even know what decade he might

3   be born in?

4      **A   No.**

5      Q   How about Bob last name unknown?

6      **A   Again, I don't know how old he is or he**

7   **was when he was hired or terminated.**

8      Q   Do you know if he was over or under 40?

9      **A   I don't know.**

10      Q   Did you ever have any discussions with him

11   that might indicate something about his age, you

12   know, talking about, you know, Led Zeppelin or

13   something?

14      **A   No.**

15      Q   Okay.  Do you know how old Mr. Macleod

16   was?

17      **A   No.**

18      Q   Do you know if he was over 40?

19      **A   I didn't know how old he was, so I**

20   **wouldn't know if he was over a certain age.**

21      Q   No idea?  I mean he's older than you, so

22   you couldn't notice that he was older than you?

EXHIBIT 2

White, David
February 5, 2021

56

1      MR. NELLANS:  Objection, argumentative.

2   You can answer.

3      THE WITNESS:  What was your question?

4   BY MR. LANGONE:

5      Q  Did you realize that Mr. Macleod was older

6   than you?

7      **A  I didn't think about it, so I don't know**

8   **what you want me to say, but I don't know how old**

9   **he was and I honestly didn't benchmark it against**

10  **anything.**

11     Q  I mean he's 57 at the time, the record

12  will reflect.  Are you saying that you can't

13  realize whether age 57 is over 40, you lack that

14  perception ability?

15     MR. NELLANS:  Object to the form.  You can

16  answer.

17     THE WITNESS:  Apparently I do.

18  BY MR. LANGONE:

19     Q  What did you mean when you said that you

20  need employees that you can mold better?

21     MR. NELLANS:  Object to the form, assumes

22  facts.  You can answer.

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

57

1          THE WITNESS:  When did I say that?

2    BY MR. LANGONE:

3      Q  I don't know.  When did you say it?

4      **A  I don't recall saying that.  That's why I**

5    **asked you when I said it.**

6      Q  Okay.  Have you ever made any comments

7    about a salesforce needing to be kind of hungry or

8    anything about, you know, moldable?

9          MR. NELLANS:  Objection, compound.  You

10   can answer.

11         THE WITNESS:  I would hope I want a sales

12   team that's hungry to be successful, so I would

13   hope that I would think that way, yes.

14   BY MR. LANGONE:

15     Q  Would it be fair to say that you were the

16   decision-maker with regard to Mr. Macleod's

17   termination?

18         MR. NELLANS:  Object to the form to the

19   extent that it calls for a legal conclusion.  You

20   can answer though.

21         THE WITNESS:  I was one of the people.

22

EXHIBIT 2

White, David
February 5, 2021

58

1   BY MR. LANGONE:

2       Q   The primary decision-maker though, right?

3           MR. NELLANS:  Same objection.  You can

4   answer.

5           THE WITNESS:  Primary, what do you mean by

6   primary?

7   BY MR. LANGONE:

8       Q   You're the one that initiated the

9   termination proceedings, right?  I mean this was

10  at your urging?

11      **A   No.**

12      Q   No?  Who initiated the termination

13  proceedings?

14      **A   The termination proceeded based on the**

15  **facts that were presented to our HR group and that**

16  **was the conclusion that the company made.**

17      Q   When you say the company, who?

18      **A   I would say myself, Burt Short, at that**

19  **point Randy Marzen, our director was consulted.**

20      Q   When was Mr. Marzen consulted?

21      **A   I don't have a specific date.**

22      Q   Who consulted Mr. Marzen?

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

59

1      **A  I don't know.**

2      Q  Was it you?

3      **A  No.**

4      Q  So you did not discuss the termination of

5      Mr. Macleod with your supervisor prior to having

6      the HR proceedings, correct?

7      **A  I don't understand the question.**

8      Q  Well, you went to Mr. Short in HR before

9      consulting with your own supervisor, correct?

10     **A  That's correct.**

11     Q  And then when was Mr. Marzen first

12     notified that there was an issue with Mr. Macleod?

13     **A  I don't know.  I wasn't involved in that**

14     **communication, so I can't answer that.  I don't**

15     **know.**

16     Q  Would it have anything to do with an

17     E-mail that Mr. Macleod might have sent to

18     Mr. Marzen after he was notified that he was being

19     terminated?

20     **A  I don't know.**

21     Q  Are you aware that Mr. Macleod had sent an

22     E-mail regarding or disputing the validity of his

EXHIBIT 2

White, David
February 5, 2021

60

1    termination?

2       **A   Yes.**

3       Q   How did you become aware of that?

4       **A   I think Mr. Marzen shared it with me after**

5    **the fact.**

6       Q   Okay.  So Mr. Macleod contacted Mr. Marzen

7    and then he shared that with you, correct?

8       **A   Correct.**

9       Q   And that was the first involvement of

10   Mr. Marzen, correct?

11          MR. NELLANS:  Object to form, misstates

12   prior testimony.  You can answer.

13          THE WITNESS:  I believe it was.  I don't

14   know, as I said earlier.

15   BY MR. LANGONE:

16      Q   Okay.  Now, I'm going to share my screen

17   and show you a document that has been produced

18   with Bates label MES000126.  Can you see that on

19   the screen?

20      **A   Yes.**

21      Q   Okay.  And I'll enlarge it.

22          MR. LANGONE:  And then, Counsel, I don't

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

61

```
 1    know if you have a copy that you want to share

 2    with the witness or we can just share on my screen

 3    here.

 4          MR. NELLANS:  If he can read with you on

 5    the screen, I do have a hard copy that I was able

 6    to pull up, but if the screen becomes an issue, he

 7    can use the hard copy.

 8    BY MR. LANGONE:

 9       Q  Okay.  Mr White, are you able to read

10    this?  Is it legible on your screen?  Is it big

11    enough?

12       A  Yes.

13       Q  Okay.  So this is an E-mail that you sent

14    to Burt Short on Thursday, October 19, 2017 at

15    8:34 a.m., correct?

16       A  Correct.

17       Q  And this E-mail starts out by saying that

18    you had a meeting with Rochelle Gobetz and Ian

19    Macleod on October 9th, correct?

20       A  Correct.

21       Q  Now, had you taken any action with regard

22    to Mr. Macleod's employment between October 9th
```

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

62

1    and sending this E-mail ten days later on

2    October 19th?

3        **A   No.**

4        Q   Okay.   Why did you wait ten days to send

5    this E-mail?

6        **A   I'm not sure.   I can't remember why.**

7        Q   Had you had any conversations with

8    Mr. Short prior to October 19th, but after

9    October 9th regarding Mr. Macleod's employment

10   performance?

11       **A   Okay.   You lost me.   So you said prior --**

12   **what was the time frame?**

13       Q   Yeah.   Between October 9 and October 19,

14   did you have any verbal or oral conversations with

15   Mr. Short before sending him this E-mail?

16       **A   I can't recall.**

17       Q   Okay.   Now, you see here where you report

18   in this E-mail, you say, "During the meeting I

19   asked him" -- meaning Mr. Macleod -- "what his top

20   priority was and he responded to get my expense

21   report done."   And then you say, "I replied no,

22   Ian.   Remember I asked you to get EMA set up so

EXHIBIT 2

White, David
February 5, 2021

63

1    you could enter in your leads."  Do you see that?

2        **A  I do.**

3        Q  And then you write, "He got agitated and

4    said his number one priority was to get his

5    expense report done.  And then when I asked him

6    why, he responded, my wife told me that I needed

7    to get my expense report in," correct?  You wrote

8    that, yes?

9        **A  Yes.**

10       Q  And you did not say that he used the word

11   God damn in this E-mail, did you?

12       **A  No, I did not.**

13       Q  And you did not say that he was trying to

14   intimidate you in this E-mail, correct?

15       **A  Correct.**

16       Q  And you did not say that he slammed his

17   hand down on the table, correct?

18       **A  Correct.**

19       Q  And this E-mail was written much closer to

20   the time of the actual events than your statements

21   today, correct?

22       **A  Correct.**

**EXHIBIT 2**

White, David
February 5, 2021

64

1    Q   Then you indicate you asked Rochelle to

2    excuse you all, the both of you, and that you

3    continued the discussion and that Ian continued to

4    become agitated was the phrase you used and you

5    told him that his wife did not work there and that

6    you had given him a directive, correct?

7    **A   Yes.**

8    Q   And then the next paragraph, you mentioned

9    that a few weeks earlier on his second day, he had

10   commented that our office was a dump, right?

11   **A   Yes.**

12   Q   And you said, "He always leaves before

13   5:00 p.m."  On what basis do you say he always

14   leaves before 5:00 p.m.?

15   **A   I can't recall.**

16   Q   What proof do you have of this?  People

17   don't clock in or clock out, right?

18   **A   No.**

19   Q   Where was the MidAmerican Energy

20   Services -- it's at 641 West Lake Street, correct?

21   **A   Yes.**

22   Q   Is it still there?

EXHIBIT 2

White, David
February 5, 2021

65

1    A    No.

2    Q    Okay.  At the time when it was at 641 West

3  Lake Street, would you need to have any kind of ID

4  swipe card or something to get into the building,

5  elevator pad, any security in the building at the

6  time?

7    A    **We had a system to enter the office.**

8    Q    And what kind of system is that?

9    A    **It was a keycard system.**

10   Q    So you would swipe a keycard to get into

11  the office?

12   A    **Yes.**

13   Q    So that would record what time people came

14  into the office presumably, right?

15   A    **Presumably, yes.**

16   Q    So there is a way if we go track that

17  data, if it still exists at least, if he was

18  coming in before 8:30, correct?

19   A    **I can't speak to the -- I can't speak to**

20  **that yes or no.  I don't know.**

21   Q    Leaving, you wouldn't have to swipe to

22  leave though, right?

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

66

1    **A  No.**

2    Q  You're saying that you have no proof that

3  he always left before 5:00 p.m., correct?

4    **A  Correct.**

5    Q  And then you claim that his attitude lacks

6  urgency?

7    **A  Yes.**

8    Q  Okay.  What do you mean lacks urgency?

9    **A  When he was hired, it was explained that**

10  **there was going to be a lot that we were expecting**

11  **of him in terms of his ability to learn, his**

12  **ability to take initiative, and he did not**

13  **demonstrate that.  He did not have the urgency of**

14  **somebody who wants to learn something new, who is**

15  **excited to be there.  He did not present that.**

16    Q  Now, you end this E-mail with the

17  statement, "Please let me know if this is

18  sufficient for what you need."  What do you mean,

19  what he needs, meaning Mr. Short?

20    **A  I'm not sure what I'm asking for there or**

21  **what I'm stating there.  I don't recall what that**

22  **would be.**

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

67

1      Q   Okay.  Have you ever seen this document

2   before, Mr. White?

3      **A  Yes.**

4      Q   This is a memo to Peg Roy from Burt Short

5   dated October 30, 2017, and it's Bates label

6   MES000102 and 103.

7          Okay.  And so who is Jeff Gust?

8      **A  I don't know.**

9      Q   Okay.  And so this E-mail indicates that

10  Mr. Macleod's employment was terminated on

11  October 23 for insubordination toward you,

12  correct, and failure to complete six months of

13  employment?

14     **A  Correct.**

15     Q   And then Mr. Macleod sent an E-mail on

16  October 24th to Randy Marzen and Jack Kelleher and

17  Burt Short, evidently the author of this memo.

18  Who is Jack Kelleher?

19     **A  Jack Kelleher at that time, he was the**

20  **president of MidAmerican Energy Services.**

21     Q   Okay.  And then Randy Marzen was your

22  direct supervisor, correct?

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

68

1      **A   Correct.**

2      Q   And that E-mail to Randy Marzen would be

3   the first that Mr. Marzen was looped into this

4   conversation about Mr. Macleod, correct?

5          MR. NELLANS:  Object to the form,

6   misstates prior testimony.  You can answer.

7          THE WITNESS:  I don't know if that was the

8   first time.

9   BY MR. LANGONE:

10     Q   But you had not looped him in prior,

11   correct?

12     **A   I don't recall doing so.**

13     Q   Now, did you participate in this

14   investigation that's being referred to in this

15   memorandum?

16     **A   I'm not sure what you mean.**

17     Q   Well, the memorandum refers to -- the

18   subject is "Investigatory Summary Update:  Ian

19   Macleod."  And then the first sentence under facts

20   says, "The investigation revealed the following

21   facts."  So I'm just wondering, did you

22   participate in what's being referred to herein as

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

69

1    an investigation?

2        **A   I participated by providing the**

3    **information that's listed here.  If it's listed in**

4    **here, yes, that was where I participated.**

5        Q   Okay.  So I guess I do have one more here.

6    So this is the E-mail that's being referred to,

7    one of them, although it's dated October 30th, but

8    it was produced as Macleod 43 and 44 and 45, 43

9    through 45.

10        Have you ever seen this E-mail, the E-mail

11   dated October 24th, 2017 from Ian Macleod to Randy

12   Marzen, Mr. Kelleher and Burt Short?

13       **A   Yes.**

14       Q   And how was this E-mail brought to your

15   attention?

16       **A   I can't recall.**

17       Q   Okay.  And do you see at the bottom of the

18   Page 2, the Macleod 44, the last sentence, it

19   says, "I left the meeting a little confused over

20   what just happened with David.  Nevertheless, I

21   thought I left on an okay note as David actually

22   said to me we are all good."  Did you say to him

EXHIBIT 2

White, David
February 5, 2021

70

1    we are all good?

2        A  I'm just reading this.  Give me a moment

3    please.

4            I do not recall saying we are all good at

5    the conclusion of that meeting, no.

6        Q  Do you deny saying it or do you just not

7    recall saying it?

8        A  I do not recall saying that at the end of

9    that meeting.

10       Q  And then do you see as it continues on to

11   the next page, it says, "Friday, October 13th was

12   the last time I spoke to David prior to our

13   meeting with Burt Short on October 20th."  Is that

14   true?  Do you recall any conversations between

15   October 13th and October 20th with Mr. Macleod?

16       A  The question for me is did I speak with

17   Ian Macleod between what dates?

18       Q  October 13th and October 20.

19       A  I don't recall.  I don't know.

20       Q  Okay.  And then do you see in the next

21   sentence Ian says, "In our meeting on October

22   13th, we went over my week and talked about my

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

71

1    strategy for the upcoming week.  He was very

2    complimentary and told me I was doing all the

3    right things and my plan was a good one."  Did you

4    make those comments to Mr. Macleod?

5       **A  I don't recall saying that.  I don't**

6    **remember.**

7       Q  Okay.  But you don't deny saying that?

8       **A  I don't remember.**

9       Q  Okay.  And this doesn't refresh your

10   recollection?

11      **A  No.**

12      Q  Now continuing down a little bit further

13   Ian says, "I had EMA installed within a half-hour

14   of my meeting with David."  Is that true?  To your

15   knowledge, did he then promptly get the EMA

16   installed?

17      **A  I don't know if he did or he didn't.  I**

18   **don't know.  I can't recall.  That was four years**

19   **ago.**

20      Q  Okay.  I'm going to stop screensharing

21   now.

22          Okay.  I do not have any other questions

EXHIBIT 2

White, David
February 5, 2021

72

1    of the witness at this time.

2            MR. NELLANS:  I think I'm going to have

3    like maybe two or three minutes of follow-up.

4            Can we take a break for me to review my

5    notes so I can expedite that a little bit?

6            MR. LANGONE:  Sure.

7            MR. NELLANS:  Five minutes okay with

8    everyone?

9            MR. LANGONE:  Let's come back at 12:50.

10   That'll be seven minutes.

11           MR. NELLANS:  Sounds good.

12                   (There was a break taken, after

13                    which the deposition was resumed

14                    as follows:)

15           MR. NELLANS:  We're ready to go back on if

16   you and Mr. Langone are.

17           MR. LANGONE:  Yup, ready.

18           MR. NELLANS:  Going back on the record.

19           EXAMINATION

20           By:  Mr. Nellans

21       Q  Mr White, I just have a handful of

22   questions for you and then we'll get you out of

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

73

1   here today.

2       A   Okay.

3       Q   I believe you referred to Mr. Macleod both

4   as an account executive and account

5   representative.  Which position did Mr. Macleod

6   hold?

7       A   Account executive.

8       Q   And you were asked about other employees

9   reporting instances where they had issues with Mr.

10  Macleod's conduct, correct?

11      A   Yes.

12      Q   And you specifically recalled the incident

13  with his photo and him referring to the office as

14  a dump, correct?

15      A   Correct.

16      Q   Were there other instances where

17  MidAmerican employees came to you about issues

18  with Ian's conduct where you can't specifically

19  recall?

20      A   Yes.

21      Q   Is there any way for you to estimate about

22  how many times an employee came to you outside of

EXHIBIT 2

White, David
February 5, 2021

74

1  those two instances?

2      **A  Two other times I believe.**

3      Q  Okay.  You were asked about whether or not

4  you wrote Ian up, correct?

5      **A  Yes.**

6      Q  After the meeting with Ian and Rochelle

7  Gobetz, you did E-mail your HR representative,

8  Burt Short, about that meeting, correct?

9      **A  Correct.**

10     Q  And while you don't recall when, you had a

11 phone call with Burt Short about the meeting as

12 well, correct?

13     **A  Correct.**

14     Q  And after the E-mail, you held a meeting

15 between you, Burt Short and Ian, correct?

16     **A  Correct.**

17     Q  And you were also asked about whether or

18 not Ian was counseled about any of the conduct

19 we've talked about at this deposition.  Was the

20 conduct that we've talked about during the course

21 of this deposition brought up at that HR meeting

22 with Burt Short?

EXHIBIT 2

White, David
February 5, 2021

75

1          A   Yes.

2          Q   And that included his attendance?

3          A   Yes.

4          Q   That included his comment about the office

5     being a dump?

6          A   Yes.

7          Q   That included his comment about the photo?

8          A   Yes.

9          Q   That included his meeting with you, Mr.

10    Macleod and Miss Gobetz?

11         A   Yes.

12         Q   And you don't recall any other specific

13    instances that were discussed during that meeting?

14         A   No.

15         Q   And you didn't reach out to Mr. Marzen

16    about the decision to terminate Ian before he was

17    terminated, correct?

18         A   Correct.

19         Q   So you don't know one way or the other if

20    Mr. Marzen was involved in the decision?

21         A   I do not.

22         Q   You were asked about timecards used in the

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

76

1    building for security purposes?

2        **A  Yes.**

3        Q  Do you know whether or not those timecards

4    save a timestamp?

5        **A  I do not.**

6        Q  If they do save a timestamp, do you have

7    any idea how long that type of information is

8    stored or saved?

9        **A  I do not.**

10       Q  And you were asked about if you had any

11   other evidence regarding when Mr. Macleod left the

12   office.  Do you recall that?

13       **A  Yes.**

14       Q  Is it fair to say you don't have any

15   evidence other than your testimony as you sit here

16   today?  Is that correct?

17       **A  Correct.**

18       Q  But you don't know what any other witness

19   might testify to?

20       **A  That's correct.**

21       Q  And you don't know what any documents that

22   you haven't seen might attest to?

EXHIBIT 2

White, David
February 5, 2021

77

1     **A  No.**

2         MR. NELLANS:  Counsel, those are all my

3    questions, pending any follow-up by you.

4         MR. LANGONE:  Yeah, just a few quick

5    follow-up.

6           FURTHER EXAMINATION

7          By:  Mr. Langone

8     Q  In the meeting with Mr. Short that you

9    just went over with your counsel, Mr. Macleod was

10   not present at that meeting, correct?

11    **A  Which meeting are you referring to?**

12    Q  The one where he just asked you if you had

13   brought up about the photo and about the dump and

14   the lateness with Mr. Short, that was your call to

15   Mr. Short prior to involving Mr. Macleod, correct?

16    **A  No, I believe that was the meeting -- I**

17   **think you're referring to the meeting where it was**

18   **me, Burt and Ian.**

19    Q  Okay.  The termination meeting, the

20   pretermination meeting?

21    **A  No.  It was the meeting where Ian was**

22   **allowed to hear the things that had happened and**

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

78

1    **that HR was allowed to speak to him about that.**

2    **That's the meeting I think you're talking about,**

3    **but you have to be more specific.**

4    Q   The investigatory, the pretermination,

5    that was not a counseling meeting, that was the

6    meeting to determine that he should be terminated,

7    correct?

8    **A  No, not correct.  It was not a**

9    **pretermination meeting.**

10    Q   What was the purpose of the meeting?

11    **A  To counsel Ian on the things that had**

12    **happened.**

13    Q   But he wasn't given an opportunity to

14    improve his performance; he was terminated shortly

15    thereafter, right?

16    MR. NELLANS:  Objection, argumentative,

17    calls for a legal conclusion.  Subject to those

18    objections, you can answer.

19    THE WITNESS:  I don't know what the time

20    frame was and I'm not -- I don't have an answer

21    for you.

22

EXHIBIT 2

White, David
February 5, 2021

79

1    BY MR. LANGONE:

2        Q   Okay.   I mean usually a counseling meeting

3    would be you have a counseling meeting to say,

4    look, you're coming in late, if you continue to

5    come in late, you're going to be terminated, and

6    then the employee is given an opportunity to like

7    see if they start coming in on time or not, right?

8    That's what a counseling meeting would be, right?

9    You bring a deficiency to an employee's

10   performance and then you see if they take that to

11   heart and change their performance, correct?

12           MR. NELLANS:   Objection, argumentative.

13   You can answer.

14           THE WITNESS:   You're giving me your

15   opinion.   I don't really -- is that a question?

16   BY MR. LANGONE:

17       Q   I'm asking if that's consistent with your

18   understanding of what a counseling meeting would

19   be?

20       **A   I don't know that I agree with you.**

21       Q   No?   What's a counseling meeting in your

22   mind?

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

80

1      A  I guess I never thought of it.  I don't

2   know.

3      Q  Okay.  Well, after meeting with Mr. Short,

4   did Mr. Macleod come in late again or leave early

5   again to your knowledge?

6      A  I can't recall.

7      Q  Did he call the office a dump again?

8      A  I don't know.

9      Q  Did he say it was bullshit that he had to

10  have his photo taken?

11     A  I don't recall.

12     Q  Was he insubordinate towards you?

13     A  Not that I recall.

14     Q  Okay.  So if it was a counseling meeting

15  where he was told these are problems, he didn't do

16  any of the things after that meeting before he was

17  terminated again, correct, to your knowledge?

18     A  Can you ask me that again?  I'm not

19  following what you're asking me.

20     Q  If this meeting with Mr. Short and Mr.

21  Macleod is to be deemed a counseling meeting where

22  it was brought to his attention that he called the

EXHIBIT 2

White, David
February 5, 2021

81

1   office a dump and he had come in late or left

2   early or that he said it was bullshit that his

3   photo would be taken or that he was insubordinate

4   to you, after that meeting with Mr. Short and you

5   and before he was terminated, he never did any of

6   those things again, correct?

7       **A   I don't know if he did or if he didn't.**

8       Q   It was not brought to your attention that

9   he did, correct?

10      **A   No, it was not brought to my attention.**

11      Q   And then these two other employees you

12  mention that made comments about Mr. Macleod,

13  you're saying you cannot recall their names?

14      **A   I know their names.**

15      Q   What are their names?

16      **A   Scott Ebeling, S-c-o-t-t, Ebeling**

17  **E-b-e-l-i-n-g.**

18      Q   Okay.

19      **A   The next one is Rob R-o-b, Dagget**

20  **D-a-g-g-e-t.**

21      Q   Okay.  You just can't recall what they

22  said?

EXHIBIT 2

White, David
February 5, 2021

82

1       **A   I can't recall specifically what was --**

2   **what their comments were, but they weren't**

3   **positive.  But because I can't be specific, I can**

4   **tell you that they both brought things to my**

5   **attention, but I can't recall them exactly.**

6       Q   And you didn't write it down, correct?

7       **A   Correct.**

8       Q   And you didn't bring it to Ian's

9   attention, correct?

10      **A   Correct.**

11      Q   And what position do these two people

12  hold?

13      **A   Scott Ebeling is a senior product manager.**

14      Q   Okay.

15      **A   And Rob Dagget is data analytics,**

16  **something with IT and data analytics.  I'm not**

17  **sure what his title is.**

18      Q   And are they both still with the company?

19      **A   Yes.**

20      Q   Okay.

21          MR. LANGONE:  No further questions.

22          MR. NELLANS:  No further questions from

EXHIBIT 2

White, David
February 5, 2021

83

1    me.

2            MR. LANGONE:  Okay.  Are you going to

3    reserve signature?

4            MR. NELLANS:  We'll waive.

5            MR. LANGONE:  Waive signature?  Okay.

6    I'll take the transcript on a regular basis, PDF,

7    mini and full size.

8            MR. NELLANS:  Same order for us, we'll

9    take a condensed and a full size.

10

11

12            AND FURTHER DEPONENT SAITH NOT

13

14

15

16

17

18

19

20

21

22

EXHIBIT 2

White, David
February 5, 2021

84

1   STATE OF ILLINOIS  )

                     ) SS.

2   COUNTY OF DU PAGE  )

3        I, JENNIE SIOLIDIS, C.S.R., in and for the

4   State of Illinois do hereby certify that DAVID

5   WHITE was first duly sworn by me to testify the

6   truth; that the above deposition was recorded in

7   shorthand and reduced to typewriting by me; that

8   the deposition is a true, correct and complete

9   transcript of the entire testimony given by the

10  said witness at the time and place hereinabove set

11  forth, and that signature is hereby waived by said

12  witness.

13    I further certify that I am not counsel for, nor

14  in any way related to any of the parties to this

15  suit, nor am I in any way interested in the

16  outcome thereof.

17    In witness hereof, I have hereunto set my hand

18  and affixed my Notarial Seal this 16th day of

19  February, A.D., 2021.

20

21                  _____

22                  JENNIE SIOLIDIS

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

85

| A | | | | | B |
|---|---|---|---|---|---|
| A-s-h-... 53:5 | 49:15 | 18:10 | 5:16 | 4:21 | B-a-n-... |
| A.D 84:19 | 51:2 | 52:17 | approp... | 7:10 | 10:21 |
| a.m 1:10 | 54:4,5 | angry 34:3 | 32:12 | 46:20 | B-i-r-... |
| 61:15 | actual | answer 5:5 | 34:6 | 66:20 | 27:19 |
| ability | 63:20 | 5:6,11 | 44:13 | 79:17 | B-r-a-... |
| 56:14 | admini... | 5:17 | approx... | 80:19 | 53:5 |
| 66:11,12 | 4:5 | 23:13 | 12:19 | aspect | B-u-r-t |
| able 39:18 | advance | 28:3 | argume... | 30:13 | 31:15 |
| 61:5,9 | 54:1 | 32:7 | 56:1 | assume | Bachel... |
| account | advancing | 34:15,18 | 78:16 | 14:2 | 6:21 7:1 |
| 9:13 | 41:20 | 36:3 | 79:12 | assumed | back 21:16 |
| 10:3 | affixed | 38:19 | arrive | 18:6,12 | 40:17 |
| 11:4,10 | 84:18 | 39:10 | 33:8 | 19:3,7 | 41:2 |
| 11:18,20 | age 55:11 | 41:13 | 36:9 | assumes | 43:18 |
| 11:21 | 55:20 | 46:8,12 | arrived | 23:12 | 72:9,15 |
| 12:1,7,8 | 56:13 | 46:19 | 36:7 | 38:19 | 72:18 |
| 12:9,12 | agitated | 48:10 | 38:16 | 43:8 | backgr... |
| 12:16 | 34:3 | 50:22 | arriving | 48:9,15 | 19:18 |
| 13:7,8,9 | 63:3 | 56:2,16 | 36:20 | 56:21 | Banistiar |
| 14:20,22 | 64:4 | 56:22 | 37:5 | attend... | 9:20 |
| 15:2 | ago 18:10 | 57:10,20 | Ashley | 75:2 | base 22:5 |
| 21:19 | 18:11 | 58:4 | 53:5 | attention | based |
| 22:12,20 | 49:12 | 59:14 | asked 7:21 | 26:1,16 | 37:15 |
| 23:1 | 71:19 | 60:12 | 13:13 | 29:8 | 50:7 |
| 27:4,11 | agree | 68:6 | 16:9,12 | 69:15 | 58:14 |
| 27:12,21 | 41:18 | 78:18,20 | 16:14 | 80:22 | basic |
| 73:4,4,7 | 42:4 | 79:13 | 26:2 | 81:8,10 | 37:12 |
| accounts | 79:20 | anybody | 33:17 | 82:5,9 | Basically |
| 14:3 | agreement | 18:22 | 34:4 | attest | 7:11 |
| 18:13 | 23:9 | 41:5 | 35:14 | 76:22 | basis |
| 21:18 | ahead | 44:22 | 41:15 | attitude | 29:22 |
| achiev... | 38:19,21 | apologies | 42:14,15 | 35:1,3 | 30:1 |
| 6:20 | allowed | 8:18 | 42:22 | 66:5 | 64:13 |
| act 45:20 | 34:19 | 52:2 | 44:11 | audible | 83:6 |
| acting | 42:3 | apologize | 46:9 | 5:6 | Bates |
| 44:13 | 77:22 | 14:13 | 57:5 | August | 60:18 |
| 46:12 | 78:1 | Appare... | 62:19,22 | 23:7,10 | 67:5 |
| action | Alt 14:9 | 56:17 | 63:5 | author | beginning |
| 61:21 | Americas | appear | 64:1 | 67:17 | 23:11 |
| actions | 8:4,17 | 15:22 | 73:8 | aware | 24:20 |
| 32:11 | analytics | appeared | 74:3,17 | 32:11 | behalf 2:6 |
| activi... | 82:15,16 | 2:6,13 | 75:22 | 38:13 | 2:13 |
| 47:17 | and-a-... | appearing | 76:10 | 39:2,4 | 4:20 |
| | 15:9,13 | 5:2 | 77:12 | 59:21 | 41:20 |
| | 17:2 | apprec... | asking | 60:3 | |

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

86

| | | | | | |
|---|---|---|---|---|---|
| believe | bottom | 70:13 | certain | 72:9 | 28:15 |
| 17:9 | 69:17 | 74:8,11 | 17:18 | 79:5 | 41:21 |
| 19:6 | Box 2:3 | 74:15,22 | 55:20 | 80:4 | 58:16,17 |
| 26:17 | Brandt | 77:18 | Certified | 81:1 | 82:18 |
| 30:19 | 53:5 | business | 1:17 | coming | compet... |
| 35:7 | break 5:14 | 6:12 | certify | 65:18 | 8:6 |
| 37:3,15 | 5:18 | 13:21,21 | 84:4,13 | 79:4,7 | complete |
| 60:13 | 40:9,14 | 14:4 | chance | commence | 67:12 |
| 73:3 | 72:4,12 | 21:13 | 48:1 | 7:5 | 84:8 |
| 74:2 | bring 79:9 | 22:19 | change | comment | completed |
| 77:16 | 82:8 | 50:19 | 79:11 | 35:12 | 33:17 |
| benchmark | bringing | | Charles | 75:4,7 | compli... |
| 54:7 | 26:15 | ——— C ——— | 1:4 | commented | 71:2 |
| 56:9 | brought | C-o-l-i-n | chart 12:2 | 64:10 | compound |
| BENJAMIN | 29:8 | 15:16 | checks | comments | 32:7 |
| 2:9 | 33:1,3,5 | C-o-p-... | 19:19 | 25:9,21 | 39:9 |
| best 10:17 | 36:6 | 20:20 | Chicago | 33:7 | 46:7 |
| better | 47:11,15 | C.S.R 84:3 | 2:10 | 35:2,6 | 48:9 |
| 56:20 | 69:14 | call 33:4 | CHRIS 2:3 | 35:15,21 | 57:9 |
| big 61:10 | 74:21 | 33:5 | Civil 1:14 | 57:6 | computer |
| Birgin | 77:13 | 49:20 | claim | 71:4 | 33:21 |
| 25:19 | 80:22 | 74:11 | 27:22 | 81:12 | 42:6 |
| 27:17 | 81:8,10 | 77:14 | 38:10 | 82:2 | concerned |
| bit 71:12 | 82:4 | 80:7 | 66:5 | Commer... | 29:10 |
| 72:5 | building | called | clarify | 6:17 | conclu... |
| bnella... | 65:4,5 | 1:12 4:8 | 5:11 | commonly | 57:19 |
| 2:11 | 76:1 | 80:22 | clear | 50:17 | 58:16 |
| Bob 9:20 | bullshit | Calling | 37:15 | commun... | 70:5 |
| 11:8 | 26:5 | 50:5 | client | 36:15,16 | 78:17 |
| 14:12,14 | 28:16 | calls 54:5 | 4:20 | 36:22 | condensed |
| 14:14,16 | 32:19 | 57:19 | clock | 37:3,7 | 83:9 |
| 14:18 | 35:13 | 78:17 | 64:17,17 | commun... | conduct |
| 17:9,14 | 80:9 | capacity | closer | 38:2 | 47:13 |
| 52:2,4 | 81:2 | 6:3 8:14 | 63:19 | 59:14 | 51:9 |
| 53:16 | Burt 31:15 | 8:19 9:2 | cold 54:4 | commun... | 73:10,18 |
| 55:5 | 32:9 | card 65:4 | Colin | 52:22 | 74:18,20 |
| Bob's | 33:4 | care 25:22 | 15:15,16 | companies | confer... |
| 14:13 | 34:9 | Careers | 17:5 | 6:17 | 33:15 |
| 52:3 | 49:1 | 20:17 | college | company | 40:5 |
| born 55:3 | 52:22 | Carter | 7:9,14 | 13:22 | 41:3 |
| boss 34:5 | 53:2 | 9:20,22 | combines | 18:7 | 47:15 |
| 43:13 | 58:18 | 11:19 | 54:3 | 19:9 | 48:2,3 |
| 45:14 | 61:14 | case 4:21 | come 16:8 | 20:17 | confid... |
| bothered | 67:4,17 | 33:20 | 16:9 | 24:21 | 23:9 |
| 26:19,20 | 69:12 | 43:17 | 27:7 | 27:15,20 | confused |

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

87

16:16
69:19
consis...
79:17
consult
17:12
consulted
58:19,20
58:22
consul...
59:9
contacted
60:6
content
40:7
context
26:15
continue
79:4
continued
64:3,3
continues
70:10
contin...
71:12
conver...
26:7
27:1
33:12
34:8,9
68:4
conver...
37:4
62:7,14
70:14
Copier
20:17,19
copy 61:1
61:5,7
copying
20:19
correct
8:18
10:13
14:4

29:11,12
34:12
35:17,22
37:1
38:8
40:2
46:17
47:4
49:19
52:7
59:6,9
59:10
60:7,8
60:10
61:15,16
61:19,20
63:7,14
63:15,17
63:18,21
63:22
64:6,20
65:18
66:3,4
67:12,14
67:22
68:1,4
68:11
73:10,14
73:15
74:4,8,9
74:12,13
74:15,16
75:17,18
76:16,17
76:20
77:10,15
78:7,8
79:11
80:17
81:6,9
82:6,7,9
82:10
84:8
counsel
30:8

40:6,21
43:10
60:22
77:2,9
78:11
84:13
counseled
30:12
35:22
36:4
74:18
counse...
30:18
31:6
32:5
78:5
79:2,3,8
79:18,21
80:14,21
County
1:18
84:2
course
74:20
court 1:1
4:2,6
5:1,6
18:3
Courts
1:15
criteria
54:6
current
22:22
currently
5:21
9:18,19
customer
9:13
21:18,19
22:5,11
22:20,22
23:1
25:20
27:21

customers
22:2

—————
D
—————
D 3:1
D-a-g-...
81:20
Dagget
81:19
82:15
daily 24:9
damn 34:1
44:8,16
45:10
63:11
data 65:17
82:15,16
date 13:3
23:4,16
23:19,22
41:8
49:5
52:16
53:10,18
58:21
dated 67:5
69:7,11
dates
15:20
70:17
Dave 37:16
David 1:9
1:12 3:2
4:7,15
9:21
11:13
69:20,21
70:12
71:14
84:4
day 33:18
38:14,17
39:6,15
39:18,19
39:20

41:11
42:16
64:9
84:18
day-to...
9:11
21:16
days 37:22
38:3
39:17
41:22
62:1,4
decade
55:2
decision
19:17
20:4,6
29:5,7
47:20
75:16,20
decisi...
57:16
58:2
decisions
19:2,11
20:1
dedicated
22:3,4
deemed
80:21
Defendant
1:7 2:13
defici...
79:9
Degree
6:21 7:2
delays
42:5,10
demons...
66:13
Denise
9:20,22
deny 70:6
71:7
depart...

42:11,11
DEPONENT
83:12
deposi...
1:8,12
4:16
40:15
72:13
74:19,21
84:6,8
deposi...
1:16
describe
9:10
17:13
21:21
22:17
24:11
50:3
described
34:15
50:10
desk 42:20
44:11
detail
41:2
determine
50:7
78:6
develo...
21:13,14
differ...
45:2
different
14:14
16:6
22:1
differ...
42:7
direct
18:20
67:22
directed
44:22

EXHIBIT 2

White, David
February 5, 2021

88

| | | | | | |
|---|---|---|---|---|---|
| 44:20 | 60:17 | 63:19 | employees | 53:21 | 22:2,4 |
| direction | 67:1 | 66:16 | 31:6 | Event 8:22 | exists |
| 29:19 | docume... | 67:9,15 | 36:8,10 | events | 65:17 |
| directive | 23:15 | 68:2 | 36:17 | 63:20 | expect |
| 64:6 | documents | 69:6,10 | 51:14 | everybody | 25:3 |
| directly | 15:22 | 69:10,14 | 56:20 | 5:15 | 48:6 |
| 18:19 | 23:6,8 | 74:7,14 | 73:8,17 | everyt... | expect... |
| director | 23:10 | E-mails | 81:11 | 5:4 | 36:11,13 |
| 17:19,21 | 39:3 | 54:5 | employ... | evidence | 36:15,16 |
| 18:8 | 76:21 | earlier | 7:5 17:1 | 76:11,15 | 37:1,2,6 |
| 19:12,13 | doing | 60:14 | 23:8 | evidently | 37:7 |
| 19:21 | 19:18 | 64:9 | 54:8 | 67:17 | expect... |
| 20:5 | 32:11 | early 23:7 | 61:22 | exact | 24:22 |
| 58:19 | 46:11 | 80:4 | 62:9 | 23:22 | 25:1,2 |
| direct... | 68:12 | 81:2 | 67:10,13 | 49:5 | 31:1 |
| 17:22 | 71:2 | Ebeling | employ... | 51:10 | expected |
| discip... | Drake 7:3 | 81:16,16 | 51:8 | exactly | 54:1 |
| 30:21 | 7:4 | 82:13 | encoun... | 47:8 | expecting |
| 31:2 | Drive 2:9 | educat... | 51:3 | 82:5 | 66:10 |
| 50:16 | DU 84:2 | 6:20 | Energy 1:6 | examin... | expedite |
| discover | duly 4:4,9 | effect | 6:1,6,11 | 1:13 3:5 | 72:5 |
| 4:20 | 84:5 | 43:22 | 8:3,5 | 4:11 | expense |
| DISCOVERY | dump 25:18 | eight | 9:9 | 72:19 | 33:19 |
| 1:8 | 26:11,21 | 50:22 | 30:20 | 77:6 | 34:1 |
| discre... | 28:22 | either 9:5 | 44:17 | examined | 41:19 |
| 17:12 | 35:13 | electr... | 45:4 | 4:9 | 44:8 |
| discuss | 64:10 | 6:13,15 | 51:13 | example | 62:20 |
| 41:1,2 | 73:14 | elevator | 64:19 | 30:5,7 | 63:5,7 |
| 59:4 | 75:5 | 65:5 | 67:20 | excited | expenses |
| discussed | 77:13 | EMA 33:21 | engaged | 66:15 | 42:1 |
| 49:16 | 80:7 | 42:18 | 25:3 | excuse | experi... |
| 75:13 | 81:1 | 43:1 | 47:14 | 34:4 | 29:20 |
| discus... | DuPage | 62:22 | enlarge | 44:12 | explain |
| 28:17,20 | 1:18 | 71:13,15 | 60:21 | 46:10 | 25:20 |
| 64:3 | ————— | employed | enter 63:1 | 64:2 | explained |
| discus... | E | 5:21 6:2 | 65:7 | executive | 32:10 |
| 36:19 | E 3:1 | 6:5 | entire | 10:3 | 66:9 |
| 55:10 | E-b-e-... | 14:20 | 10:7 | 11:4,18 | explai... |
| disputing | 81:17 | employee | 84:9 | 11:20 | 25:6 |
| 59:22 | E-mail | 50:15 | EOC 39:3 | 12:1,7,8 | 30:2 |
| District | 59:17,22 | 51:3,7 | essence | 12:16 | extent |
| 1:1,1,15 | 61:13,17 | 73:22 | 22:21 | 15:2 | 57:19 |
| document | 62:1,5 | 79:6 | estimate | 27:13 | ————— |
| 38:5 | 62:15,18 | employ... | 73:21 | 73:4,7 | F |
| 40:1 | 63:11,14 | 79:9 | evaluated | existing | fact 38:15 |

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

89

60:5
factors
38:12
facts 4:21
23:13
38:19
43:9
48:10,16
56:22
58:15
68:19,21
failure
67:12
fair 19:10
46:4
57:15
76:14
far 32:17
fashion
39:2
February
1:9
84:19
Federal
1:13
feedback
25:13,14
feel 5:9
29:14
44:4
felt 29:21
female
11:1,2
field
29:18
filed 39:3
fill 20:12
filling
20:9
Financial
8:13,18
fine 40:12
fired
34:11
44:19

first 4:9
5:17 6:9
7:9 19:4
26:1
36:8
39:19
42:22
43:3,4
59:11
60:9
68:3,8
68:19
84:5
five 6:4,7
10:12
11:11
12:20
16:19,21
27:12
40:11
51:12
72:7
focus 22:8
follow
14:1
follow-up
72:3
77:3,5
following
30:3,9
68:20
80:19
follows
4:10
40:16
72:14
form 23:12
28:2
32:6
34:13,17
36:2
38:18
43:8
46:6,18
48:8,15

56:15,21
57:18
60:11
68:5
forth
84:11
four 9:16
9:18
12:3,12
16:16
22:13
49:11
71:18
fourth
39:19
frame
62:12
78:20
frankly
25:12
free 5:9
Friday
70:11
front
44:14
frustr...
44:21
Fukumoto
25:16
26:8,10
Fukumo...
27:3
fulfill
13:17
24:22
25:1
full 4:14
83:7,9
further
71:12
77:6
82:21,22
83:12
84:13

---G---
G 11:13
G-a-u-l-t
14:10
G-r-i-...
11:15
gas 6:14
6:16
Gault 14:7
14:9,10
15:11
17:8
51:20
52:11
53:1,3
54:11
generally
51:1
genera...
50:19
gentleman
19:3
getting
41:21
42:5,10
give 30:5
35:18
45:16
70:2
given 5:4
30:22
34:16
50:15
51:7
52:18
53:13
54:1
64:6
78:13
79:6
84:9
giving
79:14
go 7:20
38:19,21

40:17
41:2
65:16
72:15
Gobetz
16:1,20
33:11
38:15
39:7
41:4
44:12
52:5,6
61:18
74:7
75:10
God 34:1
44:8,16
45:10
63:11
going 7:20
31:8
34:1
37:16
40:7
44:7
45:19,19
45:20
46:4
47:3,7
60:16
66:10
71:20
72:2,18
79:5
83:2
good 35:4
69:22
70:1,4
71:3
72:11
graduated
7:14
gradua...
7:4
gradua...

7:6,6
Great 5:20
Greg 14:7
15:11,12
17:8,14
51:20
52:11
Grinitzky
9:21
11:15
group
21:19,21
21:22
22:12
37:11,14
42:20
58:15
groups
22:8
guess 7:16
11:20
27:6
41:1
69:5
80:1
Gust 67:7

---H---
half-hour
71:13
hand 4:3
63:17
84:17
handful
72:21
hands 44:6
44:11
happened
20:22
69:20
77:22
78:12
happening
49:21
hard 61:5

EXHIBIT 2

White, David
February 5, 2021

```
   61:7              82:12            62:22            46:1,12          66:12            26:3
hear 25:11        Hon 1:4           64:3           incident         install         invest...
   77:22          honestly          68:18            35:1          42:22             32:3
heard                31:19          69:11            73:12         installed         68:14,20
   15:21             56:9           70:17,21      incidents          33:21            69:1
heart             hope 57:11        71:13            29:4          42:2,21        invest...
   79:11             57:13          74:4,6        included          71:13,16          68:18
held 8:2          HR 31:4,16        74:15,18         75:2,4,7     instance           78:4
   74:14             33:4           75:16            75:9           51:11         invited
help 42:20           34:9           77:18,21      includes        instances          21:5
herein...            49:1           78:11            54:4           73:9,16      involved
   84:10             50:1,5      Ian's           including           74:1            17:6,8
hereof               53:2           20:18            38:19          75:13            17:10
   84:17             58:15          26:1          incorrect       instit...          19:1,17
hereunto             59:6,8         34:9            8:15            7:1             19:22
   84:17             74:7,21        38:13            37:2         insubo...          20:6
Hi 4:13             78:1           73:18         incorr...          51:5            21:17
higher            human            82:8            19:5            80:12            59:13
   12:4,9            19:17       ID 65:3         indicate           81:3            75:20
highest           hungry         idea 54:14        55:11        insubo...        involv...
   6:19             57:7,12         54:21            64:1           32:16,20         21:22
hire 17:11        hypoth...         55:21        indicated          47:17            60:9
   20:7             46:7            76:7            49:18           49:16      involving
   26:18        ─────────────     ideas 30:4     indicates          67:11            77:15
hired 6:9            I              30:6,9         67:9          intera...        issue
   14:4         Ian 1:2         identi...       indica...          22:14,18         29:10
   15:12,14         4:20           35:10           54:3           24:5,7           36:7
   15:15,16         12:15       identify        indivi...          25:10            59:12
   16:12,13         16:12,13        9:17           15:15        intera...          61:6
   17:5,15          20:7        IL 2:4,10       Indivi...          29:13,14     issues
   17:19            21:4,7      Illinois         33:3            29:15            73:9,17
   20:14            25:1,7         1:1,19       indivi...        intere...    ─────────────
   21:12            25:19,21        84:1,4         14:18           84:15            J
   23:3,4           26:3,10     immedi...       indivi...        interview     J 2:9
   23:14            27:22           7:6            17:14           20:3         Jack 67:16
   55:7             28:9,17     important      indust...          21:6            67:18,19
   66:9             28:20           41:19          6:17         interv...        Jeff 67:7
hires 25:3          32:9           42:1,2      inform...          21:3         JENNIE
hiring              33:10,12    improper         20:15,18      intimi...          1:16
   17:6,8           33:16,17        46:7           23:16          34:7            84:3,22
   17:11,16         34:5        improve        inform...          43:6,11      job 7:9
   19:1,11          37:12,20        78:14          69:3           43:14,21         8:2  10:1
   19:22            38:7        inappr...      initiated          44:3,5           13:14
hold 7:18           39:21           32:15          46:16          63:14           15:1
   73:6             61:18           43:15          58:8,12     introduce          21:11,17
                                                initia...
```

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

91

| | | | | | |
|---|---|---|---|---|---|
| 24:16 | 34:6 | 65:20 | 46:15 | 25:5,8 | **long** 6:2,5 |
| 30:13 | 44:15 | 66:17 | 47:1 | **leave** 18:6 | 8:8 9:4 |
| 31:1 | 45:16 | 67:8 | 48:11,13 | 33:9 | 10:4 |
| 32:4 | 50:15 | 68:7 | 48:17,19 | 43:16 | 11:5,9 |
| 33:22 | 51:7 | 70:19 | 56:4,18 | 65:22 | 27:10 |
| 42:3,17 | 52:18 | 71:17,18 | 57:2,14 | 80:4 | 31:20 |
| **jobs** 7:13 | 53:13 | 75:19 | 58:1,7 | **leaves** | 76:7 |
| 7:18 | 57:7 | 76:3,18 | 60:15,22 | 64:12,14 | **longer** |
| **joining** | 65:3,8 | 76:21 | 61:8 | **Leaving** | 17:20 |
| 28:14 | **knew** 41:11 | 78:19 | 68:9 | 65:21 | 18:7 |
| **Judge** 1:4 | **know** 5:1 | 79:20 | 72:6,9 | **Led** 55:12 | 53:2 |
| **July** 15:6 | 5:15 | 80:2,8 | 72:16,17 | **left** 14:1 | **look** 46:1 |
| 15:6 | 10:6 | 81:7,14 | 77:4,7 | 18:5 | 79:4 |
| **jump** 21:16 | 12:17 | **knowledge** | 79:1,16 | 36:8 | **looked** |
| | 18:2,5 | 45:5 | 82:21 | 66:3 | 26:11 |
| **K** | 18:12,16 | 71:15 | 83:2,5 | 69:19,21 | 28:22 |
| **Kelleher** | 19:18 | 80:5,17 | **langon...** | 76:11 | **looking** |
| 67:16,18 | 23:7,9 | **known** | 2:5 | 81:1 | 7:16 |
| 67:19 | 26:17,18 | 50:17 | **language** | **legal** | 20:12 |
| 69:12 | 28:10 | | 34:6 | 57:19 | 23:6 |
| **Kevin** | 31:22 | **L** | 43:14 | 78:17 | 39:21 |
| 25:16,17 | 36:12 | **label** | 44:10 | **legible** | **looks** |
| 26:8,10 | 39:3,15 | 60:18 | **laptop** | 61:10 | 35:12 |
| 26:17 | 39:16 | 67:5 | 42:6,10 | **let's** 5:20 | **looped** |
| 27:11 | 41:13,16 | **lack** 56:13 | 42:14 | 14:18 | 68:3,10 |
| **Key** 18:13 | 45:8,18 | **lacks** 66:5 | 43:3,5 | 36:6 | **lose** 45:19 |
| 54:3 | 45:19,20 | 66:8 | **late** 27:13 | 72:9 | **lost** 45:22 |
| **keycard** | 47:18 | **Lake** 64:20 | 79:4,5 | **letting** | 62:11 |
| 65:9,10 | 48:6 | 65:3 | 80:4 | 49:20 | **lot** 66:10 |
| **Kim** 14:12 | 49:21 | **Langone** | 81:1 | 50:1 | **loud** 44:1 |
| 15:7,8 | 50:1,17 | 2:2,3 | **lateness** | **level** 6:19 | 45:1 |
| 17:9 | 53:4 | 3:5 4:1 | 77:14 | **License** | **lowest** |
| 51:22 | 54:13,16 | 4:12 | **lateral** | 1:16 | 12:12 |
| 53:6,6,9 | 54:20 | 23:17 | 12:3 | **listed** | |
| 53:13 | 55:1,2,6 | 28:6 | **LAW** 2:2 | 69:3,3 | **M** |
| 54:19 | 55:8,9 | 32:13 | **lead** 9:12 | **listen** | **M-a-r-...** |
| 55:1 | 55:12,12 | 34:14,19 | 9:15 | 25:4,22 | 18:4 |
| **kind** 12:11 | 55:15,18 | 35:5 | 21:17 | 28:1,9 | **Macleod** |
| 20:10 | 55:19,20 | 36:5 | 34:19 | **little** | 1:2 4:20 |
| 21:21 | 56:7,8 | 38:20 | **leading** | 24:2 | 12:15,18 |
| 29:9 | 57:3,8 | 39:13 | 34:17 | 41:2 | 12:21 |
| 30:18,21 | 59:1,13 | 40:10,12 | **leads** 63:1 | 69:19 | 13:13 |
| 30:22 | 59:15,20 | 40:17,20 | **learn** | 71:12 | 20:7,9 |
| 31:1 | 60:14 | 43:10,18 | 66:11,14 | 72:5 | 20:14 |
| 32:4 | 61:1 | 43:19 | **learning** | **LLC** 1:6 | 23:3 |

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

| | | | | | |
|---|---|---|---|---|---|
| 24:6,12 | 25:20 | 68:16 | 81:4 | 72:10 | 53:16 |
| 30:8,12 | **manager** | 79:2 | **members** | **misstates** | 55:5 |
| 31:9,17 | 5:22 6:3 | **meaning** | 17:17 | 28:3 | **names** 9:17 |
| 33:2 | 6:9 8:4 | 62:19 | 19:2 | 48:9 | 16:11 |
| 36:20 | 8:8 9:3 | 66:19 | 20:2 | 60:11 | 51:19 |
| 39:2 | 9:6,7,10 | **meet** 17:17 | 26:3 | 68:6 | 81:13,14 |
| 41:5,10 | 22:20 | 17:21 | **memo** 67:4 | **mistake** | 81:15 |
| 49:18 | 23:1 | 37:18 | 67:17 | 16:18 | **natural** |
| 51:4,15 | 27:21 | 54:2 | **memora...** | **mold** 56:20 | 6:14,16 |
| 55:15 | 82:13 | **meeting** | 68:15,17 | **moldable** | **nature** |
| 56:5 | **manner** | 26:2 | **mention** | 57:8 | 6:12 |
| 59:5,12 | 37:7 | 28:13 | 81:12 | **moment** | 22:17 |
| 59:17,21 | **margin** | 31:3,10 | **mentioned** | 35:18 | **need** 5:14 |
| 60:6 | 54:4 | 31:12,14 | 15:22 | 70:2 | 56:20 |
| 61:19 | **Marzen** | 31:18,21 | 17:4 | **money** | 65:3 |
| 62:19 | 18:1,2,4 | 32:1,8 | 21:15 | 41:20 | 66:18 |
| 67:15 | 18:5,17 | 33:10,17 | 64:8 | **month** 24:3 | **needed** |
| 68:4,19 | 18:22 | 36:11 | **MES000102** | **months** 6:4 | 44:9 |
| 69:8,11 | 20:15,17 | 40:4,7 | 67:6 | 6:7 | 63:6 |
| 69:18 | 58:19,20 | 41:3,6,8 | **MES000126** | 10:12 | **needing** |
| 70:15,17 | 58:22 | 46:21 | 60:18 | 11:7,12 | 57:7 |
| 71:4 | 59:11,18 | 47:10,11 | **MidAme...** | 50:22 | **needs** |
| 73:3,5 | 60:4,6 | 47:15,16 | 1:6 6:1 | 51:12 | 66:19 |
| 75:10 | 60:10 | 48:2 | 6:6,11 | 67:12 | **Nellans** |
| 76:11 | 67:16,21 | 61:18 | 7:15 8:3 | **morning** | 2:9 3:6 |
| 77:9,15 | 68:2,3 | 62:18 | 8:6 9:9 | 39:8 | 23:12 |
| 80:4,21 | 69:12 | 69:19 | 10:8 | **moving** | 28:2 |
| 81:12 | 75:15,20 | 70:5,9 | 30:20 | 40:6 | 32:6 |
| **Macleod's** | **McCAMB...** | 70:13,21 | 44:17 | ——————— | 34:13,17 |
| 13:20 | 2:8 | 71:14 | 45:4 | **N** | 36:2 |
| 23:18 | **mean** 7:13 | 74:6,8 | 51:13 | **N** 3:1 | 38:18 |
| 39:5 | 13:2,5 | 74:11,14 | 53:22 | **N-y-g-...** | 39:9 |
| 57:16 | 13:19 | 74:21 | 64:19 | 19:6 | 40:6,11 |
| 61:22 | 14:3 | 75:9,13 | 67:20 | **name** 4:14 | 40:13,19 |
| 62:9 | 24:9 | 77:8,10 | 73:17 | 10:20 | 43:8,16 |
| 67:10 | 30:5 | 77:11,16 | **mind** 25:5 | 11:14 | 46:6,18 |
| 73:10 | 31:5 | 77:17,19 | 25:8 | 14:8,13 | 48:8,15 |
| **MAHONEY** | 32:1 | 77:20,21 | 47:3,6,9 | 14:18 | 56:1,15 |
| 2:8 | 45:9 | 78:2,5,6 | 79:22 | 15:21 | 56:21 |
| **making** | 47:17 | 78:9,10 | **mini** 83:7 | 16:8,9 | 57:9,18 |
| 20:4 | 52:13 | 79:2,3,8 | **minimum** | 17:22 | 58:3 |
| **male** 11:1 | 55:21 | 79:18,21 | 54:7 | 19:4,4,5 | 60:11 |
| **manage...** | 56:11,19 | 80:3,14 | **minutes** | 20:16 | 61:4 |
| 9:13 | 58:5,9 | 80:16,20 | 40:8,11 | 27:6,18 | 68:5 |
| 21:19 | 66:8,18 | 80:21 | 72:3,7 | 52:3,4 | 72:2,7 |

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

93

72:11,15
72:18,20
77:2
78:16
79:12
82:22
83:4,8
never 29:8
35:22
44:15
80:1
81:5
Nevert...
69:20
new 19:8
21:13,13
25:3,5,8
26:18
28:11
50:19
66:14
Nobel 8:4
8:17
Nobody's
45:3
Norgle 1:5
normally
48:6
NORTHERN
1:1
Notarial
84:18
note 69:21
notebook
42:6
notes 28:7
28:8
72:5
notice
55:22
notified
59:12,18
number
16:11
63:4

numbers
50:20
51:2
Nyguen
19:4,7

O

oath 4:4
4:22
Object
23:12
28:2
32:6
34:13,17
36:2
38:18
43:8
46:6,18
48:8,15
56:15,21
57:18
60:11
68:5
objection
39:9
43:16
56:1
57:9
58:3
78:16
79:12
object...
78:18
obtain 7:1
obtained
6:20
obviously
19:19
occupied
10:4
11:5
21:8
occupy
9:18,19
10:1

11:3,17
12:3,15
occur
31:12,21
occurred
27:1
33:10
41:3
October
23:22
24:1
61:14,19
61:22
62:2,8,9
62:13,13
67:5,11
67:16
69:7,11
70:11,13
70:15,15
70:18,18
70:21
offended
45:9,14
office
21:5
24:8,14
25:17,18
26:4
28:22
33:7
35:2,4
35:12
36:12
37:13
39:8
49:21
64:10
65:7,11
65:14
73:13
75:4
76:12
80:7
81:1

offices
26:11,21
Oh 16:8,14
okay 4:13
4:19  5:7
5:8,12
5:13,18
5:19,20
6:8  7:13
7:20  8:1
8:16  9:9
9:22
10:20
11:3,13
11:16
12:8
13:8,12
13:18
14:11,16
15:1,7
15:18,21
16:8,14
16:20
17:4
18:9
19:10
20:9,13
20:19,22
21:15
22:14
23:3,6
23:18
24:19
25:7,14
26:20
27:6,15
27:17,22
28:17
29:2
31:5,9
33:14
35:11
36:6,19
38:21
39:14

40:4,8
40:13
41:1,14
41:18
42:9,17
43:6
48:11,17
49:3
50:1
51:21
52:1,4
52:11
53:4,6
54:11
55:15
57:6
60:6,16
60:21
61:9,13
62:4,11
62:17
65:2
66:8
67:1,7,9
67:21
69:5,17
69:21
70:20
71:7,9
71:20,22
72:7
73:2
74:3
77:19
79:2
80:3,14
81:18,21
82:14,20
83:2,5
old 54:11
54:13,20
55:1,6
55:15,19
56:8
older

55:21,22
56:5
onboar...
19:19
One-on...
37:11
open 25:5
25:8
openly
37:16
opinion
79:15
opport...
13:22
opport...
4:19
78:13
79:6
options
50:8,9
oral 62:14
order 83:8
organi...
12:2
outcome
50:8
84:16
outside
36:12
73:22
overall
22:7
35:3
oversee
9:13

P

p.m 64:13
64:14
66:3
pad 65:5
page 3:4
69:18
70:11
84:2

EXHIBIT 2

White, David
February 5, 2021

94

| | | | | | |
|---|---|---|---|---|---|
| paired | 64:16 | 80:10 | position | presented | 80:15 |
| 22:20 | 65:13 | 81:3 | 6:8 9:22 | 58:15 | procedure |
| paragraph | 82:11 | phrase | 10:5,22 | president | 1:14 |
| 64:8 | percep... | 43:21 | 11:3,6,9 | 67:20 | 30:17 |
| part 6:18 | 56:14 | 44:16 | 11:16 | presum... | proced... |
| 17:16 | perfor... | 64:4 | 12:4,9 | 65:14,15 | 37:13 |
| 20:3 | 30:13 | picture | 12:12,15 | preter... | 46:17 |
| 34:9 | 32:4 | 26:2 | 13:2,6,6 | 77:20 | proceeded |
| 37:14 | 50:18 | 28:12 | 13:13 | 78:4,9 | 58:14 |
| partic... | 52:12,13 | 32:18 | 15:4 | pretty | procee... |
| 31:9 | 52:14 | 35:14 | 16:6 | 38:16 | 58:9,13 |
| 68:13,22 | 53:12,20 | place 31:3 | 17:20 | previo... | 59:6 |
| partic... | 53:21 | 33:13 | 18:7,12 | 32:22 | process |
| 69:2,4 | 54:3 | 34:8 | 19:8 | primarily | 17:13,16 |
| parties | 62:10 | 49:15 | 21:7,9 | 22:8 | 19:20,20 |
| 84:14 | 78:14 | 84:10 | 27:3,10 | primary | 20:3,13 |
| paying | 79:10,11 | Plaintiff | 27:20 | 58:2,5,6 | 46:22 |
| 26:1 | perfor... | 1:3 2:6 | 38:13 | Principal | 50:2,3,4 |
| PD 52:20 | 24:16 | 4:8 | 39:5 | 8:12,18 | procur... |
| PDF 83:6 | 29:15 | plan 52:20 | 73:5 | prior 8:12 | 42:11 |
| Peg 67:4 | period | 71:3 | 82:11 | 8:17,21 | produced |
| pending | 7:18 | plans | positions | 8:22 | 60:17 |
| 5:17 | 14:20 | 50:19,20 | 9:19 | 16:13,17 | 69:8 |
| 77:3 | 15:3 | play 29:4 | 12:3 | 23:16 | product |
| people | 17:1 | played | 19:11 | 28:3 | 82:13 |
| 9:14,18 | 24:6,13 | 29:7 | 20:11 | 33:2 | progre... |
| 9:18 | 24:20 | 38:10 | 27:8 | 35:22 | 30:21 |
| 12:17 | 47:14 | 47:20 | positive | 36:14 | promoted |
| 14:4,6 | person | please 4:3 | 82:3 | 48:9 | 27:12 |
| 16:10,15 | 10:14 | 44:12 | possible | 53:1 | promotion |
| 17:7,11 | 12:6 | 66:17 | 39:16 | 59:5 | 18:15 |
| 17:13,19 | 25:6 | 70:3 | potent... | 60:12 | promptly |
| 19:16,19 | 49:6 | PO 2:3 | 15:6 | 62:8,11 | 71:15 |
| 19:22 | pertai... | point | pre-dates | 68:6,10 | pronou... |
| 22:1,11 | 1:15 | 17:18 | 11:11 | 70:12 | 19:7 |
| 24:22 | phone 21:4 | 34:4 | predated | 77:15 | proof |
| 25:4 | 28:14 | 47:3 | 10:10 | priority | 64:16 |
| 28:14 | 49:8 | 58:19 | present | 33:18,20 | 66:2 |
| 30:21 | 74:11 | pointing | 2:1 26:7 | 41:11,16 | provided |
| 36:16 | phonet... | 31:7 | 31:14 | 42:15,16 | 20:18 |
| 37:16 | 10:18 | points | 35:19 | 62:20 | 21:2 |
| 42:6 | photo | 17:18 | 39:6 | 63:4 | providing |
| 44:15 | 73:13 | policy | 41:6 | probably | 69:2 |
| 54:1 | 75:7 | 30:21 | 66:15 | 15:9 | pull 61:6 |
| 57:21 | 77:13 | poor 35:4 | 77:10 | problems | punch 36:8 |

EXHIBIT 2

White, David
February 5, 2021

95

| | | | | | |
|---|---|---|---|---|---|
| 36:10 | 12:11 | 25:10 | 80:6,11 | **referred** | 12:4 |
| **purpose** | 13:8 | 30:3 | 80:13 | 68:14,22 | 14:3 |
| 31:7 | 14:14 | 45:9 | 81:13,21 | 69:6 | **relevant** |
| 78:10 | **quite** | 46:1,2 | 82:1,5 | 73:3 | 4:21 |
| **purposes** | 25:11 | 79:15 | **recalled** | **referring** | 19:13 |
| 31:5 | **quizzing** | **reason** | 73:12 | 25:2 | **remember** |
| 76:1 | 41:14,15 | 5:15 | **receive** | 32:9,14 | 15:19 |
| **pursuant** | **quotas** | 34:11,16 | 25:14 | 35:15 | 51:10 |
| 1:13 | 54:2 | 53:11,19 | 38:1 | 47:18 | 52:2 |
| **put** 28:13 | ——— | **recall** | 43:3 | 73:13 | 62:6,22 |
| 50:18 | **R** | 13:11 | **received** | 77:11,17 | 71:6,8 |
| **putting** | **R** 1:5 | 21:7 | 20:15 | **refers** | **rememb...** |
| 30:18 | **R-a-n-d-y** | 23:4,22 | 25:13 | 68:17 | 14:12 |
| ——— | 18:4 | 26:14,22 | 43:4 | **reflect** | **reminded** |
| **Q** | **R-o-b** | 29:3 | 52:20 | 56:12 | 34:5 |
| **question** | 81:19 | 30:11,12 | **recoll...** | **refresh** | 43:12 |
| 5:5,10 | **Rachel** | 30:15 | 23:19 | 30:16 | **remotely** |
| 5:12,16 | 16:1,1 | 31:13,19 | 30:17 | 50:12 | 5:2 |
| 5:17 | **Raise** 4:2 | 35:19 | 33:6 | 71:9 | **repeat** |
| 7:22 | **raised** | 36:21,22 | 39:11,12 | **regard** | 28:4 |
| 11:22 | 44:6 | 38:4 | 49:22 | 32:19 | 35:8 |
| 13:4 | 45:3 | 39:20 | 50:13 | 57:16 | 38:22 |
| 23:2 | **Randy** 18:1 | 41:8 | 71:10 | 61:21 | **rephrase** |
| 28:5 | 18:4,22 | 43:2,4 | **record** | **regarded** | 48:11,17 |
| 37:3 | 19:8 | 43:20 | 4:14 | 18:14 | **replaced** |
| 38:22 | 20:15 | 47:8,22 | 36:9 | 51:4 | 12:21 |
| 41:16 | 58:19 | 49:5,11 | 40:18 | **regarding** | 13:5,12 |
| 46:7,13 | 67:16,21 | 49:13,14 | 43:17 | 23:15 | **replied** |
| 48:12,18 | 68:2 | 50:11 | 56:11 | 59:22 | 62:21 |
| 56:3 | 69:11 | 51:6,11 | 65:13 | 62:9 | **report** |
| 59:7 | **Randy's** | 52:20 | 72:18 | 76:11 | 18:19,20 |
| 70:16 | 19:3 | 53:15 | **recorded** | **regional** | 26:13 |
| 79:15 | **reach** | 57:4 | 4:22 | 5:22 6:3 | 28:21 |
| **questions** | 22:22 | 62:16 | 84:6 | 6:9 9:6 | 33:19 |
| 4:22 5:9 | 75:15 | 64:15 | **recording** | 9:10 | 34:1 |
| 71:22 | **read** 61:4 | 66:21 | 5:3 | **regular** | 44:8 |
| 72:22 | 61:9 | 68:12 | **recruited** | 24:7,9 | 62:17,21 |
| 77:3 | **reading** | 69:16 | 21:8 | 83:6 | 63:5,7 |
| 82:21,22 | 70:2 | 70:4,7,8 | **recruiter** | **reimbu...** | **reported** |
| **quick** 40:8 | **ready** | 70:14,19 | 20:16 | 41:21 | 26:10 |
| 77:4 | 40:17 | 71:5,18 | **recrui...** | **related** | **reporter** |
| **quickly** | 72:15,17 | 73:19 | 20:16 | 84:14 | 1:17 4:2 |
| 28:8 | **realize** | 74:10 | **reduced** | **relati...** | 4:6 5:1 |
| **Quinn** 9:21 | 56:5,13 | 75:12 | 84:7 | 24:12 | 5:7 18:3 |
| 11:8 | **really** | 76:12 | **refer** 42:7 | **relative** | **reporting** |

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

96

73:9
reports
41:19
repres...
11:10,21
12:9
13:7,9
14:21,22
27:5,11
31:16
49:1
50:5
53:3
73:5
74:7
repres...
12:13
13:10
request
28:11
required
54:2
requir...
54:7
reserve
83:3
resources
19:18
respect
30:10
35:21
respected
50:19
responded
62:20
63:6
respon...
9:11
13:14,20
19:4,8
21:11,17
respon...
42:17,19
respon...
42:9

résumé
21:1,2
resumed
40:15
72:13
retail
6:13
revealed
68:20
review
32:4
72:4
right 4:2
7:9 8:2
34:16
41:21
42:10,12
45:17,22
46:5
58:2,9
64:10,17
65:14,22
71:3
78:15
79:7,8
Rob 81:19
82:15
Robert
4:15
Rochelle
16:2,3
16:20
33:11,16
34:4
38:15
44:12
46:10
61:18
64:1
74:6
role 29:4
29:7
38:10
47:20
room 33:11

33:15
40:5
41:3
48:2
roughly
7:13,17
15:5
17:3
22:12
Roy 67:4
Rules 1:14
————
S
————
S-c-o-t-t
81:16
S-h-a-...
10:19
S-h-o-r-t
31:15
SAITH
83:12
salary
23:15
sales 5:22
6:3,9
8:4,8,20
9:3,5,6
9:6,10
9:14
12:18
16:5,7
16:10,15
16:17
18:13
19:2,11
20:11
21:13,18
22:3,8
22:15
26:2
28:13
51:1,2
52:14
53:22
54:4

57:11
salesf...
57:7
salesp...
9:12
28:12
35:2,3
41:19
50:18
salesp...
9:6
22:19,21
23:2
24:14
25:16
Sam 25:19
26:1,4
27:17
28:8,10
28:15
satisf...
24:17
save 76:4
76:6
saved 76:8
saying
26:18
32:18
39:1
48:1
56:12
57:4
61:17
66:2
70:4,6,7
70:8
71:5,7
81:13
says 68:20
69:19
70:11,21
71:13
schedule
21:3
Scott

81:16
82:13
screen
60:16,19
61:2,5,6
61:10
screen...
71:20
Seal 84:18
second
39:19
64:9
security
65:5
76:1
see 28:14
42:13
60:18
62:17
63:1
69:17
70:10,20
79:7,10
seeing
39:16
seen 67:1
69:10
76:22
SEGAL 2:8
sell 13:21
13:21
14:4
sells
22:19
send 62:4
sending
62:1,15
senior
10:3
11:20,20
12:1,6,7
27:21
82:13
sent 59:17
59:21

61:13
67:15
sentence
68:19
69:18
70:21
September
23:5,11
23:20
Septem...
12:19
Services
1:6 6:1
6:6,11
8:3 9:9
30:20
51:13
64:20
67:20
set 42:17
54:6
62:22
84:10,17
seven
50:22
72:10
Shabnam
9:20
10:15,16
10:22
share
60:16
61:1,2
shared
60:4,7
Short
31:15
33:4
34:9
49:2,4
53:1,2
58:18
59:8
61:14
62:8,15

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

97

| | | | | | |
|---|---|---|---|---|---|
| 67:4,17 | 43:1 | **spell** | 5:1 | **suppose** | 31:2 |
| 69:12 | **sole** 17:12 | 10:17 | **step** 43:18 | 21:1 | 33:13 |
| 70:13 | **Solutions** | 14:8 | **Steve** | **supposed** | 40:14 |
| 74:8,11 | 8:5 | 18:3 | 14:12 | 45:15 | 49:15 |
| 74:15,22 | **somebody** | 19:5 | 15:7,8 | **sure** 35:9 | 61:21 |
| 77:8,14 | 44:21 | 27:17 | 17:8,14 | 40:10,12 | 72:12 |
| 77:15 | 45:4 | **spend** 22:6 | 51:22 | 45:6 | 80:10 |
| 80:3,20 | 66:14 | **split** 22:7 | 53:6 | 50:14 | 81:3 |
| 81:4 | **someone's** | **spoke** 21:4 | **stop** 71:20 | 62:6 | **takes** 31:3 |
| **shorthand** | 23:14 | 35:7 | **stored** | 66:20 | **talk** 36:6 |
| 1:17 | 54:21 | 49:1 | 76:8 | 68:16 | 38:7 |
| 84:7 | **sorry** 8:15 | 70:12 | **strategy** | 72:6 | **talked** |
| **shortly** | 16:3,14 | **spoken** | 71:1 | 82:17 | 32:16 |
| 7:5 | 20:22 | 44:22 | **Street** | **swear** 4:1 | 33:6,7,8 |
| 78:14 | **sounds** | **SS** 84:1 | 64:20 | **swipe** 65:4 | 33:10 |
| **show** 23:7 | 46:5 | **staring** | 65:3 | 65:10,21 | 34:21 |
| 60:17 | 72:11 | 45:13 | **strike** | **sworn** 4:9 | 49:17 |
| **sign** 23:15 | **South** 2:9 | **start** | 46:5 | 84:5 | 70:22 |
| **signature** | **speak** 10:2 | 14:18 | **subject** | **system** | 74:19,20 |
| 83:3,5 | 10:10 | 23:16,19 | 68:18 | 25:21 | **talking** |
| 84:11 | 49:3,6 | 46:22 | 78:17 | 42:2 | 32:1 |
| **signif...** | 65:19,19 | 79:7 | **subseq...** | 65:7,8,9 | 49:14 |
| 22:15 | 70:16 | **started** | 39:4 | **Systems** | 55:12 |
| **signing** | 78:1 | 7:15 | **substa...** | 9:1 | 78:2 |
| 23:8,10 | **specific** | 24:15,17 | 19:20 | ――――― | **targets** |
| **SINGER** 2:8 | 15:20 | 37:12 | **succes...** | **T** | 53:22 |
| **SIOLIDIS** | 30:7 | **starting** | 57:12 | **T-r-o-u-t** | **team** 9:12 |
| 1:16 | 39:20 | 8:3 | **suffic...** | 15:17 | 9:13,14 |
| 84:3,22 | 51:1,1 | **starts** | 66:18 | **table** 44:7 | 9:19 |
| **sit** 76:15 | 52:16 | 61:17 | **suit** 84:15 | 63:17 | 12:18 |
| **situation** | 53:10,18 | **state** 1:18 | **Suite** 2:10 | **take** 5:7 | 16:5,7 |
| 50:7 | 58:21 | 4:13 | **Summary** | 5:14 | 16:10,15 |
| **six** 11:7 | 75:12 | 84:1,4 | 68:18 | 26:2 | 16:17 |
| 67:12 | 78:3 | **stated** | **superv...** | 29:19 | 17:17 |
| **size** 83:7 | 82:3 | 20:2 | 21:17 | 35:14 | 19:2,12 |
| 83:9 | **specif...** | **statement** | **superv...** | 39:18 | 20:2 |
| **Skokie** 2:4 | 31:22 | 29:9 | 18:17 | 40:8 | 21:18 |
| **slammed** | 37:10 | 66:17 | 59:5,9 | 43:18 | 22:1,2,3 |
| 44:6 | 49:20 | **statem...** | 67:22 | 66:12 | 22:15,21 |
| 63:16 | 51:10 | 63:20 | **supplied** | 72:4 | 26:3 |
| **slamming** | 73:12,18 | **States** 1:1 | 21:1 | 79:10 | 57:12 |
| 44:10 | 82:1 | 1:14 | **supplier** | 83:6,9 | **telephone** |
| **software** | **specifics** | **stating** | 6:13 | **taken** 1:13 | 49:7 |
| 33:21,22 | 31:19 | 66:21 | **supply** | 1:16 5:4 | **tell** 37:10 |
| 42:2,18 | 49:11 | **stenog...** | 6:15 | 28:12 | 44:2 |

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

White, David
February 5, 2021

98

| | | | | | |
|---|---|---|---|---|---|
| 46:10,13 | 34:16,21 | 71:3 | 21:8 | 33:18,19 | 71:14 |
| 51:19 | 36:1 | 77:22 | 22:6,7 | 33:22 | 84:8 |
| 54:21 | 38:11 | 78:11 | 24:6,12 | 34:2 | **truth** 84:6 |
| 82:4 | 46:16 | 80:16 | 27:4 | 35:22 | **try** 34:7 |
| **telling** | 47:11,16 | 81:6 | 31:16 | 44:9 | 43:6,13 |
| 37:16 | 57:17 | 82:4 | 33:8,9 | 63:6 | **trying** |
| **temper** | 58:9,12 | **think** 25:7 | 35:20 | 64:5 | 5:11 |
| 45:20,22 | 58:14 | 29:15 | 36:7,9 | 71:2 | 43:21 |
| **ten** 62:1,4 | 59:4 | 37:20 | 36:20 | 80:15 | 44:2,4 |
| **terminate** | 60:1 | 47:19 | 37:4 | **tolerate** | 63:13 |
| 29:5,8 | 77:19 | 56:7 | 38:16 | 46:2 | **two** 8:10 |
| 47:4,7 | **terms** | 57:13 | 46:13,19 | **tomorrow** | 17:2 |
| 47:21 | 19:20 | 60:4 | 47:14 | 37:17 | 18:10 |
| 75:16 | 22:6 | 72:2 | 54:11 | **tone** 44:9 | 22:7 |
| **termin...** | 66:11 | 77:17 | 56:11 | 44:10 | 29:4 |
| 12:22 | **testified** | 78:2 | 62:12 | 48:6 | 72:3 |
| 23:21 | 4:10 | **third** | 63:20 | **top** 33:18 | 74:1,2 |
| 30:14 | **testify** | 39:19 | 65:2,6 | 33:20 | 81:11 |
| 31:10,20 | 33:1 | **Thirteen** | 65:13 | 41:10,16 | 82:11 |
| 32:2 | 76:19 | 9:8 | 67:19 | 62:19 | **type** 26:5 |
| 45:7 | 84:5 | **thought** | 68:8 | **total** 9:4 | 28:16 |
| 46:4,22 | **testimony** | 25:17 | 70:12 | **totality** | 76:7 |
| 48:2 | 28:3 | 26:5,11 | 72:1 | 34:22 | **types** 54:5 |
| 49:19 | 48:9 | 28:15 | 78:19 | **track** | **typewr...** |
| 51:14 | 60:12 | 32:18 | 79:7 | 65:16 | 84:7 |
| 52:7,9 | 68:6 | 35:13 | 84:10 | **train** | |
| 52:11,15 | 76:15 | 69:21 | **timecards** | 38:15 | **U** |
| 52:19 | 84:9 | 80:1 | 75:22 | 39:7,18 | **unders...** |
| 53:3,9 | **thereof** | **three** 6:4 | 76:3 | **training** | 5:10,12 |
| 53:14,17 | 84:16 | 6:7 | **times** | 24:21 | 11:22 |
| 53:19 | **thing** 11:8 | 10:12 | 73:22 | 25:4,12 | 13:4 |
| 54:12 | 41:19 | 11:12 | 74:2 | 29:18 | 59:7 |
| 55:7 | 46:21 | 14:17 | **timestamp** | 30:1,10 | **unders...** |
| 59:19 | 47:2 | 51:12,18 | 76:4,6 | **transc...** | 79:18 |
| 67:10 | **things** | 72:3 | **title** 10:1 | 83:6 | **unfulf...** |
| 75:17 | 24:21 | **Thursday** | 15:1 | 84:9 | 13:16 |
| 78:6,14 | 25:5,8 | 61:14 | 82:17 | **Transp...** | **United** 1:1 |
| 79:5 | 26:6 | **time** 5:15 | **today** | 9:1 | 1:14 |
| 80:17 | 30:2 | 7:14,15 | 49:16 | **TRC** 42:20 | **Univer...** |
| 81:5 | 31:8 | 10:7 | 63:21 | **tried** | 7:3 |
| **termin...** | 32:9,14 | 12:18 | 73:1 | 43:11 | **unknown** |
| 53:1 | 32:14 | 14:19 | 76:16 | **Trout** | 52:4 |
| **termin...** | 34:20 | 15:3,10 | **told** 25:17 | 15:16,16 | 53:16 |
| 32:3 | 43:12 | 19:13,14 | 26:4 | 17:5,5 | 55:5 |
| 33:2 | 49:17 | 20:4,10 | 28:15 | **true** 70:14 | **unreca...** |

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

| | | | | | |
|---|---|---|---|---|---|
| 14:19 | 33:22 | 35:4 | 82:2 | 63:10 | **XYZ** 37:18 |
| **upcoming** | **voice** 44:6 | 39:21 | **West** 64:20 | **words** | |
| 71:1 | 44:10 | 41:15 | 65:2 | 30:17 | **Y** |
| **Update** | 45:1,3 | 42:5,9 | **White** 1:9 | **work** 16:1 | **yeah** 16:3 |
| 68:18 | **vs** 1:4 | 59:13 | 1:12 3:2 | 22:2,4 | 39:1 |
| **urgency** | **Vu** 19:7 | 78:13 | 4:7,13 | 29:17 | 47:19 |
| 66:6,8 | | **way** 22:15 | 4:15 | 33:9,9 | 62:13 |
| 66:13 | **W** | 22:22 | 38:21 | 42:19 | 77:4 |
| **urging** | **Wacker** 2:9 | 28:14 | 40:21 | 64:5 | **year** 15:5 |
| 58:10 | **wait** 62:4 | 29:21 | 61:9 | **worked** | 15:8,12 |
| **use** 34:6 | **waiter** | 30:8 | 67:2 | 8:12,22 | 15:13,19 |
| 45:10 | 7:12 | 38:5 | 72:21 | 16:2 | 18:10 |
| 50:21 | **waive** 83:4 | 44:13,22 | 84:5 | 25:21 | 27:13,13 |
| 54:7 | 83:5 | 45:21 | **wife** 34:2 | **working** | 52:17 |
| 61:7 | **waived** | 46:11 | 44:8 | 7:15 | **years** 6:4 |
| **usually** | 84:11 | 51:5 | 63:6 | 25:19 | 6:7 7:17 |
| 79:2 | **walked** | 57:13 | 64:5 | **workplace** | 8:10 9:4 |
| | 39:7 | 65:16 | **witness** | 44:16 | 10:12 |
| **V** | **want** 25:11 | 73:21 | 3:2 4:5 | 45:4 | 11:12 |
| **V-u** 19:5 | 29:19 | 75:19 | 4:8 | 48:7 | 14:19 |
| **vacancy** | 35:8,9 | 84:14,15 | 23:14 | **works** 15:9 | 17:2 |
| 20:10 | 56:8 | **we'll** | 28:4 | **wouldn't** | 18:10 |
| **vacant** | 57:11 | 72:22 | 32:8 | 41:18 | 27:12 |
| 13:2,13 | 61:1 | 83:4,8 | 34:20 | 55:20 | 49:12 |
| **vague** | **wanted** | **we're** 5:2 | 36:4 | 65:21 | 51:12 |
| 46:18 | 26:17,18 | 7:16,20 | 39:11 | **write** 48:4 | 71:18 |
| **validity** | 41:11,13 | 40:6 | 43:11 | 48:5,14 | **yell** 34:7 |
| 59:22 | 41:16 | 72:15 | 46:9,20 | 48:20 | **yelling** |
| **value** | 49:18 | **we've** | 56:3,17 | 63:3 | 45:13 |
| 29:20 | **wants** | 32:16 | 57:1,11 | 82:6 | **Yup** 72:17 |
| **varies** | 66:14 | 40:7 | 57:21 | **writeup** | |
| 22:10 | **warning** | 49:15 | 58:5 | 50:17 | **Z** |
| **vary** 22:9 | 29:9 | 74:19,20 | 60:13 | **writing** | **Zeppelin** |
| **verbal** | 45:17,18 | **week** 70:22 | 61:2 | 30:18 | 55:12 |
| 30:22 | 46:4 | 71:1 | 68:7 | **written** | **ZOOM** 1:8 |
| 51:8 | 48:5 | **weekly** | 72:1 | 30:22 | |
| 62:14 | 50:16 | 28:13 | 76:18 | 48:5 | **0** |
| **verbally** | 51:8 | **weeks** 64:9 | 78:19 | 50:16,16 | **084-00...** |
| 5:4 | 52:18 | **went** 13:16 | 79:14 | 54:9 | 1:17 |
| 36:18 | 53:13 | 37:12 | 84:10,12 | 63:19 | |
| 37:8 | **warnings** | 39:21 | 84:17 | **wrote** 63:7 | **1** |
| **video** 5:3 | 30:22 | 59:8 | **wondering** | 74:4 | **1:19-C...** |
| **VIDEOC...** | **wasn't** | 70:22 | 68:21 | | 1:3 |
| 1:8 | 26:1 | 77:9 | **word** 43:20 | **X** | **10** 7:19,21 |
| **vital** | 33:20 | **weren't** | 45:10 | **X** 3:1 | **10:00** |
| | | | | | 37:17 |

County Court Reporters, Inc.
630.653.1622

**EXHIBIT 2**

White, David
February 5, 2021

100

| | | |
|---|---|---|
| **11:00** 1:10 | **30** 39:17 | 37:21,22 |
| **12** 7:19,21 | 41:22 | 38:14 |
| **12:50** 72:9 | 67:5 | 39:6 |
| **13** 7:17 | **30s** 54:16 | 65:18 |
| **13-year** | 54:22 | **8:34** 61:15 |
| 7:18 | **30th** 69:7 | |
| **13th** 70:11 | **312** 2:4,11 | **9** |
| 70:15,18 | | **9** 62:13 |
| 70:22 | **4** | **9th** 61:19 |
| **15** 40:8 | **4** 3:5 | 61:22 |
| **16th** 84:18 | **40** 55:8,18 | 62:9 |
| **17** 23:5 | 56:13 | |
| 24:1 | **40s** 54:16 | |
| **19** 15:6 | 54:22 | |
| 61:14 | **43** 69:8,8 | |
| 62:13 | **44** 69:8,18 | |
| **1992** 7:3,4 | **45** 69:8,9 | |
| 7:16 | | |
| **19th** 62:2 | **5** | |
| 62:8 | **5** 1:9 | |
| | **5:00** 64:13 | |
| **2** | 64:14 | |
| **2** 69:18 | 66:3 | |
| **20** 70:18 | **5089** 2:3 | |
| **2015** 7:16 | **50s** 54:17 | |
| 7:17 | 54:22 | |
| **2016** 17:3 | **5500** 2:10 | |
| **2017** 12:19 | **57** 56:11 | |
| 13:10 | 56:13 | |
| 61:14 | | |
| 67:5 | **6** | |
| 69:11 | **60507** 2:4 | |
| **2018** 15:14 | **60606** 2:10 | |
| **2019** 17:3 | **641** 64:20 | |
| **2020** 15:6 | 65:2 | |
| **2021** 1:9 | **645-7800** | |
| 84:19 | 2:11 | |
| **20th** 70:13 | | |
| 70:15 | **7** | |
| **23** 67:11 | **72** 3:6 | |
| **233** 2:9 | **720-9191** | |
| **24th** 67:16 | 2:4 | |
| 69:11 | **77** 3:5 | |
| | | |
| **3** | **8** | |
| | **8:30** 36:13 | |

County Court Reporters, Inc.
630.653.1622

EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.2.2**
**Eastern Division**

Ian Macleod

                                Plaintiff,

v.                                       Case No.: 1:19–cv–00683
                                       Honorable Charles R. Norgle Sr.

MidAmerican Energy Services, LLC, et al.

                                Defendant.

---

### NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, March 29, 2019:

      MINUTE entry before the Honorable Charles R. Norgle: Motion of Defendant Berkshire Hathaway to Dismiss [6] is granted. Motion hearing held on 3/29/2019. Berkshire Hathaway Energy Company terminated. Status hearing is set for 5/10/2019 at 10:00 a.m. Mailed notice(ewf, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

**EXHIBIT 3**



**MidAmerican**
**ENERGY SERVICES, LLC**
A Berkshire Hathaway Energy Company

October 23, 2017

Ian Macleod
417 South Princeton Ave
Villa Park, IL 60181

Dear Mr. Macleod:

This letter is to inform you that your employment with MidAmerican Energy Services (Company) is terminated, effective immediately for failure to successfully complete your first six months of employment and for insubordination.

At a pre-disciplinary hearing on October 20, 2017, it was determined you were insubordinate to your manager on October 9, 2017, when you were argumentative concerning a valid task from your manager.

This conduct on your part is a violation of the Berkshire Hathaway Energy Code of Business Conduct (insubordination, page 20), "You are required to comply with the lawful directions and orders of management at all times."

Please turn in your keys, and all other Company property. Arrangements will be made to return your personal belongings to you. If you have any questions regarding your final pay and benefits you may contact the HR Help Line at 1-800-432-8999.

Sincerely,

David White
Regional Sales Manager
MidAmerican Energy Services

cc: Burt Short

**MES 000105**

**EXHIBIT 4**

Page 1

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION
3

     IAN MACLEOD,                    )
4                                    )
           Plaintiff,                )
5                                    )
           -vs-                      )Case No. 1:19-cv-000683
6                                    )
     MIDAMERICAN ENERGY              )
7    SERVICES, LLC,                  )
                                     )
8          Defendant.                )
     ------------------------------)
9
10                    REPORT OF PROCEEDINGS from the
11
12   discovery deposition of IAN MACLEOD taken by
13
14   Paul W. O'Connor, a CSR within and for the State of
15
16   Illinois, pursuant to the provisions of the United
17
18   States Supreme Court pertaining to the taking of
19
20   depositions for the purpose of discovery, at 233 West
21
22   Wacker Drive, Suite 5500, Chicago, Illinois, 60606,
23
24   commencing at 1:00 p.m. on July 16, 2020

EXHIBIT 5

```
                                                Page 2

 1        APPEARANCES:

 2

 3              LANGONE  BATSON  &  LAVERY

 4              17 North Wabash Avenue, Suite 500

 5              Chicago, Illinois, 60602

 6              By:  MR. MARK LAVERY

 7              Dan@ljclegal.com

 8                  Appearing on behalf of the Plaintiff;

 9

10

11              SEGAL McCAMBRIDGE SINGER & MAHONEY, LTD

12              233 South Wacker Drive, Suite 5500

13              Chicago, Illinois, 60606

14              By:  MR. BENJAMIN J. NELLANS

15              (312) 645-7800

16              Bnellans@smsm.com

17                  Appeared on behalf of the Defendant.

18

19

20

21

22        Also Present:

23

24              MR. DAVID WHITE
```

EXHIBIT 5

```
                                              Page  3

1                         I  N  D  E  X

2

3        WITNESS                         PAGE

4        IAN MACLEOD

5        Exam by Mr. Nellans                  5

         Exam by Mr. Lavery                105

6        Exam by Mr. Nellans               120

         Exam by Mr. Lavery                122

7        Exam by Mr. Nellans               123

         Exam by Mr. Lavery                123

8

9

10

11

12

13

14       EXHIBITS:

15

16       Exhibit No. 1                     25

17       Exhibit No. 2                     26

18       Exhibit No. 3                     26

19       Exhibit No. 4                     28

20       Exhibit No. 5                     30

21       Exhibit No. 6                     30

22       Exhibit No. 7                     31

23       Exhibit No. 8                     81

24       Exhibit No. 9                     94
```

EXHIBIT 5

```
                                           Page 4
 1              (Witness sworn)

 2         MR. NELLANS:  Hello, Mr. Macleod.  Is it okay if I

 3    call you Mr. Macleod?

 4         THE WITNESS:  Sure.

 5         MR. NELLANS:  You just swore an oath.  You

 6    understood that oath?

 7         THE WITNESS:  Uh-huh.

 8         MR. NELLANS:  You understand today I'll be asking

 9    you questions and you will have to answer truthfully?

10         THE WITNESS:  Yes.

11         MR. NELLANS:  You will do so to the best of your

12    ability?

13         THE WITNESS:  Absolutely.

14         MR. NELLANS:  Have you ever been deposed before?

15         THE WITNESS:  No.

16         MR. NELLANS:  I'm going to go over some ground

17    rules and how this works to make things go hopefully a

18    little bit smoother.

19         THE WITNESS:  Okay.

20         MR. NELLANS:  As this goes on it's going to get a

21    little conversational, but the difference between a

22    conversation is that we have a court reporter here who's

23    going to try to patiently take down what we are saying.

24    So to the best of your ability please wait for me to
```

**EXHIBIT 5**

Page 5

1    finish my question before answering.  I will try and do

2    the same for you, makes it easier for him.

3              In that same regard I ask when you can,

4    please give yes or no answers because things like uh-huh,

5    uhn-uhn are harder to interpret, especially now that we

6    are all wearing these nice masks.

7              If at any point you need a break, please

8    just ask and we are happy to take one.

9         THE WITNESS:  Okay.

10        MR. NELLANS:  All I ask is if I have a question

11   pending, please answer my question before we take that

12   break.

13        THE WITNESS:  Okay.

14                   IAN MACLEOD,

15   called as a witness herein, having been first duly

16   sworn, was examined upon oral interrogatories and

17   testified as follows:

18                   EXAMINATION

19                 By Mr. Nellans:

20     Q.   Can you state your name and date of birth for

21   the record.

22     A.   Ian A. Macleod.  September 21, 1960.

23     Q.   For identification purposes only can you give

24   us the last four digits of your Social Security?

EXHIBIT 5

Page 6

1     A.   8189.

2     Q.   And did you do anything to prepare for today's

3 deposition?

4     A.   Yesterday I printed up the e-mails that I sent

5 to the law firm and I think the last one I sent was in

6 August of 2018.  So yeah, I didn't really address this

7 for couple years.

8     Q.   Okay.  I don't want to know about any

9 conversations you had with your attorneys since those are

10 privileged.

11     A.   Right.

12     Q.   Did you review any e-mails other than ones

13 exchanged with your attorney?

14     A.   No.

15     Q.   Did you speak to anyone other than your

16 attorney?

17     A.   No.

18     Q.   About how long did you spend reviewing those

19 e-mails?

20     A.   I would say half hour, 45 minutes.  I just read

21 through them once.

22     Q.   You're aware that probably a ways ago you guys

23 produced some documents in this case?

24     A.   Yes.

EXHIBIT 5

```
                                                      Page  7

  1          Q.   Since then have you become aware of any

  2     additional documents relevant to this case?

  3          A.   No, not to my knowledge.

  4          Q.   As a result of your lawsuit you're claiming

  5     damages?

  6          A.   Uh-huh.

  7          Q.   Can you tell me what damages you're claiming?

  8          A.   Well, that's a big, loaded question.

  9               I was in the job less than five weeks.  I

 10     was expecting to build a business plan.  The top producer

 11     at that time I believe was making between three and

 12     $500,000 so I wanted to build my plan to get there.

 13               And so when you look at that, where I

 14     expected to be right now, I'd be making an income of 300

 15     to 400,000 if I was doing the right thing.  So.

 16               But what I ended up losing was my year's

 17     salary.  It was hard after.  With my experience you don't

 18     hire anybody for 4 or 5 weeks unless they really do

 19     something drastically wrong.

 20               So my damages are the first year in taking

 21     a lower salary and going back to the jobs that I turned

 22     down to take the MidAmerican job.  Those jobs were no

 23     longer open.

 24               So when you say damages, I had to go see a
```

EXHIBIT 5

Page 8

1   psychologist after I -- in December after I got fired.  I

2   got on medication because I was depressed, I was having

3   trouble finding a job.  After being unemployed, I applied

4   to over 200 places.  After applying for jobs I finally

5   took a job and it was half the salary of what I was

6   making at MidAmerican.

7         MR. NELLANS:  Okay.  Quite an answer.  I will move

8   to strike the non-responsive portions.

9         MR. LAVERY:  You're going to what?  Is there a

10  judge here?  Object to form and foundation.  And ask you

11  not do speaking motions during a deposition.

12        MR. NELLANS:  Okay.  Moving on.  You indicated a

13  few things in your answer and I'd like to go over them.

14        Q.   First, it sounded like you're claiming damages

15  for lost wages between the time of your termination and

16  you starting your next employment, is that correct?

17        THE WITNESS:  A   No.  When you think about the

18  emotional pain I went through; where I was building the

19  plan to, and David can attest to that fact since he's

20  here.  That I was trying to get him to work with me to

21  write a business plan, that didn't happen.  That's not

22  anywhere in these documents.

23        MR. NELLANS:  Sir, excuse me.

24        MR. LAVERY:  Excuse me.  Objection.  Harassing,

EXHIBIT 5

Page 9

1    interrupting.

2                    We're going to set some ground rules right

3    here, Mr. Nellans.  You know the civil conduct standards

4    of the Seventh Circuit, don't you?

5          MR. NELLANS:  Can we go off the record for a

6    moment.

7          MR. LAVERY:  No.

8                    (Discussion had off the record).

9          MR. NELLANS:  To clarify my question.

10         Q.   All I am asking is is one of the damages you

11   are seeking in this lawsuit the lost salary from the time

12   of your termination to the time when you accepted new

13   employment?

14         THE WITNESS:  A   Lost salary plus possible

15   commissions.

16         Q.   Then another item was the difference in salary

17   from your current position to the other?

18         A.   No.  I should still be there and be a top

19   producer at MidAmerican.  I wouldn't have taken the job

20   if I knew I was going to be there for a month.

21                    I walked into a total discombobulated

22   place to work.  It was the boys club.  I will give you

23   some examples if you ask but I'm not going to answer that

24   right now.

EXHIBIT 5

Page 10

1          So my salary could have been, my wages
2   could have been between three and $500,000 right now.  So
3   if you look back, if I made $200,000 my second year, so I
4   would have made 100,000 my first year that I was
5   guaranteed 87.  So I want the wages that I lost since
6   then.  Maybe -- my salary, the new salary I took was
7   40,000.  I just took the job because so I could start
8   working.  So figure it out.
9          First year is 87,000 plus commissions,
10  possible commissions.  The next year is up to 200,000.
11  This was all discussed in the interview with Randy
12  Marzen.  How I was going to build a plan to get to the
13  four to $500,000.  That's why I took the job.
14      Q.   So one of the damages you're claiming is the
15  difference in salary, that is one thing you would like to
16  recover?
17      A.   Yes.
18      Q.   Another thing is the lost potential from the
19  commissions?
20      A.   Yes.
21      Q.   It sounds like you also are claiming mental and
22  emotional damages?
23      A.   Yes.
24      Q.   That's because you saw a psychiatrist?

EXHIBIT 5

Page 11

1       A.    Psychiatrist and a psychologist.

2       Q.    What was the name of the psychiatrist?

3       A.    You have got the documentation.  The document

4   was sent to you but I have got it.

5             Dr. Kellie, K-E-L-L-I-E, I will spell it,

6   V-A-I-D-Y-A.  I saw her December 20, 2017.  This is the

7   insurance claim.

8       Q.    For the record you're reviewing the insurance

9   claim to doctor, in Dr. Kellie's name?

10      A.    Yeah.

11      Q.    I don't need to mark it at this time but we can

12  review it.  Was she the psychiatrist or psychologist?

13      A.    Who prescribes meds, psychiatrist or

14  psychologist.  I call it psychiatrist -- whoever can

15  prescribe meds, that's who it was.  One of the them

16  doesn't.  The psychiatrist I think.

17      Q.    Who is the other then, Dr. Kellie and --

18      A.    The one I'm seeing now is -- I don't recall his

19  name.  I'm not going to look for it but I'm seeing

20  somebody now.  I switched firms.

21      MR. NELLANS:  What I'd ask is to the extent it's

22  responsive, have your counsel timely submit the name and

23  documentation for that individual.

24      Q.    How long have you been seeing Dr. Kellie?

EXHIBIT 5

Page 12

1      A.   I only saw her once and I saw another person, I

2   can't recall the name.   I saw a psychiatrist, I saw the

3   psychologist and I just can't, I slip -- who can

4   prescribe meds, whichever can is the one.

5               So then I quit going to her because once I

6   started working again, I would just call and get meds

7   renewed, I would see her more than once.   So I was on

8   Lorazepam.

9      Q.   She prescribed that to you?

10     A.   Yes.

11     Q.   How long did you take Lorazepam?

12     A.   Maybe 3 or 4 months.

13     Q.   Why did you stop taking Lorazepam?

14     A.   The spring got nice and I didn't really feel

15   pills were doing anything to me.   They made me drowsy

16   during the day.   I started running.   It was summer.   The

17   kids were getting out of school so I felt better.

18               I was actively interviewing and feeling

19   good about myself and I'm back on them right now.

20     Q.   Why are you back on them right now?

21     A.   Because my wife has terminal cancer.

22     Q.   I'm sorry to hear that.

23               Was the, your termination at MidAmerican

24   the only reason why you originally saw Dr. Kellie?

Page 13

1      A.    Yes.

2      Q.    And the other doctor whose name you cannot

3    recall, was your termination at MidAmerican the only

4    reason you saw him or her?

5      A.    Yeah.

6      Q.    You switched --

7      A.    Can I answer that correctly?  It's one of the

8    reasons.  I was feeling so down, my wife made me, she

9    basically made the appointment for me because I was just

10   in a dark place.  So that was one of the reasons.

11            There's a lot of things that go into it.

12   I couldn't find a job.  I was getting rejected from

13   companies that were giving me offers before I went to

14   MidAmerican.  So there's one rejection after another and

15   so I was let go in October, I started to go on meds in

16   December.  Those meds usually take 30 days to kick in.

17            So that was one of the reasons.  That

18   wasn't the sole reason I went.  It was overall mental

19   health, that was the main cause of it.

20     Q.    Okay.  All right.  Moving on.  I'd like to talk

21   to you a little bit about your background if that's okay.

22     A.    Yeah.

23     Q.    Where did you go to undergrad?

24     A.    University of Iowa.

EXHIBIT 5

Page 14

1       Q.   The highest level of education you have

2   completed?

3       A.   I didn't get a degree.

4       Q.   What is the highest level of education you have

5   completed?

6       A.   I was into my senior year so I was into my

7   fourth year.  I had like 13 or 15 credit hours to go but

8   I was so far in debt with the school.  I had to pay my

9   way through college, so.

10      Q.   So after that, you began working?

11      A.   Yes, began waiting tables in downtown Chicago.

12      Q.   How long did you wait tables in downtown

13  Chicago?

14      A.   I was doing both jobs.  I was selling copiers

15  for Canon Business Solutions, they were known as

16  Ambassador Office Equipment at the time.

17               And I would -- that was on north Michigan

18  Avenue.  I get off at 5:00 and go wait tables till 10:00.

19  I did that the first year.  I was making more money

20  waiting tables than selling copiers in the city, so I

21  kept that for at least a year till I got on my feet.

22      Q.   What years were you employed with Canon?

23      A.   Oh, man, it was, I think it was late '86 to --

24  do I have to be exact on dates and months?

EXHIBIT 5

Page 15

1      Q.   If you can't recall that's a perfect answer.  I
2   know I'm going back far.
3      A.    '86 into '87.  I was there for probably 9 or
4   10 months and then I moved on to a higher paying job.  I
5   left there because the manager quit and started his own.
6   That's when FAX machines were hot, believe it or not, and
7   I became a FAX rep for a different company called
8   Distinctive Business Solutions.  And I was a FAX rep and
9   my territory was the Merchandise Mart.  I stayed there
10  for two years.
11            You want me to go through my whole
12  background?
13     Q.   We are just going to run through your
14  employment history.  So after you left Canon you --
15     A.   Distinctive Business.  I followed the
16  typewriter salesperson to Distinctive Business Solutions.
17  And so it's a FAX business.  Can you imagine I had, my
18  territory was the Merchandise Mart.  All I had to sell
19  was FAX machines.  I was selling 20 or 30 a month at that
20  time in 1987.  Then I was there for two years.
21     Q.   Why did you leave that?
22     A.   I wanted to go work for the manufacturer.  I
23  was working for a dealer.  I was doing really well.
24            So I took with Savon, which is now Ricoh.

EXHIBIT 5

Page 16

1    You remember Savon.  Again I started in there, I started

2    as account executive selling copiers and FAX machines,

3    was promoted to major account executive after my first

4    year and after two years there I was promoted to district

5    manager.  I handled five states, 28 dealers.  My job was,

6    I was basically manufacturer's rep, my title was district

7    sales manager.

8             My job was to go into small dealers to

9    large dealers.  They were doing business between $5

10   million and $100 million a year.  My job was to train the

11   staff, help hiring, work with managers and my job was to

12   fill up warehouses with my product and earn the right to

13   fill them up again by helping them sell their products.

14   I did that for five years.

15       Q.   Why did you leave that job?

16       A.   My dealer started getting -- that's when all

17   the copier industry started shrinking so Danka and Icon

18   at the time.  I started, my dealers were getting bought

19   up and I met the guy who was buying the dealers for Danka

20   when he was in one of my dealers.  And he came from

21   Savon.

22             And I ended up -- so my dealers were

23   getting bought up.  I was on the road five nights a week.

24   I was 30 years old, 35 years old, still single, couldn't

EXHIBIT 5

Page 17

1    have a relationship because I was gone all the time.

2              So my dealers would get bought up so I was

3    recruited by Danka in 1995?  So from '88 to '95 I was

4    with Savon.  Danka, I became a sales manager after six

5    months.  As a sales manager in downtown Chicago I was

6    promoted to the marketplace manager, which oversaw four

7    branch sales managers and eight reps under each one of

8    them.  Branches were in downtown Chicago, Deerfield,

9    Aurora and Westmont.

10       Q.   And after that job where did you go next?

11       A.   I was recruited by Icon, same type of company.

12   They offered me as the color graphics sales manager.  I

13   turned down the job and they wanted to know why.  This is

14   face to face and they said that, I said I don't want --

15   if you know that industry back in the mid '90s, color

16   specialist, color copiers are everywhere now, right.  So

17   at that time they weren't.  So they were still $50,000

18   and would cost you 20 cents a page to print.

19              So my job was to -- I said I don't want

20   the job because I can't stand seeing color specialists in

21   the demo rooms trying to match color pantones, they are

22   never out in the field.

23              So he said bingo.  We want a guy with a

24   black and white copier mentality to start integrating my

Page 18

```
1    eight graphic specialists into the sales force of 104

2    reps.  1995 Icon had 104 sales people in Chicagoland.  So

3    it was a job I couldn't screw up.  It's the most money I

4    ever made and all I had to do was befriend the managers,

5    help train their reps.  I became involved in business

6    plan writing with the company so I was training managers

7    all over the country on how to write business plans with

8    their reps.  They were called individual development

9    plans.  So how to dig in and build reps' careers through

10   their own personal goals.

11            So whether it's a kid that wants to buy

12   his first condo, you help them get to that goal and you

13   work with them and you're laser focused on their goal,

14   individual development plan and you review every month

15   for two hours and keep them on track.  It decreases

16   turnover, everything.

17   Q.   So what year did you start that job?

18   A.   2000.  I think it was year 2000 or 2001.

19   Q.   If I understand your testimony correctly it was

20   the nature of the opportunity is why you left the

21   previous job to take that?

22   A.   Well, I met my wife at Icon.  She had a high up

23   position as a business analyst and we sort of reported to

24   the same person.  I had eight females working for me at
```

EXHIBIT 5

1   the time so it started, I turned down a president club

2   trip because you couldn't take an employee unless you

3   were married to them.

4           So I turned it down and so I just said you

5   know what, I started looking for a job and she stayed

6   there.  She was still there up till she got sick.

7           So it was personal, mostly personal.  Just

8   she stayed there, she had the better salary and I moved

9   on.

10     Q.   When did you move on from Icon?

11     A.   Hold on.  I think I got my resume here.  I

12   don't have it.

13     Q.   You can be approximate, sir.

14     A.   I think 2005 maybe.

15     Q.   And where did you go after Icon?

16     A.   I went to, I did a very short stint at

17   Panasonic.  They folded their -- I was hired as a major

18   account rep.  My job, it was a full concept.  My job was

19   to work -- I will give you an example.

20           Panasonic cash registers are in every

21   McDonald's.  They have been there since 1979.  I don't

22   know if they are still there but they had an account

23   since 1979.  My job was to integrate with that deal and

24   go get their printing business, McDonald's printing

EXHIBIT 5

Page 20

1    business, that type of job.  And I have 13 states in the

2    Midwest to do that.

3            Shortly after I was hired, when I was

4    hired my boss out of New Jersey said your job reps didn't

5    get approved.  I hired you -- anyway, they found a place

6    for me in Elgin.  So I went to the big Pana -- it's now

7    the nut company.  So I still worked and I traveled with

8    the reps and I was training, but I started looking for a

9    job immediately because they shut down that division that

10   I was hired into.

11       Q.   Okay.

12       A.   I think I was there 8 months maybe.

13       Q.   Where did you go after Panasonic?

14       A.   Toshiba I think.

15       Q.   You went to Toshiba because they shut down that

16   division?

17       A.   So when I was a regional manager at Savon I was

18   calling my old dealer principals, the owners of dealers,

19   and my dealer in Wisconsin had bought the Toshiba dealer

20   in Chicago.  And he was the regional VP.  He stayed on

21   with the three-year contract.  He hired me as director of

22   sales.  And eight months into it he died and they,

23   Toshiba sold his branch and I could either move to

24   Louisville, Kentucky or Saint Louis.  I started looking

EXHIBIT 5

Page 21

1   for a job.

2              So by that time our industry was

3   shrinking, so I was already looking outside of the

4   industry.  I left there to go help a buddy of mine in Elk

5   Grove who is also a Savon dealer, still Savon dealer.

6              I was on a consultant basis.  He paid me

7   for a year and that's when I started interviewing with

8   MidAmerican, after about six months of being there.

9       Q.   How long were you at Toshiba then?

10      A.   A little over a year maybe.

11      Q.   You worked for the Savon dealer in between

12  Toshiba and --

13      A.   Yeah, it was just a buddy of mine who I was

14  helping out.

15      Q.   How long had you worked for him?

16      A.   It was under a year.

17      Q.   You left both that and the Toshiba because

18  those markets were shrinking?

19      A.   Yeah.  Toshiba, so Danka is now Konica Minolta,

20  so they got bought.  Icon is now Ricoh so you can see the

21  industry was just shrinking and it's time to get out.

22              But you have got somebody here buying all

23  your office equipment on-line probably so yeah, it's a

24  dead and dying industry but it's what I grew up in,

EXHIBIT 5

Page 22

1    printing.

2         Q.   Did you have any gaps between either --

3         A.   Yeah, yeah.

4         Q.   Okay.

5         A.   I was, when I was laid off from -- anyway, 2009

6    through 2011 I was a stay-at-home dad.  And I stayed at

7    home because my wife, she had her second baby and

8    started -- anyway, she wanted me to stay home.

9                   It's usually the opposite way around.

10   They try to get you back to work.  But we were doing well

11   at the time.

12                   And I stayed home for three months because

13   he was born in June, and just stayed home with her during

14   maternity leave and I ended up staying out for I think it

15   was 22 months.  That's when I went to Toshiba.  I think.

16        Q.   It's your recollection you went to Toshiba

17   after that period as a stay-at-home father?

18        A.   Yeah, I think that's -- I'm almost positive but

19   I can't 100 percent.

20        Q.   Was there any gap in your time between Toshiba

21   and working for your friend at the --

22        A.   No.

23        Q.   Was there any gap between working for your

24   friend and when you started at MidAmerican?

EXHIBIT 5

Page 23

1        A.    Oh, yeah, I took the summer off.

2        Q.    How did you hear about the position at

3    MidAmerican?

4        A.    I was recruited by a headhunting group out of

5    Minneapolis called Copier Careers.  Randy Marzen at the

6    time was, he came from Konica Minolta.  So he had the

7    same background as I did.  He was recruiting copier reps

8    because they knew how to prospect and sell and that's how

9    they were trained.

10            It used to be known if you can sell

11   copiers you can sell anything.  People were telling me I

12   didn't have any sales experience.  Where do I get sales

13   experience as a young guy.  Go sell copiers for a couple

14   years.

15       Q.    That was your bulk of your job experience

16   before MidAmerican was almost all sales?

17       A.    For MidAmerican.

18       Q.    Before MidAmerican?

19       A.    Oh, yeah, yeah.

20       Q.    Okay.  And most of that was copiers?

21       A.    Yeah, copiers, printers.

22       Q.    After that did you eventually interview for a

23   position at MidAmerican?

24       A.    Yes.

EXHIBIT 5

Page 24

1      Q.    You interviewed with Mr. Marzen and Mr. White,

2   correct?

3      A.    I interviewed with Randy.

4      Q.    Did you have a second interview then?

5      A.    With David White.

6      Q.    Was Randy present at the second?

7      A.    No.

8      Q.    After that last interview were you offered a

9   position at MidAmerican?

10     A.    No.

11     Q.    When were you eventually offered a position at

12  MidAmerican?

13     A.    The third interview with Randy and David, the

14  Marriott Hotel.  You need the date?  I think it was

15  August 4, 2017.

16     Q.    So there's one interview with each of them

17  individually and one with them together?

18     A.    Yeah.

19     Q.    And you were eventually offered the account

20  executive position, correct?

21     A.    Yes.

22     Q.    And David White encouraged you to apply for

23  that position because of your sales experience?

24     A.    No.  There was an account representative and

EXHIBIT 5

Page 25

1    David and Randy said it was my choice which job I took.

2    I left the interview, went out to the parking lot, came

3    back in and said I wanted the account executive position

4    because I wanted the higher salary and I had the sales

5    experience so as long as I learned the product, I know I

6    can do well.

7         Q.   Okay.  And you accepted the account executive

8    position?

9         A.   Yes.

10        MR. NELLANS:  I'm going to run through some

11   documents related to your hiring.  I have got copies for

12   everyone.

13            (Deposition Exhibit No. 1 marked)

14        MR. NELLANS:  Q   Do you recognize this?

15        THE WITNESS:  A   Yeah, I have got a copy of it

16   here.

17        Q.   This is an e-mail from David White?

18        A.   Yeah.

19        Q.   That based on your representation is inviting

20   you to apply for the AE role?

21        A.   Right.

22        Q.   Your understanding is AE, that means account

23   executive, correct?

24        A.   Yes.

EXHIBIT 5

Page 26

1              MR. NELLANS:  Okay.

2                   (Deposition Exhibit No. 2 marked)

3              MR. NELLANS:  Q   Do you recognize this e-mail?

4              THE WITNESS:  A   Yeah.  I mean I don't remember it

5        specifically but I know that -- yeah.

6         Q.   This is an e-mail between you and David White?

7         A.   Right.

8         Q.   And David White it appears is sending you the

9        offer letter?

10        A.   Yep.

11             MR. NELLANS:  Okay.

12                  (Deposition Exhibit No. 3 marked)

13             MR. NELLANS:  Q   Do you recognize this document?

14             THE WITNESS:  A   Yep.

15        Q.   Is this your offer letter?

16        A.   Yes.

17        Q.   Is that your signature on the bottom?

18        A.   It is.

19        Q.   The second to last paragraph says on behalf of

20       David White and the rest of the sales group we welcome

21       you to our team?

22        A.   Yep.

23        Q.   Okay.  So what was your understanding of your

24       role and responsibilities as account executive at

EXHIBIT 5

Page 27

1    MidAmerican?

2        A.    So my understanding after my third and final

3    interview was that, you know, I was pretty hungry.  My

4    job was to learn the product, prospect, go through

5    training and then the first 90 days I was told I'd be in

6    the office doing a lot of training.  Intense training.

7    That obviously wasn't true.

8                So my job was to -- as an account

9    executive you're building your sales plan.  You work the

10   plan every day.  You write business plans quarterly and

11   annually.  And I had these conversations with Randy

12   Marzen about writing business plans and that was on my

13   second interview.  So that's what my job was.  That's

14   what my job was.  I was nervous about the new product,

15   not familiar with the product at all.

16               But I knew the Berkshire Hathaway name.

17   Would use that to my fullest ability while selling on

18   presentations.  So that's my job.  So I knew there was

19   going to be a lot of prospecting my first year.

20       Q.    So this was at its core a sales position?

21       A.    At its core a sales position, yes.

22       Q.    And you needed to develop and execute a sales

23   plan?

24       A.    Yep, yes.

EXHIBIT 5

Page 28

1     Q.   And business plans that you discussed?

2     A.   Yes.

3     Q.   Did you have any responsibilities other than

4  that?

5     A.   Is this a trick question, I don't know.  Sales

6  is sales.  You write your numbers, you work with the

7  team.  So I don't know if you're looking for more or I'm

8  missing something in your eyes, but.

9     Q.   I'm just asking the questions.

10    A.   It was a sales job, so.

11     MR. NELLANS:  And I'd like to return to -- I'm

12  going to use the next exhibit.

13          (Deposition Exhibit No. 4 marked)

14     MR. NELLANS:  Q  Do you recognize this document,

15  actually series of documents; so if you want to take a

16  minute to look at it.

17     THE WITNESS:  A  This is non compete?  What is it?

18     Q.   Take your time to review it to refresh your

19  recollection, happy to take the time.

20     A.   I signed it so it's just a standard non

21  compete; right to hire.

22     Q.   I believe there are a few documents.  The first

23  one is labeled an employment confidentiality agreement,

24  is that correct?

EXHIBIT 5

Page 29

1     A.   Right.

2     Q.   And I believe on the third page of this exhibit

3  is signed, you signed, is that correct?

4     A.   Yep.

5     Q.   There's agreement titled prior agreements?

6     A.   Yes.

7     Q.   Your signature?

8     A.   Yeah.

9     Q.   Then the previously-discussed offer letter, is

10  that correct?

11    A.   Okay.

12    Q.   And your offer letter includes your base

13  salary, correct?

14    A.   Right.

15    Q.   And a plan with regards to commission?

16    A.   Guaranteed 12 months commission, yes.

17    Q.   And I'd like to direct your attention to page

18  two, the second to last page.

19    A.   Okay.

20    Q.   In the second, bold heading called at will

21  employment.  You see the second to last page?

22    A.   Yep, I got it.

23    Q.   You were an at will employee at MidAmerican,

24  correct?

```
                                                          Page 30

  1        A.   Yes.

  2        Q.   And you had a six-month probationary period at

  3   MidAmerican?

  4        A.   I believe so, yes.

  5          MR. NELLANS:  Just to confirm I have the next

  6   exhibit.

  7                  (Deposition Exhibit No. 5 marked).

  8          THE WITNESS:  I have never seen this, no, I don't

  9   believe.  I don't think.  Was it in my employee handbook

 10   or where would I have seen this?

 11          MR. NELLANS:  Well, maybe it will help if I show

 12   you the next exhibit.  Set that aside for now.

 13                  (Deposition Exhibit No. 6 marked)

 14          MR. NELLANS:  Showing you what appears to be a

 15   print-out you get if you did an on-line training.

 16          THE WITNESS:  Oh, that was my first, that was my

 17   code of ethics with Berkshire on the phone or somebody.

 18   Yeah, it was Berkshire.

 19          MR. NELLANS:  Q   So wheN you started with

 20   Berkshire you reviewed some documents on-line on a

 21   computer?

 22          THE WITNESS:  A   Yeah, I had to borrow a computer,

 23   laptop.  Or it was in the conference room but I did not

 24   have a computer at that time.
```

EXHIBIT 5

Page 31

1     Q.   Okay.  So returning to the employment

2  classification, you said it appears to be standard

3  classification document?

4     A.   Says full time salary or hourly employees,

5  regular work schedules are 40 or more hours per week.

6     Q.   Can you also read the section where it says

7  probationary?

8     A.   All representative employees full-time,

9  part-time.  Okay.

10    Q.   Can you finish reading out loud, please?

11    A.   Okay.  Is this like.

12    Q.   Just for the record, sir.

13    A.   All represented employees full-time, part-time

14 or temporary will be considered probationary for the

15 first six months of employment.

16              (Deposition Exhibit No. 7 marked)

17    MR. NELLANS:  Previously we saw you completed

18 review of the code of business conduct.

19    Q.   Does this appear to be the code of business

20 conduct?

21    A.   I don't recognize this.  Did I sign something

22 for this?

23    Q.   Is this --

24    A.   If this is what was on-line but I've never seen

Page 32

1    this.

2         Q.    Is this document entitled Berkshire Hathaway

3    Energy Code of Business Conduct?

4         A.    Are you asking me?

5         Q.    Yes.

6         A.    Okay, I don't understand these questions.  It's

7    like it says right here, Berkshire Hathaway Energy Code

8    of Business Conduct.

9         Q.    Sir, I promise I'm not trying to harass you.

10   The reason I'm asking --

11        A.    Why are you having me read aloud.  We are all

12   here.  We are all grownups.  Why am I reading aloud.

13        Q.    Because there's a gentleman typing this down

14   and there won't be images of these.  So it's important

15   the words be read and be on that transcript.  I don't

16   mean to harass you at all.

17        A.    Can't you read them?

18        Q.    I want you to read them because you're the

19   witness and you're offering testimony.  I'm not

20   testifying.

21        A.    Okay.  What am I reading next?

22        Q.    So that's titled Berkshire Hathaway Energy Code

23   of Business Conduct, correct?

24        A.    Yes.

EXHIBIT 5

Page 33

1      Q.   If we turn to the previous exhibit, this

2   document, yes.  Also says Berkshire Hathaway Energy Code

3   of Business Conduct?

4      A.   Yes.

5      Q.   It has your name under employee name?

6      A.   Yes.

7      Q.   Says completed?

8      A.   Yes.

9      Q.   Does that refresh your recollection as to

10  whether or not you reviewed this document?

11     A.   If it was on-line, I have never seen this

12  document.  I don't recall seeing this document ever.

13     Q.   Okay.

14     A.   So if I signed something then, but I do not

15  recall seeing this.

16     Q.   We will move on.  I want to talk to you now

17  about your time at MidAmerican Energy Company if that's

18  okay.

19     A.   Sure.

20     Q.   I believe you started at Berkshire or excuse

21  me, at MidAmerican on September 3rd or September 13th?

22     A.   I thought it was the 14th.

23     Q.   Is that your recollection?

24     A.   Yeah.  Says right here.  I think I did this my

EXHIBIT 5

Page 34

1    first day.  The 14th.

2        Q.   You had a medical emergency the prior day so

3    you started on the 14th?

4        A.   I had a medical emergency on September 11th,

5    Sunday.

6        Q.   As a result of that you delayed your start date

7    one day?

8        A.   Yeah.  Do you need to see a doctor's report?

9        Q.   No, that's fine.

10       A.   Can I show it for the --

11          MR. LAVERY:  I will give it to him.

12          MR. NELLANS:  Q   When you started on your first

13   day what happened?

14          THE WITNESS:  A   So my first day there was a sales

15   meeting.  Just intro, typical sales meeting.

16               We took a break.  I remember it was a hot

17   day.  I went outside and one of the reps, younger reps

18   Kevin was outside smoking.  And he said in a joking way

19   what do you think of the job so far, and I had been there

20   two hours and we sort of chuckled.  And I said I'm

21   surprised.  I said the office when I was interviewing in

22   here, Randy didn't tell me was under construction.  It's

23   such a dump.  Every time I interviewed in there was such

24   a dump because there was plastic hanging from the

Page 35

1      ceilings to catch the sawdust from up above.

2                      And I said I'm used to, it's weird because

3      I am so used to bringing customers into the facility, my

4      facility and just show off your showroom just like you

5      guys do here.

6                      Can you ask the question again?

7          Q.   I will follow up on your answer.

8                      Was that the only time that you had a

9      conversation like that about the conditions of the

10     office?

11         A.   No.  I was talking to Randy about it when Randy

12     came to visit, he -- or was on the phone with Randy, I

13     said you didn't tell me this place was under

14     construction.  He says I know, I should have.  He should

15     tell all candidates walking into your office that it was

16     pretty messy.

17         Q.   After that did you ever complain about the

18     conditions?

19         A.   No.  An hour later David pulled me in the

20     office and said why are you calling this place a dump?

21                     So Kevin took what I said in a joking way

22     and turned it into like oh, my God, I'm being reprimanded

23     my first day.  It was unprofessional.  It was obviously I

24     was walking into a young environment, a group of frat

EXHIBIT 5

Page 36

1    boys type thing and I was out of place and I knew that on

2    my last interview with David who started arguing with me,

3    said I'm going to be riding you.  You're not going to

4    manage me, I'm going to manage you.

5              I'm like why are you arguing with me

6    during an interview and Randy starts laughing, like chill

7    out, David.  So.  If you want me to go on and on.

8              David did not want to hire me.  He told

9    people before I hired that he hired an elderly, an older

10   person.  Everybody when I walked in my first day knew the

11   exact age of myself.  I said how does everybody know my

12   age.  David told us last week in the sales meeting.

13             Why is he talking about my age.  I came

14   from -- I hired hundreds of sales people.  I would never

15   handle -- I always required to have -- all my managers

16   from my past are required to have laptops, business cards

17   when the employee walked in.  I walked into where you

18   want to sit.

19             Everybody is laughing and it was just --

20   it was a boys trip.  F bombs, fuck this, fuck that all

21   over the place.  It was a terrible atmosphere and I was

22   the young buck they were trying to get out -- the old guy

23   they were trying to get out.  It was so obvious.

24             David ignored me, didn't train me; my

EXHIBIT 5

Page 37

1    training was an hour.  He spent a full ride day in the

2    field with me and said you don't need my help and leave.

3    Nobody would know where he went for the rest of the day.

4    While I'm helping Rochelle with State Farm.  No he's not.

5    I'm in the office and David isn't here.  So come on.

6              I'm going to get worked up here, so.  I'm

7    so passionate about what was so wrongly done to me and

8    how it messed up my career moving forward and it was

9    because I was working for a very inexperienced manager

10   who I had way more experience than.

11             So I was the old guy they wanted out from

12   day one.  Even before day one.  That's how much I felt

13   20 minutes into sitting at my desk, my very first day on

14   the job.  I was the old guy in that guy's eyes

15   (indicating), and he didn't want me to work for him but

16   Randy wanted me there.  So I'm the old guy.

17             I was age discriminated against and it was

18   so blatant.  So blatant it was -- even doing race

19   discrimination with an elderly black woman.  So it was so

20   obvious, it was so idiotic.  He was such a human resource

21   nightmare and I was working for him.

22        MR. NELLANS:  Move to strike the non-responsive.  I

23   understand your objection.

24        MR. LAVERY:  Objection, to form and foundation.

```
                                                        Page 38

 1           MR. NELLANS:  I can feel you getting frustrated.

 2    Would you like to take a break?

 3           THE WITNESS:  No.

 4           MR. LAVERY:  Objection, form and foundation.

 5           MR. NELLANS:  Okay.  That said sir, I'm going to

 6    keep going.  You gave a lot there.  I promise I'm going

 7    to touch on it.  But this will go a lot quicker if you

 8    answer the question I ask.  Your counsel will have an

 9    opportunity to ask you questions and I promise I will

10    touch on many of the subjects you're getting to.

11           THE WITNESS:  Okay.

12           MR. NELLANS:  Just in the interest of keeping

13    things moving.

14           MR. LAVERY:  Object to the form.

15           MR. NELLANS:  Q   So on that first day, you said

16    that after you told that joke --

17           THE WITNESS:  A   It wasn't a joke.  It was a

18    casual conversation.

19                   I'm sorry, I won't interrupt you.  Go

20    ahead and finish.

21           MR. NELLANS:  Q   After you told that joke, you had

22    a meeting with David about it, is that correct?

23           MR. LAVERY:  Object to form and foundation.

24           THE WITNESS:  Does that mean I'm answering?
```

EXHIBIT 5

1          MR. LAVERY:  Yeah.

2          THE WITNESS:  A   It was within a 24-hour period of

3     me saying that what you called a joke, wasn't a joke to

4     me, and I actually thought the office was a dump.  And I

5     was telling a fellow employee, a younger employee who

6     then said, went to his manager and said he said this

7     place is a dump.

8               So it got really misconstrued and I

9     understand those things happen, but they took a really

10    small thing and made it into a big thing.

11         Q.   Before the sales meeting were you asked to take

12    a photo?

13         A.   No.

14         Q.   Were you asked to take a photo on your first

15    day?

16         A.   I don't recall.  I remember having to take a

17    photo for a national sales meeting coming up and it was,

18    you know, it was an on-line sales meeting, webinar.

19               So they were going to take my picture and

20    put it up.  And you want me to finish it up because I

21    know -- go ahead and ask the question.

22         Q.   Did you take issue with having your photo

23    taken?

24         A.   Again, there was a young guy in the room who

EXHIBIT 5

Page 40

1    was taking my picture, there's nobody else in the room.

2    And I said I thought I was done with this childish stuff.

3    That young guy went to his manager, my manager and told

4    him what I said.  Then it came back and it was told, my

5    words were put in my mouth as I can't believe I'm doing

6    this shit.  Okay, come on.  I never said that.  I would

7    never say that.

8                    I'm a consonants person.  I have been

9    through human resource training.  I would not say that on

10   my first week or last week at any company.  There's no

11   cussing.  These guys were dropping F bombs every day.

12   So.  And I'm sure you'll find that out.  Go ahead.

13       Q.   Do you recall saying anything about the photo

14   other than you thought it was childish?

15       A.   Yeah.  I don't like, I don't like my photo -- I

16   gained weight.  I didn't want my photo up for national --

17   I had a right to refuse being photographed but I didn't.

18       Q.   Did you at any point refuse?

19       A.   No.

20       Q.   Do you recall the name of the person that was

21   taking your picture?

22       A.   His name is Ben.  Somebody.  I don't know what

23   his last name is.  I think his name was Ben.

24       Q.   Was anyone else present?

Page 41

1    A.   I don't remember.  I don't think so.

2    Q.   When you had that conversation where you

3  referred to the office as a dump, was anyone else

4  present?

5    A.   No.

6    Q.   After your first day you began working at

7  MidAmerican, can you describe what you day-to-day job

8  duties looked like?

9    A.   Yeah.  Well it was very, very -- one of the

10  first things I noticed having experience in sales people

11  and hiring sales people is there was nothing for me to

12  do.

13           So very quickly, on my third or fourth day

14  I sort of started talking -- she worked right through my

15  cube is a glass wall -- started talking to a lady named

16  Rochelle.  I happened to have a ride day with her before

17  I started.  Randy set up a ride day for me to spend a day

18  in the field with her.  So we sort of got to know each

19  other.

20           She said you're never going to learn the

21  products being here.  She said I don't like prospecting,

22  I don't like sales, but I know the product.  I will work

23  with you in teaching you the product if you can work with

24  me in getting my fear of prospecting in the field.

EXHIBIT 5

1    So that's what we sort of formed a

2  partnership, David let us travel in the field together.

3  We'd go -- if we got a lead we'd split it.  We'd take

4  turns if there was a good prospect.

5    But I spent a lot of time learning from

6  Rochelle because I wasn't getting trained.

7    Basically if you ever started a job as a

8  young rep and your boss comes in and says read these

9  brochures and you're sitting there all day reading

10  brochures, that's pretty much what they were doing.

11    So I had to take the initiative because

12  nobody was going to do it for me.  I had to create my own

13  action.  Because it was nothing happening, there was

14  nothing happening with leadership in the local Chicago

15  office.

16    Q.   So you had a prospecting day where you went out

17  in the field with Rochelle, correct?

18    A.   I had nothing else to do but prospect.  And let

19  me expound on that.

20    As a sales manager, when you hire somebody

21  you don't know what you're going to get except from your

22  gut for the first 90 days.  So to eliminate that we

23  started doing, I'd hire reps, give them 50 temporary

24  business cards and map out what territory they are going

EXHIBIT 5

Page 43

1    to do.  Go introduce yourself to 12 businesses and bring

2    their business cards back.  It was called the 50s test.

3              So sales rep right out of college, you

4    don't know what you're going to get, so let's put him to

5    work the first day.  He's going to go cold calling.  All

6    he or she would go cold calling all day.  50 percent of

7    them would quit halfway through the day because they

8    don't want to cold call.  You know what you got up front.

9    You pay them for the day and they are on their way.

10             Here nothing was done.  So I was like a

11   rep, who I trained managers to not -- you can't have a

12   rep sit in his or her first week at a cube with nothing

13   to do.  Gives them a bad taste of the company.  There's

14   no direction, they are lost their first week.  That's

15   exactly what I was feeling.  I said that to Rochelle.

16   She said I will train you.  So.

17       Q.   In addition to that field day with Rochelle you

18   had two field days with David White, correct?

19       A.   No.  I had a ride day with Rochelle prior to my

20   being hired.

21             I had two field days that were scheduled

22   with David.  They would start either 9:30 or 10:00 in the

23   morning, we'd go to lunch at 11:30, he'd go.  He'd take

24   off.  That was the ride day, less than two hours for both

EXHIBIT 5

Page 44

1    of them.

2         Q.   Okay.

3         A.   He did not want to be with me.  When you hire

4    somebody, before you hire them just think to yourself can

5    I spend a day in the car with this person?  If you don't,

6    then don't hire them.  He did not want to be with me.  He

7    was told to hire me.

8         Q.   You had training meetings with Andrew Spencer?

9         A.   I had, Andrew spent half an hour with me going

10   over how to read an invoice.  He sat -- Scott Emberling

11   for about 45 minutes.

12        Q.   Correct.  And at some point you did develop a

13   sales plan at MidAmerican, correct?

14        A.   No.

15        Q.   You did not?

16        A.   No.

17        Q.   And so --

18        A.   There was no -- okay.  Go ahead, I'll answer

19   the question.  No, I didn't.

20        Q.   Other than these training -- I apologize, I

21   don't know the term you used, ride --

22        A.   Ride days.

23        Q.   Ride days?

24        A.   Yeah.

EXHIBIT 5

Page 45

1    Q.    Sounds like the bulk of your day-to-day duties

2    were cold calls?

3    A.    Uh-huh.

4    Q.    Or going out on your own and calling on

5    business persons?

6    A.    Yep.

7    Q.    And did you do both of those things?

8    A.    Yes.

9    Q.    How often were you in the field versus in the

10   office doing cold calls?

11   A.    Well the first month, the first few weeks I was

12   in the office a lot.  I started getting my wings and

13   taking things upon myself.  And I'd tell Rochelle I got

14   to learn, I got to get going.  And she was hurting on her

15   sales and I was trying to get going so yeah, I partnered

16   up with somebody and I encourage that with every rep, all

17   reps.

18            Kevin Fukumoto and the other guy, Spencer,

19   they were like frick and frack, they were always

20   together.  They didn't have to come to meetings either.

21   The young guys, they didn't have to come to meetings.

22   The two older people had to come to meetings.

23   Q.    So would you be able to estimate then after

24   that first three weeks --

EXHIBIT 5

Page 46

1      A.   I don't know.  We did a lot --

2      Q.   I apologize.  If I can finish my question so

3  it's clear for the record.

4      A.   Okay.

5      Q.   After that first three weeks where you said you

6  were heavily in the office, can you estimate how much

7  your time was in the field for sales calls versus in the

8  office for cold calling?

9      A.   I don't like -- I have never liked the phones.

10  I'm better cold calling so my prospecting days would be

11  heavy.  Sometimes I'd pick Rochelle up at her house

12  8:30 in the morning or 9:00.  She lived in Saint Charles

13  and we would go, you know, out to the western suburbs,

14  Rockford.  So I guess I was in the field mostly with her.

15  Versus the phone.

16           If I was in the phones it would be in the

17  conference room.  It was the type of office everybody

18  could hear you talk and hard to make phone calls, so I

19  just didn't like it.  I used my cell. phone more than my

20  desk phone.

21      Q.   When you prospected in the field did you have

22  to notify anybody at MidAmerican's office?

23      A.   Yeah.

24      Q.   Who did you notify when you were in the field?

EXHIBIT 5

```
                                                         Page 47

 1        A.    David.

 2        Q.    Did you notify David every time you --

 3        A.    Yes, we were on the phone.  I checked in with

 4   him every morning, every afternoon.

 5        Q.    Apologize, finish my question so it's full for

 6   the record.

 7              Every time you prospected in the field did

 8   you check in with David?

 9        A.    Yeah, I mean -- let me back up a little bit.

10              On Monday mornings, I would lay out what I

11   was going to do.  Eventually, that was my third week.

12   The first two weeks I was a puppet.  I didn't know what I

13   was doing, nobody was showing me to do anything.  I was

14   sitting there.  But it was really Rochelle's action that

15   got me into action.  She said come on, we will team up,

16   what I said earlier.

17              But yeah I just didn't -- yes, I

18   communicated it, I wouldn't do that.  I wouldn't wander

19   off.

20        Q.    And did you always communicate that by phone?

21        A.    Yes.  Or in person.

22        Q.    In person meaning earlier in the week?

23        A.    Monday morning, early in the week.

24        MR. NELLANS:  Take a short break.  I'm going to
```

EXHIBIT 5

Page 48

1    look at some stuff.  You take five minutes.

2                    (Short recess taken)

3         MR. NELLANS:  We can go back on the record.

4         Q.   At some point during your employment did you

5    have a meeting where you had an argument with David

6    White?

7         THE WITNESS:  A   Yes.

8         Q.   Was that meeting around October 9?

9         A.   It was on October 9.

10        Q.   And at that meeting were you asked what your

11   number one priority was for the day?

12        A.   Yes.

13        Q.   And did you say that it was to get your expense

14   reports done?

15        A.   Yes.

16        Q.   And did David White at that time remind you

17   about the MES software?

18        A.   So you're asking a question that I need to

19   qualify it a little more.

20        Q.   If you can answer my question and then qualify,

21   it would be great.

22        A.   Ask me again, please.

23        Q.   At that point did he remind you about the MES

24   software?

EXHIBIT 5

Page 49

1          A.    Yes.

2              MR. LAVERY:  Object to the form.

3              MR. NELLANS:   Q   And you said you needed to give

4      context to this answer?

5              THE WITNESS:  A   Yes.  I received my laptop the

6      week of October 4th I think it was.  When I called to get

7      up on the MES and the TRC I think was called the

8      training.  I was not -- they said you're not even

9      established as an employee.  So October 4th, 5th or 6th,

10     one of those days I was told after being there for almost

11     three weeks that I wasn't an employee.  I was nowhere.

12     My employee number wasn't sent in.  Nobody requested a

13     new laptop.

14              So they ended up having to overnight me a

15     laptop, get me set up.  So that's why on October 9th,

16     when I finally had my laptop up and running, Monday

17     October 9, I was brought in -- again, the two younger

18     reps that are Monday October 9th -- was it a Monday?  I

19     need to look.  I need to look.

20              Anyway, on or about -- there was two sales

21     reps in the room with David for our Monday morning

22     meeting.  Once again the two younger reps who were

23     together got to phone in, they got to phone in.  They

24     didn't have to come into the office.  They were always

EXHIBIT 5

Page 50

1    together.  The two younger reps.

2                Me and the African-American, 52-year old

3    woman were in the conference room.  We came from the

4    western suburbs early morning trains, and these two guys

5    lived in the city.  They don't have to come into the

6    office, again the two younger guys.

7                So I did not have a working laptop.  When

8    I left for work on Monday morning my wife said to me you

9    got three weeks of expense reports, you need to get your

10   expenses done today.  Being the financial person that she

11   is.  David asked me you got two things to accomplish

12   today.  One of them is get set up on MES, the employee

13   portal after my three weeks there, I only had two left to

14   go.  Employee portal, and to get my expenses done.

15               I said -- he said what's more important,

16   MES or expenses.  I said expenses.  He said wrong answer.

17   Rochelle, the African-American woman, could you please

18   leave the room.  And he turned beet red, was standing up

19   in the conference room.  He said why would you say that

20   when you know what the answer should have been.  I said

21   why did you ask me the question.

22               That was our argument.  Why did you ask me

23   a question if I couldn't answer it honestly.  And I was

24   pissed off.  And he was, too, and I said all right, well

EXHIBIT 5

Page 51

1    I need to make sure we are okay.  I'll go do my expense

2    reports and -- an hour later I was set up for everything.

3              It was an unnecessary argument from a

4    sales leader to give to an employee because I was doing

5    all the right things.  I didn't have the company tools to

6    work for.  This old guy didn't even -- wasn't even

7    established as an employee as of October 4th.  Look at

8    those records, look at my requests to the TRC.  They had

9    no record of me being there.

10             So David blamed it on Randy.  Said Randy

11   forgot to turn your paperwork in from your -- for your

12   employee.  But for some reason HR had it or else I

13   wouldn't have been on this call.  So why wasn't

14   technology there.  So I had no laptop ordered till they

15   overnight it to me and I think it was middle of the week

16   the week of October 4th.  So I had nothing to work with.

17             So here's a guy who could have done my

18   expense reports for me, let me borrow his laptop and

19   teach me the MES, I would have done it.  It's a sales

20   tool, like Salesforce.  It's how you record everything.

21   I had business cards all over the place.  I had no

22   organization.  Again there was no -- it was the older

23   guy, he didn't want me to be there.

24             Next question, please.

EXHIBIT 5

Page 52

1          MR. NELLANS:  Move to strike the non responsive

2    portion.

3          MR. LAVERY:  Object to that once again.  Improper.

4    Ask you to please stop doing this.  There's no judge

5    here.  This is not a live trial.

6          MR. NELLANS:  Moving on.  You mentioned getting

7    your laptop on October 4.

8          Q.  What prompted that?

9          THE WITNESS:  A   I didn't get my laptop on

10   October 4th.  I called the TRC in Des Moines, Iowa and

11   wanted to know where my laptop was.  Because David said

12   oh, it will be here any time.  Nobody was doing anything.

13               So I called the TRC.  They said Ian, we

14   don't even have you listed as getting a laptop.  We don't

15   even have your employee number yet established.

16               I'm thinking okay, well -- I tell him.  So

17   Randy had to get it approved to overnight to me so

18   nothing was done.  So I think that was -- I will look, I

19   will give you the -- it was on or about October 4.

20         Q.  Was that time the first time the issue of you

21   not having a laptop come up?

22         A.  The first time my laptop was working was

23   Monday, October 9.  That's when he said what's your

24   priority for the day.

Page 53

1      My priority was to get money.  Second

2    priority was to get on MES.  Both of them combined take

3    about an hour.  Why are you asking which one goes first.

4    I answered you honestly again.

5           I keep saying it.  He just didn't want me

6    there.  He was starting arguments just for the sake of --

7    he was like trying to draw insubordination out of me when

8    he was the insubordinate one.  He did not want the older

9    guy on his team.

10      Q.   My question is a little different.

11           On October 4 or around October 4, was that

12   the first time the issue of not having a laptop had come

13   up?

14      A.   Yes.

15      MR. LAVERY:  Object to the form, foundation.

16      THE WITNESS:  A   I believe so.

17      MR. NELLANS:  Q   So before that no one raised it

18   with you and you didn't raise it with them?

19      A.   Oh, no.  My laptop was on its way for three

20   weeks.  It became a joke around the office, I don't have

21   my laptop.  So no, I wanted it every day.  It was

22   stopping me from getting organized to go do my job.

23      Q.   So there were discussions about your laptop

24   before October 4th?

EXHIBIT 5

Page 54

1    A.   Yes.  David, where is my laptop.  I will make a
2  call.  Should be here any day.
3    Q.   Who did you talk to about not having a laptop?
4    A.   David, several occasions, David.  Everybody in
5  the office knew, Ian doesn't have his laptop yet.  Monday
6  morning meetings with me and the older rep Rochelle was
7  in the room.  The two other guys would phone in from
8  wherever they were, at Denny's or something.
9           So yes, I had conversations.  It was a
10  known fact that Ian didn't have his laptop.  He's been
11  here three weeks and he doesn't have his laptop.
12    Q.   Other than David, who else did you discuss your
13  laptop with?
14    A.   I don't know.  Nobody, I didn't discuss it.  It
15  was like a joke.  Rochelle probably.
16    Q.   Is there anyone other than Rochelle?
17    A.   Rochelle was telling me who I need to call to
18  get my laptop so no, I can't recall talking to anybody
19  else specifically.
20    Q.   Then on or around October 4, is that the first
21  time you called the person that Rochelle said you needed
22  to call?
23    A.   I don't know, I don't remember.
24    Q.   You testified that then you needed software

EXHIBIT 5

Page 55

1    added to your laptop after that?

2        A.   I don't recall.  Did I testify that I needed

3    software added?

4        Q.   When you got your laptop was the laptop fully

5    functional to be used?

6        A.   My first time of having a fully functional

7    laptop was October 9.  It wasn't functional -- I didn't

8    have it till Wednesday or Thursday before that weekend.

9        Q.   So why on Wednesday or Thursday before that

10   Monday was the laptop not functional?

11       A.   Because I didn't have an employee number.  Or I

12   don't recall.  I really don't remember why it wasn't

13   functional.

14       Q.   Okay.  So it's your testimony that while you're

15   not sure if it's the employee number or not, that Monday

16   was the first time where both those issues were resolved?

17       A.   Monday was the first time I had a functioning

18   laptop when all the software had been loaded from Des

19   Moines, Iowa.  So I must have got the laptop on a

20   Thursday.  But I don't recall.

21       Q.   Okay.  Returning to that meeting.  After David

22   told you that --

23       A.   I gave him the wrong answer.

24       Q.   After David told you you gave him the wrong

EXHIBIT 5

Page 56

1   answer, what else was said?

2       A.   David would ask me if I wanted -- he'd ask me

3   this on more than one occasion.  Do you want to be here?

4   I'm like what kind of question is that, to an employee

5   that's been here a week or three weeks.

6            Because you can leave right now if you

7   want.  Terrible way to talk to any employee, whatever age

8   they are.  You shouldn't say you want to be here on your

9   second week or fourth week of employment.  Because that's

10  telling them that they don't want you here.

11      Q.   You referred to a document in answering.  What

12  documents do you have in front of you, sir?

13      A.   It's the same one you do probably.  The e-mail

14  of my -- that I sent to their paralegal on August of

15  2018.

16      Q.   Okay.

17      A.   I have got -- I will strike one thing from

18  this, David was not yelling at me.  David became very

19  condescending.  Which is his usual occurrence with me and

20  Rochelle anyway.

21           Then he asked Rochelle to leave the room,

22  Mr. Macleod did at some point -- go ahead.

23           MR. NELLANS:  We haven't had that as an exhibit.

24           MR. LAVERY:  That's a privileged document.  He's

EXHIBIT 5

Page 57

1    using it to refresh his recollection.

2         THE WITNESS:  It's just my notes, because this is

3    two years ago.

4         MR. LAVERY:  I didn't realize that that's what this

5    was till now.  Inadvertent that he disclosed it.  But the

6    notes, I don't think there was anything privileged in it

7    just revealed but, yeah.

8         MR. NELLANS:  Okay.  I prefer going forward you

9    attempt to answer my question first.  If you need to

10   refer to your notes, please let me know.  Okay?

11        THE WITNESS:  Okay.

12        MR. NELLANS:  Q   So you said in addition to that

13   you got the wrong answer, David asked you if you wanted

14   to be here?

15        THE WITNESS:  A   Uh-huh.

16        Q.   Did you say anything in response to that?

17        A.   Yes.  I said of course I want to be here.  I

18   searched high and wide and far for getting that job.  And

19   I got the job that I wanted and I turned other jobs down

20   to take that job.  And I saw it as a job that I could

21   build on and build on and be a regional leader.

22             So of course he said do you want to be

23   here, again he was beet red, and I didn't understand why

24   it was this was -- I said I am not here to argue with

EXHIBIT 5

Page 58

1    you.  I don't understand why we are having this.

2                    I says, I said I'm sorry if I came across

3    that way and he said I'm sorry, too.  He said are we

4    good, I said we are good.

5                    I left the room, got MES loaded on my

6    laptop and then I did my expense reports and told David

7    everything is done and that was before lunch.

8        Q.   Do you recall saying anything else before you

9    two exchanged apologies?

10       A.   No.  I don't remember, but.

11       Q.   Do you recall anything else that David said --

12       A.   No.

13       Q.   -- before -- apologize, finish my question.

14                    Do you recall anything else that David

15   said before you two exchanged apologies?

16       A.   No.

17       Q.   At what point in the exchange did Rochelle

18   leave the room?

19       A.   When he told me wrong answer and I said how

20   could it be a wrong answer, I gave you an honest answer

21   and he said Rochelle, please leave the room.

22       Q.   So it's your memory that Rochelle was not

23   present after that initial exchange?

24       A.   Yes.

EXHIBIT 5

Page 59

1      Q.   And we already talked about in-person sales

2   calls.

3                 Other than those sales calls, were you

4   ever out of the office?

5      A.   Ever out of the office for non sales, no.

6      Q.   Not counting times you were out with Rochelle

7   or on your own making in-person sales calls.

8      A.   Was I out of the office, no.  I guess can you

9   ask, say that again, ask it again.

10     Q.   Were you ever out of the --

11     A.   Like was I sick or --

12     Q.   For any reason?

13     A.   I don't believe I called in sick.  No, I don't

14   think so.

15     Q.   Were you ever late to work?

16     A.   So every day I took the same train as Rochelle

17   did.  I was never late.  We had an 8:30 regional meeting

18   and our train got stuck on one of those days and I don't

19   recall the date, but we walked in about three minutes

20   late for that and we were notified we were late by David

21   and we couldn't help the train had got stuck.  It was

22   stopped on the tracks so yeah, that was the only time I

23   was late.

24                 I took the same train as Rochelle to work

EXHIBIT 5

Page 60

1   and home from work.  We left the office every day

2   together and we walked in together every day.  Every

3   single day of my employment at least after the third day

4   when we found out we were taking the same train.  I know

5   what car she was in.  Her train left at 7:14 I believe

6   from Saint Charles.  And in Villa Park it would stop at

7   7:36.  It would get us in shortly after 8:00.  So I was

8   never late.

9       Q.   I just want to --

10      A.   I was never reprimanded for being late.  I was

11  never written up for being late.  I was never told I was

12  going to be late.  I walked in every day with Rochelle

13  and left every day with Rochelle.

14      Q.   I want to clarify two things about what you

15  said.

16           When you said you were never reprimanded

17  for being late, was that aside from the one time you were

18  late because of train stoppage?

19      A.   No, I was never reprimand besides that.

20      Q.   When you say you rode the train together every

21  day, those would be I'm assuming only the days where you

22  both were going to the office, not days where you were

23  making in-person sales calls?

24      A.   Well Rochelle -- yes, yes.  Majority we had to

EXHIBIT 5

Page 61

1    go into the office, especially my first two weeks.

2         Q.   When you made in-person sales calls, I know you

3    often went with Rochelle?

4         A.   Uh-huh.

5         Q.   Did you ever do those on your own?

6         A.   Oh, yeah.

7         Q.   Do you know what percent of the time you were

8    on your own versus with Rochelle?

9         A.   Majority of the time I was with Rochelle.  I

10   don't know -- I remember being on, like one day I -- you

11   know, I tend to target businesses or places to go to in

12   my prospecting.  So I would like, I would focus on

13   colleges in the Chicagoland area in the western suburbs

14   for a day.  So there's a ton of them in the western

15   suburbs as you know.  So I would focus on that.

16   Manufacturing in Downers Grove.  I would target on.

17              And then I would go with Rochelle and just

18   learn from her on her appointments as well.  So --

19   because she was very good.

20        Q.   Were there times where you were making sales

21   calls but Rochelle would be going in the office?

22        A.   Oh, yeah.

23        Q.   Were there times where she was making sales

24   calls but you would be going in the office?

EXHIBIT 5

Page 62

1      A.   I'm sure there was.  I don't know for a fact.

2  If I was in the office I sometimes didn't know where

3  Rochelle was.  Rochelle would go to Decatur like every

4  other week for a couple days.  I didn't go with her.

5      Q.   Was she making sales calls in Decatur?

6      A.   Yes.

7      Q.   So every other week for couple days?

8      A.   I mean I don't know how often, once or twice

9  during my tenure there she would go to Decatur.

10     Q.   So when you say you rode the train every day,

11 that means excepting all these other circumstances?

12     A.   There was a couple occasions I would drive

13 because I would start my day out in the field and then

14 come into the office and park into the parking down here.

15 One time I needed, I had a question from one of the guys

16 who understand -- I needed some training and I don't

17 recall what the training was, but David was out of town

18 and I called Ben.  I hope that's his name.  I called Ben

19 to see if he could help me.  I was in, I was calling from

20 College of DuPage.

21          I said do you have any time in the next

22 couple days to help me.  He says I can help you this

23 afternoon.  So I said okay, I'm coming in.  So I got into

24 the office like 1:00 o'clock and I don't know if Ben ever

EXHIBIT 5

Page 63

1   did -- he was on the phone a lot so I don't know if he

2   ever answered my questions.  I don't recall.

3                   But so yeah, that happened.  I mean in

4   sales, if somebody lives in Villa Park and they are going

5   to their territory in Downers Grove, why would they come

6   all the way to the Loop and then go out there first, but

7   I had to.  My first couple weeks.  So.

8        Q.   You've also mentioned couple times during this

9   deposition, excuse me, couple times in this deposition

10  you referred to yourself and Rochelle as older employees

11  and then others as younger employees.

12                  Can you tell me who you were including in

13  that group of younger employees?

14       A.   Let me just put it this way:  Everybody else in

15  the office besides Rochelle and myself.  I don't remember

16  their names.  Scott Emberling, maybe he's closer to my

17  age.  Ben, I forget his last name.  Kevin Fukumoto.

18  Probably not that much younger.  Kevin was probably

19  30 years old at the time.  I don't even remember the guy

20  who sat right across from me but he was still in his 20s

21  or early 30s.

22       Q.   You mentioned Andrew Spencer.  Would you

23  include --

24       A.   Yep.

EXHIBIT 5

Page 64

1     Q.   You -- what facts support your -- strike that.

2              What facts support your belief that you

3  were treated differently than those employees?

4     A.   I knew it the first hour -- I knew it, I had a

5  feeling after I accepted the job.  Dave was arguing with

6  me during the interview and I asked him why are you

7  arguing with me, I don't even work for you yet.  And

8  Randy was laughing.  So I felt a twinge of it before I

9  was hired.

10            I really felt it 20 minutes into my job

11  just sitting there not getting any direction, I'm like

12  this is terrible.  It's like a copier rep when I was

13  23 years old.  There's no direction.

14            So I knew and David told me that I was

15  going to have the most intense training for the first

16  90 days.  Well, that wasn't very intense.  There was

17  nothing done.

18            I got the younger reps could come and go

19  as they please.  The younger reps could go have a beer at

20  lunch if they wanted to.  That happened more than one

21  occasion while I was there.  Nothing was ever done.  They

22  are still there.  I don't know if they are still there

23  but they were when I left.  I never went drinking during

24  work hours.  Younger reps did though so I don't know if

EXHIBIT 5

Page 65

1    David, maybe you went with them.

2                My whole being, I knew that I was being

3    discriminated against while I was at MidAmerican.  And I

4    couldn't go to Randy.  Rochelle was already going to

5    Randy about her issues.  I couldn't go to HR because I

6    didn't feel like HR was employee oriented with

7    MidAmerican.  They were very not -- they were not the HR

8    department that I was used to.  It's more textbook black

9    and white.

10               I didn't have anybody to go to except for

11   Rochelle and it was obvious in her eyes that David didn't

12   like me.  And I couldn't figure out why.

13               It had to do with he didn't pick me, Randy

14   wanted to hire me.  David didn't want to because I was

15   the older guy, which he told everybody in the conference

16   room before I started.  My first hour Kevin Fukumoto said

17   I didn't know you were 56.  You don't look 56.  I said

18   how do you know how old I am.  David brought it up in the

19   interview, and Rochelle said that's right, he did.

20               Why do you talk about somebody's age to

21   your sales force.  After hiring over 100 sales people I

22   would not bring up -- that's like HR-101, why would you

23   bring up my age.

24               The guy didn't want me there.  I don't

EXHIBIT 5

Page 66

1    know how much more I can tell it.  I felt age

2    discrimination every time I was picked on.  I was laughed

3    at by the younger two, the F bombs that were thrown over

4    the office.  It was a very immature office to be at.

5              The day after the massacre in Las Vegas,

6    Scott Emberling was joking about seeing all the people

7    running around getting picked off.  That was the kind of

8    atmosphere I was in.  They weren't frat boys but this was

9    a frat group and I was the odd, older guy out.

10             It was obvious to Rochelle, and you know

11   what, race discrimination was going on in that office.

12   So that's what I couldn't believe that I was working for

13   an HR nightmare.  But here I was trapped and little did I

14   know that I would not survive.  Because he wanted me out.

15   I knew it the first 20 minutes I walked in the door.

16             He didn't want -- he didn't want to spend

17   any time with me and he didn't.  You go on a ride day

18   with somebody you don't go for an hour.  A ride day, a

19   good ride day?  Sales is 9:00 to 4:00.  You ask any sales

20   manager of any business if they are going on ride days

21   with their reps.  The ride days, plan the days by the

22   reps, the manager shows up for support and training

23   purposes.  No.

24        MR. NELLANS:  Move to strike the non-responsive.

EXHIBIT 5

Page 67

```
 1        THE WITNESS:  What non-responsive?

 2        MR. LAVERY:  Object to the form and foundation.

 3        MR. NELLANS:  So I'm going to get to the other

 4   aspects of age discrimination and promise right now I'm

 5   not trying to trick you.  I just want to get a list.

 6        Q.   So you have mentioned in your answer that you

 7   believe that younger employees were treated differently

 8   because they were --

 9        THE WITNESS:  A   They didn't have to come into the

10   office.

11        Q.   And they were allowed to get beers.

12             Was there any other grounds that you

13   thought those employees were treated differently than

14   you?

15        A.   They could do whatever they want every day.

16   They were -- Kevin Spencer, David White and -- Fukumoto,

17   Spencer and White, they were in it together.  They were

18   in kahootz.  They did everything together and David and

19   Andrew, just go do whatever you want.

20             That's the type of atmosphere I was in.

21   Very unprofessional sales environment and I would have --

22   yeah.

23        Q.   So in addition to the not coming into the

24   office, the beers, you believe they just had -- this is
```

**EXHIBIT 5**

Page 68

1    my expression, I don't mean to put words in your mouth --

2    just you had a shorter leash than they did?

3        MR. LAVERY:  Object to the form.

4        A.   Tell you what, you look at their activities,

5    their weekly activity every sales meeting, I was smoking

6    them because they would do 20 cold calls a week.  I can

7    do that in an hour.  Effective cold calls.

8            Dave was with me, we did 30 in an hour and

9    a half.  They weren't doing anything.  They weren't

10   working and they were laughing about it.

11       Q.   Do you know what Kevin's position was?

12       A.   He was the account rep I believe.

13       Q.   Do you know what his age was?

14       A.   No.

15       Q.   Do you know what Andrew's position was?

16       A.   I think he was an AE but I'm not sure.  I think

17   he just got promoted while I was there.

18       Q.   Do you know what his age was?

19       A.   No, but I think he was around 30 at the time I

20   believe.

21       Q.   You mentioned Ben.  Do you know what his

22   position was?

23       A.   He was the -- I forget what it was.  He was

24   some sort of expert in writing the contracts.  I think, I

EXHIBIT 5

Page 69

1    don't know.

2         Q.   He was not a sales person?

3         A.   No.

4         Q.   I asked about Andrew and Ben.  Were there any

5    other salesmen that you thought were not required to be

6    in the office?

7         A.   Those were the only other two sales people

8    besides me and Rochelle that were in the office.

9         Q.   What was Rochelle's position?

10        A.   I think she might have been -- I don't know,

11   either AE or AR.

12        Q.   Did all of the sales people in the office have

13   to do both on phone and in-person cold calls?

14        A.   Yes.

15        Q.   Would you know --

16        A.   I mean I don't think they ever -- I don't know

17   if they had to do anything.  I never saw them on the

18   phone making phone calls, but it was a very hard

19   environment to make phone calls from.

20        Q.   Do you know what their schedule was in terms of

21   in person sales calls?

22        A.   No.  I never saw them.

23        Q.   So when they were out of the office, would you

24   know if they were out of the office making a sales call

EXHIBIT 5

Page 70

1   or if they were just out of the office?

2        A.   I don't know, I didn't care.

3        Q.   After that October 9 meeting, did you have

4   another meeting about that meeting?

5        A.   October 9, on October 13 -- the Friday -- so

6   Dave was going to a regional meeting.  The week of -- it

7   was -- if the 9th was a Monday, that Friday I was in one

8   of the spare offices making phone calls and doing my

9   reports.  And because I was getting used to the software

10  so every phone call you make, you have to enter it in.

11  It gets faster as you go but it's very time consuming

12  when you start out with.

13            So David came into me, it was like --

14  because we had a meeting, I think it was scheduled for

15  3:00 p.m. that day.  He came in and I was on a ride day

16  with him the -- I don't know.  Scratch that.

17            I don't know if I was on a ride day with

18  him that week or not, but he told me that he was leaving

19  town.  I told him that next week I'm going to, I'm going

20  to focus on the colleges, I'm going to spend the Tuesday

21  with Rochelle.  So I laid out my week for him.

22            That Friday the 13th during our meeting in

23  the afternoon, David White told me I'm doing everything

24  that I should be doing.

EXHIBIT 5

Page 71

1        My next meeting with David White was on

2    October 20th at 3:00 p.m. when I thought I was going to

3    go in.  Since he was out of town Monday through Thursday

4    for a meeting.  When I went into the meeting to go over,

5    review my week and upcoming week with him, Burt Short

6    from human resources was on the phone.  And said this is

7    a hearing for insubordination.

8        I said I am totally caught off guard.

9    What is this about.  Then he brought up how I was

10   insubordinate to David White on October 9 when he asked

11   me the question what are you going to do.  Are you going

12   to get your expense reports in or going to get the MES

13   loaded.  I said expense reports.  That was what they

14   termed insubordination.

15       I mean I was in disbelief.  I worked with

16   human resources all my career and I'm getting called in

17   for insubordination when it wasn't insubordination.  I

18   was the old fucker in the room.  That's what it was.

19       That's -- so no, my next meeting was I'm

20   told I'm doing a great job, keep doing what you're doing.

21   Then a week later, you're in a disciplinary hearing with

22   human resources out of California on the phone.

23       I have my call sheets, I had everything to

24   review with David White and I was just ambushed by human

Page 72

1    resources and him, David White.  So I had two meetings.

2    So I was ambushed, yeah.  Then they had to give it the

3    weekend so they can think about it.  I walked in on

4    Monday and I get an e-mail saying your laptop usage is

5    being terminated.

6              I showed Rochelle and she starts crying.

7    She said they can't.  So David White called me and I

8    already knew I was fired, why are you doing this.  So I

9    walked out without -- because this is wrong and you can

10   talk about the rebuttal I sent, which was a fair rebuttal

11   I thought.

12             Terrible what happened to me.  It's

13   terrible what happened to me just because of my age.  I

14   would have been kicking ass for that company right now if

15   it wasn't for that man at the end of the table, David

16   White.

17        Q.   Starting with that meeting with HR, was anyone

18   present other than yourself, David White and Burt Short

19   on the phone?

20        A.   No.

21        Q.   Other than the October 9 meeting, was anything

22   else discussed at that meeting?

23        A.   No, but I did remember something really amazing

24   because that Friday, it was either Thursday or Friday,

EXHIBIT 5

Page 73

1  the 12th, maybe October 12th, I'll ask Rochelle.

2              Rochelle and David had a meeting in the

3  conference room so it's a loft, it's a loft office so you

4  can hear everything.  Rochelle was telling him you son of

5  a bitch.  You're not going to treat me like this because

6  of my color.  And it went on for two hours her yelling at

7  him.  Her yelling at him.  She still had her job when I

8  left.

9              What is insubordination?  I'm going to

10 have a couple of beers down the street?  It's Friday at

11 noon, we are going to drink during our lunch.  Holy -- I

12 mean come on.

13             Did I answer your question or no?  So

14 aggravating.

15     MR. NELLANS:  I will move to strike the

16 non-responsive.  I apologize, I know this was

17 frustrating.

18     THE WITNESS:  What does it mean to move to strike

19 the non-responsive?

20     MR. NELLANS:  It's for the lawyers.

21     MR. LAVERY:  Where is that in the Code of Civil

22 Procedure?  I've been a lawyer for 20 years, I never seen

23 that.

24     MR. NELLANS:  Okay.

EXHIBIT 5

Page 74

1          MR. LAVERY:  No, just humor me.

2          MR. NELLANS:  You can state your objection.

3          MR. LAVERY:  Where is it permitted for you to make

4    a motion in a dep.

5          MR. NELLANS:  I am going to proceed with my

6    deposition.

7          MR. LAVERY:  No, you're not.  You're making motions

8    in the deposition.  You're supposed to ask questions and

9    get answers.  So just stop making motions.

10         MR. NELLANS:  Q   So at that meeting was anything

11   discussed other than the October 9th meeting?  And this

12   is the meeting between you and --

13         THE WITNESS:  A   Yes, it did.  It came up that I

14   called the place a dump.  Such rinky dink shit, man.

15              I called the place a dump when Kevin

16   Fukumoto was having a cigarette out front.  I referred to

17   my interview process and I thought the place was a dump.

18              Two weeks later I'm on the phone with

19   Randy, I said you didn't tell me during the interview

20   process that you were going through construction here.

21   And he goes I should tell people I bring in there the

22   place is so trashy.  So yeah, that got brought up.

23              What else got brought up.  How I'm late.

24   I believe that came up.  I never been late.  Except for

EXHIBIT 5

Page 75

1    that one day when we had a regional meeting and our train

2    got stopped.  If I was going to be late with the train

3    schedule I would be coming in at noon if I didn't take

4    the train.  So nothing happened like that.

5              I shouldn't have even brought that up but,

6    did I answer your question?

7         Q.   Yes.  Anything else?

8         A.   That I thought my picture was -- I said that I

9    am sick of this shit getting my picture taken.  Words put

10   into my mouth.  I would never swear in an office

11   environment.  I'm swearing now, excuse me, but I would

12   never swear, especially being a new rep two weeks into my

13   job.  I wouldn't make fun of somebody taking a picture of

14   me.

15             I said I hated my picture being taken.  I

16   got in trouble for that.  I just don't like my picture

17   being taken, I'm getting reprimanded for it.  But I

18   didn't fight it.  I said I gained weight.  I don't like

19   it.  So anyway, I think those were the only things that

20   were brought up.  I already -- yeah.

21             Terrible, terrible, unprofessional thing

22   to do to a person.  I was trapped.  I thought I was going

23   in for one reason, I was caught off guard.  Terrible

24   thing to do to another human being.  You don't treat

EXHIBIT 5

Page 76

1    people that way, young or old, but he wanted me out of

2    there.

3                So on October 13th, I have a meeting with

4    David.  He tells me I'm doing all the right things in my

5    job.  I'm laying out my plan for him, what my next week

6    would be.  He said good job.  We will review it next

7    Friday.  David's out of town Monday through Thursday of

8    that week.

9                So I have a talk with him telling I'm

10   doing a good job on Friday the 13th and on the following

11   Friday I'm on the phone with human resources.  What

12   happened in those four days that I didn't see him.  What

13   happened.  He was with other managers.  And MES, they

14   found a loophole to get me out and that's what they took.

15   They took my insubordination of saying, answering a

16   question correctly.  I just don't get it.  It was my age.

17       Q.   Unpacking that some.  You mentioned this

18   before, having that meeting with David on the 13th.  To

19   discuss your activity for the coming week.  Correct?

20       A.   Yep.

21       Q.   Was that something that happened every week?

22       A.   That was the first time it happened.  Because

23   he was going out of town and he wanted to know how my

24   week went.  I think he was still shooken up from Rochelle

EXHIBIT 5

1    yelling at him for about two hours.

2        Q.   Returning to this meeting with Burt and David.

3             Do you recall what Burt Short said during

4    the meeting?

5        A.   I think he brought up code of ethics.  Code of

6    business conduct that he put me -- I had -- I had

7    training with him my first day.  That was half an hour of

8    common sense code of ethics that we all go through.  I

9    think that's all he brought up.

10            I just said I can't believe you trapped

11   me.  You like -- I forgot the word for it, but I'm here

12   and I'm not here for the reason I thought and sort of

13   being insubordinate because I answered the question in

14   the opinion of a sales manager in the wrong way?  Oh,

15   boy.

16            I tell you what, that's age discrimination

17   and they are just trying to find a way to get rid of me.

18   Same thing I felt day one after every meeting with David.

19   Condescending, would talk over me.  Yeah.  It's -- I

20   couldn't believe it and I have been through a lot of

21   hirings and firings in my life, but I didn't think that

22   would ever happen to me like that for doing my job.

23            Trying to do my job with no support.

24   Whether on-line support, the minimal training, the

EXHIBIT 5

Page 78

1    intense training I was told during the interview process.

2                    Randy spent two hours with me training me

3    a week before I was fired.  He went through a big

4    presentation he was going to do over the phone.

5    Rochelle was in the Quad Cities with him and she

6    encouraged him to get me on the phone and show me his

7    presentation.  That was a week before I was terminated.

8                    Why would Randy put me through a two-hour

9    training that was confidential to his company when I was

10   going to be fired seven business days later or six

11   business days later; why would they do that?

12                    I don't know.  It's because of my age.

13        Q.   Other than feeling, saying you felt trapped, do

14   you recall saying anything else during that meeting with

15   Burt?

16        A.   I was very upset.  I don't remember anything I

17   said.  I was very upset though.  I mean I wanted to cry.

18   I actually wanted to cry because I couldn't believe I was

19   put into this trap.

20                    And it was organized by David White, who

21   wanted me out because of my fucking age.

22        Q.   Do you recall anything else that David said

23   during the deposition -- or excuse me.

24                    Do you recall anything else that David

EXHIBIT 5

Page 79

1  said during that meeting with you and Burt?

2      A.   I mean, I could read my notes.

3      Q.   If you need to refresh your recollection,

4  review your notes.

5      A.   No, I mean I don't remember saying anything

6  else.

7      Q.   We discussed the comment you made on your first

8  day about the office being a dump.

9           Other than the office conditions, did you

10  ever complain about MES while working there?

11      A.   I only had MES for like -- no, I mean I

12  didn't -- what is MES?  Let me ask you that.  What is

13  MES?

14      Q.   I apologize.  Did you ever complain about

15  MidAmerican while working there?

16      A.   No.

17      Q.   Did you ever complain about David while working

18  at MidAmerican?

19      MR. LAVERY:  Object to the form.

20      THE WITNESS:  A  I'm trying to think if I ever

21  said anything.

22      MR. NELLANS:  Q  Take your time.

23      A.   I know I did but I'm pretty sure it was to

24  Rochelle because we became pretty close.

EXHIBIT 5

Page 80

```
 1              She knew I wasn't getting the support.  I
 2    mean that's how this all started.  So I guess if you talk
 3    about -- you're not going to get any help from David.
 4    You got to do it on your own.  You got to take it upon
 5    yourself.  That was the advice I got from her after my
 6    first week, so I guess yes, I'm sure I probably did
 7    complain about David.  I know she was to Randy.
 8         Q.   Did you complain to anyone other than Rochelle
 9    about David?
10         A.   I don't recall.  I don't know for sure.  I
11    don't remember.
12         Q.   Did you ever have a conversation with HR about
13    how you felt you were being treated differently than
14    younger employees?
15         A.   No.
16         Q.   Did you ever have a conversation with anyone at
17    MidAmerican about how you felt you were being treated
18    differently?
19         A.   Rochelle.
20         Q.   Other than Rochelle?
21         A.   No, I didn't trust anybody else.  So if I did I
22    would have regretted doing it right away if I talked,
23    complained to David.  Because I could -- I'm not the
24    person to run to HR.  Maybe I should have.
```

EXHIBIT 5

Page 81

1              But I was mature enough to know what I had

2      to do.  Because I led so many sales people to do the same

3      job, just a different product.  Same stuff, different

4      product.

5              So I knew what I had to do so I thought I

6      could overcome everything and looking back getting

7      through my first year, I wouldn't have to deal with David

8      very long.  I really, truly believed that David wouldn't

9      be there very long myself.

10         MR. NELLANS:  Turn your attention to another

11     exhibit.

12              (Deposition Exhibit No. 8 marked)

13         MR. NELLANS:  Q    Do you recognize this document?

14         THE WITNESS:  A    Oh, yeah.  This is the one that I

15     probably didn't even read it.  Yeah, this is -- yep.

16              This is what was handed to me after I got

17     an e-mail saying I was terminated from the TRC or

18     something.  That my laptop is no longer able to function.

19     I was terminated.

20         Q.   And in this letter it refers to that hearing on

21     October 20.  Is that the meeting we were previously --

22         A.   Yes, yes.

23         Q.   I'm going to finish my question.

24              Is that the meeting we were discussing

EXHIBIT 5

Page 82

1    between you, David and Burt?

2         A.   Yes.

3         Q.   Is your understanding the October 9 meeting

4    that it's referring to is the one we previously discussed

5    as well?

6         A.   Yes.

7         Q.   Okay.  And in the second to last full paragraph

8    it says -- or excuse me, strike that question.

9              In the first full paragraph it says that

10   you were being terminated for failure to successfully

11   complete your first six months employment and for

12   insubordination.  Is that what it says?

13        A.   So my understanding was it was -- since I

14   violated the code of business conduct, I was not able to

15   comply, it's sort of the same thing.

16             Anyway, what's your question?  I got this

17   on my last day.  I probably didn't read it though.  I

18   mean handed to me.  I didn't sit down, say thank you for

19   the experience.  I grabbed it, threw my keys on the --

20   everything that belonged to the company on my desk and

21   walked out the door.

22        Q.   And what facts support your belief that you

23   were not terminated for insubordination?

24        A.   Okay.  I think I answered this.  Because here's

**EXHIBIT 5**

Page 83

1   my insubordination.  My laptop was functional for the

2   first time October 9th.  Okay.  Or it might have been

3   functional the Friday before.

4                   So when I came in, when I left for work

5   that morning, my wife said turn your expenses in, we are

6   going to start getting late because I used one credit

7   card for my expenses for work.  So she would get late

8   charge, you need your money.  So get your expenses turned

9   in today.

10                  Two hours forward, David White says you

11  have two things to accomplish today, MES and your

12  expenses, which is more important.  I said my expenses.

13  That was my insubordination.  That was my

14  insubordination.  That is not insubordination, that's

15  answering a question honestly.  They called it

16  insubordination.

17                  I call it a fun discussion, I said the

18  office was a dump when I was there.  Two weeks later I

19  was on the phone with David White's boss and I said you

20  didn't tell me this place was under construction, it's

21  trashy.  He goes I should tell people that I am

22  interviewing there.  That's good to know.  He goes yeah,

23  it is sort of a scruffy office.

24                  So my, my insubordination that day was how

EXHIBIT 5

Page 84

1    I answered that question.  That's what I was told in the,

2    during Burt Short's interview or pre-disciplinary hearing

3    they called it.  So I was, my insubordination was not

4    insubordination.  I was terminated 100 percent because of

5    my age.  100 percent.  I didn't feel any different.  I

6    felt the same way 20 minutes into my job as the day I

7    walked out.  So I knew I needed to do something about it.

8            Because how that person David White was

9    treating people, me and a colored woman, was absolutely

10   disgusting.

11       Q.   Other than your position that that conduct was

12   not insubordinate, is there anything else that supports

13   your position that --

14       A.   I was never insubordinate, I can answer that

15   100 percent.  I was not insubordinate ever.

16            He was, he talked down to me, degradingly.

17   He's insubordinate and it's really hard for me to take as

18   a grown man.  But as an older man who felt like he was

19   being escorted out the door.  20 minutes into his first

20   day.  Sounds like a broken record.

21            Did I answer your question?

22       Q.   Do you have anything else?

23       A.   I have to leave my phone on, I'm sorry.  My

24   wife.

EXHIBIT 5

Page 85

1      Q.   I completely understand.

2           Do you have anything else to add to that

3   answer?

4      A.   I don't think so, no.

5      Q.   Okay.  And what facts support your belief that

6   you were not terminated for failure to successfully

7   complete your first six months?

8      A.   I didn't have a chance.  I said to you, I told

9   you about the 50s test, you know what you're hiring.  I

10  hired hundreds of people.  You have got to give them

11  90 days in sales to get going.

12          It's the sales manager job to make sure

13  from day one they have the tools to prepare to do well

14  because it's our duty as a company, this is every sales

15  organization, Xerox 101, you got to give a person 90 days

16  in their sales territory.  Heck, they were giving me a

17  year.  They didn't expect me to sell anything for a year.

18          I wasn't.  I was doing my job to the best

19  of my capability, 100 percent to my capability.  And

20  behind my back there was this guy who didn't want me

21  there, who saw me as a threat and I was too old; who told

22  me during the interview process I had more experience

23  than him and he wasn't going -- you say to somebody in

24  the interview you're not going to manage me, I am going

Page 86

1     to manage you.  Hey, I didn't say anything, okay, dude.

2     I'll let you manage me.  He didn't manage me.  He didn't

3     do anything.  There was no daily interaction except for

4     Mondays, here's what I am doing.  Go do it.

5                Then all of a sudden when he really, all

6     of a sudden I'm terminated for answering a question yes

7     or no.  That's ridiculous.  And it's because of age

8     discrimination.

9        Q.   You stated your weren't given a chance.

10               Is there anything else that you believe

11    supports the position you were not terminated for not

12    successfully completing your first six months?

13       A.   So I was terminated for not completing my first

14    six months because my insubordination?  Is that how you

15    see it written?

16       Q.   I'm asking you --

17       A.   Because Randy White a week before I was --

18    David wasn't on the phone, but Randy White a week before

19    I was terminated was telling me he heard I was doing a

20    great job.  Who did I hear it from?  Rochelle and the rep

21    down there, what's her face who I called.  I was calling

22    other reps for help.

23       Q.   I will rephrase my question.

24               Other than the fact you were not given a

EXHIBIT 5

Page 87

1    chance to succeed, what other facts support your position

2    you were on track to successfully complete your first six

3    months?

4         MR. LAVERY:  Object to the form, foundation.

5         THE WITNESS:  A   I have -- so I know my own

6    ability.  Sales is activity.  You put into it what you're

7    going to get out of it.

8              I had no fear, I have no fear of cold

9    calling.  And that's why most sales people fail is

10   because they don't, they are not good on appointments.

11   They don't know their competition and they are afraid to

12   prospect.  Prospect is number one.  So the only thing I

13   could do is prospect.

14             I didn't know the product.  The only thing

15   I could do is collect names of people who make the

16   decisions in each company that I stopped in to.  And

17   that's easier to do face to face.  You follow up with

18   phone calls after that so I was doing all that.  I was

19   doing everything.

20             And the Friday before I was hired, one

21   week ago, I was told I was doing all the right things.

22   Week later I'm on a pre-disciplinary, so what happened

23   during -- I'd love to find out how David got me fired the

24   week he was out of town.

EXHIBIT 5

Page 88

1      Q.   Ask a clarification question in a minute, but

2    is there anything else that you want to add to your

3    answer with respect to the successful completion of your

4    first six months?

5          MR. LAVERY:   Object to the form.

6          THE WITNESS:   A   It's a poorly-written termination

7    letter and I'm -- the only reason I got terminated was

8    that I was so-called insubordinate and that's why I told

9    you I was getting -- does that have something to do

10   with -- since I was insubordinate, I'm reading this as

11   though since I was insubordinate, you failed the first

12   six months.   You're insubordinate so you failed the first

13   six months.   That's how I read it.

14              Is that how you read it?

15         MR. NELLANS:   Q   So you don't believe that that is

16   a separate ground for your termination?

17      A.   No.  No.  How would he know.  He didn't know

18   what I was doing.

19      Q.   And if that were another ground of your

20   termination, it's your position that you were not given a

21   chance to succeed and that you were doing the right sales

22   calls and leads?

23      A.   I didn't get leads.  I was generating my own.

24   There's no leads, I wasn't getting leads.

EXHIBIT 5

Page 89

```
 1              The younger guys got those leads if you
 2    want to talk about that, that's another subject.  The
 3    younger guys got the leads.
 4              They had all the current customers.  I had
 5    zero.  Rochelle had zero.  Except the ones she found on
 6    her own.  She had been there for two years.  So the
 7    younger guys were getting everything.
 8              Kevin got his whole territory handed to
 9    him.  He inherited all those accounts.  I wasn't getting
10    anything.  It was all me generated.  And I was getting no
11    support from management.
12              Randy hired me, sales manager David White
13    inherited me.  Didn't like me because of my age.  He
14    wanted a younger team which he told me on several
15    occasions he could mold.  He wanted reps he could mold.
16    I wasn't the moldable rep but I -- I wasn't
17    insubordinate.  I was doing my job, I was never late.
18              I was typing in my records once I got my
19    laptop.  So -- I didn't fail to do anything my first six
20    months.  So no, I'm reading them as the same thing.  If
21    they tell me that I was unable to comply, where does it
22    say that.  Because a failure to successfully complete my
23    first six months of employment.
24              I'd like to see some -- I'd like to see
```

EXHIBIT 5

Page 90

1    what conversations he was having about me because I was

2    told a week before I was doing a great job.  Five

3    business days before October 20 I was told I'm doing all

4    the right things.  That was October 13.

5                   October 20 I was railroaded, I was ganged

6    up on by HR and David White.

7         Q.   The next conversation where you said you were

8    doing all the right things?

9         A.   Yes.

10        Q.   Is that referring to your plan for activities

11   on the week of the 13th?

12        A.   Yes.

13        Q.   Okay.  And so --

14        A.   Week of the 13th.

15        Q.   I believe you said that meeting occurred on

16   October 13 where he said you were --

17        A.   Yes, Friday; yeah, it was.

18        Q.   That was for the perspective week?

19        A.   No, it was for the past week.  And while he was

20   out of town, here's what I am doing next week.  I laid it

21   all out for him.  He said you're doing all the right

22   things, I'll talk to you next Friday.  I'll be out of

23   town for a regional meeting.  So what happened in those

24   five business days.

EXHIBIT 5

Page 91

1                    And then listening to Rochelle during the
2        week of October 9, taking him into the conference room
3        and yelling at him literally for two hours, you're
4        ashamed, you should be ashamed of yourselves.  You don't
5        talk to me that way.
6                    If there was ever insubordination, it was
7        done by her.  She was still there when I left.
8            Q.    You mentioned sales.  Did you have an existing
9        book of business?
10           A.    No.
11           Q.    Did any of your in-person or telephonic cold
12       calls result in a sale?
13           A.    No, I didn't sell anything.  They weren't
14       expecting me to.  I was getting up the prospecting.
15       That's why they give a year guarantee.  They are very
16       long sales cycles.  You're not going to close a deal in a
17       month.
18           Q.    You state in this deposition you were
19       terminated based on your age.  I understand you
20       referenced a number of things throughout your deposition.
21                    Can you please tell me what facts support
22       your position that you were terminated based on your age?
23           MR. LAVERY:  Object to the form, foundation.
24           THE WITNESS:  Didn't you already ask this question?

EXHIBIT 5

Page 92

1          MR. NELLANS:  I asked this with respect to what

2     facts supported your belief about you being treated

3     differently than employees.  If that's part of your

4     answer to this one.

5          THE WITNESS:  It is.

6          MR. NELLANS:  You can reference that.

7          THE WITNESS:  A   I was treated very differently by

8     all the employees except for Rochelle.

9               I think I answered -- everything that I

10    experienced on a day-to-day basis.  When you hear on your

11    first day from a guy that he says he knew my age, so did

12    Rochelle.  They all knew I was 56.

13               Because -- how would you feel about that

14    your first 20 minutes of employment.  Everybody knows

15    your age because their sales manager talked about hiring

16    an older guy, Randy wants me to hire an older guy.

17               So your first 20 minutes of employment,

18    that's when the discrimination started.

19               Every single day, the October 9 meeting,

20    condescending crap that he did to me on a weekly, daily

21    basis and I'd ask him for training, he didn't have time.

22    I got a phone call, I got to do all these reports.

23               And I was asking for help and I just

24    wasn't getting it.  I was asking for help like I was a

EXHIBIT 5

Page 93

1   broken record and got sick of asking it, took it upon my

2   hands, this guy didn't like me because of my age and I

3   felt like that every single day.

4               So when you say facts, it came up during

5   the meeting.  That he -- that I am older -- in our

6   interview -- that I am older and got management

7   experience, and you're going to do what I tell you to do.

8               I should have just said I don't want this

9   job, I don't want to work for you.  In hindsight maybe I

10  should have said that.  Because it turned out to be

11  detrimental to my career.

12              So if you want me to --

13       MR. NELLANS:  Q   If there's anything else you have

14  to add.

15       A.   I think I covered everything in the questions.

16       Q.   Okay.  After you left MidAmerican, did you have

17  any further contact with MidAmerican?

18       A.   Rochelle -- I haven't talked to Rochelle since

19  like the Christmastime, but her and I, she actually

20  became one of my customers at my next job.  Her company

21  that she ended up going to.  They were, they became a big

22  account of mine.

23       Q.   Did you exchange any messages with Rochelle

24  related to MidAmerican?  I don't care about social.

EXHIBIT 5

Page 94

1      A.   No.  My wife got sick last fall and Rochelle

2   was praying for me and those were the, she would just

3   check up and see how my wife is doing.

4              (Deposition Exhibit No. 9 marked).

5      THE WITNESS:  Who is this from.  Got to be from

6   Rochelle, right?

7         MR. NELLANS:  Q   Does that look familiar?

8         THE WITNESS:  A   I mean I can pull it up on my

9   phone.

10     Q.   I can represent to you we received this in

11   response to a subpoena from Rochelle.

12     A.   Okay.

13     Q.   This subpoena asked for conversations she had

14   with you related to MidAmerican and other topics in your

15   lawsuit.  This is the only text we got.

16              You may have already answered this in your

17   previous question, but are you aware of any other

18   messages in any format with her related to this lawsuit?

19     A.   No, I did not discuss my lawsuit I don't think.

20     Q.   Or any of the allegations contained in the

21   lawsuit?

22     A.   Oh, her and I would talk about that.  I mean

23   she hasn't seen anything.  I guess what are you asking.

24   Let me just see.

EXHIBIT 5

1    Q.   Did you have any other conversations with

2  Rochelle about the facts of this case after she left?

3    A.   I don't believe so.

4    Q.   Okay.  That's good enough.  So do you have any

5  knowledge about the operations of the sales department at

6  MidAmerican after you left?

7    A.   You mean what happened after I left?

8    Q.   Yes.

9    A.   As far as Rochelle goes?

10   Q.   As far as how the department operated?

11   A.   No I never -- no, I don't know.

12       MR. NELLANS:  Okay.  We've been going about another

13  hour.  Take another five-minute break.  Use the rest

14  room.

15            I don't have too much more, counsel.

16       MR. LAVERY:  Okay.

17            (Short recess taken).

18       MR. NELLANS:  Back on the record.  I just have one

19  more thing to follow up on and then I think I will move

20  on to your time after MidAmerican.

21            You mentioned as one of the things that

22  younger employees did that you did not, was go for beers.

23   Q.   Do you know how often that would occur?

24       THE WITNESS:  A   No.

EXHIBIT 5

Page 96

1      Q.    Do you know the purpose of those beers?

2      A.    No.

3      Q.    After you were terminated at MidAmerican, when

4  did you start working again?

5      A.    I think it was the following August or

6  September.  I'm not sure which month.

7      Q.    Where did you start working?

8      A.    At a franchise named Sir Speedy.

9      Q.    Are you still with them?

10      A.    No.

11      Q.    Where you at now?

12      A.    I am taking care of my wife.  I had to leave.

13  My wife has been in the hospital 10 weeks in 2020.  And

14  she was in the Mayo clinic for a month so I couldn't

15  work.

16              I had to -- I have a 7-year old and

17  11-year old.  So it was very -- so the guy worked out

18  with me, very nice man, that I could stay and finish up

19  my deals but I couldn't -- I couldn't take off for three

20  weeks and go so I had to -- it's a full-time job, I'm

21  nursing my wife.  She's very ill.

22      Q.    I'm sorry to hear that, sir.

23      A.    So that's what I have been doing since October

24  of last year.

EXHIBIT 5

Page 97

1     Q.   So October of last year is when you stepped
2   down from that position?
3     A.   No, it was in December, like middle of
4   December.  So I mean, yeah, I mean they were, they were
5   great to me.  The place that I was working.  I was
6   growing their business and so, yeah.
7     Q.   Was that a sales position?
8     A.   Uh-huh.
9     Q.   And what was your base salary?
10    A.   40,000.
11    Q.   What was your commission rate?
12    A.   I got eight percent of everything I wrote,
13  eight percent of the revenue.
14    Q.   At the time you left what were your average
15  commissions?
16    A.   I mean I don't know what the average was but
17  some months you could be, again they are longer -- I sold
18  signs.  So I focused on signage.
19           So with signage, I was the new guy so it's
20  a lot of project planning, a lot of design, we had
21  interior designers at work.  There's a lot of, there's a
22  lot of manufacturing of signage.  So take about six weeks
23  when you start a deal to finally get it.
24           But anyway, so average sign deal was 11 to

EXHIBIT 5

Page 98

1    15,000 for each one.

2         Q.   Okay.

3         A.   I have sold oh, my gosh.  So in the time I was

4    there, I was probably only making 1,100, 1,500 a month.

5    We were working, we were re-working my comp plan for this

6    year when I left because I wanted to more focus on a

7    piece of the profit.

8              So these were small business owners, they

9    want to grow their company.  So I was, after being there

10   a year I was telling what we could do differently.

11             So yeah, comp plan was a moving target but

12   I wasn't making good money.

13        Q.   So around 1,100 would be the average

14   commissions per month?

15        A.   Yeah, I'm not sure.

16        Q.   Then you had your base salary?

17        A.   Yeah.

18        Q.   And you mentioned salary difference and

19   commission difference, not exclusively, as damages that

20   you're claiming in this lawsuit earlier, correct?

21        A.   Yes.

22        Q.   And in terms of commissions, at the time you

23   left MidAmerican you were not making anything on

24   commissions yet, correct?

EXHIBIT 5

Page 99

1      A.   No, I had the guarantee, a monthly guarantee.

2      Q.   Were you paid on that?

3      A.   I had -- no I wasn't.  I was terminated.

4      Q.   So during your time at MidAmerican --

5      A.   I don't think I received a bonus check but I

6 might be wrong.

7      Q.   Other than maybe a bonus check --

8      A.   Part of my salary guarantee, I don't know if it

9 was, if I ever saw it or not.  I'm sure I did because it

10 was part of my weekly pay.

11         So yeah, I would be getting it.

12      Q.   So other than your base salary and potentially

13 bonus check, you think you were getting a commission

14 guarantee payment as well?

15      A.   It's in my offer letter I got 23 percent

16 guaranteed.  I think it was for my first year so

17 23 percent of 70,000 is 16,000, is that what it turns out

18 to be?  Yeah, like 87,000 guarantee.

19      Q.   Okay.

20      A.   That was included.  Or somewhere around there.

21      Q.   Was there any other compensation you were

22 receiving at the time of your termination?

23      A.   No.

24      Q.   Then I believe we covered your psychologist and

EXHIBIT 5

1  psychiatrist.  Are there any other damages that you're

2  claiming other than those wages, be they commission or

3  salary, or the damages with respect to your psychologist

4  and psychiatrist?

5      A.   No.

6      Q.   During that time off before you started your

7  new job, what efforts were you taking to find a new job?

8      A.   I was, it took me a while to get going.  I was

9  really, really, really depressed and really down.

10  Because I put all my eggs in one basket and really

11  thought I was starting a new career.  I was very down to

12  the point where made me go see somebody.

13            What was your question?  Please, again?

14      Q.   What efforts you made during that time to find

15  any work?

16      A.   I made a lot of efforts.  I believe I applied

17  for over 200 positions through Indeed.  I had several

18  interviews that were low key.  I thought about going into

19  my own business.  I didn't have the money.

20            My wife didn't want me to take a

21  high-paying mid sales management job in the industry I

22  came from.  That would have been the most logical move

23  for me to make.  And I just didn't want to -- a dying

24  industry and there's layoffs happening, especially now.

EXHIBIT 5

Page 101

1    So I made a lot of efforts.

2                   You have to prove it to your employment

3    office if they ever call you.

4        Q.   So you didn't want to return to your other

5    industry?

6        A.   But I was getting to the point where I would

7    have taken -- I sort of did.  I still, instead of selling

8    the hardware I was selling the output, that's what I

9    ended up doing, the commercial print.  And I caught on to

10   the signage and signage is a, signage is Sir Speedy's

11   fastest growing revenue generation in the United States

12   right now.  That could be all the signs on your floors

13   keeping, you know, the libraries and; so printers are

14   actually killing it during COVID right now.  Because of

15   all of the signage being put up.

16                  But yeah, my wife won't let me just sit at

17   home and not try to get a job.  I was diligent about my

18   job, starting January of that year.

19       Q.   And were you looking for exclusively sales

20   positions?

21       A.   Not necessarily.  I mean I looked at

22   everything.  I have a good friend of mine who is head of

23   HR for DuPage County.  So you can get a low paying, you

24   know, $55,000 salary at the County of DuPage and retire

EXHIBIT 5

Page 102

1    in ten years and get a pension.  Not a bad gig.  So I

2    looked at that but I needed something more lucrative.

3              I enjoy the sales process, I enjoy being

4    out.  So for me to be in an office all day is not ideal

5    for me.  I enjoy being out talking to people and that's

6    the fun part of sales.

7        Q.   You indicated you applied through Indeed?

8        A.   Mostly, yeah.

9        Q.   Were there any other methods you used to apply

10   or inquire about jobs?

11       A.   I didn't used Linkedin at all.  It was phoning

12   connections.  I grew up with, I have got 50 names of guys

13   I grew up -- guys and gals I grew up with in the industry

14   and I went that route and most -- I just found that

15   people were leaving the industry.

16             So I would take my connections -- I ended

17   up working at Sir Speedy because of a marketing guy I

18   knew in Los Angeles from Sir Speedy.  And he actually

19   said they are actually looking to do something in your

20   area, where do you live.  I said Villa Park.  He said

21   that's about a mile from your house.  So it's connections

22   how I ended up where I got.

23             I didn't use Linkedin because I didn't

24   want people to know what I was doing.

EXHIBIT 5

1     Q.  I believe you mentioned was it how many Indeed

2  applications did you submit?

3     A.  I think the reason I know this is because their

4  paralegal asked me if I had any documentation.  I think I

5  sent her documentation of over 200 applications I did

6  with Indeed.  I think I did.  If not I can get it.

7     MR. NELLANS:  Again, I wanted to remind you not to

8  tell me about any conversations with your attorney.  You

9  aren't, but just don't want you to breach that.

10        That said, I would ask that you hang on to

11  those 200 applications to the extent you still personally

12  have them.  That may be something we ask for in

13  discovery.

14     THE WITNESS:  Okay.

15     MR. NELLANS:  Other than those applications you

16  said you talked to contacts.

17     Q.  May be a difficult question but any way you can

18  estimate about how many people you reached out to as part

19  of that process?

20     THE WITNESS:  A  Oh, my gosh.  Including the ones

21  my wife was reaching out to?  Came from the same industry

22  so she would do it, too.  Oh, my gosh.  I don't know -- I

23  don't know.  20.

24     Q.  You said you started yourself in January?

EXHIBIT 5

1    A.   Well that's when I got -- so the first, during

2    the holidays my wife said you're not going to find

3    anything in November and December.  Let's just plan on --

4    yeah, so early January is when I kicked it in I believe.

5    Q.   From January --

6    A.   But I procrastinated.

7    Q.   From January to early August or September I

8    believe when you were hired, were all of these

9    applications spread out evenly over their time or were

10   the bulk of them at any one point?

11   A.   I don't know for sure.  I mean I was on Indeed

12   probably every day, making phone calls.  Yeah, I don't

13   know.

14        MR. NELLANS:  Okay.  With that said, sir, I have

15   asked you a lot of questions today.  And I know that this

16   is something -- strike that.

17             I have asked you a lot of questions about

18   this today.

19   Q.   Is there anything else that you think I need to

20   know about this lawsuit or about your termination at MES,

21   I mean MidAmerican, that we haven't talked about?

22   A.   Is that a trick question?

23   Q.   I'm just giving you the opportunity, open-ended

24   question if there's anything you think I need to know?

EXHIBIT 5

Page 105

1  A. I don't think so, no.

2   MR. NELLANS: I will reserve to follow up but I

3 will turn you over to your counsel in case he has any

4 questions.

5        EXAMINATION

6      by Mr. Lavery:

7  Q. Burt, could you turn to this -- what exhibit is

8 this. The code of business conduct.

9  A. Seven.

10  Q. Defendant's Exhibit 7. Like you to turn to

11 page two. See where it says disciplinary action for

12 violation of rules at the top?

13  A. Okay, yeah.

14  Q. Did you abide by all the rules and practices

15 established by I guess the business platform in which you

16 worked?

17  A. Are you asking me?

18  Q. Yeah, did you follow those rules?

19  A. Yes.

20  Q. Did you commit theft?

21  A. No.

22  Q. Did you abuse alcohol or drugs on the job?

23  A. No.

24  Q. Did you ever engage in insubordination?

EXHIBIT 5

```
                                           Page 106
 1         A.    No.

 2         Q.    Did you engage in any dishonesty?

 3         A.    No.

 4         Q.    Did you engage in any fighting?

 5         A.    No.

 6         Q.    Did you engage in any falsification of records?

 7         A.    No.

 8         Q.    Did you engage in any sexual harassment?

 9         A.    No.

10         Q.    Did you failure to cooperate or provide false

11   information in a company investigation?

12         A.    No.

13         Q.    Did you intentionally destroy or abuse

14   property?

15         A.    No.

16         Q.    Did you threaten, intimidate or interfere with

17   other employees?

18         A.    No.

19         Q.    Did you do anything to create a hostile working

20   environment?

21         A.    No.

22         Q.    Did you have any unauthorized use of company

23   equipment computers or communication system?

24         A.    No.
```

Page 107

1    Q.   Okay.  Now you have referred to the sales

2    staff, that there was two younger workers.

3                   What were their names?

4    A.   Kevin and --

5    Q.   Andrew?

6    A.   Andrew.

7    Q.   Yeah.  Were you aware of any theft by them?

8    A.   No.

9    Q.   Were you aware of any abuse of alcohol or drugs

10   by them?

11   A.   I mean if you're having couple beers at lunch,

12   I don't know if that's abuse, but let's call it.

13                   I mean anybody would be terminated at any

14   company in a sales organization if they were going behind

15   the company's code of ethics and drinking at lunch.

16   Q.   It was your understanding at MES that drinking

17   on the job was not permitted, correct?

18   A.   Yes.

19   Q.   Did you see any insubordination by Kevin or

20   Andrew or any other younger worker?

21   A.   Yes.  Actually, no.

22                   Because they would drop F bombs like they

23   were all frat buddies to each other.  So they weren't

24   being insubordinate to their others, you know.

EXHIBIT 5

Page 108

1          Let's put it this way:  They had a

2   relationship with Dave that if one of them said go fuck

3   yourself, Dave probably would have laughed.

4        Q.   Let's turn to the next page.  Where

5   insubordination is defined.

6              It says you're required to comply with

7   lawful directions and orders of managers at all times.

8   Being insubordinate, threatening, intimidating,

9   disrespectful or assaulting any employee, customer or

10  vendor is prohibited.  You see that?

11       A.   Which paragraph?

12       Q.   At the bottom in red?

13       A.   Yep, yep.

14       Q.   Did you comply with all lawful directions from

15  David White?

16       A.   Yes.

17       Q.   Did you comply with all orders of management at

18  all times from David White?

19       A.   Yes.

20       Q.   For example, he asked you a question in that

21  meeting on October 9, correct?

22       A.   Right.

23       Q.   Did you refuse to answer it?

24       A.   No.

EXHIBIT 5

```
                                            Page 109

 1        Q.   Did you answer it in a threatening manner?

 2        A.   No.

 3        Q.   Did you answer it in an intimidating manner?

 4        A.   No.

 5        Q.   Did you answer it in a disrespectful manner?

 6        A.   No.

 7        Q.   Did you make any assault threat towards him?

 8        A.   No.

 9        Q.   Or any customer or vendor ever?

10        A.   No.

11        Q.   Now --

12        A.   I answered it.  Very honestly.

13        Q.   Now with respect to these younger workers,

14   Andrew and Kevin, were they disrespectful on the job?

15        A.   Oh, yeah.

16        Q.   How so?

17        A.   Well they were all buddies.  It would be like

18   going, like going to a ball game.  They were all like

19   this (indicating).  That's why they could come and go as

20   they pleased.

21             I was the outsider, they were the insiders

22   and I never talked to them because I knew they were tight

23   with David.

24        Q.   So you would witness these younger workers be
```

**EXHIBIT 5**

Page 110

1    disrespectful to David and David to accept it?

2         A.   Yes.

3         Q.   Explain that?

4         A.   So they could be talking about a football game

5    and they are dropping F bombs; did you see that F'g

6    thing.  And I would be just sitting at my cube in

7    disbelief.

8              Again, you think it's insubordinate for a

9    person in the office named Scott Emberling to -- after

10   the Las Vegas massacre, he comes into the office and

11   joking about people being picked off and everybody start

12   laughing, including David, Kevin and Andrew, like a big

13   joke.  I was disgusted.  I had to walk out of the office.

14        Q.   Let's go to the previous page there.  And where

15   it says general rules.

16        A.   Yep.

17        Q.   There's something in bright red, it says

18   abusive language?

19        A.   Right.

20        Q.   Did you use any abusive language at the

21   workplace?

22        A.   No.

23        Q.   Did you use any profane language on the

24   workplace?

EXHIBIT 5

Page 111

1      A.    No.

2      Q.    Was the accusation that you used the word shit

3   true or false; did you ever use that word shit at work?

4      A.    I don't think so.

5      Q.    Okay.  On company premises or in any area where

6   company operations are conducted you did not use profane

7   language, did you?

8      A.    No.

9      Q.    Did you ever hear David White use profane

10  language?

11     A.    Yes.

12     Q.    Give me some examples.

13     A.    He swears a lot.  In fact Rochelle probably

14  called Randy and HR to complain about it because it was

15  every day, fuck this, shit that.  It was F'g everything.

16         MR. NELLANS:  Objection, speculation.

17         MR. LAVERY:  Q   Is that speculation or did you

18  directly witness it?

19         THE WITNESS:  A   I directly heard it and all those

20  guys in that office, they were all F bombs every day all

21  throughout.  You would never bring anybody to that

22  office.  So unprofessional.

23     Q.    Okay.  Did David White use abusive language?

24     A.    Yes.

EXHIBIT 5

Page 112

1    Q.    How so?

2    A.    So let me back up and answer that.

3          I was being abused on that October 9, he

4    was abusive to me in his demeanor.  He was abusive to

5    Rochelle with his demeanor on several occasions and

6    that's why they had a yelling match.

7          Literally Rochelle was putting him in his

8    place for it was a good hour and a half.  And I don't

9    know what was going on there but you could hear you're

10   not going to talk to me like that.  I'm a black woman and

11   you're disgusting me.  You're not going to talk about

12   like that.

13         She didn't swear.  But F bombs were on a

14   daily basis.  I should have documented every time I heard

15   it.  I'd have sticks (indicating).  I wouldn't be able to

16   do my job.  So yes.

17   Q.    So did you ever hear Andrew use profane

18   language?

19   A.    I heard every single person in that office

20   except for Rochelle use profane language.

21   Q.    To your knowledge were any of them terminated?

22   A.    No.

23   Q.    Let's talk about did -- what -- let's just

24   start with David White.

Page 113

1          What did David White do to create a

2  hostile work environment?

3         MR. NELLANS:  Object to the form of the question.

4         THE WITNESS:  A   It wasn't a hostile work

5  environment except for with me.  Everybody else got along

6  like peas in a pod.  It was a boys club and that's what I

7  walked in to, a boys club.

8         And there was abusive language thrown back

9  all day during the day.  It was sort of idiotic because

10  here they have a new employee and I'm witnessing all

11  this.  And I just, again, I was working for a human

12  resource nightmare is what we would prefer to call the

13  guys who would get let go for doing something sexually

14  abusive or.

15         So did I answer your question, I'm sorry.

16    Q.   So you felt like David White created a hostile

17  work environment that was directed at you?

18        MR. NELLANS:  Object to the form, misstates

19  testimony.

20        THE WITNESS:  A   I guess I don't think it was a

21  hostile work environment because I was mature enough to

22  know what I had to do for myself.  I strongly believed

23  that he might not be in the position in the short term

24  because he kept sticking his foot in his mouth.

EXHIBIT 5

Page 114

1          But we were so closed off from the rest of

2    the company with the little office in downtown Chicago.

3    In Davenport or Quad Cities where they were headquartered

4    at the time was a very successful office.  I don't think

5    our office did much at all.

6         Q.   Is it your understanding that you were hired

7    because of Randy Marzen's --

8         A.   Absolutely.

9         Q.   -- power and authority in the business or David

10   White -- let me finish.

11        A.   Okay.

12        Q.   Or David White?

13        A.   Randy Marzen, 100 percent.

14        Q.   Why do you say that?

15        A.   Because Randy and I hit it off.  We had the

16   similar background.  My first interview with him was

17   between 2 and 3 hours, which is a good sign.  And we knew

18   some of the same people from 20 years earlier.

19          A guy who hired me, promoted me and is a

20   reference of mine to this day, his name is Rick Taylor.

21   He's the CEO of Konica Minolta, where Randy came from.  I

22   was promoted by Rick Taylor to that regional position

23   when I was 30, when he worked for Savon.  So we talked

24   about that for a long time.

EXHIBIT 5

```
                                          Page 115

 1               He saw that I had, that I knew Rick Taylor

 2     and other leaders around the country that he knew as

 3     well.  So 100 percent Randy Marzen hired me.

 4        Q.   Who is the superior authority in the company,

 5     Randy Marzen or David White?

 6        A.   Randy Marzen.

 7               MR. NELLANS:  Object to the question.

 8               THE WITNESS:  A   Randy Marzen.  I don't know if he

 9     still is but that's how he was.

10               MR. LAVERY:  Q   What was the first indication of

11     age bias that you saw demonstrated by David White during

12     your experience with MES?

13               MR. NELLANS:  Object to form, assumes facts.

14               THE WITNESS:  A   First 20 minutes in the office

15     when I started hearing from all the other people they

16     knew that I was 56 years old.  And when I said how would

17     you know that.  Rochelle told me, Kevin told me because

18     he sat right next to me.  Said David told us all last

19     week in the sales meeting he was hiring an older guy,

20     56 years old.

21               So that's when I realized why would he

22     bring that up.  That's a silly HR mistake.  That's silly.

23     That's like asking somebody how old they are in an

24     interview.
```

Page 116

1      Q.   Let's turn to this exhibit, the August 8th

2   letter.

3           MR. NELLANS:  Exhibit 3.

4           THE WITNESS:  Yeah.

5           MR. LAVERY:  Referring to Defendant's Exhibit 3.

6   Can you turn to the second page.

7           THE WITNESS:  Yeah.

8           MR. LAVERY:  Where it says at will employment.

9                It says your employment will be as an at

10   will employee.  Accordingly, you're not guaranteed

11   employment for any specified period of time and you can

12   be terminated or have your employment terms altered for

13   any legal reason at any time.  You also have the right to

14   resign your employment at any time.

15      Q.   Was there any legal reason that you had your

16   employment terms altered for?

17           MR. NELLANS:  Object to the form.  Calls for a

18   legal conclusion.

19           THE WITNESS:  A   No.

20           MR. LAVERY:  Q   What was the illegal reason upon

21   which your employment terms was altered?

22           MR. NELLANS:  Object to the form of the question,

23   assumes facts.  Calls for legal conclusion.  Misstates

24   prior testimony.

EXHIBIT 5

Page 117

1    MR. LAVERY:  You can answer.

2    THE WITNESS:  A   The -- I answered a question

3    honestly and I was fired for answering the question

4    honestly.  It was unbelievable.

5           So I was asked what is more important,

6    getting MES loaded on your laptop or doing your expense

7    reports.  Why would you ask somebody that.  If you knew

8    the answer, just tell me what to do.

9    MR. LAVERY:  Q   Was that a pretextual reason or

10   was it the actual reason you were fired?

11   MR. NELLANS:  Object to the form of the question.

12   Assumes facts.

13   THE WITNESS:  A   I was told that's what my

14   disciplinary meeting was called for.

15          Then they brought up -- can you imagine a

16   guy smoking a cigarette out in front of the office and

17   you go down and he says how is your first day -- how is

18   work going so far.  And we sort of chuckled.  I said I

19   didn't realize you guys had construction going on.  I

20   always thought the office was just a dump.  He started

21   laughing.  He runs up and tells Dave what I said.  It

22   comes back to me and I'm reprimanded.

23          Couple weeks go by.  I got my picture

24   taken from a guy named Ben and I say I can't believe I am

EXHIBIT 5

1    doing this childish stuff.  I don't want my face up in

2    front of the whole country.  Ben leaves the room and

3    tells David what I just said.  What kind of environment

4    is that?

5              Did that really happen or is that David

6    drilling them for stuff to get on me.  That's what was

7    happening.  Discrimination.  He was picking on me.

8        MR. LAVERY:  Q   What do you believe the true

9    reason for your termination was?

10       A.   My age.

11       Q.   Based on your experiences with David White, was

12   his age discrimination willful or negligent?

13       MR. NELLANS:  Object to the form of the question.

14   Calls for legal conclusion.

15       THE WITNESS:  A   Willful.

16       MR. LAVERY:  Q   What facts would support your

17   conclusion that he engaged in willful age discrimination?

18       MR. NELLANS:  Object to the form of the question.

19       THE WITNESS:  A   His daily acts were obvious he

20   didn't like me and I knew it.  And you know when somebody

21   doesn't like you.  But you know when somebody doesn't

22   like you the first day of employment, why is that?

23             Because he wanted a younger rep to mold in

24   his place and he was probably told by Randy to hire me,

EXHIBIT 5

Page 119

1   that Randy wanted to hire me.

2               That's how I felt.  If it's not true then

3   I was wrong.  But from the get go, his body language, he

4   did not like me and I knew that.  He did not want to

5   spend any time with me.  He did not try to train me in

6   any way except for an hour.  Even during that hour he was

7   condescending.

8               I truly, truly believe the man didn't like

9   me because I wasn't of his molding type.  I had too much

10  experience, I would have been hard to manage.

11      MR. NELLANS:  Objection, speculation.

12      MR. LAVERY:  So now there was some reference to

13  training from Andrew.

14      Q.  Did you have any training from Andrew that you

15  thought --

16      THE WITNESS:  A  30 minutes sitting at my cube

17  learning how to read an MES invoice.  30 minutes.

18      Q.  Was that for more like just basic information?

19      A.  It was good to know because I needed to know --

20      MR. NELLANS:  Objection to form.

21      THE WITNESS:  A  -- how customers were reading

22  their invoice since I didn't know the terminology.  Not

23  looking like at your electrical bill at home, we are

24  looking at complex invoices.  So it was helpful.  But.

**EXHIBIT 5**

Page 120

1        MR. LAVERY:  Q   But that was the extent of it?

2        A.   Right.

3        Q.   And did you feel like based on your, you know,

4    decades of experience in sales, do you feel like David

5    White provided you any meaningful training?

6        A.   No.

7        MR. NELLANS:  Object to the form of the question.

8        THE WITNESS:  A   Absolutely not.

9        MR. LAVERY:  I will tender the witness.

10                      EXAMINATION

11                  by Mr. Nellans:

12       Q.   You stated during the examination by your

13   counsel that you believed that Randy Marzen was the one

14   that actually hired you?

15       A.   I think it was Randy's decision and that's how

16   I felt all through the process.

17       Q.   I'd like to direct you back to Exhibit 1.

18       A.   Yep.

19       Q.   This was the e-mail from David where he's

20   inviting you to apply to the account executive position,

21   correct?

22       A.   Yes.

23       Q.   Then turning to Exhibit 2.

24       A.   Okay.

EXHIBIT 5

Page 121

1      Q.   This is the e-mail from David where he sends

2   your offer letter?

3      A.   Yep.

4      Q.   Then turning to Exhibit 3.  On the final page.

5           This is your offer letter?

6      A.   Uh-huh.

7      Q.   The final page the first paragraph, excuse me,

8   final paragraph on the first page?

9      A.   Yeah.

10     Q.   Can you read the first sentence, please?

11     A.   On behalf of David White and the rest of the

12   sales group, we welcome you to the team.

13     Q.   Thank you.  Have that back.

14          You mentioned that your training from

15   David was limited to a one-hour meeting?

16     A.   Yes.

17     Q.   Did David take you on two field days?

18     A.   I took him onto field days because he is

19   required to do so.  Every Thursday in his position.

20          So my field days were two

21   one-and-a-half-hour field days, maybe two hours on one of

22   them.  But then I'd take him to lunch, put it on my

23   expense account, so there's documentation of those.  And

24   he would not -- we would just talk as I walked from

EXHIBIT 5

Page 122

1    building to building and did cold calling.

2         Q.    On October 13, he reviewed your activity from

3    the prior week and for the prospective week?

4         A.    Yes, and said I was doing all of the right

5    things.

6         MR. NELLANS:  I believe those are all my questions.

7                        EXAMINATION

8                     by Mr. Lavery:

9         Q.    Those first three exhibits that counsel asked

10   you about, do you believe those were just pro forma

11   corporate documents?

12        A.    Absolutely.  As a hiring manager it was, as a

13   hiring sales manager that is typical form.

14              He's not writing these things.  You could

15   say since I was going to be his direct report, it has to

16   come from him.  That's a human resource common sense move

17   they did there.  Randy had behind the scenes.

18        Q.    So based on your experience with MES, was it

19   Randy Marzen offering you the employment opportunity or

20   David White?

21        MR. NELLANS:  Objection to form of the question.

22        THE WITNESS:  A   It was Randy White making the

23   decision.

24        Q.    Randy White?

EXHIBIT 5

Page 123

1    A.   I mean Randy Marzen.

2       MR. LAVERY:  No further questions.

3       MR. NELLANS:  Last question.

4                    EXAMINATION

5                    by Mr. Nellans:

6    Q.   Is your basis for your belief that Randy hired

7  you on the rapport you had with Randy at your interview?

8    A.   And my background, the same background he had.

9  Absolutely.

10   Q.   During your interview process, did David White

11 ever say he did not want to hire you?

12   A.   No.

13      MR. NELLANS:  Those are all my questions.

14      MR. LAVERY:  Okay.

15                   EXAMINATION

16                   by Mr. Lavery:

17   Q.   Let's talk about David White in the interview

18 process.

19            Did you see any cues from him that he

20 demonstrated an age bias?

21   A.   No.

22      MR. NELLANS:  Object to the form of the question.

23      THE WITNESS:  A   No.

24      MR. LAVERY:  Q   Did you see any reluctance from

Page 124

1   him?

2        A.   I saw an inexperienced manager interviewing me.

3   That's what I saw.

4            MR. LAVERY:  Okay.  Thanks.

5            THE WITNESS:  So.

6            MR. NELLANS:  With that we will conclude the

7   deposition.  We will order a copy on behalf of

8   MidAmerican.

9            MR. LAVERY:  You want to review your deposition

10  transcript before it's official?

11           THE WITNESS:  Yeah.  When can I do that?

12           MR. LAVERY:  You want to reserve.

13

14

15               (Whereupon, proceedings were

16                adjourned in this deposition)

17

18

19

20

21

22

23

24

EXHIBIT 5

```
                                                    Page 125

 1    STATE OF ILLINOIS     )

                            ) SS

 2    COUNTY OF COOK        )

 3

 4              I, PAUL W. O'CONNOR, do hereby certify

 5    that I reported in machine shorthand and via real time

 6    transcription the testimony taken at the discovery

 7    deposition of IAN MacLEOD on July 16, 2020; and that

 8    this transcript is a true and accurate transcription

 9    of my machine shorthand notes so taken to the best of

10    my ability, and contains all of the proceedings given

11    at said discovery deposition.

12

13

14

15

16                   Paul W O'Connor, CSR
                     License No. 084.002955

17

18

19

20

21

22

23

24
```

EXHIBIT 5

```
                                                    Page 126

 1                    Veritext Legal Solutions
                        1100 Superior Ave
 2                          Suite 1820
                      Cleveland, Ohio 44114
 3                    Phone: 216-523-1313
 4    July 30, 2020
 5    To: Mark Lavery, Esq.
 6    Case Name: MacLeod, Ian v. Midamerican Energy Services
 7    Veritext Reference Number: 4161864
 8    Witness:  Ian Macleod        Deposition Date:  7/16/2020
 9    Dear Sir/Madam:
10    The deposition transcript taken in the above-referenced
11    matter, with the reading and signing having not been
12    expressly waived, has been completed and is available
13    for review and signature.  Please call our office to
14    make arrangements for a convenient location to
15    accomplish this or if you prefer a certified transcript
16    can be purchased.
17    If the errata is not returned within thirty days of your
18    receipt of this letter, the reading and signing will be
19    deemed waived.
20
      Sincerely,
21
22    Production Department
23
24    NO NOTARY REQUIRED IN CA
```

EXHIBIT 5

Page 127

```
 1                   DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 4161864
 3      CASE NAME: Macleod, Ian v. Midamerican Energy Services
        DATE OF DEPOSITION: 7/16/2020
 4      WITNESS' NAME: Ian MacLeod
 5      In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7      I have made no changes to the testimony
     as transcribed by the court reporter.
 8
     _____        _____
 9   Date                   Ian Macleod
10      Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
            Statement; and
14      Their execution of this Statement is of
            their free act and deed.
15
        I have affixed my name and official seal
16
     this _____ day of_____, 20_____.
17
                     _____
18                   Notary Public
19                   _____
                     Commission Expiration Date
20
21
22
23
24
25
```

EXHIBIT 5

Page 128

1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 4161864
3       CASE NAME: MacLeod, Ian v. Midamerican Energy Services
        DATE OF DEPOSITION: 7/16/2020
4       WITNESS' NAME: Ian Macleod
5           In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7           I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9           I request that these changes be entered
    as part of the record of my testimony.
10
            I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                    Ian Macleod
14
            Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18              in the appended Errata Sheet;
            They signed the foregoing Sworn
19              Statement; and
            Their execution of this Statement is of
20              their free act and deed.
21          I have affixed my name and official seal
22  this _____ day of_____, 20____.
23          _____
            Notary Public
24
            _____
25          Commission Expiration Date

EXHIBIT 5

Page 129

1                      ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2                ASSIGNMENT NO: 7/16/2020
3     PAGE/LINE(S) /        CHANGE        /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19

      _____      _____
20    Date                  Ian Macleod
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24
                      _____
25                    Commission Expiration Date

EXHIBIT 5

**[& - 8th]**  Page 1

## &

**&**  2:3,11

## 0

**000683**  1:5
**084.002955**  125:16

## 1

**1**  3:16 25:13
120:17
**1,100**  98:4,13
**1,500**  98:4
**10**  15:4 96:13
**100**  16:10 22:19
65:21 84:4,5,15
85:19 114:13
115:3
**100,000**  10:4
**101**  65:22 85:15
**104**  18:1,2
**105**  3:5
**10:00**  14:18 43:22
**11**  96:17 97:24
**1100**  126:1
**11:30**  43:23
**11th**  34:4
**12**  29:16 43:1
**120**  3:6
**122**  3:6
**123**  3:7,7
**12th**  73:1,1
**13**  14:7 20:1 70:5
90:4,16 122:2
**13th**  33:21 70:22
76:3,10,18 90:11
90:14
**14th**  33:22 34:1,3
**15**  14:7
**15,000**  98:1
**16**  1:24 125:7
**16,000**  99:17

**17**  2:4
**1820**  126:2
**1960**  5:22
**1979**  19:21,23
**1987**  15:20
**1995**  17:3 18:2
**1:00**  1:24 62:24
**1:19**  1:5

## 2

**2**  3:17 26:2 114:17
120:23
**20**  11:6 15:19
17:18 37:13 64:10
66:15 68:6 73:22
81:21 84:6,19
90:3,5 92:14,17
103:23 114:18
115:14 127:16
128:22 129:22
**200**  8:4 100:17
103:5,11
**200,000**  10:3,10
**2000**  18:18,18
**2001**  18:18
**2005**  19:14
**2009**  22:5
**2011**  22:6
**2017**  11:6 24:15
**2018**  6:6 56:15
**2020**  1:24 96:13
125:7 126:4
**20s**  63:20
**20th**  71:2
**21**  5:22
**216-523-1313**
126:3
**22**  22:15
**23**  64:13 99:15,17
**233**  1:20 2:12
**24**  39:2

**24765**  125:15
**25**  3:16
**26**  3:17,18
**28**  3:19 16:5

## 3

**3**  3:18 12:12 26:12
114:17 116:3,5
121:4
**30**  3:20,21 13:16
15:19 16:24 63:19
68:8,19 114:23
119:16,17 126:4
**300**  7:14
**30s**  63:21
**31**  3:22
**312**  2:15
**35**  16:24
**3:00**  70:15 71:2
**3rd**  33:21

## 4

**4**  3:19 7:18 12:12
24:15 28:13 52:7
52:19 53:11,11
54:20
**40**  31:5
**40,000**  10:7 97:10
**400,000**  7:15
**4161864**  126:7
127:2 128:2
**44114**  126:2
**45**  6:20 44:11
**4:00**  66:19
**4th**  49:6,9 51:7,16
52:10 53:24

## 5

**5**  3:5,20 7:18 16:9
30:7
**50**  42:23 43:6
102:12

**50,000**  17:17
**500**  2:4
**500,000**  7:12 10:2
10:13
**50s**  43:2 85:9
**52**  50:2
**55,000**  101:24
**5500**  1:22 2:12
**56**  65:17,17 92:12
115:16,20
**5:00**  14:18
**5th**  49:9

## 6

**6**  3:21 30:13
**60602**  2:5
**60606**  1:22 2:13
**645-7800**  2:15
**6th**  49:9

## 7

**7**  3:22 31:16 96:16
105:10
**7/16/2020**  126:8
127:3 128:3 129:2
**70,000**  99:17
**7:14**  60:5
**7:36**  60:7

## 8

**8**  3:23 20:12 81:12
**81**  3:23
**8189**  6:1
**86**  14:23 15:3
**87**  10:5 15:3
**87,000**  10:9 99:18
**88**  17:3
**8:00**  60:7
**8:30**  46:12 59:17
**8th**  116:1

EXHIBIT 5

**[9 - appointments]**

Page 2

**9**

**9** 3:24 15:3 48:8,9
49:17 52:23 55:7
70:3,5 71:10
72:21 82:3 91:2
92:19 94:4 108:21
112:3
**90** 27:5 42:22
64:16 85:11,15
**90s** 17:15
**94** 3:24
**95** 17:3
**9:00** 46:12 66:19
**9:30** 43:22
**9th** 49:15,18 70:7
74:11 83:2

**a**

**abide** 105:14
**ability** 4:12,24
27:17 87:6 125:10
**able** 45:23 81:18
82:14 112:15
**absolutely** 4:13
84:9 114:8 120:8
122:12 123:9
**abuse** 105:22
106:13 107:9,12
**abused** 112:3
**abusive** 110:18,20
111:23 112:4,4
113:8,14
**accept** 110:1
**accepted** 9:12 25:7
64:5
**accomplish** 50:11
83:11 126:15
**account** 16:2,3
19:18,22 24:19,24
25:3,7,22 26:24
27:8 68:12 93:22

120:20 121:23
**accounts** 89:9
**accurate** 125:8
**accusation** 111:2
**acknowledge**
127:11 128:16
**act** 127:14 128:20
**action** 42:13 47:14
47:15 105:11
**actively** 12:18
**activities** 68:4
90:10
**activity** 68:5 76:19
87:6 122:2
**acts** 118:19
**actual** 117:10
**add** 85:2 88:2
93:14
**added** 55:1,3
**addition** 43:17
57:12 67:23
**additional** 7:2
**address** 6:6
**adjourned** 124:16
**advice** 80:5
**ae** 25:20,22 68:16
69:11
**affixed** 127:15
128:21
**afraid** 87:11
**african** 50:2,17
**afternoon** 47:4
62:23 70:23
**age** 36:11,12,13
37:17 56:7 63:17
65:20,23 66:1
67:4 68:13,18
72:13 76:16 77:16
78:12,21 84:5
86:7 89:13 91:19
91:22 92:11,15

93:2 115:11
118:10,12,17
123:20
**aggravating** 73:14
**ago** 6:22 57:3
87:21
**agreement** 28:23
29:5
**agreements** 29:5
**ahead** 38:20 39:21
40:12 44:18 56:22
**alcohol** 105:22
107:9
**allegations** 94:20
**allowed** 67:11
**aloud** 32:11,12
**altered** 116:12,16
116:21
**amazing** 72:23
**ambassador** 14:16
**ambushed** 71:24
72:2
**american** 50:2,17
**analyst** 18:23
**andrew** 44:8,9
63:22 67:19 69:4
107:5,6,20 109:14
110:12 112:17
119:13,14
**andrew's** 68:15
**angeles** 102:18
**annually** 27:11
**answer** 4:9 5:11
8:7,13 9:23 13:7
15:1 35:7 38:8
44:18 48:20 49:4
50:16,20,23 55:23
56:1 57:9,13
58:19,20,20 67:6
73:13 75:6 84:14
84:21 85:3 88:3

92:4 108:23 109:1
109:3,5 112:2
113:15 117:1,8
**answered** 53:4
63:2 77:13 82:24
84:1 92:9 94:16
109:12 117:2
**answering** 5:1
38:24 56:11 76:15
83:15 86:6 117:3
**answers** 5:4 74:9
**anybody** 7:18
46:22 54:18 65:10
80:21 107:13
111:21
**anyway** 20:5 22:5
22:8 49:20 56:20
75:19 82:16 97:24
**apologies** 58:9,15
**apologize** 44:20
46:2 47:5 58:13
73:16 79:14
**appear** 31:19
127:11 128:15
**appearances** 2:1
**appeared** 2:17
**appearing** 2:8
**appears** 26:8
30:14 31:2
**appended** 128:11
128:18
**applications** 103:2
103:5,11,15 104:9
**applied** 8:3 100:16
102:7
**apply** 24:22 25:20
102:9 120:20
**applying** 8:4
**appointment** 13:9
**appointments**
61:18 87:10

EXHIBIT 5

**[approved - boys]**

**approved** 20:5 52:17

**approximate** 19:13

**ar** 69:11

**area** 61:13 102:20 111:5

**argue** 57:24

**arguing** 36:2,5 64:5,7

**argument** 48:5 50:22 51:3

**arguments** 53:6

**arrangements** 126:14

**ashamed** 91:4,4

**aside** 30:12 60:17

**asked** 39:11,14 48:10 50:11 56:21 57:13 64:6 69:4 71:10 92:1 94:13 103:4 104:15,17 108:20 117:5 122:9

**asking** 4:8 9:10 28:9 32:4,10 48:18 53:3 86:16 92:23,24 93:1 94:23 105:17 115:23

**aspects** 67:4

**ass** 72:14

**assault** 109:7

**assaulting** 108:9

**assignment** 127:2 128:2 129:2

**assumes** 115:13 116:23 117:12

**assuming** 60:21

**atmosphere** 36:21 66:8 67:20

**attached** 128:7

**attempt** 57:9

**attention** 29:17 81:10

**attest** 8:19

**attorney** 6:13,16 103:8

**attorneys** 6:9

**august** 6:6 24:15 56:14 96:5 104:7 116:1

**aurora** 17:9

**authority** 114:9 115:4

**authorize** 128:11

**available** 126:12

**ave** 126:1

**avenue** 2:4 14:18

**average** 97:14,16 97:24 98:13

**aware** 6:22 7:1 94:17 107:7,9

**b**

**baby** 22:7

**back** 7:21 10:3 12:19,20 15:2 17:15 22:10 25:3 40:4 43:2 47:9 48:3 81:6 85:20 95:18 112:2 113:8 117:22 120:17 121:13

**background** 13:21 15:12 23:7 114:16 123:8,8

**bad** 43:13 102:1

**ball** 109:18

**base** 29:12 97:9 98:16 99:12

**based** 25:19 91:19 91:22 118:11

120:3 122:18

**basic** 119:18

**basically** 13:9 16:6 42:7

**basis** 21:6 92:10 92:21 112:14 123:6

**basket** 100:10

**batson** 2:3

**beer** 64:19

**beers** 67:11,24 73:10 95:22 96:1 107:11

**beet** 50:18 57:23

**befriend** 18:4

**began** 14:10,11 41:6

**behalf** 2:8,17 26:19 121:11 124:7

**belief** 64:2 82:22 85:5 92:2 123:6

**believe** 7:11 15:6 28:22 29:2 30:4,9 33:20 40:5 53:16 59:13 60:5 66:12 67:7,24 68:12,20 74:24 77:10,20 78:18 86:10 88:15 90:15 95:3 99:24 100:16 103:1 104:4,8 117:24 118:8 119:8 122:6 122:10

**believed** 81:8 113:22 120:13

**belonged** 82:20

**ben** 40:22,23 62:18,18,24 63:17 68:21 69:4 117:24 118:2

**benjamin** 2:14

**berkshire** 27:16 30:17,18,20 32:2,7 32:22 33:2,20

**best** 4:11,24 85:18 125:9

**better** 12:17 19:8 46:10

**bias** 115:11 123:20

**big** 7:8 20:6 39:10 78:3 93:21 110:12

**bill** 119:23

**bingo** 17:23

**birth** 5:20

**bit** 4:18 13:21 47:9

**bitch** 73:5

**black** 17:24 37:19 65:8 112:10

**blamed** 51:10

**blatant** 37:18,18

**bnellans** 2:16

**body** 119:3

**bold** 29:20

**bombs** 36:20 40:11 66:3 107:22 110:5 111:20 112:13

**bonus** 99:5,7,13

**book** 91:9

**born** 22:13

**borrow** 30:22 51:18

**boss** 20:4 42:8 83:19

**bottom** 26:17 108:12

**bought** 16:18,23 17:2 20:19 21:20

**boy** 77:15

**boys** 9:22 36:1,20 66:8 113:6,7

EXHIBIT 5

**branch** 17:7 20:23
**branches** 17:8
**breach** 103:9
**break** 5:7,12 34:16
    38:2 47:24 95:13
**bright** 110:17
**bring** 43:1 65:22
    65:23 74:21
    111:21 115:22
**bringing** 35:3
**brochures** 42:9,10
**broken** 84:20 93:1
**brought** 49:17
    65:18 71:9 74:22
    74:23 75:5,20
    77:5,9 117:15
**buck** 36:22
**buddies** 107:23
    109:17
**buddy** 21:4,13
**build** 7:10,12
    10:12 18:9 57:21
    57:21
**building** 8:18 27:9
    122:1,1
**bulk** 23:15 45:1
    104:10
**burt** 71:5 72:18
    77:2,3 78:15 79:1
    82:1 84:2 105:7
**business** 7:10 8:21
    14:15 15:8,15,16
    15:17 16:9 18:5,7
    18:23 19:24 20:1
    27:10,12 28:1
    31:18,19 32:3,8,23
    33:3 36:16 42:24
    43:2 45:5 51:21
    66:20 77:6 78:10
    78:11 82:14 90:3
    90:24 91:9 97:6

98:8 100:19 105:8
    105:15 114:9
**businesses** 43:1
    61:11
**buy** 18:11
**buying** 16:19
    21:22

**c**

**ca** 126:24
**california** 71:22
**call** 4:3 11:14 12:6
    43:8 51:13 54:2
    54:17,22 69:24
    70:10 71:23 83:17
    92:22 101:3
    107:12 113:12
    126:13
**called** 5:15 15:7
    18:8 23:5 29:20
    39:3 43:2 49:6,7
    52:10,13 54:21
    59:13 62:18,18
    71:16 72:7 74:14
    74:15 83:15 84:3
    86:21 88:8 111:14
    117:14
**calling** 20:18
    35:20 43:5,6 45:4
    46:8,10 62:19
    86:21 87:9 122:1
**calls** 45:2,10 46:7
    46:18 59:2,3,7
    60:23 61:2,21,24
    62:5 68:6,7 69:13
    69:18,19,21 70:8
    87:18 88:22 91:12
    104:12 116:17,23
    118:14
**cancer** 12:21
**candidates** 35:15

**canon** 14:15,22
    15:14
**capability** 85:19
    85:19
**car** 44:5 60:5
**card** 83:7
**cards** 36:16 42:24
    43:2 51:21
**care** 70:2 93:24
    96:12
**career** 37:8 71:16
    93:11 100:11
**careers** 18:9 23:5
**case** 1:5 6:23 7:2
    95:2 105:3 126:6
    127:3 128:3
**cash** 19:20
**casual** 38:18
**catch** 35:1
**caught** 71:8 75:23
    101:9
**cause** 13:19
**ceilings** 35:1
**cell** 46:19
**cents** 17:18
**ceo** 114:21
**certificate** 128:11
**certification** 127:1
    128:1
**certified** 126:15
**certify** 125:4
**chance** 85:8 86:9
    87:1 88:21
**change** 128:8
    129:3
**changes** 127:7
    128:7,9
**charge** 83:8
**charles** 46:12 60:6
**check** 47:8 94:3
    99:5,7,13

**checked** 47:3
**chicago** 1:22 2:5
    2:13 14:11,13
    17:5,8 20:20
    42:14 114:2
**chicagoland** 18:2
    61:13
**childish** 40:2,14
    118:1
**chill** 36:6
**choice** 25:1
**christmastime**
    93:19
**chuckled** 34:20
    117:18
**cigarette** 74:16
    117:16
**circuit** 9:4
**circumstances**
    62:11
**cities** 78:5 114:3
**city** 14:20 50:5
**civil** 9:3 73:21
    127:5 128:5
**claim** 11:7,9
**claiming** 7:4,7
    8:14 10:14,21
    98:20 100:2
**clarification** 88:1
**clarify** 9:9 60:14
**classification** 31:2
    31:3
**clear** 46:3
**cleveland** 126:2
**clinic** 96:14
**close** 79:24 91:16
**closed** 114:1
**closer** 63:16
**club** 9:22 19:1
    113:6,7

EXHIBIT 5

**code** 30:17 31:18
31:19 32:3,7,22
33:2 73:21 77:5,5
77:8 82:14 105:8
107:15
**cold** 43:5,6,8 45:2
45:10 46:8,10
68:6,7 69:13 87:8
91:11 122:1
**collect** 87:15
**college** 14:9 43:3
62:20
**colleges** 61:13
70:20
**color** 17:12,15,16
17:20,21 73:6
**colored** 84:9
**combined** 53:2
**come** 37:5 40:6
45:20,21,22 47:15
49:24 50:5 52:21
53:12 62:14 63:5
64:18 67:9 73:12
109:19 122:16
**comes** 42:8 110:10
117:22
**coming** 39:17
62:23 67:23 75:3
76:19
**commencing** 1:24
**comment** 79:7
**commercial** 101:9
**commission** 29:15
29:16 97:11 98:19
99:13 100:2
127:19 128:25
129:25
**commissions** 9:15
10:9,10,19 97:15
98:14,22,24

**commit** 105:20
**common** 77:8
122:16
**communicate**
47:20
**communicated**
47:18
**communication**
106:23
**comp** 98:5,11
**companies** 13:13
**company** 15:7
17:11 18:6 20:7
33:17 40:10 43:13
51:5 72:14 78:9
82:20 85:14 87:16
93:20 98:9 106:11
106:22 107:14
111:5,6 114:2
115:4
**company's** 107:15
**compensation**
99:21
**compete** 28:17,21
**competition** 87:11
**complain** 35:17
79:10,14,17 80:7,8
111:14
**complained** 80:23
**complete** 82:11
85:7 87:2 89:22
**completed** 14:2,5
31:17 33:7 126:12
**completely** 85:1
**completing** 86:12
86:13
**completion** 88:3
**complex** 119:24
**comply** 82:15
89:21 108:6,14,17

**computer** 30:21
30:22,24
**computers** 106:23
**concept** 19:18
**conclude** 124:6
**conclusion** 116:18
116:23 118:14,17
**condescending**
56:19 77:19 92:20
119:7
**conditions** 35:9,18
79:9
**condo** 18:12
**conduct** 9:3 31:18
31:20 32:3,8,23
33:3 77:6 82:14
84:11 105:8
**conducted** 111:6
**conference** 30:23
46:17 50:3,19
65:15 73:3 91:2
**confidential** 78:9
**confidentiality**
28:23
**confirm** 30:5
**connections**
102:12,16,21
**considered** 31:14
**consonants** 40:8
**construction**
34:22 35:14 74:20
83:20 117:19
**consultant** 21:6
**consuming** 70:11
**contact** 93:17
**contacts** 103:16
**contained** 94:20
**contains** 125:10
**context** 49:4
**contract** 20:21

**contracts** 68:24
**convenient** 126:14
**conversation** 4:22
35:9 38:18 41:2
80:12,16 90:7
**conversational**
4:21
**conversations** 6:9
27:11 54:9 90:1
94:13 95:1 103:8
**cook** 125:2
**cooperate** 106:10
**copier** 16:17 17:24
23:5,7 64:12
**copiers** 14:14,20
16:2 17:16 23:11
23:13,20,21
**copies** 25:11
**copy** 25:15 124:7
**core** 27:20,21
**corporate** 122:11
**correct** 8:16 24:2
24:20 25:23 28:24
29:3,10,13,24
32:23 38:22 42:17
43:18 44:12,13
76:19 98:20,24
107:17 108:21
120:21
**corrections** 128:17
**correctly** 13:7
18:19 76:16
**cost** 17:18
**counsel** 11:22 38:8
95:15 105:3
120:13 122:9
**counting** 59:6
**country** 18:7
115:2 118:2
**county** 101:23,24
125:2 127:10

EXHIBIT 5

[county - deposition]

128:15
**couple** 6:7 23:13
  62:4,7,12,22 63:7
  63:8,9 73:10
  107:11 117:23
**course** 57:17,22
**court** 1:1,18 4:22
  127:7
**covered** 93:15
  99:24
**covid** 101:14
**crap** 92:20
**create** 42:12
  106:19 113:1
**created** 113:16
**credit** 14:7 83:6
**cry** 78:17,18
**crying** 72:6
**csr** 1:14 125:16
**cube** 41:15 43:12
  110:6 119:16
**cues** 123:19
**current** 9:17 89:4
**cussing** 40:11
**customer** 108:9
  109:9
**customers** 35:3
  89:4 93:20 119:21
**cv** 1:5
**cycles** 91:16

**d**

**d** 3:1 11:6
**dad** 22:6
**daily** 86:3 92:20
  112:14 118:19
**damages** 7:5,7,20
  7:24 8:14 9:10
  10:14,22 98:19
  100:1,3
**dan** 2:7

**danka** 16:17,19
  17:3,4 21:19
**dark** 13:10
**date** 5:20 24:14
  34:6 59:19 126:8
  127:3,9,19 128:3
  128:13,25 129:20
  129:25
**dates** 14:24
**dave** 64:5 68:8
  70:6 108:2,3
  117:21
**davenport** 114:3
**david** 2:24 8:19
  24:5,13,22 25:1,17
  26:6,8,20 35:19
  36:2,7,8,12,24
  37:5 38:22 42:2
  43:18,22 47:1,2,8
  48:5,16 49:21
  50:11 51:10 52:11
  54:1,4,4,12 55:21
  55:24 56:2,18,18
  57:13 58:6,11,14
  59:20 62:17 64:14
  65:1,11,14,18
  67:16,18 70:13,23
  71:1,10,24 72:1,7
  72:15,18 73:2
  76:4,18 77:2,18
  78:20,22,24 79:17
  80:3,7,9,23 81:7,8
  82:1 83:10,19
  84:8 86:18 87:23
  89:12 90:6 108:15
  108:18 109:23
  110:1,1,12 111:9
  111:23 112:24
  113:1,16 114:9,12
  115:5,11,18 118:3
  118:5,11 120:4,19

121:1,11,15,17
  122:20 123:10,17
**david's** 76:7
**day** 12:16 27:10
  34:1,2,7,13,14,17
  35:23 36:10 37:1
  37:3,12,12,13
  38:15 39:15 40:11
  41:6,7,7,13,16,17
  41:17 42:9,16
  43:5,6,7,9,17,19
  43:24 44:5 45:1,1
  48:11 52:24 53:21
  54:2 59:16 60:1,2
  60:3,3,12,13,21
  61:10,14 62:10,13
  66:5,17,18,19
  67:15 70:15,15,17
  75:1 77:7,18 79:8
  82:17 83:24 84:6
  84:20 85:13 92:10
  92:10,11,19 93:3
  102:4 104:12
  111:15,20 113:9,9
  114:20 117:17
  118:22 127:16
  128:22 129:22
**days** 13:16 27:5
  42:22 43:18,21
  44:22,23 46:10
  49:10 59:18 60:21
  60:22 62:4,7,22
  64:16 66:20,21,21
  76:12 78:10,11
  85:11,15 90:3,24
  121:17,18,20,21
  126:17
**dead** 21:24
**deal** 19:23 81:7
  91:16 97:23,24

**dealer** 15:23 16:16
  20:18,19,19 21:5,5
  21:11
**dealers** 16:5,8,9
  16:18,19,20,22
  17:2 20:18
**deals** 96:19
**dear** 126:9
**debt** 14:8
**decades** 120:4
**decatur** 62:3,5,9
**december** 8:1 11:6
  13:16 97:3,4
  104:3
**decision** 120:15
  122:23
**decisions** 87:16
**decreases** 18:15
**deed** 127:14
  128:20
**deemed** 126:19
**deerfield** 17:8
**defendant** 1:8
  2:17
**defendant's**
  105:10 116:5
**defined** 108:5
**degradingly** 84:16
**degree** 14:3
**delayed** 34:6
**demeanor** 112:4,5
**demo** 17:21
**demonstrated**
  115:11 123:20
**denny's** 54:8
**dep** 74:4
**department** 65:8
  95:5,10 126:22
**deposed** 4:14
**deposition** 1:12
  6:3 8:11 25:13

EXHIBIT 5

26:2,12 28:13
30:7,13 31:16
63:9,9 74:6,8
78:23 81:12 91:18
91:20 94:4 124:7
124:9,16 125:7,11
126:8,10 127:1,3
128:1,3
**depositions** 1:20
**depressed** 8:2
100:9
**des** 52:10 55:18
**describe** 41:7
**design** 97:20
**designers** 97:21
**desk** 37:13 46:20
82:20
**destroy** 106:13
**detrimental** 93:11
**develop** 27:22
44:12
**development** 18:8
18:14
**died** 20:22
**difference** 4:21
9:16 10:15 98:18
98:19
**different** 15:7
53:10 81:3,3 84:5
**differently** 64:3
67:7,13 80:13,18
92:3,7 98:10
**difficult** 103:17
**dig** 18:9
**digits** 5:24
**diligent** 101:17
**dink** 74:14
**direct** 29:17
120:17 122:15
**directed** 113:17

**direction** 43:14
64:11,13
**directions** 108:7
108:14
**directly** 111:18,19
**director** 20:21
**disbelief** 71:15
110:7
**disciplinary** 71:21
84:2 87:22 105:11
117:14
**disclosed** 57:5
**discombobulated**
9:21
**discovery** 1:12,20
103:13 125:6,11
**discriminated**
37:17 65:3
**discrimination**
37:19 66:2,11
67:4 77:16 86:8
92:18 118:7,12,17
**discuss** 54:12,14
76:19 94:19
**discussed** 10:11
28:1 29:9 72:22
74:11 79:7 82:4
**discussing** 81:24
**discussion** 9:8
83:17
**discussions** 53:23
**disgusted** 110:13
**disgusting** 84:10
112:11
**dishonesty** 106:2
**disrespectful**
108:9 109:5,14
110:1
**distinctive** 15:8,15
15:16

**district** 1:1,1 16:4
16:6
**division** 1:2 20:9
20:16
**doctor** 11:9 13:2
**doctor's** 34:8
**document** 11:3
26:13 28:14 31:3
32:2 33:2,10,12,12
56:11,24 81:13
**documentation**
11:3,23 103:4,5
121:23
**documented**
112:14
**documents** 6:23
7:2 8:22 25:11
28:15,22 30:20
56:12 122:11
**doing** 7:15 12:15
14:14 15:23 16:9
22:10 27:6 37:18
40:5 42:10,23
45:10 47:13 51:4
52:4,12 68:9 70:8
70:23,24 71:20,20
71:20 72:8 76:4
76:10 77:22 80:22
85:18 86:4,19
87:18,19,21 88:18
88:21 89:17 90:2
90:3,8,20,21 94:3
96:23 101:9
102:24 113:13
117:6 118:1 122:4
**door** 66:15 82:21
84:19
**downers** 61:16
63:5
**downtown** 14:11
14:12 17:5,8

114:2
**dr** 11:5,9,17,24
12:24
**drastically** 7:19
**draw** 53:7
**drilling** 118:6
**drink** 73:11
**drinking** 64:23
107:15,16
**drive** 1:22 2:12
62:12
**drop** 107:22
**dropping** 40:11
110:5
**drowsy** 12:15
**drugs** 105:22
107:9
**dude** 86:1
**duly** 5:15
**dump** 34:23,24
35:20 39:4,7 41:3
74:14,15,17 79:8
83:18 117:20
**dupage** 62:20
101:23,24
**duties** 41:8 45:1
**duty** 85:14
**dying** 21:24
100:23

| e |
| --- |

**e** 3:1 6:4,12,19
11:5,5 25:17 26:3
26:6 56:13 72:4
81:17 120:19
121:1
**earlier** 47:16,22
98:20 114:18
**early** 47:23 50:4
63:21 104:4,7
**earn** 16:12

EXHIBIT 5

easier  5:2 87:17
eastern  1:2
education  14:1,4
effective  68:7
efforts  100:7,14,16
  101:1
eggs  100:10
eight  17:7 18:1,24
  20:22 97:12,13
either  20:23 22:2
  43:22 45:20 69:11
  72:24
elderly  36:9 37:19
electrical  119:23
elgin  20:6
eliminate  42:22
elk  21:4
emberling  44:10
  63:16 66:6 110:9
emergency  34:2,4
emotional  8:18
  10:22
employed  14:22
employee  19:2
  29:23 30:9 33:5
  36:17 39:5,5 49:9
  49:11,12 50:12,14
  51:4,7,12 52:15
  55:11,15 56:4,7
  65:6 108:9 113:10
  116:10
employees  31:4,8
  31:13 63:10,11,13
  64:3 67:7,13
  80:14 92:3,8
  95:22 106:17
employment  8:16
  9:13 15:14 28:23
  29:21 31:1,15
  48:4 56:9 60:3
  82:11 89:23 92:14

92:17 101:2 116:8
  116:9,11,12,14,16
  116:21 118:22
  122:19
encourage  45:16
encouraged  24:22
  78:6
ended  7:16 16:22
  22:14 49:14 93:21
  101:9 102:16,22
  104:23
energy  1:6 32:3,7
  32:22 33:2,17
  126:6 127:3 128:3
engage  105:24
  106:2,4,6,8
engaged  118:17
enjoy  102:3,3,5
enter  70:10
entered  128:9
entire  127:5 128:5
entitled  32:2
environment
  35:24 67:21 69:19
  75:11 106:20
  113:2,5,17,21
  118:3
equipment  14:16
  21:23 106:23
errata  126:17
  128:7,10,18 129:1
escorted  84:19
especially  5:5 61:1
  75:12 100:24
esq  126:5
established  49:9
  51:7 52:15 105:15
estimate  45:23
  46:6 103:18
ethics  30:17 77:5,8
  107:15

evenly  104:9
eventually  23:22
  24:11,19 47:11
everybody  36:10
  36:11,19 46:17
  54:4 63:14 65:15
  92:14 110:11
  113:5
exact  14:24 36:11
exactly  43:15
exam  3:5,5,6,6,7,7
examination  5:18
  105:5 120:10,12
  122:7 123:4,15
examined  5:16
example  19:19
  108:20
examples  9:23
  111:12
excepting  62:11
exchange  58:17,23
  93:23
exchanged  6:13
  58:9,15
exclusively  98:19
  101:19
excuse  8:23,24
  33:20 63:9 75:11
  78:23 82:8 121:7
execute  27:22
executed  128:10
execution  127:14
  128:19
executive  16:2,3
  24:20 25:3,7,23
  26:24 27:9 120:20
exhibit  3:16,17,18
  3:19,20,21,22,23
  3:24 25:13 26:2
  26:12 28:12,13
  29:2 30:6,7,12,13

31:16 33:1 56:23
  81:11,12 94:4
  105:7,10 116:1,3,5
  120:17,23 121:4
exhibits  3:14
  122:9
existing  91:8
expect  85:17
expected  7:14
expecting  7:10
  91:14
expense  48:13
  50:9 51:1,18 58:6
  71:12,13 117:6
  121:23
expenses  50:10,14
  50:16,16 83:5,7,8
  83:12,12
experience  7:17
  23:12,13,15 24:23
  25:5 37:10 41:10
  82:19 85:22 93:7
  115:12 119:10
  120:4 122:18
experienced  92:10
experiences
  118:11
expert  68:24
expiration  127:19
  128:25 129:25
explain  110:3
expound  42:19
expression  68:1
expressly  126:12
extent  11:21
  103:11 120:1
eyes  28:8 37:14
  65:11

EXHIBIT 5

**[f - friend]**

**f**

**f** 36:20 40:11 66:3 107:22 110:5 111:20 112:13
**f'g** 110:5 111:15
**face** 17:14,14 86:21 87:17,17 118:1
**facility** 35:3,4
**fact** 8:19 54:10 62:1 86:24 111:13
**facts** 64:1,2 82:22 85:5 87:1 91:21 92:2 93:4 95:2 115:13 116:23 117:12 118:16
**fail** 87:9 89:19
**failed** 88:11,12
**failure** 82:10 85:6 89:22 106:10
**fair** 72:10
**fall** 94:1
**false** 106:10 111:3
**falsification** 106:6
**familiar** 27:15 94:7
**far** 14:8 15:2 34:19 57:18 95:9 95:10 117:18
**farm** 37:4
**faster** 70:11
**fastest** 101:11
**father** 22:17
**fax** 15:6,7,8,17,19 16:2
**fear** 41:24 87:8,8
**feel** 12:14 38:1 65:6 84:5 92:13 120:3,4
**feeling** 12:18 13:8 43:15 64:5 78:13

**feet** 14:21
**fellow** 39:5
**felt** 12:17 37:12 64:8,10 66:1 77:18 78:13 80:13 80:17 84:6,18 93:3 113:16 119:2 120:16
**females** 18:24
**field** 17:22 37:2 41:18,24 42:2,17 43:17,18,21 45:9 46:7,14,21,24 47:7 62:13 121:17,18 121:20,21
**fight** 75:18
**fighting** 106:4
**figure** 10:8 65:12
**fill** 16:12,13
**final** 27:2 121:4,7 121:8
**finally** 8:4 49:16 97:23
**financial** 50:10
**find** 13:12 40:12 77:17 87:23 100:7 100:14 104:2
**finding** 8:3
**fine** 34:9
**finish** 5:1 31:10 38:20 39:20 46:2 47:5 58:13 81:23 96:18 114:10
**fired** 8:1 72:8 78:3 78:10 87:23 117:3 117:10
**firings** 77:21
**firm** 6:5
**firms** 11:20
**first** 5:15 7:20 8:14 10:4,9 14:19

16:3 18:12 27:5 27:19 28:22 30:16 31:15 34:1,12,14 35:23 36:10 37:13 38:15 39:14 40:10 41:6,10 42:22 43:5,12,14 45:11 45:11,24 46:5 47:12 52:20,22 53:3,12 54:20 55:6,16,17 57:9 61:1 63:6,7 64:4 64:15 65:16 66:15 76:22 77:7 79:7 80:6 81:7 82:9,11 83:2 84:19 85:7 86:12,13 87:2 88:4,11,12 89:19 89:23 92:11,14,17 99:16 104:1 114:16 115:10,14 117:17 118:22 121:7,8,10 122:9
**five** 7:9 16:5,14,23 48:1 90:2,24 95:13
**floors** 101:12
**focus** 61:12,15 70:20 98:6
**focused** 18:13 97:18
**folded** 19:17
**follow** 35:7 87:17 95:19 105:2,18
**followed** 15:15
**following** 76:10 96:5
**follows** 5:17
**foot** 113:24
**football** 110:4

**force** 18:1 65:21
**foregoing** 127:13 128:18
**forget** 63:17 68:23
**forgot** 51:11 77:11
**form** 8:10 37:24 38:4,14,23 49:2 53:15 67:2 68:3 79:19 87:4 88:5 91:23 113:3,18 115:13 116:17,22 117:11 118:13,18 119:20 120:7 122:13,21 123:22
**forma** 122:10
**format** 94:18
**formed** 42:1
**forward** 37:8 57:8 83:10
**found** 20:5 60:4 76:14 89:5 102:14
**foundation** 8:10 37:24 38:4,23 53:15 67:2 87:4 91:23
**four** 5:24 10:13 17:6 76:12
**fourth** 14:7 41:13 56:9
**frack** 45:19
**franchise** 96:8
**frat** 35:24 66:8,9 107:23
**free** 127:14 128:20
**frick** 45:19
**friday** 70:5,7,22 72:24,24 73:10 76:7,10,11 83:3 87:20 90:17,22
**friend** 22:21,24 101:22

EXHIBIT 5

**front** 43:8 56:12
74:16 117:16
118:2
**frustrated** 38:1
**frustrating** 73:17
**fuck** 36:20,20
108:2 111:15
**fucker** 71:18
**fucking** 78:21
**fukumoto** 45:18
63:17 65:16 67:16
74:16
**full** 19:18 31:4,8
31:13 37:1 47:5
82:7,9 96:20
**fullest** 27:17
**fully** 55:4,6
**fun** 75:13 83:17
102:6
**function** 81:18
**functional** 55:5,6
55:7,10,13 83:1,3
**functioning** 55:17
**further** 93:17
123:2

**g**

**gained** 40:16
75:18
**gals** 102:13
**game** 109:18
110:4
**ganged** 90:5
**gap** 22:20,23
**gaps** 22:2
**general** 110:15
**generated** 89:10
**generating** 88:23
**generation** 101:11
**gentleman** 32:13
**getting** 12:17
13:12 16:16,18,23

38:1,10 41:24
42:6 45:12 52:6
52:14 53:22 57:18
64:11 66:7 70:9
71:16 75:9,17
80:1 81:6 83:6
88:9,24 89:7,9,10
91:14 92:24 99:11
99:13 101:6 117:6
**gig** 102:1
**give** 5:4,23 9:22
19:19 34:11 42:23
49:3 51:4 52:19
72:2 85:10,15
91:15 111:12
**given** 86:9,24
88:20 125:10
**gives** 43:13
**giving** 13:13 85:16
104:23
**glass** 41:15
**go** 4:16,17 7:24
8:13 9:5 13:11,15
13:15,23 14:7,18
15:11,22 16:8
17:10 19:15,24
20:13 21:4 23:13
27:4 36:7 38:7,19
39:21 40:12 42:3
43:1,5,6,23,23
44:18 46:13 48:3
50:14 51:1 53:22
56:22 61:1,11,17
62:3,4,9 63:6
64:18,19 65:4,5,10
66:17,18 67:19
70:11 71:3,4 77:8
86:4 95:22 96:20
100:12 108:2
109:19 110:14
113:13 117:17,23

119:3
**goal** 18:12,13
**goals** 18:10
**god** 35:22
**goes** 4:20 53:3
74:21 83:21,22
95:9
**going** 4:16,20,23
7:21 8:9 9:2,20,23
10:12 11:19 12:5
15:2,13 25:10
27:19 28:12 36:3
36:3,4 37:6 38:5,6
38:6 39:19 41:20
42:12,21,24 43:4,5
44:9 45:4,14,15
47:11,24 57:8
60:12,22 61:21,24
63:4 64:15 65:4
66:11,20 67:3
70:6,19,19,20 71:2
71:11,11,12 73:5,9
73:11 74:5,20
75:2,22 76:23
78:4,10 80:3
81:23 83:6 85:11
85:23,24,24 87:7
91:16 93:7,21
95:12 100:8,18
104:2 107:14
109:18,18 112:9
112:10,11 117:18
117:19 122:15
**good** 12:19 42:4
58:4,4 61:19
66:19 76:6,10
83:22 87:10 95:4
98:12 101:22
112:8 114:17
119:19

**gosh** 98:3 103:20
103:22
**grabbed** 82:19
**graphic** 18:1
**graphics** 17:12
**great** 48:21 71:20
86:20 90:2 97:5
**grew** 21:24 102:12
102:13,13
**ground** 4:16 9:2
88:16,19
**grounds** 67:12
**group** 23:4 26:20
35:24 63:13 66:9
121:12
**grove** 21:5 61:16
63:5
**grow** 98:9
**growing** 97:6
101:11
**grown** 84:18
**grownups** 32:12
**guarantee** 91:15
99:1,1,8,14,18
**guaranteed** 10:5
29:16 99:16
116:10
**guard** 71:8 75:23
**guess** 46:14 59:8
80:2,6 94:23
105:15 113:20
**gut** 42:22
**guy** 16:19 17:23
23:13 36:22 37:11
37:14,16 39:24
40:3 45:18 51:6
51:17,23 53:9
63:19 65:15,24
66:9 85:20 92:11
92:16,16 93:2
96:17 97:19

EXHIBIT 5

102:17 114:19
115:19 117:16,24
**guy's** 37:14
**guys** 6:22 35:5
40:11 45:21 50:4
50:6 54:7 62:15
89:1,3,7 102:12,13
111:20 113:13
117:19

**h**

**half** 6:20 8:5 44:9
68:9 77:7 112:8
121:21
**halfway** 43:7
**handbook** 30:9
**handed** 81:16
82:18 89:8
**handle** 36:15
**handled** 16:5
**hands** 93:2
**hang** 103:10
**hanging** 34:24
**happen** 8:21 39:9
77:22 118:5
**happened** 34:13
41:16 63:3 64:20
72:12,13 75:4
76:12,13,21,22
87:22 90:23 95:7
**happening** 42:13
42:14 100:24
118:7
**happy** 5:8 28:19
**harass** 32:9,16
**harassing** 8:24
**harassment** 106:8
**hard** 7:17 46:18
69:18 84:17
119:10
**harder** 5:5

**hardware** 101:8
**hated** 75:15
**hathaway** 27:16
32:2,7,22 33:2
**head** 101:22
**headhunting** 23:4
**heading** 29:20
**headquartered**
114:3
**health** 13:19
**hear** 12:22 23:2
46:18 73:4 86:20
92:10 96:22 111:9
112:9,17
**heard** 86:19
111:19 112:14,19
**hearing** 71:7,21
81:20 84:2 115:15
**heavily** 46:6
**heavy** 46:11
**heck** 85:16
**hello** 4:2
**help** 16:11 18:5,12
21:4 30:11 37:2
59:21 62:19,22,22
80:3 86:22 92:23
92:24
**helpful** 119:24
**helping** 16:13
21:14 37:4
**hey** 86:1
**high** 18:22 57:18
100:21
**higher** 15:4 25:4
**highest** 14:1,4
**hindsight** 93:9
**hire** 7:18 28:21
36:8 42:20,23
44:3,4,6,7 65:14
92:16 118:24
119:1 123:11

**hired** 19:17 20:3,4
20:5,10,21 36:9,9
36:14 43:20 64:9
85:10 87:20 89:12
104:8 114:6,19
115:3 120:14
123:6
**hiring** 16:11 25:11
41:11 65:21 85:9
92:15 115:19
122:12,13
**hirings** 77:21
**history** 15:14
**hit** 114:15
**hold** 19:11
**holidays** 104:2
**holy** 73:11
**home** 22:6,7,8,12
22:13,17 60:1
101:17 119:23
**honest** 58:20
**honestly** 50:23
53:4 83:15 109:12
117:3,4
**hope** 62:18
**hopefully** 4:17
**hospital** 96:13
**hostile** 106:19
113:2,4,16,21
**hot** 15:6 34:16
**hotel** 24:14
**hour** 6:20 35:19
37:1 39:2 44:9
51:2 53:3 64:4
65:16 66:18 68:7
68:8 77:7 78:8
95:13 112:8 119:6
119:6 121:15,21
**hourly** 31:4
**hours** 14:7 18:15
31:5 34:20 43:24

64:24 73:6 77:1
78:2 83:10 91:3
114:17 121:21
**house** 46:11
102:21
**hr** 51:12 65:5,6,7
65:22 66:13 72:17
80:12,24 90:6
101:23 111:14
115:22
**huh** 4:7 5:4 7:6
45:3 57:15 61:4
97:8 121:6
**human** 37:20 40:9
71:6,16,22,24
75:24 76:11
113:11 122:16
**humor** 74:1
**hundreds** 36:14
85:10
**hungry** 27:3
**hurting** 45:14

**i**

**ian** 1:3,12 3:4 5:14
5:22 52:13 54:5
54:10 125:7 126:6
126:8 127:3,4,9
128:3,4,13 129:20
**icon** 16:17 17:11
18:2,22 19:10,15
21:20
**ideal** 102:4
**identification** 5:23
**idiotic** 37:20 113:9
**ignored** 36:24
**illegal** 116:20
**illinois** 1:1,16,22
2:5,13 125:1
**images** 32:14
**imagine** 15:17
117:15

EXHIBIT 5

immature 66:4
immediately 20:9
important 32:14
  50:15 83:12 117:5
improper 52:3
inadvertent 57:5
include 63:23
included 99:20
includes 29:12
including 63:12
  103:20 110:12
income 7:14
incorporated
  128:12
indicated 8:12
  102:7
indicating 37:15
  109:19 112:15
indication 115:10
individual 11:23
  18:8,14
individually 24:17
industry 16:17
  17:15 21:2,4,21,24
  100:21,24 101:5
  102:13,15 103:21
inexperienced
  37:9 124:2
information
  106:11 119:18
inherited 89:9,13
initial 58:23
initiative 42:11
inquire 102:10
insiders 109:21
insubordinate
  53:8 71:10 77:13
  84:12,14,15,17
  88:8,10,11,12
  89:17 107:24
  108:8 110:8

insubordination
  53:7 71:7,14,17,17
  73:9 76:15 82:12
  82:23 83:1,13,14
  83:14,16,24 84:3,4
  86:14 91:6 105:24
  107:19 108:5
insurance 11:7,8
integrate 19:23
integrating 17:24
intense 27:6 64:15
  64:16 78:1
intentionally
  106:13
interaction 86:3
interest 38:12
interfere 106:16
interior 97:21
interpret 5:5
interrogatories
  5:16
interrupt 38:19
interrupting 9:1
interview 10:11
  23:22 24:4,8,13,16
  25:2 27:3,13 36:2
  36:6 64:6 65:19
  74:17,19 78:1
  84:2 85:22,24
  93:6 114:16
  115:24 123:7,10
  123:17
interviewed 24:1,3
  34:23
interviewing
  12:18 21:7 34:21
  83:22 124:2
interviews 100:18
intimidate 106:16
intimidating 108:8
  109:3

intro 34:15
introduce 43:1
investigation
  106:11
inviting 25:19
  120:20
invoice 44:10
  119:17,22
invoices 119:24
involved 18:5
iowa 13:24 52:10
  55:19
issue 39:22 52:20
  53:12
issues 55:16 65:5
item 9:16

**j**

j 2:14
january 101:18
  103:24 104:4,5,7
jersey 20:4
job 7:9,22 8:3,5
  9:19 10:7,13
  13:12 15:4 16:5,8
  16:10,11,15 17:10
  17:13,19,20 18:3
  18:17,21 19:5,18
  19:18,23 20:1,4,9
  21:1 23:15 25:1
  27:4,8,13,14,18
  28:10 34:19 37:14
  41:7 42:7 53:22
  57:18,19,20,20
  64:5,10 71:20
  73:7 75:13 76:5,6
  76:10 77:22,23
  81:3 84:6 85:12
  85:18 86:20 89:17
  90:2 93:9,20
  96:20 100:7,7,21
  101:17,18 105:22

107:17 109:14
  112:16
jobs 7:21,22 8:4
  14:14 57:19
  102:10
joke 38:16,17,21
  39:3,3 53:20
  54:15 110:13
joking 34:18 35:21
  66:6 110:11
judge 8:10 52:4
july 1:24 125:7
  126:4
june 22:13

**k**

k 11:5
kahootz 67:18
keep 18:15 38:6
  53:5 71:20
keeping 38:12
  101:13
kellie 11:5,17,24
  12:24
kellie's 11:9
kentucky 20:24
kept 14:21 113:24
kevin 34:18 35:21
  45:18 63:17,18
  65:16 67:16 74:15
  89:8 107:4,19
  109:14 110:12
  115:17
kevin's 68:11
key 100:18
keys 82:19
kick 13:16
kicked 104:4
kicking 72:14
kid 18:11
kids 12:17

EXHIBIT 5

**killing** 101:14
**kind** 56:4 66:7
  118:3
**knew** 9:20 23:8
  27:16,18 36:1,10
  54:5 64:4,4,14
  65:2 66:15 72:8
  80:1 81:5 84:7
  92:11,12 102:18
  109:22 114:17
  115:1,2,16 117:7
  118:20 119:4
**know** 6:8 9:3 15:2
  17:13,19 19:5,22
  25:5 26:5 27:3
  28:5,7 35:14
  36:11 37:3 39:18
  39:21 40:22 41:18
  41:22 42:21 43:4
  43:8 44:21 46:1
  46:13 47:12 50:20
  52:11 54:14,23
  57:10 60:4 61:2,7
  61:10,11,15 62:1,2
  62:8,24 63:1
  64:22,24 65:17,18
  66:1,10,14 68:11
  68:13,15,18,21
  69:1,10,15,16,20
  69:24 70:2,16,17
  73:16 76:23 78:12
  79:23 80:7,10
  81:1 83:22 85:9
  87:5,11,14 88:17
  88:17 95:11,23
  96:1 97:16 99:8
  101:13,24 102:24
  103:3,22,23
  104:11,13,15,20
  104:24 107:12,24
  112:9 113:22

115:8,17 118:20
  118:21 119:19,19
  119:22 120:3
**knowledge** 7:3
  95:5 112:21
**known** 14:15
  23:10 54:10
**knows** 92:14
**konica** 21:19 23:6
  114:21

**l**

**l** 11:5,5
**labeled** 28:23
**lady** 41:15
**laid** 22:5 70:21
  90:20
**langone** 2:3
**language** 110:18
  110:20,23 111:7
  111:10,23 112:18
  112:20 113:8
  119:3
**laptop** 30:23 49:5
  49:13,15,16 50:7
  51:14,18 52:7,9,11
  52:14,21,22 53:12
  53:19,21,23 54:1,3
  54:5,10,11,13,18
  55:1,4,4,7,10,18
  55:19 58:6 72:4
  81:18 83:1 89:19
  117:6
**laptops** 36:16
**large** 16:9
**las** 66:5 110:10
**laser** 18:13
**late** 14:23 59:15
  59:17,20,20,23
  60:8,10,11,12,17
  60:18 74:23,24
  75:2 83:6,7 89:17

**laughed** 66:2
  108:3
**laughing** 36:6,19
  64:8 68:10 110:12
  117:21
**lavery** 2:3,6 3:5,6
  3:7 8:9,24 9:7
  34:11 37:24 38:4
  38:14,23 39:1
  49:2 52:3 53:15
  56:24 57:4 67:2
  68:3 73:21 74:1,3
  74:7 79:19 87:4
  88:5 91:23 95:16
  105:6 111:17
  115:10 116:5,8,20
  117:1,9 118:8,16
  119:12 120:1,9
  122:8 123:2,14,16
  123:24 124:4,9,12
  126:5
**law** 6:5
**lawful** 108:7,14
**lawsuit** 7:4 9:11
  94:15,18,19,21
  98:20 104:20
**lawyer** 73:22
**lawyers** 73:20
**lay** 47:10
**laying** 76:5
**layoffs** 100:24
**lead** 42:3
**leader** 51:4 57:21
**leaders** 115:2
**leadership** 42:14
**leads** 88:22,23,24
  88:24 89:1,3
**learn** 27:4 41:20
  45:14 61:18
**learned** 25:5

**learning** 42:5
  119:17
**leash** 68:2
**leave** 15:21 16:15
  22:14 37:2 50:18
  56:6,21 58:18,21
  84:23 96:12
**leaves** 118:2
**leaving** 70:18
  102:15
**led** 81:2
**left** 15:5,14 18:20
  21:4,17 25:2 50:8
  50:13 58:5 60:1,5
  60:13 64:23 73:8
  83:4 91:7 93:16
  95:2,6,7 97:14
  98:6,23
**legal** 116:13,15,18
  116:23 118:14
  126:1 129:1
**letter** 26:9,15 29:9
  29:12 81:20 88:7
  99:15 116:2 121:2
  121:5 126:18
**level** 14:1,4
**libraries** 101:13
**license** 125:16
**life** 77:21
**liked** 46:9
**limited** 121:15
**line** 21:23 30:15
  30:20 31:24 33:11
  39:18 77:24 128:7
  129:3
**linkedin** 102:11,23
**list** 67:5
**listed** 52:14 128:7
  128:17
**listening** 91:1

EXHIBIT 5

**listing** 128:7
**literally** 91:3
 112:7
**little** 4:18,21 13:21
 21:10 47:9 48:19
 53:10 66:13 114:2
**live** 52:5 102:20
**lived** 46:12 50:5
**lives** 63:4
**ljclegal.com** 2:7
**llc** 1:7
**loaded** 7:8 55:18
 58:5 71:13 117:6
**local** 42:14
**location** 126:14
**loft** 73:3,3
**logical** 100:22
**long** 6:18 11:24
 12:11 14:12 21:9
 21:15 25:5 81:8,9
 91:16 114:24
**longer** 7:23 81:18
 97:17
**look** 7:13 10:3
 11:19 28:16 48:1
 49:19,19 51:7,8
 52:18 65:17 68:4
 94:7
**looked** 41:8
 101:21 102:2
**looking** 19:5 20:8
 20:24 21:3 28:7
 81:6 101:19
 102:19 119:23,24
**loop** 63:6
**loophole** 76:14
**lorazepam** 12:8,11
 12:13
**los** 102:18
**losing** 7:16

**lost** 8:15 9:11,14
 10:5,18 43:14
**lot** 13:11 25:2 27:6
 27:19 38:6,7 42:5
 45:12 46:1 63:1
 77:20 97:20,20,21
 97:22 100:16
 101:1 104:15,17
 111:13
**loud** 31:10
**louis** 20:24
**louisville** 20:24
**love** 87:23
**low** 100:18 101:23
**lower** 7:21
**lucrative** 102:2
**lunch** 43:23 58:7
 64:20 73:11
 107:11,15 121:22

**m**

**machine** 125:5,9
**machines** 15:6,19
 16:2
**macleod** 1:3,12
 3:4 4:2,3 5:14,22
 56:22 125:7 126:6
 126:8 127:3,4,9
 128:3,4,13 129:20
**madam** 126:9
**mahoney** 2:11
**mail** 25:17 26:3,6
 56:13 72:4 81:17
 120:19 121:1
**mails** 6:4,12,19
**main** 13:19
**major** 16:3 19:17
**majority** 60:24
 61:9
**making** 7:11,14
 8:6 14:19 59:7
 60:23 61:20,23

**man** 14:23 72:15
 74:14 84:18,18
 96:18 119:8
**manage** 36:4,4
 85:24 86:1,2,2
 119:10
**management**
 89:11 93:6 100:21
 108:17
**manager** 15:5
 16:5,7 17:4,5,6,12
 20:17 37:9 39:6
 40:3,3 42:20
 66:20,22 77:14
 85:12 89:12 92:15
 122:12,13 124:2
**managers** 16:11
 17:7 18:4,6 36:15
 43:11 76:13 108:7
**manner** 109:1,3,5
**manufacturer**
 15:22
**manufacturer's**
 16:6
**manufacturing**
 61:16 97:22
**map** 42:24
**mark** 2:6 11:11
 126:5
**marked** 25:13
 26:2,12 28:13
 30:7,13 31:16
 81:12 94:4
**marketing** 102:17
**marketplace** 17:6
**markets** 21:18

62:5 69:18,24
 70:8 74:7,9 98:4
 98:12,23 104:12
 122:22

**married** 19:3
**marriott** 24:14
**mart** 15:9,18
**marzen** 10:12 23:5
 24:1 27:12 114:13
 115:3,5,6,8 120:13
 122:19 123:1
**marzen's** 114:7
**masks** 5:6
**massacre** 66:5
 110:10
**match** 17:21 112:6
**maternity** 22:14
**matter** 126:11
**mature** 81:1
 113:21
**mayo** 96:14
**mccambridge**
 2:11
**mcdonald's** 19:21
 19:24
**mean** 26:4 32:16
 38:24 47:9 62:8
 63:3 68:1 69:16
 71:15 73:12,18
 78:17 79:2,5,11
 80:2 82:18 94:8
 94:22 95:7 97:4,4
 97:16 101:21
 104:11,21 107:11
 107:13 123:1
**meaning** 47:22
**meaningful** 120:5
**means** 25:22 62:11
**medical** 34:2,4
**medication** 8:2
**meds** 11:13,15
 12:4,6 13:15,16
**meeting** 34:15,15
 36:12 38:22 39:11
 39:17,18 48:5,8,10

EXHIBIT 5

49:22 55:21 59:17
68:5 70:3,4,4,6,14
70:22 71:1,4,4,19
72:17,21,22 73:2
74:10,11,12 75:1
76:3,18 77:2,4,18
78:14 79:1 81:21
81:24 82:3 90:15
90:23 92:19 93:5
108:21 115:19
117:14 121:15
**meetings** 44:8
45:20,21,22 54:6
72:1
**memory** 58:22
**mental** 10:21
13:18
**mentality** 17:24
**mentioned** 52:6
63:8,22 67:6
68:21 76:17 91:8
95:21 98:18 103:1
121:14
**merchandise** 15:9
15:18
**mes** 48:17,23 49:7
50:12,16 51:19
53:2 58:5 71:12
76:13 79:10,11,12
79:13 83:11
104:20 107:16
115:12 117:6
119:17 122:18
**messages** 93:23
94:18
**messed** 37:8
**messy** 35:16
**met** 16:19 18:22
**methods** 102:9
**michigan** 14:17

**mid** 17:15 100:21
**midamerican** 1:6
7:22 8:6 9:19
12:23 13:3,14
21:8 22:24 23:3
23:16,17,18,23
24:9,12 27:1
29:23 30:3 33:17
33:21 41:7 44:13
65:3,7 79:15,18
80:17 93:16,17,24
94:14 95:6,20
96:3 98:23 99:4
104:21 124:8
126:6 127:3 128:3
**midamerican's**
46:22
**middle** 51:15 97:3
**midwest** 20:2
129:1
**mile** 102:21
**million** 16:10,10
**mine** 21:4,13
93:22 101:22
114:20
**minimal** 77:24
**minneapolis** 23:5
**minolta** 21:19
23:6 114:21
**minute** 28:16 88:1
95:13
**minutes** 6:20
37:13 44:11 48:1
59:19 64:10 66:15
84:6,19 92:14,17
115:14 119:16,17
**misconstrued** 39:8
**missing** 28:8
**misstates** 113:18
116:23

**mistake** 115:22
**moines** 52:10
55:19
**mold** 89:15,15
118:23
**moldable** 89:16
**molding** 119:9
**moment** 9:6
**monday** 47:10,23
49:16,18,18,21
50:8 52:23 54:5
55:10,15,17 70:7
71:3 72:4 76:7
**mondays** 86:4
**money** 14:19 18:3
53:1 83:8 98:12
100:19
**month** 9:20 15:19
18:14 30:2 45:11
91:17 96:6,14
98:4,14
**monthly** 99:1
**months** 12:12
14:24 15:4 17:5
20:12,22 21:8
22:12,15 29:16
31:15 82:11 85:7
86:12,14 87:3
88:4,12,13 89:20
89:23 97:17
**morning** 43:23
46:12 47:4,23
49:21 50:4,8 54:6
83:5
**mornings** 47:10
**motion** 74:4
**motions** 8:11 74:7
74:9
**mouth** 40:5 68:1
75:10 113:24

**move** 8:7 19:10
20:23 33:16 37:22
52:1 66:24 73:15
73:18 95:19
100:22 122:16
**moved** 15:4 19:8
**moving** 8:12 13:20
37:8 38:13 52:6
98:11

**n**

**n** 3:1
**name** 5:20 11:2,9
11:19,22 12:2
13:2 27:16 33:5,5
40:20,22,23,23
62:18 63:17
114:20 126:6
127:3,4,15 128:3,4
128:21
**named** 41:15 96:8
110:9 117:24
**names** 63:16 87:15
102:12 107:3
**national** 39:17
40:16
**nature** 18:20
**necessarily** 101:21
**need** 5:7 11:11
24:14 34:8 37:2
48:18 49:19,19
50:9 51:1 54:17
57:9 79:3 83:8
104:19,24
**needed** 27:22 49:3
54:21,24 55:2
62:15,16 84:7
102:2 119:19
**negligent** 118:12
**nellans** 2:14 3:5,6
3:7 4:2,5,8,11,14
4:16,20 5:10,19

EXHIBIT 5

8:7,12,23 9:3,5,9
11:21 25:10,14
26:1,3,11,13 28:11
28:14 30:5,11,14
30:19 31:17 34:12
37:22 38:1,5,12,15
38:21 47:24 48:3
49:3 52:1,6 53:17
56:23 57:8,12
66:24 67:3 73:15
73:20,24 74:2,5,10
79:22 81:10,13
88:15 92:1,6
93:13 94:7 95:12
95:18 103:7,15
104:14 105:2
111:16 113:3,18
115:7,13 116:3,17
116:22 117:11
118:13,18 119:11
119:20 120:7,11
122:6,21 123:3,5
123:13,22 124:6

**nervous** 27:14

**never** 17:22 30:8
31:24 33:11 36:14
40:6,7 41:20 46:9
59:17 60:8,10,11
60:11,16,19 64:23
69:17,22 73:22
74:24 75:10,12
84:14 89:17 95:11
109:22 111:21

**new** 9:12 10:6
20:4 27:14 49:13
75:12 97:19 100:7
100:7,11 113:10

**nice** 5:6 12:14
96:18

**nightmare** 37:21
66:13 113:12

**nights** 16:23

**non** 8:8 28:17,20
37:22 52:1 59:5
66:24 67:1 73:16
73:19

**noon** 73:11 75:3

**north** 2:4 14:17

**northern** 1:1

**notary** 126:24
127:10,18 128:15
128:23 129:23

**notes** 57:2,6,10
79:2,4 125:9

**noticed** 41:10

**notified** 59:20

**notify** 46:22,24
47:2

**november** 104:3

**number** 48:11
49:12 52:15 55:11
55:15 87:12 91:20
126:7

**numbers** 28:6
128:7

**nursing** 96:21

**nut** 20:7

---

**o**

**o'clock** 62:24

**o'connor** 1:14
125:4,16

**oath** 4:5,6

**object** 8:10 38:14
38:23 49:2 52:3
53:15 67:2 68:3
79:19 87:4 88:5
91:23 113:3,18
115:7,13 116:17
116:22 117:11
118:13,18 120:7
123:22

**objection** 8:24
37:23,24 38:4
74:2 111:16
119:11,20 122:21

**obvious** 36:23
37:20 65:11 66:10
118:19

**obviously** 27:7
35:23

**occasion** 56:3
64:21

**occasions** 54:4
62:12 89:15 112:5

**occur** 95:23

**occurred** 90:15

**occurrence** 56:19

**october** 13:15 48:8
48:9 49:6,9,15,17
49:18 51:7,16
52:7,10,19,23
53:11,11,24 54:20
55:7 70:3,5,5 71:2
71:10 72:21 73:1
74:11 76:3 81:21
82:3 83:2 90:3,4,5
90:16 91:2 92:19
96:23 97:1 108:21
112:3 122:2

**odd** 66:9

**offer** 26:9,15 29:9
29:12 99:15 121:2
121:5

**offered** 17:12 24:8
24:11,19

**offering** 32:19
122:19

**offers** 13:13

**office** 14:16 21:23
27:6 34:21 35:10
35:15,20 37:5
39:4 41:3 42:15

45:10,12 46:6,8,17
46:22 49:24 50:6
53:20 54:5 59:4,5
59:8 60:1,22 61:1
61:21,24 62:2,14
62:24 63:15 66:4
66:4,11 67:10,24
69:6,8,12,23,24
70:1 73:3 75:10
79:8,9 83:18,23
101:3 102:4 110:9
110:10,13 111:20
111:22 112:19
114:2,4,5 115:14
117:16,20 126:13

**offices** 70:8

**official** 124:10
127:15 128:21

**oh** 14:23 23:1,19
30:16 35:22 52:12
53:19 61:6,22
77:14 81:14 94:22
98:3 103:20,22
109:15

**ohio** 126:2

**okay** 4:2,19 5:9,13
6:8 8:7,12 13:20
13:21 20:11 22:4
23:20 25:7 26:1
26:11,23 29:11,19
31:1,9,11 32:6,21
33:13,18 38:5,11
40:6 44:2,18 46:4
51:1 52:16 55:14
55:21 56:16 57:8
57:10,11 62:23
73:24 82:7,24
83:2 85:5 86:1
90:13 93:16 94:12
95:4,12,16 98:2
99:19 103:14

EXHIBIT 5

104:14 105:13
107:1 111:5,23
114:11 120:24
123:14 124:4
**old** 16:24,24 20:18
36:22 37:11,14,16
50:2 51:6 63:19
64:13 65:18 71:18
76:1 85:21 96:16
96:17 115:16,20
115:23
**older** 36:9 45:22
51:22 53:8 54:6
63:10 65:15 66:9
84:18 92:16,16
93:5,6 115:19
**once** 6:21 12:1,5,7
49:22 52:3 62:8
89:18
**ones** 6:12 89:5
103:20
**open** 7:23 104:23
**operated** 95:10
**operations** 95:5
111:6
**opinion** 77:14
**opportunity** 18:20
38:9 104:23
122:19
**opposite** 22:9
**oral** 5:16
**order** 124:7
**ordered** 51:14
**orders** 108:7,17
**organization**
51:22 85:15
107:14
**organized** 53:22
78:20
**oriented** 65:6

**originally** 12:24
**output** 101:8
**outside** 21:3 34:17
34:18
**outsider** 109:21
**overall** 13:18
**overcome** 81:6
**overnight** 49:14
51:15 52:17
**oversaw** 17:6
**owners** 20:18 98:8

**p**

**p.m.** 1:24 70:15
71:2
**page** 3:3 17:18
29:2,17,18,21
105:11 108:4
110:14 116:6
121:4,7,8 128:7
129:3
**paid** 21:6 99:2
**pain** 8:18
**pana** 20:6
**panasonic** 19:17
19:20 20:13
**pantones** 17:21
**paperwork** 51:11
**paragraph** 26:19
82:7,9 108:11
121:7,8
**paralegal** 56:14
103:4
**park** 60:6 62:14
63:4 102:20
**parking** 25:2
62:14
**part** 31:9,13 92:3
99:8,10 102:6
103:18 128:9
**partnered** 45:15

**partnership** 42:2
**passionate** 37:7
**patiently** 4:23
**paul** 1:14 125:4,16
**pay** 14:8 43:9
99:10
**paying** 15:4
100:21 101:23
**payment** 99:14
**peas** 113:6
**pending** 5:11
**pension** 102:1
**people** 18:2 23:11
36:9,14 41:10,11
45:22 65:21 66:6
69:7,12 74:21
76:1 81:2 83:21
84:9 85:10 87:9
87:15 102:5,15,24
103:18 110:11
114:18 115:15
**percent** 22:19 43:6
61:7 84:4,5,15
85:19 97:12,13
99:15,17 114:13
115:3
**perfect** 15:1
**period** 22:17 30:2
39:2 116:11
**permitted** 74:3
107:17
**person** 12:1 18:24
36:10 40:8,20
44:5 47:21,22
50:10 54:21 59:1
59:7 60:23 61:2
69:2,13,21 75:22
80:24 84:8 85:15
91:11 110:9
112:19

**personal** 18:10
19:7,7
**personally** 103:11
127:11 128:15
**persons** 45:5
**perspective** 90:18
**pertaining** 1:18
**phone** 30:17 35:12
46:15,18,19,20
47:3,20 49:23,23
54:7 63:1 69:13
69:18,18,19 70:8
70:10 71:6,22
72:19 74:18 76:11
78:4,6 83:19
84:23 86:18 87:18
92:22 94:9 104:12
126:3
**phones** 46:9,16
**phoning** 102:11
**photo** 39:12,14,17
39:22 40:13,15,16
**photographed**
40:17
**pick** 46:11 65:13
**picked** 66:2,7
110:11
**picking** 118:7
**picture** 39:19 40:1
40:21 75:8,9,13,15
75:16 117:23
**piece** 98:7
**pills** 12:15
**pissed** 50:24
**place** 9:22 13:10
20:5 35:13,20
36:1,21 39:7
51:21 74:14,15,17
74:22 83:20 97:5
112:8 118:24

EXHIBIT 5

**places**  8:4 61:11
**plaintiff**  1:4 2:8
**plan**  7:10,12 8:19
   8:21 10:12 18:6
   18:14 27:9,10,23
   29:15 44:13 66:21
   76:5 90:10 98:5
   98:11 104:3
**planning**  97:20
**plans**  18:7,9 27:10
   27:12 28:1
**plastic**  34:24
**platform**  105:15
**please**  4:24 5:4,7
   5:11 31:10 48:22
   50:17 51:24 52:4
   57:10 58:21 64:19
   91:21 100:13
   121:10 126:13
**pleased**  109:20
**plus**  9:14 10:9
**pod**  113:6
**point**  5:7 40:18
   44:12 48:4,23
   56:22 58:17
   100:12 101:6
   104:10
**poorly**  88:6
**portal**  50:13,14
**portion**  52:2
**portions**  8:8
**position**  9:17
   18:23 23:2,23
   24:9,11,20,23 25:3
   25:8 27:20,21
   68:11,15,22 69:9
   84:11,13 86:11
   87:1 88:20 91:22
   97:2,7 113:23
   114:22 120:20
   121:19

**positions**  100:17
   101:20
**positive**  22:18
**possible**  9:14
   10:10
**potential**  10:18
**potentially**  99:12
**power**  114:9
**practices**  105:14
**praying**  94:2
**pre**  84:2 87:22
**prefer**  57:8 113:12
   126:15
**premises**  111:5
**prepare**  6:2 85:13
**prescribe**  11:15
   12:4
**prescribed**  12:9
**prescribes**  11:13
**present**  2:22 24:6
   40:24 41:4 58:23
   72:18
**presentation**  78:4
   78:7
**presentations**
   27:18
**president**  19:1
**pretextual**  117:9
**pretty**  27:3 35:16
   42:10 79:23,24
**previous**  18:21
   33:1 94:17 110:14
**previously**  29:9
   31:17 81:21 82:4
**principals**  20:18
**print**  17:18 30:15
   101:9
**printed**  6:4
**printers**  23:21
   101:13

**printing**  19:24,24
   22:1
**prior**  29:5 34:2
   43:19 116:24
   122:3
**priority**  48:11
   52:24 53:1,2
**privileged**  6:10
   56:24 57:6
**pro**  122:10
**probably**  6:22
   15:3 21:23 54:15
   56:13 63:18,18
   80:6 81:15 82:17
   98:4 104:12 108:3
   111:13 118:24
**probationary**  30:2
   31:7,14
**procedure**  73:22
   127:5 128:5
**proceed**  74:5
**proceedings**  1:10
   124:15 125:10
**process**  74:17,20
   78:1 85:22 102:3
   103:19 120:16
   123:10,18
**procrastinated**
   104:6
**produced**  6:23
**producer**  7:10
   9:19
**product**  16:12
   25:5 27:4,14,15
   41:22,23 81:3,4
   87:14
**production**  126:22
**products**  16:13
   41:21
**profane**  110:23
   111:6,9 112:17,20

**profit**  98:7
**prohibited**  108:10
**project**  97:20
**promise**  32:9 38:6
   38:9 67:4
**promoted**  16:3,4
   17:6 68:17 114:19
   114:22
**prompted**  52:8
**property**  106:14
**prospect**  23:8 27:4
   42:4,18 87:12,12
   87:13
**prospected**  46:21
   47:7
**prospecting**  27:19
   41:21,24 42:16
   46:10 61:12 91:14
**prospective**  122:3
**prove**  101:2
**provide**  106:10
**provided**  120:5
**provisions**  1:16
**psychiatrist**  10:24
   11:1,2,12,13,14,16
   12:2 100:1,4
**psychologist**  8:1
   11:1,12,14 12:3
   99:24 100:3
**public**  127:10,18
   128:15,23 129:23
**pull**  94:8
**pulled**  35:19
**puppet**  47:12
**purchased**  126:16
**purpose**  1:20 96:1
**purposes**  5:23
   66:23
**pursuant**  1:16
**put**  39:20 40:5
   43:4 63:14 68:1

EXHIBIT 5

75:9 77:6 78:8,19
87:6 100:10
101:15 108:1
121:22
**putting**  112:7

**q**

**quad**  78:5 114:3
**qualify**  48:19,20
**quarterly**  27:10
**question**  5:1,10,11
7:8 9:9 28:5 35:6
38:8 39:21 44:19
46:2 47:5 48:18
48:20 50:21,23
51:24 53:10 56:4
57:9 58:13 62:15
71:11 73:13 75:6
76:16 77:13 81:23
82:8,16 83:15
84:1,21 86:6,23
88:1 91:24 94:17
100:13 103:17
104:22,24 108:20
113:3,15 115:7
116:22 117:2,3,11
118:13,18 120:7
122:21 123:3,22
**questions**  4:9 28:9
32:6 38:9 63:2
74:8 93:15 104:15
104:17 105:4
122:6 123:2,13
**quicker**  38:7
**quickly**  41:13
**quit**  12:5 15:5 43:7
**quite**  8:7

**r**

**race**  37:18 66:11
**railroaded**  90:5

**raise**  53:18
**raised**  53:17
**randy**  10:11 23:5
24:3,6,13 25:1
27:11 34:22 35:11
35:11,12 36:6
37:16 41:17 51:10
51:10 52:17 64:8
65:4,5,13 74:19
78:2,8 80:7 86:17
86:18 89:12 92:16
111:14 114:7,13
114:15,21 115:3,5
115:6,8 118:24
119:1 120:13
122:17,19,22,24
123:1,6,7
**randy's**  120:15
**rapport**  123:7
**rate**  97:11
**reached**  103:18
**reaching**  103:21
**read**  6:20 31:6
32:11,15,17,18
42:8 44:10 79:2
81:15 82:17 88:13
88:14 119:17
121:10 127:5,6,12
128:5,6,17
**reading**  31:10
32:12,21 42:9
88:10 89:20
119:21 126:11,18
**real**  125:5
**realize**  57:4
117:19
**realized**  115:21
**really**  6:6 7:18
12:14 15:23 39:8
39:9 47:14 55:12
64:10 72:23 81:8

84:17 86:5 100:9
100:9,9,9,10 118:5
**reason**  12:24 13:4
13:18 32:10 51:12
59:12 75:23 77:12
88:7 103:3 116:13
116:15,20 117:9
117:10 118:9
128:8 129:3
**reasons**  13:8,10,17
**rebuttal**  72:10,10
**recall**  11:18 12:2
13:3 15:1 33:12
33:15 39:16 40:13
40:20 54:18 55:2
55:12,20 58:8,11
58:14 59:19 62:17
63:2 77:3 78:14
78:22,24 80:10
**receipt**  126:18
**received**  49:5
94:10 99:5
**receiving**  99:22
**recess**  48:2 95:17
**recognize**  25:14
26:3,13 28:14
31:21 81:13
**recollection**  22:16
28:19 33:9,23
57:1 79:3
**record**  5:21 9:5,8
11:8 31:12 46:3
47:6 48:3 51:9,20
84:20 93:1 95:18
128:9
**records**  51:8 89:18
106:6
**recover**  10:16
**recruited**  17:3,11
23:4

**recruiting**  23:7
**red**  50:18 57:23
108:12 110:17
**refer**  57:10
**reference**  92:6
114:20 119:12
126:7 127:2 128:2
**referenced**  91:20
126:10 127:11
128:15
**referred**  41:3
56:11 63:10 74:16
107:1
**referring**  82:4
90:10 116:5
**refers**  81:20
**refresh**  28:18 33:9
57:1 79:3
**refuse**  40:17,18
108:23
**regard**  5:3
**regards**  29:15
**regional**  20:17,20
57:21 59:17 70:6
75:1 90:23 114:22
**registers**  19:20
**regretted**  80:22
**regular**  31:5
**rejected**  13:12
**rejection**  13:14
**related**  25:11
93:24 94:14,18
**relationship**  17:1
108:2
**relevant**  7:2
**reluctance**  123:24
**remember**  16:1
26:4 34:16 39:16
41:1 54:23 55:12
58:10 61:10 63:15
63:19 72:23 78:16

EXHIBIT 5

79:5 80:11
**remind** 48:16,23
103:7
**renewed** 12:7
**rep** 15:7,8 16:6
19:18 42:8 43:3
43:11,12 45:16
54:6 64:12 68:12
75:12 86:20 89:16
118:23
**rephrase** 86:23
**report** 1:10 34:8
122:15
**reported** 18:23
125:5
**reporter** 4:22
127:7
**reports** 48:14 50:9
51:2,18 58:6 70:9
71:12,13 92:22
117:7
**represent** 94:10
**representation**
25:19
**representative**
24:24 31:8
**represented** 31:13
**reprimand** 60:19
**reprimanded**
35:22 60:10,16
75:17 117:22
**reps** 17:7 18:2,5,8
18:9 20:4,8 23:7
34:17,17 42:23
45:17 49:18,21,22
50:1 64:18,19,24
66:21,22 86:22
89:15
**request** 128:9,11
**requested** 49:12

**requests** 51:8
**required** 36:15,16
69:5 108:6 121:19
126:24
**reserve** 105:2
124:12
**resign** 116:14
**resolved** 55:16
**resource** 37:20
40:9 113:12
122:16
**resources** 71:6,16
71:22 72:1 76:11
**respect** 88:3 92:1
100:3 109:13
**response** 57:16
94:11
**responsibilities**
26:24 28:3
**responsive** 8:8
11:22 37:22 52:1
66:24 67:1 73:16
73:19
**rest** 26:20 37:3
95:13 114:1
121:11
**result** 7:4 34:6
91:12
**resume** 19:11
**retire** 101:24
**return** 28:11
101:4
**returned** 126:17
**returning** 31:1
55:21 77:2
**revealed** 57:7
**revenue** 97:13
101:11
**review** 6:12 11:12
18:14 28:18 31:18
71:5,24 76:6 79:4

124:9 126:13
127:1 128:1
**reviewed** 30:20
33:10 122:2
**reviewing** 6:18
11:8
**rick** 114:20,22
115:1
**ricoh** 15:24 21:20
**rid** 77:17
**ride** 37:1 41:16,17
43:19,24 44:21,22
44:23 66:17,18,19
66:20,21 70:15,17
**ridiculous** 86:7
**riding** 36:3
**right** 6:11 7:14,15
9:2,24 10:2 12:19
12:20 13:20 16:12
17:16 25:21 26:7
28:21 29:1,14
32:7 33:24 40:17
41:14 43:3 50:24
51:5 56:6 63:20
65:19 67:4 72:14
76:4 80:22 87:21
88:21 90:4,8,21
94:6 101:12,14
108:22 110:19
115:18 116:13
120:2 122:4
**rinky** 74:14
**road** 16:23
**rochelle** 37:4
41:16 42:6,17
43:15,17,19 45:13
46:11 50:17 54:6
54:15,16,17,21
56:20,21 58:17,21
58:22 59:6,16,24
60:12,13,24 61:3,8

61:9,17,21 62:3,3
63:10,15 65:4,11
65:19 66:10 69:8
70:21 72:6 73:1,2
73:4 76:24 78:5
79:24 80:8,19,20
86:20 89:5 91:1
92:8,12 93:18,18
93:23 94:1,6,11
95:2,9 111:13
112:5,7,20 115:17
**rochelle's** 47:14
69:9
**rockford** 46:14
**rode** 60:20 62:10
**role** 25:20 26:24
**room** 30:23 39:24
40:1 46:17 49:21
50:3,18,19 54:7
56:21 58:5,18,21
65:16 71:18 73:3
91:2 95:14 118:2
**rooms** 17:21
**route** 102:14
**rules** 4:17 9:2
105:12,14,18
110:15 127:5
128:5
**run** 15:13 25:10
80:24
**running** 12:16
49:16 66:7
**runs** 117:21

**s**

**s** 128:8,8 129:3
**saint** 20:24 46:12
60:6
**sake** 53:6
**salary** 7:17,21 8:5
9:11,14,16 10:1,6
10:6,15 19:8 25:4

EXHIBIT 5

29:13 31:4 97:9
98:16,18 99:8,12
100:3 101:24
**sale** 91:12
**sales** 16:7 17:4,5,7
17:12 18:1,2
20:22 23:12,12,16
24:23 25:4 26:20
27:9,20,21,22 28:5
28:6,10 34:14,15
36:12,14 39:11,17
39:18 41:10,11,22
42:20 43:3 44:13
45:15 46:7 49:20
51:4,19 59:1,3,5,7
60:23 61:2,20,23
62:5 63:4 65:21
65:21 66:19,19
67:21 68:5 69:2,7
69:12,21,24 77:14
81:2 85:11,12,14
85:16 87:6,9
88:21 89:12 91:8
91:16 92:15 95:5
97:7 100:21
101:19 102:3,6
107:1,14 115:19
120:4 121:12
122:13
**salesforce** 51:20
**salesmen** 69:5
**salesperson** 15:16
**sat** 44:10 63:20
115:18
**savon** 15:24 16:1
16:21 17:4 20:17
21:5,5,11 114:23
**saw** 10:24 11:6
12:1,1,2,2,24 13:4
31:17 57:20 69:17
69:22 85:21 99:9

115:1,11 124:2,3
**sawdust** 35:1
**saying** 4:23 39:3
40:13 53:5 58:8
72:4 76:15 78:13
78:14 79:5 81:17
**says** 26:19 31:4,6
32:7 33:2,7,24
35:14 42:8 58:2
62:22 82:8,9,12
83:10 92:11
105:11 108:6
110:15,17 116:8,9
117:17
**scenes** 122:17
**schedule** 69:20
75:3
**scheduled** 43:21
70:14
**schedules** 31:5
**school** 12:17 14:8
**scott** 44:10 63:16
66:6 110:9
**scratch** 70:16
**screw** 18:3
**scruffy** 83:23
**seal** 127:15 128:21
**searched** 57:18
**second** 10:3 22:7
24:4,6 26:19
27:13 29:18,20,21
53:1 56:9 82:7
116:6
**section** 31:6
**security** 5:24
**see** 7:24 12:7
21:20 29:21 34:8
62:19 76:12 86:15
89:24,24 94:3,24
100:12 105:11
107:19 108:10

110:5 123:19,24
**seeing** 11:18,19,24
17:20 33:12,15
66:6
**seeking** 9:11
**seen** 30:8,10 31:24
33:11 73:22 94:23
**segal** 2:11
**sell** 15:18 16:13
23:8,10,11,13
85:17 91:13
**selling** 14:14,20
15:19 16:2 27:17
101:7,8
**sending** 26:8
**sends** 121:1
**senior** 14:6
**sense** 77:8 122:16
**sent** 6:4,5 11:4
49:12 56:14 72:10
103:5
**sentence** 121:10
**separate** 88:16
**september** 5:22
33:21,21 34:4
96:6 104:7
**series** 28:15
**services** 1:7 126:6
127:3 128:3
**set** 9:2 30:12 41:17
49:15 50:12 51:2
**seven** 78:10 105:9
**seventh** 9:4
**sexual** 106:8
**sexually** 113:13
**sheet** 128:7,10,18
129:1
**sheets** 71:23
**shit** 40:6 74:14
75:9 111:2,3,15

**shooken** 76:24
**short** 19:16 47:24
48:2 71:5 72:18
77:3 95:17 113:23
**short's** 84:2
**shorter** 68:2
**shorthand** 125:5,9
**shortly** 20:3 60:7
**show** 30:11 34:10
35:4 78:6
**showed** 72:6
**showing** 30:14
47:13
**showroom** 35:4
**shows** 66:22
**shrinking** 16:17
21:3,18,21
**shut** 20:9,15
**sick** 19:6 59:11,13
75:9 93:1 94:1
**sign** 31:21 97:24
114:17
**signage** 97:18,19
97:22 101:10,10
101:10,15
**signature** 26:17
29:7 125:15
126:13
**signed** 28:20 29:3
29:3 33:14 127:13
128:18
**signing** 126:11,18
**signs** 97:18 101:12
**silly** 115:22,22
**similar** 114:16
**sincerely** 126:20
**singer** 2:11
**single** 16:24 60:3
92:19 93:3 112:19
**sir** 8:23 19:13
31:12 32:9 38:5

EXHIBIT 5

56:12 96:8,22
101:10 102:17,18
104:14 126:9
**sit** 36:18 43:12
82:18 101:16
**sitting** 37:13 42:9
47:14 64:11 110:6
119:16
**six** 17:4 21:8 30:2
31:15 78:10 82:11
85:7 86:12,14
87:2 88:4,12,13
89:19,23 97:22
**slip** 12:3
**small** 16:8 39:10
98:8
**smoking** 34:18
68:5 117:16
**smoother** 4:18
**smsm.com** 2:16
**social** 5:24 93:24
**software** 48:17,24
54:24 55:3,18
70:9
**sold** 20:23 97:17
98:3
**sole** 13:18
**solutions** 14:15
15:8,16 126:1
129:1
**somebody** 11:20
21:22 30:17 40:22
42:20 44:4 45:16
63:4 66:18 75:13
85:23 100:12
115:23 117:7
118:20,21
**somebody's** 65:20
**son** 73:4
**sorry** 12:22 38:19
58:2,3 84:23

96:22 113:15
**sort** 18:23 34:20
41:14,18 42:1
68:24 77:12 82:15
83:23 101:7 113:9
117:18
**sounded** 8:14
**sounds** 10:21 45:1
84:20
**south** 2:12
**spare** 70:8
**speak** 6:15
**speaking** 8:11
**specialist** 17:16
**specialists** 17:20
18:1
**specifically** 26:5
54:19
**specified** 116:11
**speculation**
111:16,17 119:11
**speedy** 96:8
102:17,18
**speedy's** 101:10
**spell** 11:5
**spencer** 44:8
45:18 63:22 67:16
67:17
**spend** 6:18 41:17
44:5 66:16 70:20
119:5
**spent** 37:1 42:5
44:9 78:2
**split** 42:3
**spread** 104:9
**spring** 12:14
**ss** 125:1
**staff** 16:11 107:2
**stand** 17:20
**standard** 28:20
31:2

**standards** 9:3
**standing** 50:18
**start** 10:7 17:24
18:17 34:6 43:22
62:13 70:12 83:6
96:4,7 97:23
110:11 112:24
**started** 12:6,16
13:15 15:5 16:1,1
16:16,17,18 19:1,5
20:8,24 21:7 22:8
22:24 30:19 33:20
34:3,12 36:2
41:14,15,17 42:7
42:23 45:12 65:16
80:2 92:18 100:6
103:24 115:15
117:20
**starting** 8:16 53:6
72:17 100:11
101:18
**starts** 36:6 72:6
**state** 1:14 5:20
37:4 74:2 91:18
125:1 127:10
128:15
**stated** 86:9 120:12
**statement** 127:13
127:14 128:19,19
**states** 1:1,18 16:5
20:1 101:11
**stay** 22:6,8,17
96:18
**stayed** 15:9 19:5,8
20:20 22:6,12,13
**staying** 22:14
**stepped** 97:1
**sticking** 113:24
**sticks** 112:15
**stint** 19:16

**stop** 12:13 52:4
60:6 74:9
**stoppage** 60:18
**stopped** 59:22
75:2 87:16
**stopping** 53:22
**street** 73:10
**strike** 8:8 37:22
52:1 56:17 64:1
66:24 73:15,18
82:8 104:16
**strongly** 113:22
**stuck** 59:18,21
**stuff** 40:2 48:1
81:3 118:1,6
**subject** 89:2
**subjects** 38:10
**submit** 11:22
103:2
**subpoena** 94:11
94:13
**subscribed** 127:10
128:14 129:21
**suburbs** 46:13
50:4 61:13,15
**succeed** 87:1
88:21
**successful** 88:3
114:4
**successfully** 82:10
85:6 86:12 87:2
89:22
**sudden** 86:5,6
**suite** 1:22 2:4,12
126:2
**summer** 12:16
23:1
**sunday** 34:5
**superior** 115:4
126:1

EXHIBIT 5

**support** 64:1,2
66:22 77:23,24
80:1 82:22 85:5
87:1 89:11 91:21
118:16
**supported** 92:2
**supports** 84:12
86:11
**supposed** 74:8
**supreme** 1:18
**sure** 4:4 33:19
40:12 51:1 55:15
62:1 68:16 79:23
80:6,10 85:12
96:6 98:15 99:9
104:11
**surprised** 34:21
**survive** 66:14
**swear** 75:10,12
112:13
**swearing** 75:11
**swears** 111:13
**switched** 11:20
13:6
**swore** 4:5
**sworn** 4:1 5:16
127:10,13 128:14
128:18 129:21
**system** 106:23

**t**

**table** 72:15
**tables** 14:11,12,18
14:20
**take** 4:23 5:8,11
7:22 12:11 13:16
18:21 19:2 28:15
28:18,19 38:2
39:11,14,16,19,22
42:3,11 43:23
47:24 48:1 53:2
57:20 75:3 79:22

80:4 84:17 95:13
96:19 97:22
100:20 102:16
121:17,22
**taken** 1:12 9:19
39:23 48:2 75:9
75:15,17 95:17
101:7 117:24
125:6,9 126:10
**talk** 13:20 33:16
46:18 54:3 56:7
65:20 72:10 76:9
77:19 80:2 89:2
90:22 91:5 94:22
112:10,11,23
121:24 123:17
**talked** 59:1 80:22
84:16 92:15 93:18
103:16 104:21
109:22 114:23
**talking** 35:11
36:13 41:14,15
54:18 102:5 110:4
**target** 61:11,16
98:11
**taste** 43:13
**taylor** 114:20,22
115:1
**teach** 51:19
**teaching** 41:23
**team** 26:21 28:7
47:15 53:9 89:14
121:12
**technology** 51:14
**telephonic** 91:11
**tell** 7:7 34:22
35:13,15 45:13
52:16 63:12 66:1
68:4 74:19,21
77:16 83:20,21
89:21 91:21 93:7

103:8 117:8
**telling** 23:11 39:5
54:17 56:10 73:4
76:9 86:19 98:10
**tells** 76:4 117:21
118:3
**temporary** 31:14
42:23
**ten** 102:1
**tend** 61:11
**tender** 120:9
**tenure** 62:9
**term** 44:21 113:23
**termed** 71:14
**terminal** 12:21
**terminated** 72:5
78:7 81:17,19
82:10,23 84:4
85:6 86:6,11,13,19
88:7 91:19,22
96:3 99:3 107:13
112:21 116:12
**termination** 8:15
9:12 12:23 13:3
88:6,16,20 99:22
104:20 118:9
**terminology**
119:22
**terms** 69:20 98:22
116:12,16,21
**terrible** 36:21 56:7
64:12 72:12,13
75:21,21,23
**territory** 15:9,18
42:24 63:5 85:16
89:8
**test** 43:2 85:9
**testified** 5:17
54:24
**testify** 55:2

**testifying** 32:20
**testimony** 18:19
32:19 55:14
113:19 116:24
125:6 127:6,7
128:6,9,12
**text** 94:15
**textbook** 65:8
**thank** 82:18
121:13
**thanks** 124:4
**theft** 105:20 107:7
**thing** 7:15 10:15
10:18 36:1 39:10
39:10 56:17 75:21
75:24 77:18 82:15
87:12,14 89:20
95:19 110:6
**things** 4:17 5:4
8:13 13:11 38:13
39:9 41:10 45:7
45:13 50:11 51:5
60:14 75:19 76:4
83:11 87:21 90:4
90:8,22 91:20
95:21 122:5,14
**think** 6:5 8:17
11:16 14:23 18:18
19:11,14 20:12,14
22:14,15,18 24:14
30:9 33:24 34:19
40:23 41:1 44:4
49:6,7 51:15
52:18 57:6 59:14
68:16,16,19,24
69:10,16 70:14
72:3 75:19 76:24
77:5,9,21 79:20
82:24 85:4 92:9
93:15 94:19 95:19
96:5 99:5,13,16

**EXHIBIT 5**

**[think - turning]**

103:3,4,6 104:19
104:24 105:1
110:8 111:4
113:20 114:4
120:15
**thinking** 52:16
**third** 24:13 27:2
29:2 41:13 47:11
60:3
**thirty** 126:17
**thought** 33:22
39:4 40:2,14
67:13 69:5 71:2
72:11 74:17 75:8
75:22 77:12 81:5
100:11,18 117:20
119:15
**threat** 85:21 109:7
**threaten** 106:16
**threatening** 108:8
109:1
**three** 7:11 10:2
20:21 22:12 45:24
46:5 49:11 50:9
50:13 53:19 54:11
56:5 59:19 96:19
122:9
**threw** 82:19
**thrown** 66:3 113:8
**thursday** 55:8,9
55:20 71:3 72:24
76:7 121:19
**tight** 109:22
**till** 14:18,21 19:6
51:14 55:8 57:5
**time** 7:11 8:15
9:11,12 11:11
14:16 15:20 16:18
17:1,17 19:1 21:2
21:21 22:11,20
23:6 28:18,19

30:24 31:4,8,9,13
31:13 33:17 34:23
35:8 42:5 46:7
47:2,7 48:16
52:12,20,20,22
53:12 54:21 55:6
55:16,17 59:22
60:17 61:7,9
62:15,21 63:19
66:2,17 68:19
70:11 76:22 79:22
83:2 92:21 95:20
96:20 97:14 98:3
98:22 99:4,22
100:6,14 104:9
112:14 114:4,24
116:11,13,14
119:5 125:5
**timely** 11:22
**times** 59:6 61:20
61:23 63:8,9
108:7,18
**title** 16:6
**titled** 29:5 32:22
**today** 4:8 50:10,12
83:9,11 104:15,18
**today's** 6:2
**told** 27:5 36:8,12
38:16,21 40:3,4
44:7 49:10 55:22
55:24 58:6,19
60:11 64:14 65:15
70:18,19,23 71:20
78:1 84:1 85:8,21
87:21 88:8 89:14
90:2,3 115:17,17
115:18 117:13
118:24
**ton** 61:14
**tool** 51:20

**tools** 51:5 85:13
**top** 7:10 9:18
105:12
**topics** 94:14
**toshiba** 20:14,15
20:19,23 21:9,12
21:17,19 22:15,16
22:20
**total** 9:21
**totally** 71:8
**touch** 38:7,10
**town** 62:17 70:19
71:3 76:7,23
87:24 90:20,23
**track** 18:15 87:2
**tracks** 59:22
**train** 16:10 18:5
36:24 43:16 59:16
59:18,21,24 60:4,5
60:18,20 62:10
75:1,2,4 119:5
**trained** 23:9 42:6
43:11
**training** 18:6 20:8
27:5,6,6 30:15
37:1 40:9 44:8,20
49:8 62:16,17
64:15 66:22 77:7
77:24 78:1,2,9
92:21 119:13,14
120:5 121:14
**trains** 50:4
**transcribed** 127:7
**transcript** 32:15
124:10 125:8
126:10,15 127:5
127:12 128:5,11
128:17
**transcription**
125:6,8

**trap** 78:19
**trapped** 66:13
75:22 77:10 78:13
**trashy** 74:22 83:21
**travel** 42:2
**traveled** 20:7
**trc** 49:7 51:8 52:10
52:13 81:17
**treat** 73:5 75:24
**treated** 64:3 67:7
67:13 80:13,17
92:2,7
**treating** 84:9
**trial** 52:5
**trick** 28:5 67:5
104:22
**trip** 19:2 36:20
**trouble** 8:3 75:16
**true** 27:7 111:3
118:8 119:2 125:8
**truly** 81:8 119:8,8
**trust** 80:21
**truthfully** 4:9
**try** 4:23 5:1 22:10
101:17 119:5
**trying** 8:20 17:21
32:9 36:22,23
45:15 53:7 67:5
77:17,23 79:20
**tuesday** 70:20
**turn** 33:1 51:11
81:10 83:5 105:3
105:7,10 108:4
116:1,6
**turned** 7:21 17:13
19:1,4 35:22
50:18 57:19 83:8
93:10
**turning** 120:23
121:4

EXHIBIT 5

turnover 18:16
turns 42:4 99:17
twice 62:8
twinge 64:8
two 15:10,20 16:4
18:15 29:18 34:20
43:18,21,24 45:22
47:12 49:17,20,22
50:1,4,6,11,13
54:7 57:3 58:9,15
60:14 61:1 66:3
69:7 72:1 73:6
74:18 75:12 77:1
78:2,8 83:10,11,18
89:6 91:3 105:11
107:2 121:17,20
121:21
type 17:11 20:1
36:1 46:17 67:20
119:9
typewriter 15:16
typical 34:15
122:13
typing 32:13 89:18

**u**

uh 4:7 5:4 7:6 45:3
57:15 61:4 97:8
121:6
uhn 5:5,5
unable 89:21
unauthorized
106:22
unbelievable
117:4
undergrad 13:23
understand 4:8
18:19 32:6 37:23
39:9 57:23 58:1
62:16 85:1 91:19
understanding
25:22 26:23 27:2

82:3,13 107:16
114:6
understood 4:6
unemployed 8:3
united 1:1,16
101:11
university 13:24
unnecessary 51:3
unpacking 76:17
unprofessional
35:23 67:21 75:21
111:22
upcoming 71:5
upset 78:16,17
usage 72:4
use 27:17 28:12
95:13 102:23
106:22 110:20,23
111:3,6,9,23
112:17,20
usual 56:19
usually 13:16 22:9

**v**

v 11:6 126:6 127:3
128:3
vegas 66:5 110:10
vendor 108:10
109:9
veritext 126:1,7
129:1
versus 45:9 46:7
46:15 61:8
villa 60:6 63:4
102:20
violated 82:14
violation 105:12
visit 35:12
vp 20:20
vs 1:5

**w**

w 1:14 125:4,16
wabash 2:4
wacker 1:22 2:12
wages 8:15 10:1,5
100:2
wait 4:24 14:12,18
waiting 14:11,20
waived 126:12,19
walk 110:13
walked 9:21 36:10
36:17,17 59:19
60:2,12 66:15
72:3,9 82:21 84:7
113:7 121:24
walking 35:15,24
wall 41:15
wander 47:18
want 6:8 10:5
15:11 17:14,19,23
28:15 32:18 33:16
36:7,8,18 37:15
39:20 40:16 43:8
44:3,6 51:23 53:5
53:8 56:3,7,8,10
57:17,22 60:9,14
65:14,24 66:16,16
67:5,15,19 85:20
88:2 89:2 93:8,9
93:12 98:9 100:20
100:23 101:4
102:24 103:9
118:1 119:4
123:11 124:9,12
wanted 7:12 15:22
17:13 22:8 25:3,4
37:11,16 52:11
53:21 56:2 57:13
57:19 64:20 65:14
66:14 76:1,23
78:17,18,21 89:14

89:15 98:6 103:7
118:23 119:1
wants 18:11 92:16
warehouses 16:12
way 14:9 22:9
34:18 35:21 37:10
43:9 53:19 56:7
58:3 63:6,14 76:1
77:14,17 84:6
91:5 103:17 108:1
119:6
ways 6:22
we've 95:12
wearing 5:6
webinar 39:18
wednesday 55:8,9
week 16:23 31:5
36:12 40:10,10
43:12,14 47:11,22
47:23 49:6 51:15
51:16 56:5,9,9
62:4,7 68:6 70:6
70:18,19,21 71:5,5
71:21 76:5,8,19,21
76:24 78:3,7 80:6
86:17,18 87:21,22
87:24 90:2,11,14
90:18,19,20 91:2
115:19 122:3,3
weekend 55:8 72:3
weekly 68:5 92:20
99:10
weeks 7:9,18
45:11,24 46:5
47:12 49:11 50:9
50:13 53:20 54:11
56:5 61:1 63:7
74:18 75:12 83:18
96:13,20 97:22
117:23

EXHIBIT 5

**weight** 40:16
75:18
**weird** 35:2
**welcome** 26:20
121:12
**went** 8:18 13:13
13:18 19:16 20:6
20:15 22:15,16
25:2 34:17 37:3
39:6 40:3 42:16
61:3 64:23 65:1
71:4 73:6 76:24
78:3 102:14
**west** 1:20
**western** 46:13
50:4 61:13,14
**westmont** 17:9
**whichever** 12:4
**white** 2:24 17:24
24:1,5,22 25:17
26:6,8,20 43:18
48:6,16 65:9
67:16,17 70:23
71:1,10,24 72:1,7
72:16,18 78:20
83:10 84:8 86:17
86:18 89:12 90:6
108:15,18 111:9
111:23 112:24
113:1,16 114:10
114:12 115:5,11
118:11 120:5
121:11 122:20,22
122:24 123:10,17
**white's** 83:19
**wide** 57:18
**wife** 12:21 13:8
18:22 22:7 50:8
83:5 84:24 94:1,3
96:12,13,21
100:20 101:16

103:21 104:2
**willful** 118:12,15
118:17
**wings** 45:12
**wisconsin** 20:19
**witness** 3:3 4:1,4,7
4:10,13,15,19 5:9
5:13,15 8:17 9:14
25:15 26:4,14
28:17 30:8,16,22
32:19 34:14 38:3
38:11,17,24 39:2
48:7 49:5 52:9
53:16 57:2,11,15
67:1,9 73:18
74:13 79:20 81:14
87:5 88:6 91:24
92:5,7 94:5,8
95:24 103:14,20
109:24 111:18,19
113:4,20 115:8,14
116:4,7,19 117:2
117:13 118:15,19
119:16,21 120:8,9
122:22 123:23
124:5,11 126:8
127:1,4,11 128:1,4
128:15
**witnessing** 113:10
**woman** 37:19 50:3
50:17 84:9 112:10
**word** 77:11 111:2
111:3
**words** 32:15 40:5
68:1 75:9
**work** 8:20 9:22
15:22 16:11 18:13
19:19 22:10 27:9
28:6 31:5 37:15
41:22,23 43:5
50:8 51:6,16

59:15,24 60:1
64:7,24 83:4,7
93:9 96:15 97:21
100:15 111:3
113:2,4,17,21
117:18
**worked** 20:7 21:11
21:15 37:6 41:14
71:15 96:17
105:16 114:23
**worker** 107:20
**workers** 107:2
109:13,24
**working** 10:8 12:6
14:10 15:23 18:24
22:21,23 37:9,21
41:6 50:7 52:22
66:12 68:10 79:10
79:15,17 96:4,7
97:5 98:5,5
102:17 106:19
113:11
**workplace** 110:21
110:24
**works** 4:17
**write** 8:21 18:7
27:10 28:6
**writing** 18:6 27:12
68:24 122:14
**written** 60:11
86:15 88:6
**wrong** 7:19 50:16
55:23,24 57:13
58:19,20 72:9
77:14 99:6 119:3
**wrongly** 37:7
**wrote** 97:12

|  | x |  |
| --- | --- | --- |

**x** 3:1
**xerox** 85:15

|  | y |  |
| --- | --- | --- |

**y** 11:6
**yeah** 6:6 11:10
13:5,22 21:13,19
21:23 22:3,3,18
23:1,19,19,21
24:18 25:15,18
26:4,5 29:8 30:18
30:22 33:24 34:8
39:1 40:15 41:9
44:24 45:15 46:23
47:9,17 57:7
59:22 61:6,22
63:3 67:22 72:2
74:22 75:20 77:19
81:14,15 83:22
90:17 97:4,6
98:11,15,17 99:11
99:18 101:16
102:8 104:4,12
105:13,18 107:7
109:15 116:4,7
121:9 124:11
**year** 7:20 10:3,4,9
10:10 14:6,7,19,21
16:4,10 18:17,18
20:21 21:7,10,16
27:19 50:2 81:7
85:17,17 91:15
96:16,17,24 97:1
98:6,10 99:16
101:18
**year's** 7:16
**years** 6:7 14:22
15:10,20 16:4,14
16:24,24 23:14
57:3 63:19 64:13
73:22 89:6 102:1
114:18 115:16,20
**yelling** 56:18 73:6
73:7 77:1 91:3

EXHIBIT 5

**[yelling - zero]** Page 27

112:6
**yep**  26:10,14,22
   27:24 29:4,22
   45:6 63:24 76:20
   81:15 108:13,13
   110:16 120:18
   121:3
**yesterday**  6:4
**young**  23:13 35:24
   36:22 39:24 40:3
   42:8 45:21 76:1
**younger**  34:17
   39:5 49:17,22
   50:1,6 63:11,13,18
   64:18,19,24 66:3
   67:7 80:14 89:1,3
   89:7,14 95:22
   107:2,20 109:13
   109:24 118:23

**z**

**zero**  89:5,5

EXHIBIT 5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**EXHIBIT 5**

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**EXHIBIT 5**

**EXHIBIT**

7

7-16-20

**Maliha Iqbal**

| | |
|---|---|
| **From:** | ian macleod <imacleod2005@yahoo.com> |
| **Sent:** | Thursday, October 18, 2018 11:39 AM |
| **To:** | Maliha Iqbal |
| **Subject:** | Email 1 - EEOC Response for MidAmerican |

----- Forwarded Message -----
**From:** "White, David R" <DRWhite@midamericanenergyservices.com>
**To:** ian macleod <imacleod2005@yahoo.com>
**Sent:** Thursday, August 3, 2017 10:04 AM
**Subject:** Please apply online for the AE position

Hi Ian,

Please visit midamericanenergyservices.com and apply for the AE role online asap. Also, just to clarify our meeting tomorrow is the O'Hare Hilton at

## CHICAGO MARRIOTT OHARE

**Address:** 8535 W HIGGINS RD, Chicago, IL, 60631, US

**Phone:** (1773) 6934444          **Fax:** (1773) 6933164

**Check In Date:** Thursday 03 August 2017

**Check Out Date:** Friday 04 August 2017

**Number Of Nights:** 1

    **Rate:** USD 179.00 per night may be subject to local taxes and service charges

    **Guaranteed to:** CA XXXXXXXXXXXX0831

    **Reference Number:** 86309188          **Status:** Confirmed          **Number Of Room**

**Additional Information**

Thanks and see you tomorrow at 1:00.

David R. White
*Regional Sales Manager - Midwest*
**MidAmerican Energy Services, LLC**
A Berkshire Hathaway Energy Company



641 West Lake Street, Suite 401
Chicago, IL 60661
Direct: 312-517-8910
Cell: 312-771-0769
Fax: 312-517-8949

drwhite@midamericanenergyservices.com
**www.MidAmericanEnergyServices.com**
*Supplying Electricity in the following regions: DE, MD, DC, TX, OH, IL, MI, PA*
*Supplying Natural Gas in the following regions: IL, IA, MI, SD, NE*

MACLEOD012
**EXHIBIT 5**

**Maliha Iqbal**

| | |
|---|---|
| **From:** | ian macleod <imacleod2005@yahoo.com> |
| **Sent:** | Tuesday, October 16, 2018 11:27 AM |
| **To:** | Maliha Iqbal |
| **Subject:** | Fwd: offer letter |
| **Attachments:** | Ian Macleod Offer 8.8.17.pdf |

Sent from my iPhone

Begin forwarded message:

> **From:** "White, David R" <DRWhite@midamericanenergyservices.com>
> **Date:** August 8, 2017 at 12:40:51 PM CDT
> **To:** ian macleod <imacleod2005@yahoo.com>
> **Subject: offer letter**
>
> Hi Ian,
>
> Please find the attached offer letter for your review. Please note, this offer is contingent upon the confirmation of your references and W2's. As soon as I receive those I will be in touch. Enjoy your vacation and I look forward to speaking with you upon your return.
>
> David

**DAVID R. WHITE**
*REGIONAL SALES MANAGER - MIDWEST*
MIDAMERICAN ENERGY SERVICES, LLC
A BERKSHIRE HATHAWAY ENERGY COMPANY

**MidAmerican**
**ENERGY SERVICES, LLC**
A Berkshire Hathaway Energy Company

641 WEST LAKE STREET, SUITE 401
CHICAGO, IL 60661
DIRECT: 312-517-8910
CELL: 312-771-0769
FAX: 312-517-8949

1

PENGAD 800-631-6989

EXHIBIT
7-16-20 *to*
2

**EXHIBIT 5**

EXHIBIT
3
7-16-20



August 8, 2017

Ian Macleod
417 South Princeton Ave
Villa Park, IL 60181

Dear Ian:

Congratulations! I am pleased to extend an offer of employment with MidAmerican Energy
Services. Your position title will be Account Executive in the Unregulated Services department
located in Chicago, Illinois. You will report to David White with a start date to be determined.

**Salary**
Your base salary will be $70,000.00 yearly, which will be earned and paid on a bi-weekly basis.
In addition to your base salary, you are eligible to participate in the company sales commission
plan.

**Commission Plan Participation**
You are eligible to participate in the Company sales commission plan for Account Executives
with guaranteed commission for the first 12 months. The annual Plan payout for first year
account executives is 23%.

**Performance Evaluation**
You and your manager will determine your goals and objectives for the year. You will have
periodic performance reviews with the potential to earn a base salary increase, effective January
1 of each year, depending on your performance and the company's performance.

**Performance Incentive Award**
You will be eligible to participate in the company's performance incentive plan. This award is
made at management's discretion and is based on achievement of your individual goals, your
overall performance and the company's performance.

**Paid Time Off**
You will accrue paid time off each pay period based on your years of service. During the first
calendar year, you will accrue a prorated 144 PTO hours. You will receive two months of PTO
accruals on your first day of employment, and additional PTO accrues each pay period after two
months of employment. PTO is available to use upon accrual. In addition to PTO, you will
receive 10 paid holidays, including eight scheduled and two floating holidays.

Scanned by CamScanner

**Insurance Benefits**

You and your family are eligible for the company's medical, dental, vision, disability and life insurance plans starting your first day of employment. The company pays the majority of health care premiums and pays the total cost of basic life insurance and long-term disability benefits. You will receive additional information about benefits, including plan coverage and premium costs, during your first week of employment.

**401(k) Plan**

You will be eligible for 401(k) plan benefits on your first day of employment. The company will contribute a fixed contribution of 4% of your eligible pay to the plan. In addition, you may contribute to the plan on a pretax, after tax or Roth basis. The company will match 65% of the first 6% of your pretax or Roth 401(k) contributions.

**Profit-Sharing Match**

The company may make a discretionary matching contribution based upon achievement of company goals. The profit-sharing match, which is equal to 1% of your eligible pay, may be earned annually and added to the 401(k) plan. Eligible employees must be employed from January 1 through December 31 of the award year.

**Contingencies**

This offer is contingent upon the following: receipt of acceptable references, the accuracy of application information, pre-employment and any subsequent background checks, physical and drug screenings, executed Employment Confidentiality Agreement, executed Prior Agreements Statement and executed Sign-on Repayment Agreement.

**At-Will Employment**

Your employment will be as an at-will employee. Accordingly, you are not guaranteed employment for any specified period of time, and you can be terminated or have your employment terms altered for any legal reason at any time. You also have the right to resign your employment at any time.

**Identification Requirements**

In compliance with the Immigration Reform and Control Act of 1986, employers are required to verify the identity and employment eligibility of all new employees upon hire. The company participates in E-Verify, a secure Internet-based system that compares information provided on an individual's Form I-9 to data from the U.S. Department of Homeland Security and Social Security Administration records to confirm employment eligibility.

You are required to complete the Form I-9, which is attached. You also must provide documentation establishing both identity and eligibility to work in the U.S. Please refer to the Form I-9 for a list of acceptable documents to fulfill this requirement. Note that any item provided in List B must contain a photograph. Please bring all necessary documentation on your first day of employment. Failure to bring the proper identification and complete the Form I-9 within your first two days of employment may result in termination of employment.

Scanned by CamScanner

MACLEOD029

**EXHIBIT 5**

If you have questions, contact the HR helpline at 800-432-8999, Option 3. For additional information regarding E-Verify or the Form I-9, visit the U.S. Citizenship and Immigration Services website at http://www.uscis.gov/.

This offer is valid until close of business on August 9, 2017, after which time, the offer will expire. To accept this offer of employment, please sign a copy of this letter along with the Employment Confidentiality Agreement, Prior Agreements Statement, and Sign-on Repayment Agreement. Return the completed forms by August 9, 2017, and retain a copy for your records.

On behalf of David White and the rest of the Sales group, we welcome you to our team. We equip employees with the resources and support they need to be successful. We look forward to your contribution to our success in upholding Berkshire Hathaway Energy's vision: To be the best energy company in serving our customers, while delivering sustainable energy solutions.

If you have questions, please contact David White at 312-517-8910.

Sincerely,

*Burt Short*

Burt Short
HR Manager
BHE Renewables and MidAmerican Energy Services

**Acceptance:**


Signature: _____*Ian Macleod*_____ Date: _8/8/17_

Ian Macleod

MACLEOD030

**EXHIBIT 5**

EXHIBIT

4

7-16-20


**MidAmerican**
**ENERGY SERVICES, LLC**
A Berkshire Hathaway Energy Company

### Employment Confidentiality Agreement

### Ian Macleod

This Agreement is entered into as of the day and year written below, between the undersigned employee of the Company ("Employee") and the Company. The term "Company" shall mean Berkshire Hathaway Energy Company and its predecessors and successors, or any parent, subsidiary or affiliated corporation for which Employee performs services.

The Company employs Employee, subject to the following terms and conditions to which Employee, in consideration of his or her employment by the Company, eligibility for the Company's incentive compensation program, and any salary or other benefits paid or provided by the Company, agrees:

**Confidential Information.** During Employee's employment Employee has access to trade secret information, confidential information and proprietary information (altogether "Confidential Information") that is of great competitive value to Company, its partners, joint venturers, clients and subcontractors and which Company is legally entitled to maintain as secret. In order to clarify and confirm the parties' understanding of Company's Confidential Information and Employee's obligation with respect to maintaining the confidentiality of such Confidential Information, the parties agree as follows:

**A.** The Confidential Information that Company is entitled to maintain as secret include, but are not limited to: customer lists, customer contact information, lists of potential customers, estimating, pricing and bidding practices; the existence and terms of customer and utility contracts; organization and qualifications of Company personnel; details of past, current or future projects considered or developed by Company; business strategies; Company marketing plans and sales strategies; technical design, know-how and engineering information; industry and business secrets; confidential and proprietary processes; confidential financial information and projections; and confidential or otherwise proprietary information of partners, joint venturers, clients and subcontractors of Company.

**B.** Employee agrees not to disclose or use either directly or indirectly in any manner said Confidential Information. Employee agrees that any such disclosure or use of such Confidential Information without the express written authorization of Company would constitute a misappropriation of Confidential Information. Employee will immediately return all confidential information to Company upon termination of the employment relationship.

**C.** The prohibition contained in subsection (B) above shall not apply with respect to information (i) supplied to Employee's attorney(s) and/or accountant(s) on the basis that they agree to be bound by the confidentiality provisions hereof or (ii) which becomes publicly available through no breach by Employee of this Agreement or (iii) information required to be provided by Employee pursuant to subpoena or court order. However, Employee agrees that if Employee is

Scanned by CamScanner
MES 00844 **EXHIBIT 5**

served with a subpoena or court order which seeks any information subject to this Agreement, Employee shall by the fastest means possible notify Company's General Counsel of such event and provide sufficient information to Company so that Company can act to protect its interests in seeking to preserve the confidentiality of such information. Further, the Federal Defend Trade Secrets Act of 2016 provides immunity from civil or criminal liability for any employee who discloses a trade secret "in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney" where the disclosure by the employee is "solely for the purpose of reporting or investigating a suspected violation of law" or "is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal."

**Non-solicitation of employees.** During the term of Employee's employment and for one year following termination of Employee's employment, Employee will not (either alone or in conjunction with any other person or entity), solicit any of Company's employees to leave the employ of Company and/or to be employed by any other person or entity and/or to become a consultant or independent contractor, except upon prior written agreement of Company.

**Non-compete.** During Employee's employment and for a period of one year following the termination of Employee's employment, Employee will not:

**A.** Participate, personally or financially, directly or indirectly in competition with Company in the business of unregulated retail sales of natural gas, electricity, or enegery management services in Employee's former sales territory;

**B.** Sell, attempt to sell, or service any customers with whom Employee had an attempted sales, sales or servicing relationship during the year prior to termination. This includes but is not limited to providing advice and consultation to such customers regarding purchase of natural gas, electricity, or energy management services and inducing Company's existing customers to cease doing business with Company. The obligations in subsection 4(A). and 4(B) above apply whether Employee is working as an individual; as a partner, agent, employee, salesperson of any entity; or as an officer or director or stockholder of any closely-held corporation.

**Breach of Agreement/Remedies.** Employee acknowledges that Employee's failure to abide by the terms hereof may, at the Company's sole discretion, subject the Employee to sanctions, including but not limited to, termination without prior notice, suspension without pay or benefits, demotion, reduction in grade or pay, or reassignment. Employee acknowledges that any breach or evasion of the terms of this Agreement will result in irreparable and continuing damages to the Company and will entitle the Company to injunctive relief and money damages as well as to all other legal or equitable remedies. Employee agrees to pay any and all reasonable attorney's fees incurred by the Company in successfully enforcing this Agreement in a court of law and in securing damages or injunctive relief based on a violation of this Agreement by the Employee. Employee acknowledges that this Agreement does not prohibit Company from bringing action in a court of law against anyone who aids Employee in violating this Agreement, or who benefits in any way from Employee's violation.

**At-Will Employment.** Employee acknowledges that the terms of employment are at-will; either the Company or Employee has the right to terminate the employment relationship at any time

Scanned by CamScanner
MFS 000443
EXHIBIT 5

with or without cause for any or no reason. Upon termination, Employee shall continue to have the obligations to the Company as set forth herein.

**Assignment.** Employee acknowledges that this Agreement shall be binding upon and inure to the benefit of the Company, its successors and assigns. This Agreement may be assigned by the Company to any party without Employee's consent. The transfer of Employee to any parent, subsidiary or affiliate of the Company shall constitute an assignment of this Agreement. This Agreement may not be assigned by Employee.

**Entire Agreement.** This is the entire Agreement between the parties hereto with respect to the subject matter hereof, and supersedes any previous communication, representation, arrangement or agreement, whether oral or written. This Agreement shall be modified only in writing. This Agreement is not a promise of future employment, and shall remain effective after termination of the employment relationship, regardless of the reason for termination.

**Severability.** If any such term of this Agreement or the application thereof shall, to any extent, be construed to be invalid or unenforceable in whole or in part, then such term shall be construed in a manner so as to permit its enforceability under the applicable law to the fullest extent permitted by law. In any case, the remaining terms of this Agreement or the application thereof shall remain in full force and effect.

**Applicable Law.** This Agreement shall be construed under the laws of the State of Iowa, without regard to the principles of conflicts of law, and any action to construe or enforce this Agreement may be brought in the courts of the State of Iowa.

**Non-Waiver.** The failure to insist upon strict compliance with any of the terms of this Agreement shall not be deemed a waiver of such term, and the waiver or relinquishment of any right or power under this Agreement at any one or more times shall not be deemed a waiver or relinquishment of such right or power at any other time or times.

**Employee's Copy.** By execution hereof, Employee acknowledges receipt of a copy of this Agreement and the ability to discuss it with a legal advisor. Employee authorizes the Company to provide a copy of this Agreement to any prospective or subsequent employer of Employee.

Signature: _(signature)_      Date: 8/8/17
Ian Macleod

Scanned by CamScanner

EXHIBIT 5



### Prior Agreements Statement

### Ian Macleod

I am not currently subject to an employment agreement, a noncompetition agreement, or a confidentiality agreement with a former employer or any other person or entity which prohibits or limits my employment with Berkshire Hathaway Energy Company or any of its subsidiaries or affiliates as the Account Executive. In addition, I will not be using any proprietary information taken from my former employer(s).

**Agreed to and accepted:**

Signature: _____ Date: 8/8/17

Ian Macleod

Scanned by CamScanner

EXHIBIT 5

MES 000418


**MidAmerican**
ENERGY SERVICES, LLC
A Berkshire Hathaway Energy Company

August 8, 2017

Ian Macleod
417 South Princeton Ave
Villa Park, IL 60181

Dear Ian:

Congratulations! I am pleased to extend an offer of employment with MidAmerican Energy Services. Your position title will be Account Executive in the Unregulated Services department located in Chicago, Illinois. You will report to David White with a start date to be determined.

**Salary**
Your base salary will be $70,000.00 yearly, which will be earned and paid on a bi-weekly basis. In addition to your base salary, you are eligible to participate in the company sales commission plan.

**Commission Plan Participation**
You are eligible to participate in the Company sales commission plan for Account Executives with guaranteed commission for the first 12 months. The annual Plan payout for first year account executives is 23%.

**Performance Evaluation**
You and your manager will determine your goals and objectives for the year. You will have periodic performance reviews with the potential to earn a base salary increase, effective January 1 of each year, depending on your performance and the company's performance.

**Performance Incentive Award**
You will be eligible to participate in the company's performance incentive plan. This award is made at management's discretion and is based on achievement of your individual goals, your overall performance and the company's performance.

**Paid Time Off**
You will accrue paid time off each pay period based on your years of service. During the first calendar year, you will accrue a prorated 144 PTO hours. You will receive two months of PTO accruals on your first day of employment, and additional PTO accrues each pay period after two months of employment. PTO is available to use upon accrual. In addition to PTO, you will receive 10 paid holidays, including eight scheduled and two floating holidays.

Scanned by CamScanner

EXHIBIT 5

MES 000112

**Insurance Benefits**

You and your family are eligible for the company's medical, dental, vision, disability and life insurance plans starting your first day of employment. The company pays the majority of health care premiums and pays the total cost of basic life insurance and long-term disability benefits. You will receive additional information about benefits, including plan coverage and premium costs, during your first week of employment.

**401(k) Plan**

You will be eligible for 401(k) plan benefits on your first day of employment. The company will contribute a fixed contribution of 4% of your eligible pay to the plan. In addition, you may contribute to the plan on a pretax, after tax or Roth basis. The company will match 65% of the first 6% of your pretax or Roth 401(k) contributions.

**Profit-Sharing Match**

The company may make a discretionary matching contribution based upon achievement of company goals. The profit-sharing match, which is equal to 1% of your eligible pay, may be earned annually and added to the 401(k) plan. Eligible employees must be employed from January 1 through December 31 of the award year.

**Contingencies**

This offer is contingent upon the following: receipt of acceptable references, the accuracy of application information, pre-employment and any subsequent background checks, physical and drug screenings, executed Employment Confidentiality Agreement, executed Prior Agreements Statement and executed Sign-on Repayment Agreement.

**At-Will Employment**

Your employment will be as an at-will employee. Accordingly, you are not guaranteed employment for any specified period of time, and you can be terminated or have your employment terms altered for any legal reason at any time. You also have the right to resign your employment at any time.

**Identification Requirements**

In compliance with the Immigration Reform and Control Act of 1986, employers are required to verify the identity and employment eligibility of all new employees upon hire. The company participates in E-Verify, a secure Internet-based system that compares information provided on an individual's Form I-9 to data from the U.S. Department of Homeland Security and Social Security Administration records to confirm employment eligibility.

You are required to complete the Form I-9, which is attached. You also must provide documentation establishing both identity and eligibility to work in the U.S. Please refer to the Form I-9 for a list of acceptable documents to fulfill this requirement. Note that any item provided in List B must contain a photograph. Please bring all necessary documentation on your first day of employment. Failure to bring the proper identification and complete the Form I-9 within your first two days of employment may result in termination of employment.

Scanned by CamScanner

MES 0000418

EXHIBIT 5

If you have questions, contact the HR helpline at 800-432-8999, Option 3. For additional information regarding E-Verify or the Form I-9, visit the U.S. Citizenship and Immigration Services website at http://www.uscis.gov/.

This offer is valid until close of business on August 9, 2017, after which time, the offer will expire. To accept this offer of employment, please sign a copy of this letter along with the Employment Confidentiality Agreement, Prior Agreements Statement, and Sign-on Repayment Agreement. Return the completed forms by August 9, 2017, and retain a copy for your records.

On behalf of David White and the rest of the Sales group, we welcome you to our team. We equip employees with the resources and support they need to be successful. We look forward to your contribution to our success in upholding Berkshire Hathaway Energy's vision: To be the best energy company in serving our customers, while delivering sustainable energy solutions.

If you have questions, please contact David White at 312-517-8910.

Sincerely,

*Burt Short*

Burt Short
HR Manager
BHE Renewables and MidAmerican Energy Services

**Acceptance:**

Signature: _____ Date: 8/8/17
Ian Macleod

MES 0001<br>EXHIBIT 5

Berkshire Hathaway Energy Human Resources Policies





**Berkshire Hathaway Energy**
**Human Resources Policy**

**General Employment**

**April 30, 2014**

## Employment Classifications

Berkshire Hathaway Energy maintains four employment classifications. The classifications are as follows:

**Full-time**

- Salaried or hourly paid employees whose regular work schedules are 40 or more hours per week.

**Part-time**

- Salaried or hourly paid employees whose regular work schedules are up to 39 hours per week. Part-time employees are eligible for benefits, including paid time off.

**Temporary**

- Salaried or hourly paid employees whose work schedules may be part-time or full-time but whose employment is determined to be of a temporary duration. Temporary employees are not eligible for Berkshire Hathaway Energy benefits except for government mandated benefits such as workers compensation benefits. In no case will such individuals be considered Berkshire Hathaway Energy employees nor will they be eligible for benefits or other employee programs provided by Berkshire Hathaway Energy to its employees.

**Probationary**

- All represented employees, full-time, part-time or temporary, will be considered probationary for the first six months of employment.

These policies supersede and revoke any and all past policies and practices, oral and written representations, or statements regarding terms and conditions of employment concerning the subject matter covered herein. Berkshire Hathaway Energy reserves the right to add to, delete, change or revoke these policies at any time, with or without notice. These policies do not create a contract between Berkshire Hathaway Energy and any employee, nor do they create any entitlement to employment or any benefit provided by Berkshire Hathaway Energy to its employees.

CAUTION! - This document may be out of date if printed

---

**Berkshire Hathaway Energy**

E-mail questions or comments to the HR Helpline

Return to Policy Index

EXHIBIT 6

PENGAD 800-631-6989

7-16-20 PD

**EXHIBIT E**

### IAN MACLEOD'S COMPLETION OF THE BHE CODE OF BUSINESS CONDUCT

| Item ID | Item Type | Description | User ID | Employee Name | Organization ID | Completion Status | Completion Date |
|---------|-----------|-------------|---------|---------------|-----------------|-------------------|-----------------|
| HRDER00003 | OL | Berkshire Hathaway Energy Code of Business Conduct with Conflicts Questionnaire | T28246 | MACLEOD, IAN A | MESVCSMES MES 7175 | Completed | 9/14/2017 |

**EXHIBIT D**



B E R K S H I R E   H A T H A W A Y   E N E R G Y

# CODE OF BUSINESS CONDUCT

     



## DISCIPLINARY ACTION FOR VIOLATION OF RULES

**YOU MUST ABIDE BY RULES AND PRACTICES ESTABLISHED BY THE BUSINESS PLATFORM IN WHICH YOU WORK.** Rule infractions will be dealt with according to the seriousness of the offense and the particular facts of each case. You are expected to follow this code except where specifically instructed by business policies established to comply with laws outside the domestic United States. Employees who violate rules contained in this code or those policies established by the department or area where they work will be subject to disciplinary action up to and including termination and possible liability. Some acts of misconduct, even if committed for the first time, are so serious that standing alone they may justify immediate termination. Some examples of these offenses are:

- Theft.
- Abuse of alcohol or drugs.
- Insubordination.
- Dishonesty.
- Fighting.
- Falsification of records.
- Sexual harassment.
- Failure to cooperate or providing false information in a company investigation.
- Intentional destruction or abuse of property.
- Threatening, intimidating or interfering with other employees.
- Creating a hostile working environment.
- Unauthorized use of company equipment, computers or communication systems.

### USE GOOD JUDGMENT

These basic rules are not an all-inclusive list. You are expected to use good judgment and common sense and to comply with rules of conduct that are commonly accepted in a working environment. These rules also apply to employees covered by a collective bargaining agreement, except where a rule is in direct conflict with the express written terms of an applicable collective bargaining agreement.



## GENERAL RULES

### ABUSE OF PROPERTY

Defacing, mutilating, misusing or otherwise abusing company equipment or property, or the property of customers or other employees during the course of your work assignment is prohibited.

### ABUSIVE LANGUAGE

You are required to refrain from the use of abusive or profane language on company premises or in any area where company operations are conducted.

### ADDRESS AND TELEPHONE

It is required that you keep your manager and human resources advised of your current residence address and contact number.

EXHIBIT 5

## COST CONTAINMENT

You are required to respect the financial, equipment and personnel resources of the company and make decisions that use them prudently.

## EQUIPMENT AND TOOLS

Unauthorized use or operation of tools, equipment or vehicles is strictly prohibited. You are not permitted to use or operate any tool, piece of equipment or vehicle unless you are qualified to do so. Lending company equipment or tools is not permitted without the express approval of management.

## FITNESS

You must be physically and mentally fit for the safe performance of the work you are assigned. Continued employment may be dependent upon the maintenance of this qualification. You must cooperate fully in efforts by the company to determine your fitness.



## GAMES AND GAMBLING

You are not permitted to play cards or other games on company property during work time without the express approval of your manager. Gambling on company property or during your work shift, including lunch and other break periods, is prohibited.

## HONESTY

It is a basic requirement of your job that you be honest and truthful in all aspects of your employee-employer relationship with the company. Dishonesty of any kind in relations with the company is strictly prohibited.

## DRESS CODE

Personal grooming and attire must be neat, in good taste and in conformity with applicable business platform and work area standards. Because of the diverse business operations ranging from office environments to power plant operations and construction sites, business and department heads have the discretion to determine the appropriate dress code within their areas. Appearance is a direct reflection on the company; therefore, there are times when what is considered fashionable will not be considered appropriate or acceptable. The primary objective must be to project a professional image while recognizing the practical implications of the work being done.

## INJURY

You must report all injuries sustained on the job as soon as possible to your manager regardless of the nature, cause or seriousness of the injury.

## INSUBORDINATION

You are required to comply with the lawful directions and orders of management at all times. Being insubordinate, threatening, intimidating, disrespectful or assaulting any employee, customer or vendor is prohibited.

**EXHIBIT 5**

**EXHIBIT C**





October 23, 2017

Ian Macleod
417 South Princeton Ave
Villa Park, IL 60181

Dear Mr. Macleod:

This letter is to inform you that your employment with MidAmerican Energy Services (Company) is terminated, effective immediately for failure to successfully complete your first six months of employment and for insubordination.

At a pre-disciplinary hearing on October 20, 2017, it was determined you were insubordinate to your manager on October 9, 2017, when you were argumentative concerning a valid task from your manager.

This conduct on your part is a violation of the Berkshire Hathaway Energy Code of Business Conduct (insubordination, page 20), "You are required to comply with the lawful directions and orders of management at all times."

Please turn in your keys, and all other Company property. Arrangements will be made to return your personal belongings to you. If you have any questions regarding your final pay and benefits you may contact the HR Help Line at 1-800-432-8999.

Sincerely,

David White
Regional Sales Manager
MidAmerican Energy Services

cc: Burt Short





  

**EXHIBIT 5**

**Maliha Iqbal**

| | |
|---|---|
| **From:** | ian macleod <imacleod2005@yahoo.com> |
| **Sent:** | Thursday, October 18, 2018 11:39 AM |
| **To:** | Maliha Iqbal |
| **Subject:** | Email 1 - EEOC Response for MidAmerican |

----- Forwarded Message -----
**From:** "White, David R" <DRWhite@midamericanenergyservices.com>
**To:** ian macleod <imacleod2005@yahoo.com>
**Sent:** Thursday, August 3, 2017 10:04 AM
**Subject:** Please apply online for the AE position

Hi Ian,

Please visit midamericanenergyservices.com and apply for the AE role online asap.  Also, just to clarify our meeting tomorrow is the O'Hare Hilton at

**CHICAGO MARRIOTT OHARE**

**Address:** 8535 W HIGGINS RD, Chicago, IL, 60631, US
  **Phone:** (1773) 6934444          **Fax:** (1773) 6933164
**Check In Date:** Thursday 03 August 2017
**Check Out Date:** Friday 04 August 2017
**Number Of Nights:** 1
  **Rate:** USD 179.00 per night may be subject to local taxes and service charges
  **Guaranteed to:** CA XXXXXXXXXXX0831
  **Reference Number:** 86309188          **Status:** Confirmed          **Number Of Room**
**Additional Information**

Thanks and see you tomorrow at 1:00.

David R. White
*Regional Sales Manager - Midwest*
**MidAmerican Energy Services, LLC**
A Berkshire Hathaway Energy Company



641 West Lake Street, Suite 401
Chicago, IL 60661
Direct: 312-517-8910
Cell: 312-771-0769
Fax: 312-517-8949

drwhite@midamericanenergyservices.com
www.MidAmericanEnergyServices.com
*Supplying Electricity in the following regions: DE, MD, DC, TX, OH, IL, MI, PA*
*Supplying Natural Gas in the following regions: IL, IA, MI, SD, NE*

1

MACLEOD012

**EXHIBIT 6**

**Maliha Iqbal**

| | |
|---|---|
| **From:** | ian macleod <imacleod2005@yahoo.com> |
| **Sent:** | Tuesday, October 16, 2018 11:27 AM |
| **To:** | Maliha Iqbal |
| **Subject:** | Fwd: offer letter |
| **Attachments:** | Ian Macleod Offer 8.8.17.pdf |

Sent from my iPhone

Begin forwarded message:

> **From:** "White, David R" <DRWhite@midamericanenergyservices.com>
> **Date:** August 8, 2017 at 12:40:51 PM CDT
> **To:** ian macleod <imacleod2005@yahoo.com>
> **Subject: offer letter**
>
> Hi Ian,
>
> Please find the attached offer letter for your review.  Please note, this offer is contingent upon the confirmation of your references and W2's.  As soon as I receive those I will be in touch.  Enjoy your vacation and I look forward to speaking with you upon your return.
>
> David
>
> **DAVID R. WHITE**
> *REGIONAL SALES MANAGER - MIDWEST*
> MIDAMERICAN ENERGY SERVICES, LLC
> A BERKSHIRE HATHAWAY ENERGY COMPANY
>
> 
>
> 641 WEST LAKE STREET, SUITE 401
> CHICAGO, IL 60661
> DIRECT: 312-517-8910
> CELL: 312-771-0769
> FAX: 312-517-8949

1

MACLEOD013

EXHIBIT 6

DRWHITE@MIDAMERICANENERGYSERVICES.COM
WWW.MIDAMERICANENERGYSERVICES.COM
*Supplying Electricity in the following regions: DE, MD, DC, TX, OH, IL, MI, PA*
*Supplying Natural Gas in the following regions: IL, IA, MI, SD, NE*

MidAmerican Energy Services, LLC is a licensed retail electric supplier/provider in Delaware (Order 8809), Illinois (15-0440), Maryland (IR-3548) Michigan (Case U-17888), Pennsylvania (A-2015-2496354), Ohio (15-1001E), Texas (10233) and Washington D.C. (Order 17996). This communication, along with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the individual or entity to which this communication is addressed, you are hereby notified that any dissemination, distribution or copying of this message, or any attachment is strictly prohibited. If you have received this message in error, please notify the original sender immediately by return email and delete this message, along with any attachments, from your computer, thank you

MACLEOD014

**EXHIBIT 6**



August 8, 2017

Ian Macleod
417 South Princeton Ave
Villa Park, IL 60181

Dear Ian:

Congratulations! I am pleased to extend an offer of employment with MidAmerican Energy Services. Your position title will be Account Executive in the Unregulated Services department located in Chicago, Illinois. You will report to David White with a start date to be determined.

**Salary**
Your base salary will be $70,000.00 yearly, which will be earned and paid on a bi-weekly basis. In addition to your base salary, you are eligible to participate in the company sales commission plan.

**Commission Plan Participation**
You are eligible to participate in the Company sales commission plan for Account Executives with guaranteed commission for the first 12 months. The annual Plan payout for first year account executives is 23%.

**Performance Evaluation**
You and your manager will determine your goals and objectives for the year. You will have periodic performance reviews with the potential to earn a base salary increase, effective January 1 of each year, depending on your performance and the company's performance.

**Performance Incentive Award**
You will be eligible to participate in the company's performance incentive plan. This award is made at management's discretion and is based on achievement of your individual goals, your overall performance and the company's performance.

**Paid Time Off**
You will accrue paid time off each pay period based on your years of service. During the first calendar year, you will accrue a prorated 144 PTO hours. You will receive two months of PTO accruals on your first day of employment, and additional PTO accrues each pay period after two months of employment. PTO is available to use upon accrual. In addition to PTO, you will receive 10 paid holidays, including eight scheduled and two floating holidays.

MACLEOD015

EXHIBIT 6

**Insurance Benefits**

You and your family are eligible for the company's medical, dental, vision, disability and life insurance plans starting your first day of employment. The company pays the majority of health care premiums and pays the total cost of basic life insurance and long-term disability benefits. You will receive additional information about benefits, including plan coverage and premium costs, during your first week of employment.

**401(k) Plan**

You will be eligible for 401(k) plan benefits on your first day of employment. The company will contribute a fixed contribution of 4% of your eligible pay to the plan. In addition, you may contribute to the plan on a pretax, after tax or Roth basis. The company will match 65% of the first 6% of your pretax or Roth 401(k) contributions.

**Profit-Sharing Match**

The company may make a discretionary matching contribution based upon achievement of company goals. The profit-sharing match, which is equal to 1% of your eligible pay, may be earned annually and added to the 401(k) plan. Eligible employees must be employed from January 1 through December 31 of the award year.

**Contingencies**

This offer is contingent upon the following: receipt of acceptable references, the accuracy of application information, pre-employment and any subsequent background checks, physical and drug screenings, executed Employment Confidentiality Agreement, executed Prior Agreements Statement and executed Sign-on Repayment Agreement.

**At-Will Employment**

Your employment will be as an at-will employee. Accordingly, you are not guaranteed employment for any specified period of time, and you can be terminated or have your employment terms altered for any legal reason at any time. You also have the right to resign your employment at any time.

**Identification Requirements**

In compliance with the Immigration Reform and Control Act of 1986, employers are required to verify the identity and employment eligibility of all new employees upon hire. The company participates in E-Verify, a secure Internet-based system that compares information provided on an individual's Form I-9 to data from the U.S. Department of Homeland Security and Social Security Administration records to confirm employment eligibility.

You are required to complete the Form I-9, which is attached. You also must provide documentation establishing both identity and eligibility to work in the U.S. Please refer to the Form I-9 for a list of acceptable documents to fulfill this requirement. Note that any item provided in List B must contain a photograph. Please bring all necessary documentation on your first day of employment. Failure to bring the proper identification and complete the Form I-9 within your first two days of employment may result in termination of employment.

EXHIBIT 6

If you have questions, contact the HR helpline at 800-432-8999, Option 3. For additional information regarding E-Verify or the Form I-9, visit the U.S. Citizenship and Immigration Services website at http://www.uscis.gov/.

This offer is valid until close of business on August 9, 2017, after which time, the offer will expire. To accept this offer of employment, please sign a copy of this letter along with the Employment Confidentiality Agreement, Prior Agreements Statement, and Sign-on Repayment Agreement. Return the completed forms by August 9, 2017, and retain a copy for your records.

On behalf of David White and the rest of the Sales group, we welcome you to our team. We equip employees with the resources and support they need to be successful. We look forward to your contribution to our success in upholding Berkshire Hathaway Energy's vision: To be the best energy company in serving our customers, while delivering sustainable energy solutions.

If you have questions, please contact David White at 312-517-8910.

Sincerely,

Burt Short

Burt Short
HR Manager
BHE Renewables and MidAmerican Energy Services

**Acceptance:**


Signature: _____ Date: _____
       Ian Macleod


MACLEOD017

**EXHIBIT 6**



**Employment Confidentiality Agreement**

**Ian Macleod**

This Agreement is entered into as of the day and year written below, between the undersigned employee of the Company ("Employee") and the Company. The term "Company" shall mean Berkshire Hathaway Energy Company and its predecessors and successors, or any parent, subsidiary or affiliated corporation for which Employee performs services.

The Company employs Employee, subject to the following terms and conditions to which Employee, in consideration of his or her employment by the Company, eligibility for the Company's incentive compensation program, and any salary or other benefits paid or provided by the Company, agrees:

**Confidential Information.** During Employee's employment Employee has access to trade secret information, confidential information and proprietary information (altogether "Confidential Information") that is of great competitive value to Company, its partners, joint venturers, clients and subcontractors and which Company is legally entitled to maintain as secret. In order to clarify and confirm the parties' understanding of Company's Confidential Information and Employee's obligation with respect to maintaining the confidentiality of such Confidential Information, the parties agree as follows:

**A.** The Confidential Information that Company is entitled to maintain as secret include, but are not limited to: customer lists, customer contact information, lists of potential customers, estimating, pricing and bidding practices; the existence and terms of customer and utility contracts; organization and qualifications of Company personnel; details of past, current or future projects considered or developed by Company; business strategies; Company marketing plans and sales strategies; technical design, know-how and engineering information; industry and business secrets; confidential and proprietary processes; confidential financial information and projections; and confidential or otherwise proprietary information of partners, joint venturers, clients and subcontractors of Company.

**B.** Employee agrees not to disclose or use either directly or indirectly in any manner said Confidential Information. Employee agrees that any such disclosure or use of such Confidential Information without the express written authorization of Company would constitute a misappropriation of Confidential Information. Employee will immediately return all confidential information to Company upon termination of the employment relationship.

**C.** The prohibition contained in subsection (B) above shall not apply with respect to information (i) supplied to Employee's attorney(s) and/or accountant(s) on the basis that they agree to be bound by the confidentiality provisions hereof or (ii) which becomes publicly available through no breach by Employee of this Agreement or (iii) information required to be provided by Employee pursuant to subpoena or court order. However, Employee agrees that if Employee is

MACLEOD018

EXHIBIT 6

served with a subpoena or court order which seeks any information subject to this Agreement, Employee shall by the fastest means possible notify Company's General Counsel of such event and provide sufficient information to Company so that Company can act to protect its interests in seeking to preserve the confidentiality of such information. Further, the Federal Defend Trade Secrets Act of 2016 provides immunity from civil or criminal liability for any employee who discloses a trade secret "in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney" where the disclosure by the employee is "solely for the purpose of reporting or investigating a suspected violation of law" or "is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal."

**Non-solicitation of employees.** During the term of Employee's employment and for one year following termination of Employee's employment, Employee will not (either alone or in conjunction with any other person or entity), solicit any of Company's employees to leave the employ of Company and/or to be employed by any other person or entity and/or to become a consultant or independent contractor, except upon prior written agreement of Company.

**Non-compete.** During Employee's employment and for a period of one year following the termination of Employee's employment, Employee will not:

**A.** Participate, personally or financially, directly or indirectly in competition with Company in the business of unregulated retail sales of natural gas, electricity, or enegery management services in Employee's former sales territory;

**B.** Sell, attempt to sell, or service any customers with whom Employee had an attempted sales, sales or servicing relationship during the year prior to termination. This includes but is not limited to providing advice and consultation to such customers regarding purchase of natural gas, electricity, or energy management services and inducing Company's existing customers to cease doing business with Company. The obligations in subsection 4(A). and 4(B) above apply whether Employee is working as an individual; as a partner, agent, employee, salesperson of any entity; or as an officer or director or stockholder of any closely-held corporation.

**Breach of Agreement/Remedies.** Employee acknowledges that Employee's failure to abide by the terms hereof may, at the Company's sole discretion, subject the Employee to sanctions, including but not limited to, termination without prior notice, suspension without pay or benefits, demotion, reduction in grade or pay, or reassignment. Employee acknowledges that any breach or evasion of the terms of this Agreement will result in irreparable and continuing damages to the Company and will entitle the Company to injunctive relief and money damages as well as to all other legal or equitable remedies. Employee agrees to pay any and all reasonable attorney's fees incurred by the Company in successfully enforcing this Agreement in a court of law and in securing damages or injunctive relief based on a violation of this Agreement by the Employee. Employee acknowledges that this Agreement does not prohibit Company from bringing action in a court of law against anyone who aids Employee in violating this Agreement, or who benefits in any way from Employee's violation.

**At-Will Employment.** Employee acknowledges that the terms of employment are at-will; either the Company or Employee has the right to terminate the employment relationship at any time

MACLEOD019

EXHIBIT 6

with or without cause for any or no reason. Upon termination, Employee shall continue to have the obligations to the Company as set forth herein.

**Assignment.** Employee acknowledges that this Agreement shall be binding upon and inure to the benefit of the Company, its successors and assigns. This Agreement may be assigned by the Company to any party without Employee's consent. The transfer of Employee to any parent, subsidiary or affiliate of the Company shall constitute an assignment of this Agreement. This Agreement may not be assigned by Employee.

**Entire Agreement.** This is the entire Agreement between the parties hereto with respect to the subject matter hereof, and supersedes any previous communication, representation, arrangement or agreement, whether oral or written. This Agreement shall be modified only in writing. This Agreement is not a promise of future employment, and shall remain effective after termination of the employment relationship, regardless of the reason for termination.

**Severability.** If any such term of this Agreement or the application thereof shall, to any extent, be construed to be invalid or unenforceable in whole or in part, then such term shall be construed in a manner so as to permit its enforceability under the applicable law to the fullest extent permitted by law. In any case, the remaining terms of this Agreement or the application thereof shall remain in full force and effect.

**Applicable Law.** This Agreement shall be construed under the laws of the State of Iowa, without regard to the principles of conflicts of law, and any action to construe or enforce this Agreement may be brought in the courts of the State of Iowa.

**Non-Waiver.** The failure to insist upon strict compliance with any of the terms of this Agreement shall not be deemed a waiver of such term, and the waiver or relinquishment of any right or power under this Agreement at any one or more times shall not be deemed a waiver or relinquishment of such right or power at any other time or times.

**Employee's Copy.** By execution hereof, Employee acknowledges receipt of a copy of this Agreement and the ability to discuss it with a legal advisor. Employee authorizes the Company to provide a copy of this Agreement to any prospective or subsequent employer of Employee.


Signature: _____ Date: _____
      Ian Macleod

MACLEOD020

EXHIBIT 6



**Prior Agreements Statement**

**Ian Macleod**

I am not currently subject to an employment agreement, a noncompetition agreement, or a confidentiality agreement with a former employer or any other person or entity which prohibits or limits my employment with Berkshire Hathaway Energy Company or any of its subsidiaries or affiliates as the Account Executive. In addition, I will not be using any proprietary information taken from my former employer(s).

**Agreed to and accepted:**


Signature: _____ Date: _____
      Ian Macleod

**EXHIBIT 6**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

IAN MACLEOD                )
                                   )
           Plaintiffs,     )
                                   )    Case No.: 19-CV-683
     v.                     )
                                   )    Judge Charles R. Norgle, Sr.
MID AMERICAN ENERGY    )
SERVICES, and BERKSHIRE    )    Magistrate Judge: Sunil R.
HATHAWAY ENERGY COMPANY    )    Harjani
                                   )
          Defendants.   )

**DECLARATION OF DAVID WHITE
<u>IN SUPPORT OF MIDAMERICAN ENERGY SERVICES, LLC'S MOTION FOR
SUMMARY JUDGMENT</u>**

On this day, David White, the declarant, on his oath declares as follows:

1.    My name is David White. I am over 18 years of age, of sound mind, and competent to make the statements in this Declaration. The facts stated in this Declaration are within my personal knowledge and are true and correct.

2.    I am the Regional Sales Manager for the Chicago office of MidAmerican Energy Services, LLC. ("MES").

3.    Ian Macleod was employed for MidAmerican Energy Services as an Account Executive from September 12, 2017 to October 23, 2017.

4.    I was Mr. Macleod's direct supervisor.

5.    MidAmerican's Chicago office has three sales positions: Senior Account Executive, Account Executive and Account Representative.

6.    These are different positions with different qualifications and obligations.

7.    Account Executives duties include but are not limited to:

    a.   generating leads and perform selling duties for larger size customers and prospects.

    b.  achieving their sales quota and quarterly and annual revenue/gross margin targets.

    c.  providing a mentoring system for the Account Representative so that they can grow their skill sets to eventually qualify for an Account Executive and Senior

1

**EXHIBIT 7**

Account Executive position.

8. The qualifications for an Account Executive include, but are not limited to:

   a. A bachelor's degree in business, marketing or related field; or at least six years related work experience.

   b. Five years field sales or customer service experience a plus.

   c. Utility/energy deregulation experience a plus

   d. Strong interpersonal skills in dealing with potential customers, existing customers, co-workers and other internal departments.

9. An Account Executive is senior sales position.

10. Account Representatives have a lower pay rate and a lower sales quota.

11. Account Representatives are not expected to perform leadership tasks or mentor other employees.

12. Account Representatives are not expected to perform selling duties with larger sized customers.

13. Account Representatives are not required to have prior sales experience.

14. Account Representatives are not required to have a business degree or 6 years or related work experience.

15. At the time Mr. Macleod was hired, MidAmerican was growing the Chicago office.

16. The plan was to continue to hire qualified sales employees at both the account representative and account executive level.

EXHIBIT 7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 6/7/2021

Executed by: _____

David White
Regional Sales Manager
MidAmerican Energy Services, LLC

3

**EXHIBIT 7**



**Position Description**

| Position | Account Executive |
|---|---|
| **Department** | Unregulated Retail Services - Sales Department |
| **Work Location** | Various |
| **Position Reports To** | Sales Manager - Direct Sales |
| **Pay Grade** | 014 Exempt |
| **Most Recent Update** | July 2012 |
| **Job Code** | MKT301 |
| **Job Code Extent** | 0257 |

**Purpose of Position**
Contact energy prospects, educate on MidAmerican Energy Company's product offerings, gather data to develop cost proposal, present and close proposed electric and/or natural gas service contracts. Assist senior management with ongoing market strategy to best develop the territory. Build a book of business while attaining personal sales quotas as established by the sale manager.

**Direct Reports**
None

**Indirect Reports**
None

**Provides Support to the Following Positions**
Sales manager
Director - Gas products
Director - Electric products
Account managers
Energy consultants

**Primary Job Duties and Responsibilities (Essential Job Functions)**
Perform selling duties for larger size customers and prospects. Build personal relationships with key customers and prospects.

Pre-qualify leads by determining appropriate energy buyer/decision maker and level of interest in various MidAmerican Energy Company products and services utilizing prospect lists from strategy and other resources.

Contact prospects to build relationships, understand their energy needs and objectives and to introduce MidAmerican Energy Company products and services. Telephone and in-person selling is required.

MES 000020
EXHIBIT 8

Educate prospects on the benefit of the MidAmerican Energy Company product offering; gather customer data necessary to generate a cost proposal and present benefits of our proposal to the prospect.

Responsible for successfully closing contracts on proposals presented to customers.

May be required to assist account executives and senior account executives on business development efforts. This will provide a mentoring system for the account representative so that they can grow their skill sets to eventually qualify for an account executive and senior account executive position.

Need to properly document selling activities, forecasts and actual results in company supplied software systems.

Provide technical input to assist in development of project planning.

Performs additional responsibility as requested or assigned.

**Communications/Contacts**
Internal - Departmental staff, products and strategy

External - Prospects and customers, chambers of commerce, business development groups and other appropriate trade associations

**Performance Expectations (Key Success Factors)**
Achievement of quarterly and annual revenue/gross margin targets.

Ongoing skill set development to qualify for an account executive position.

Development of solid relationships with MidAmerican Energy Company customers and prospects.

Satisfactory documentation of selling activities and results.

Perform responsibilities as directed within determined time frames and with a high degree of accuracy.

Provide accurate input into the budget process and contribute to meeting the actual targets.

Establish and maintain effective work relationships within the department and the company.

Maintain the professional competence, knowledge and skills necessary to effectively complete responsibilities; enhance job knowledge and abilities by taking personal responsibility for professional development and training.

MES 000021
EXHIBIT 8

Maintain sensitive and confidential information regarding company information.

Accountable for achieving annual and long-term business goals.

Document and report product success and failures. Gather feedback from MidAmerican Energy Company proposals to determine customer perception of MidAmerican Energy Company strengths and weaknesses. Make ongoing recommendations to the sales manager and product directors on what MidAmerican Energy Company should do to build on strengths and improve on weaknesses.

Attend work on a regular basis and support the company's employee policies and procedures, including workplace safety rules.

Perform all tasks and responsibilities while incurring no Occupational Safety and Health Administration recordable or environmental incidents.

Ensures all compliance aspects of position are known and followed; understands and complies with all policies, codes and regulations applicable to position and company.

**Position Requirements**
Bachelor's degree in business, marketing or related field; or equivalent related work experience. (Typically six years of related, progressive work experience would be needed for candidates applying for this position who do not possess a bachelor's degree.)

Five years field sales or customer service experience a plus.

Strong interpersonal skills in dealing with potential customers, existing customers, co-workers and other internal departments.

With proper mentoring, training and personal development must be able to develop their skill sets that over time would qualify them for an account executive and senior account executive position.

Utility/energy deregulation experience a plus.

Effective oral and written communication skills.

Effective analytical and problem-solving skills.

Ability to prioritize and handle multiple tasks and projects concurrently.

Employees must be able to perform the essential functions of the position, with or without an accommodation.

All qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.

MES 000022
EXHIBIT 8

**Position descriptions are developed as guides for the employees of MidAmerican Energy Company. The management team of MidAmerican Energy Company reserves the right to modify job responsibilities and position requirements to meet the corporate business goals and needs.**

MES 000023

EXHIBIT 8



| Berkshire Hathaway Energy Human Resources Policy | General Employment |
|---|---|

April 30, 2014

## Employment At-Will

Berkshire Hathaway Energy employees are employed for indefinite terms. This employment relationship is known as employment at-will. Under this employment relationship, employees may resign at any time and Berkshire Hathaway Energy has the right to terminate employees at any time without restrictions. Any contract of employment must have advance approval, in writing, by the chairman, president and chief executive officer of Berkshire Hathaway Energy.

Where an employee is a member of a bargaining unit covered by a collective bargaining agreement, Berkshire Hathaway Energy will comply with the specific provisions of the collective bargaining agreement.

These policies supersede and revoke any and all past policies and practices, oral and written representations, or statements regarding terms and conditions of employment concerning the subject matter covered herein. Berkshire Hathaway Energy reserves the right to add to, delete, change or revoke these policies at any time, with or without notice. These policies do not create a contract between Berkshire Hathaway Energy and any employee, nor do they create any entitlement to employment or any benefit provided by Berkshire Hathaway Energy to its employees.

CAUTION! - This document may be out of date if printed

---

## Berkshire Hathaway Energy

E-mail questions or comments to the HR Helpline

Return to Policy Index

MES 000063

EXHIBIT 9



Berkshire Hathaway Energy
Human Resources Policy                                    General Employment

April 30, 2014

## Employment Classifications

Berkshire Hathaway Energy maintains four employment classifications. The classifications are as follows:

**Full-time**

- Salaried or hourly paid employees whose regular work schedules are 40 or more hours per week.

**Part-time**

- Salaried or hourly paid employees whose regular work schedules are up to 39 hours per week. Part-time employees are eligible for benefits, including paid time off.

**Temporary**

- Salaried or hourly paid employees whose work schedules may be part-time or full-time but whose employment is determined to be of a temporary duration. Temporary employees are not eligible for Berkshire Hathaway Energy benefits except for government mandated benefits such as workers compensation benefits. In no case will such individuals be considered Berkshire Hathaway Energy employees nor will they be eligible for benefits or other employee programs provided by Berkshire Hathaway Energy to its employees.

**Probationary**

- All represented employees, full-time, part-time or temporary, will be considered probationary for the first six months of employment.

These policies supersede and revoke any and all past policies and practices, oral and written representations, or statements regarding terms and conditions of employment concerning the subject matter covered herein. Berkshire Hathaway Energy reserves the right to add to, delete, change or revoke these policies at any time, with or without notice. These policies do not create a contract between Berkshire Hathaway Energy and any employee, nor do they create any entitlement to employment or any benefit provided by Berkshire Hathaway Energy to its employees.

CAUTION! - This document may be out of date if printed

---

**Berkshire Hathaway Energy**

E-mail questions or comments to the HR Helpline

Return to Policy Index

MES 000064

EXHIBIT 10

**Archived:** Thursday, October 10, 2019 10:02:34 PM
**From:**
**To:**
**Subject:** RE: Ian Macleod
**Sensitivity:** Normal

---

This is perfect thank you.

---

**From:** White, David R
**Sent:** Thursday, October 19, 2017 8:34 AM
**To:** Short, Burt <Burt.Short@calenergy.com>
**Subject:** Ian Macleod

Burt,

On October 9th I was having a meeting with Rochelle Gobetz and Ian Macleod. The week before I had told Ian that his first priority was to have TRC assisst him in setting up EMA so he could enter in leads and look up companies that he wanted to prospect. During the meeting I asked him what his top priority was and he responded, "To get my expense report done". I replied, "No Ian, remember I asked you to get EMA set up so you could enter in your leads etc.". He got agitated and said that his number one priority was to get his expense report done. When I asked him why, he responded "My wife told me that I needed to get my expense report in". At this point I asked Rochelle to excuse us and we continued the discussion.

Ian continued to become agitated and said that his wife told him to get his expense report done but I reminded him that his wife did not work here and that I had given him a directive.

A few weeks earlier, on his second day he commented to Kevin Fukumoto that our office was a dump. He has been late on several occasions and always leaves before 5:00pm. His overall attitude lacks the urgency that a new hire should have. If he is not being watched he will be gone for a day or so without letting me know here he is going. While he may be in the field, I have no way to verify this and again all it would take is a simple phone call or email to let me know what he is doing.

In general I do not believe Ian will be successful in this role and that we need to part ways.

Please let me know if this is sufficient for what you need.

Thank you.

**DAVID R. WHITE**
*REGIONAL SALES MANAGER - MIDWEST*
**MIDAMERICAN ENERGY SERVICES, LLC**
A BERKSHIRE HATHAWAY ENERGY COMPANY



641 WEST LAKE STREET, SUITE 401
CHICAGO, IL 60661
DIRECT: 312-517-8910
CELL: 312-771-0769
FAX: 312-517-8949

DRWHITE@MIDAMERICANENERGYSERVICES.COM
WWW.MIDAMERICANENERGYSERVICES.COM
*Supplying Electricity in the following regions: DE, MD, DC, TX, OH, IL, MI, PA*
*Supplying Natural Gas in the following regions: IL, IA, MI, SD, NE*

MES 000126

EXHIBIT 11

MidAmerican Energy Services, LLC is a licensed retail electric supplier/provider in Delaware (Order 8809), Illinois (15-0440), Maryland (IR-3548) Michigan (Case U-17888), Pennsylvania (A-2015-2496354), Ohio (15-1001E), Texas (10233) and Washington D.C. (Order 17996). This communication, along with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the individual or entity to which this communication is addressed, you are hereby notified that any dissemination, distribution or copying of this message, or any attachment is strictly prohibited. If you have received this message in error, please notify the original sender immediately by return email and delete this message, along with any attachments, from your computer, thank you

**MES 000127**

**EXHIBIT 11**

| | |
|---|---|
| **From:** | White, David R |
| **Sent:** | Monday, October 23, 2017 11:11 AM |
| **To:** | Short, Burt; Roy, Peg A; Kelleher, Jack P; Gust, Jeffery J; Marzen, Randy J |
| **Subject:** | RE: Ian Macleod termination |

Burt,

I agree that Ian should be terminated.  He is in the office today and this would allow me to complete the process today.

Thank you.

---

**From:** Short, Burt
**Sent:** Monday, October 23, 2017 11:09 AM
**To:** Roy, Peg A <PARoy@midamerican.com>; White, David R <DRWhite@midamericanenergyservices.com>; Kelleher, Jack P <jpkelleher@midamericanenergyservices.com>; Gust, Jeffery J <JJGust@midamerican.com>; Marzen, Randy J <RJMarzen@midamericanenergyservices.com>
**Subject:** Ian Macleod termination

All,

We are all in agreement that Ian Macleod's employment should be terminated.
Please review the draft termination letter.

David,
Is he in the office today?  You or I will need to enter a termination change notice once we determine which day (today or tomorrow).

Thank you,
Burt

**Burt Short**
Manager, Human Resources
CalEnergy and BHE Renewables
(760) 348-4235 desk phone
(760) 604-3820 cell
Burt.Short@calenergy.com

MES 000138

EXHIBIT 12



**EXHIBIT B**

October 20, 2017

**TO:**      Jack Kelleher

**FROM:**   Burt Short

**CC:**      Jeff Gust, Peg Roy, Randy Marzen, and David White

**SUBJECT:** Investigatory Summary – Ian Macleod

---

**Executive Summary**

On October 20, 2017, a pre-disciplinary hearing was conducted with Ian Macleod (account executive, Chicago) regarding his conduct and behavior. In attendance were myself, David White (regional sales manager, Chicago), and Ian Macleod. The hearing was conducted via telephone.

The investigation showed Macleod was insubordinate to his manager on October 9, 2017, and Macleod was untruthful about how many times he has been late to work.

**Facts**

The investigation revealed the following facts:

1. Reviewed investigation process and expectations.
2. Macleod acknowledged he completed the Berkshire Hathaway Energy code of conduct training in September 2017.
3. The week of October 2, 2017, White tasked Macleod with installing EMA software on his company computer. White told Macleod it was his top priority. Macleod acknowledged White tasking him with contacting the technology resource center for help in installing the software.
4. Macleod did not recall why he did not complete the task the week of October 2, 2017, but he thought he may have submitted a ticket for help.
5. In a meeting on October 9, 2017, White asked Macleod about his top priority for the day. Macleod responded he was going to complete an expense report. White responded that his top priority was the EMA software as tasked the week before and not the expense report. Macleod responded his wife wanted him to get the expense report completed. Macleod became agitated and argued with White about the priority. Macleod acknowledged becoming agitated and arguing about the EMA software and his expense report. Macleod did complete the EMA software installation
6. Macleod was asked about his work hours and he responded that he works from 8:30 am to 5:00 pm.
7. Macleod was asked what time he arrived each day, and he said a few minutes before 8:30 and leaves a few minutes early to catch the train.

**EXHIBIT 13**

8. Macleod was asked how many times he's been late and he said only once since he started.
9. White said Macleod is on time approximately 50% of the time and has been late more than 10 times.
10. Macleod was asked if he kept White apprised of his schedule while out in the field and Macleod said he thought White could see his calendar.
11. On Tuesday, October 17, Macleod left at 4:00 pm. White was out of town and Macleod said he did not ask anyone or send a note to White. Macleod said he was an adult and thought he could make the decision about leaving early by himself. Macleod said he left early because of traffic and he needed to be home for a family event.
12. Macleod was asked why he told a coworker on September 15th, that the office was a dump. Macleod said he last company had a shiny, neat office since clients came in for presentations. Macleod said he thinks the statement about the place being a dump came out wrong.
13. Macleod made a derogatory statement about White taking his picture for a national sales meeting to a coworker. Macleod said he doesn't recall his exact words, but he was unhappy because he had gained weight and did not want his picture shown at the sales meeting.

**Aggravating Factors**
1. None

**Mitigating Factors**
1. Macleod has worked for the company since September 2017.

**Discussion**

Macleod's conduct and behavior in his first two months of employment are unacceptable. He has been insubordinate to his manager, alienated his coworkers, and is continually late. He was untruthful regarding him being late to work. Macleod is not successfully completing his first six months of employment.

A discussion should be held between management and human resources to discuss the next steps.

**EXHIBIT 13**